**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>RELIZ TECHNOLOGY GROUP HOLDINGS INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-10371 (___)<br><br>(Joint Administration Requested) |

**DECLARATION OF MARK RENZI IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Mark Renzi, pursuant to section 1746 of title 28 of the United States Code hereby declare that the following is true to the best of my knowledge, information, and belief:

**INTRODUCTION**

1. I am the Chief Restructuring Officer ("CRO") of Reliz Technology Group Holdings, Inc., the group holding company and parent entity of Reliz Ltd., Reliz Technologies LLC, and Reliz CI Ltd. (the "Debtors," or "BlockFills"). I have held the CRO position since August 2025, when I was hired by the board of directors ("Board") of Reliz Technology Group Holdings, Inc. I am a Managing Director and the Head of the Corporate Finance Financial Institutions Group for Berkeley Research Group, LLC ("BRG"), the financial advisor to the Debtors.

2. BRG's corporate finance practice consists of senior financial, management consulting, accounting, and other professionals who specialize in providing financial, business, and strategic assistance typically in distressed business settings. BRG has a wealth of experience

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are: Reliz Technology Group Holdings Inc. (6265); Reliz Technologies LLC (1968); Reliz LTD (N/A); and Reliz CI LTD (N/A). The Debtors' service address is 401 West Ontario St., Suite 400, Chicago, IL 60654.

in providing financial advisory services in in- and out-of-court restructuring, sale, and wind down scenarios, and enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States. BRG professionals have significant restructuring and industry experience assisting distressed companies with financial and operational challenges and working with management teams and boards of directors of large companies facing financial challenges similar to those of the Debtors. BRG regularly assists large and complex businesses similar to the Debtors.

3. BRG has acted as financial advisor, crisis manager, and corporate officer in middle market to large multinational companies in crisis or those in need of performance improvement in specific financial and operational areas across a wide array of industries. Moreover, the professionals at BRG have assisted and advised debtors, creditors, creditors' committees, bondholders, investors, and others in numerous bankruptcy cases.

4. I am a member of the Association of Insolvency and Restructuring Advisors, as well as the Turnaround Management Association. I have more than twenty-five (25) years of business experience, with approximately twenty (20) years of financial consulting experience, including liquidity and capital structure assessment, debt and equity restructuring advice, and identification of reorganization alternatives. During the course of my career, I have personally provided restructuring services on more than thirty-five (35) engagements in both out-of-court workout situations and in-court reorganizations. Further, I have served in interim management positions and advised distressed companies with day-to-day management activities, including development of pro forma financials, cash flow management, cost rationalization, and identification of liquidity enhancing activities. In addition to operational turnarounds, I have

assisted in financial restructurings, including refinancings, recapitalizations, debt-for-equity swaps, and strategic mergers and acquisitions.

5. Prior to joining BRG, I was a Senior Managing Director at a global business advisory firm with a 15-year tenure. I also worked at a boutique money management firm in New York evaluating equity and commodity derivative portfolios, and held various positions in FP&A, business plan development, treasury, and global cash management. I received a B.A. in Economics from Washington College and an M.S. in Finance from Boston College.

6. Since being appointed CRO, I have worked closely with the Debtors' management and other professionals on the Debtors' restructuring efforts. I also lead the BRG team advising the Debtors, and in this capacity I have become well-acquainted with the Debtors' business and restructuring efforts.

7. I have personal knowledge of and familiarity with day-to-day business operations, business dealings, agreements, books and records and the financial condition of the Debtors since taking the position and I have been authorized to provide this declaration (the "Declaration") on behalf of the Debtors. I am providing this Declaration to assist the Court and parties-in-interest in understanding circumstances that led to the commencement of these chapter 11 cases (the "Chapter 11 Cases") and in support of (i) the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (ii) the relief that the Debtors will request pursuant to the motions and applications (the "First Day Motions") filed shortly after the Petition Date in the United States Bankruptcy Court for the District of Delaware (the "Court").

8. Except as otherwise indicated, the facts provided in this Declaration are generally based on the information I have learned since becoming CRO, including facts based on my personal knowledge, my review of relevant documents, information provided to me (including by

the Board and Board members, and the Debtors' management, advisors, consultants, professional service providers, employees and others), my opinion based upon my experience, or my knowledge of the industry. If called as a witness, I could and would testify competently regarding the facts set forth in this Declaration.

9. As part of this Declaration, the following sections have been provided and organized to familiarize the Court with the Debtors and the relief the Debtors seek early in the Chapter 11 Cases:

- **Section I** provides a description of BlockFills' corporate history and business operations.
- **Section II** provides an overview of BlockFills' organizational structure, prepetition equity structure, prepetition capital structure, and management.
- **Section III** describes the circumstances leading to the commencement of the Chapter 11 Cases.
- **Section IV** describes BlockFills' efforts to respond to certain of the events described in Section III.
- **Section V** identifies the Debtors' Chapter 11 goals.
- **Section VI** identifies the First Day Motions, which are critical to administering the Chapter 11 Cases and maximizing the value of the Debtors' estates.

## PRELIMINARY STATEMENT

10. BlockFills filed for chapter 11 relief to protect its customers and preserve the business. Through these Chapter 11 Cases, BlockFills intends to achieve a number of goals, including, without limitation, protection of assets, a fair and timely resolution of customer claims, pursuing strategic alternatives, and ensuring adequate measures are taken to maximize value to customers and creditors. Consistent with those goals, BlockFills has been negotiating a proposed exit plan with an Ad Hoc Group (the "Ad Hoc Group") made up of BlockFills' largest customers. As a result of those negotiations, BlockFills and the Ad Hoc Group have executed a term sheet

(the "Term Sheet"),[2] a copy of which is attached hereto as **Exhibit B**, that lays the framework for a chapter 11 plan.

11. The Term Sheet provides that BlockFills will reorganize into a newly formed entity ("NewCo") and any assets not transferred to NewCo will be transferred to a liquidating trust (the "Trust"). Certain existing customers of BlockFills will be eligible to receive a pro rata share of interests in the Trust and a pro rata share of BlockFills' liquid assets, which can be received in (i) payment of such customer's pro rata share of recoveries, (ii) full conversion of such customer's pro rata share of recoveries into equity of NewCo, or (iii) a combination of the two. The remaining customers of BlockFills will be paid in full as part of a Convenience Class.

12. This structure maximizes the value of BlockFills for the benefit of customers while ensuring that all creditors are treated fairly and equitably.

## BACKGROUND

## I. Debtors' Corporate History and Business Operations

### A. Corporate History

13. BlockFills was founded in 2017 by Nicholas Hammer and Gordon Wallace as a digital asset brokerage services company. BlockFills started providing digital asset trading and fiat-on ramp trading access to the approximately top ten cryptocurrencies by market capitalization.

14. With minimal capital to start the business, the primary entity in the corporate structure was Reliz Ltd., a Cayman Islands entity, which raised $250,000.00 of equity capital and a $750,000.00 line of credit for initial cryptocurrency trading operations and settlements.

15. As the industry grew rapidly, BlockFills expanded its services to accommodate additional digital assets that were increasing in market capitalization. BlockFills also introduced

2 The Term Sheet is intended to provide an overall framework for a chapter 11 plan. However, certain terms are still the subject of negotiation.

derivatives trading and collateralized lending of fiat currency and stablecoins with other digital assets pledged as collateral (as further discussed in Section I.B.).

16. Due to the rapid expansion of the cryptocurrency industry and the many unique opportunities the industry offered, BlockFills, like many other companies in the sector, raised additional capital in 2021. In or around May 2021, BlockFills raised approximately $7 million of equity in a "Pre-Series A" round ("Pre-Series A Round").

17. And, in January 2022, BlockFills closed a Series A capital raise of approximately $36 million ("Series A Round"). BlockFills' Series A Round proceeds were expected to be invested largely in Bitcoin mining machines, which were to generate new bitcoin proceeds, which could be held by BlockFills or converted to U.S. Dollars, or similar, for the purposes of fulfilling daily transactional business with customers, while also obtaining a return on the invested capital.

**B. Business Operations**

18. Prior to the Petition Date, BlockFills operated proprietary trading technology that offered professional and institutional customers the ability to buy and sell cryptocurrency and cryptocurrency derivatives. Customers could execute transactions using BlockFills' front-end trading platform, application programming interface ("API") connection or through over-the-counter ("OTC") trades that linked with cryptocurrency liquidity providers.

19. BlockFills focused solely on institutional, high net worth, and sophisticated traders. BlockFills did not offer its services to retail traders. Since 2018, BlockFills had been regarded as a reputable place to do such business and respected for its institutional investors. BlockFills provided market access 24 hours a day and 7 days a week to many cryptocurrency native companies and high-net worth professional traders, as well as traditional financial firms including

hedge funds, brokers/broker-dealers, exchanges, crypto mining companies, investment managers and more.

20. In 2022, shortly after BlockFills' Series A Round, the industry experienced significant turmoil as a major algorithmic stablecoin, Terraform Labs' UST, de-pegged and lost essentially all of its value, leading to many individual investors and industry firms experiencing significant losses. Subsequent to those events, several industry players experienced significant losses either directly or indirectly tied to UST, which had many downstream impacts such as bankruptcies and significant counterparty risk management issues from 2022-2023. Indeed, many well-known cryptocurrency businesses have ceased to exist after the de-pegging, including Voyager, Celsius, BlockFi, FTX, and Terraform Labs.

21. As a result of both the reduction in available options and overall concern with the industry, sophisticated investors were looking for a more professional platform to transact. BlockFills' reputation placed it in a unique position and in late 2023, new customers and business began to significantly increase.

22. Prior to the Petition Date, BlockFills' suite of offerings included access to a trading platform for fiat on and off ramp settlement, cryptocurrency liquidity and trading services (including OTC), cryptocurrency options trading, collateralized lending and credit, and mining services, each as described in more detail below.

23. The management of cryptocurrency deposits, collateral and custody has had a number of solutions throughout BlockFills' history. BlockFills utilized, almost exclusively, Fireblocks custody technology for cryptocurrency deposits. Fireblock's infrastructure utilizes direct counterparty connectivity, whitelisting and enhanced security mechanisms, including no single-point-of-failure, which was ideal for BlockFills' security and operational needs.

**i. Banking Rails for Fiat On and Off Ramp Settlement**

24. BlockFills utilized many different U.S. and non-U.S. fiat currency banking solutions. From 2018-2023, BlockFills used Silvergate Bank and Signature Bank, until their failures in March 2023. Thereafter, BlockFills sought numerous other banking solutions throughout the U.S. and abroad to ensure redundant capabilities in case further banking incidents occurred.

**ii. Cryptocurrency Liquidity and Trading Services**

25. BlockFills' proprietary and unique aggregation of liquidity capabilities created value in its trading ecosystem for customers. Aggregated liquidity refers to BlockFills' ability to consolidate order books from multiple exchanges and market makers into a unified, deep liquidity pool. BlockFills' smart order routing technology, based on building blocks from the traditional markets, sought out the best available prices across multiple exchanges and market makers so customers could execute trades optimally. Customers could also customize their liquidity providers based on their trading strategies.

26. BlockFills sourced cryptocurrency prices and liquidity from world-leading institutions who specialize in such offerings. Through BlockFills' proprietary technology, all market prices, feeds and liquidity were aggregated into one bespoke pricing mechanism, thus frequently offering the customer a better price and better liquidity than alternatives in the market. When the customer executed a trade, so long as the market price of the asset they were looking to transact was still available, the customer received a notification that the trade had been fully or partially executed along with any other customary transaction details.

27. Trades were primarily placed through BlockFills' front-end trading platform Vision Trader, which displayed a user interface with positions, credit utilization, available balances, and

order controls. BlockFills also provided API access that allowed customers to connect their own platforms to integrate into BlockFills' liquidity and trading capabilities.

28. Each day, BlockFills fulfilled numerous settlements throughout different parts of the day. Various cryptocurrency liquidity providers have different operational procedures or settlement policies, thus only allowing settlement of transactions one or two times per day rather than bespoke settlements. Therefore, BlockFills had credit relationships with its liquidity providers, which were crucial to offer instantaneous transaction execution.

29. BlockFills maintained the practice of having all of the day's trading activities settled before the end of the day at 4:00 p.m. Central Time, each day, unless the trade was a derivatives trade or a borrowing and lending transaction that had a maturity in the future.

**iii. Derivatives Trading**

30. BlockFills also operated an OTC derivatives desk for qualified individuals and business entity customers in the United States (each a "Eligible Contract Participant" or "ECP"). An ECP must meet the definition under Section 1a(18) of the Commodity Exchange Act and related guidance. BlockFills also offered options products to certain non-United States professional customers.

**iv. Collateralized Lending and Credit Services**

31. Borrowing and lending cryptocurrency has been a BlockFills service offering since 2019. These loans were typically tied to lending agreements that allowed BlockFills to liquidate collateral in the event of default.

**v. Crypto Mining**

32. BlockFills also offered services geared towards large-scale cryptocurrency miners for mining pool access, trading and OTC support, and treasury services.

## II. Debtors' Organizational and Capital Structure

### A. The Debtors' Prepetition Organizational Structure

33. A summary chart depicting the Debtors' corporate and capital structure is attached hereto as **Exhibit A**.

### B. The Debtor's Prepetition Equity Structure

34. In May 2021, BlockFills launched the Pre-Series A Round. The Pre-Series A Round encompassed an approximately $7 million equity capital raise provided by seven (7) capital providers.

35. In October 2021, BlockFills began the Series A Round, with an objective to raise up to $50 million in proceeds to project BlockFills forward in its growth. At this time, peer cryptocurrency companies were raising hundreds of millions of dollars at industry-leading pace.

36. BlockFills closed the Series A Round in January 2022 after securing a total of approximately $36 million in proceeds across two closings dated December 2021 and January 2022.

### C. The Debtors' Prepetition Capital Structure

37. As more fully explained in Section III.B, BlockFills entered into a settlement agreement regarding a dispute with Celsius Network Ltd. ("Celsius"), which included promissory notes to be paid consistent with a negotiated payment schedule. The current amount outstanding to Celsius is approximately $4.8 million, which includes accrued interest.

38. The Debtors have approximately $145 million of general unsecured debt.

### D. History of BlockFills' Management

39. Nicholas Hammer, a co-founder of BlockFills, served as Chief Executive Officer from 2017 until July 2025. Gordon Wallace, also a co-founder, has served as President and Head of Global Trading Operations since 2017.

40. In July 2021, BlockFills hired Brian King as its Chief Compliance Officer, and in October 2023 BlockFills hired Ross Kleiman as General Counsel.

41. BlockFills did not have any other senior executive management until late 2024 when it hired and repositioned numerous individuals. Gabriella Kusz became Head of Strategy in August 2024 until she was repositioned as Chief Operating Officer in December 2024. Neil Van Huis, one of the earliest investors and a director since 2018, was repositioned from a business development role to Chief Strategy Officer. Amy Shelly was appointed Chief Financial Officer in October 2024 until she resigned in January 2026.

42. On July 23, 2025, BlockFills hired Joseph Perry as the Interim Chief Executive Officer. In August 2025, BlockFills hired BRG to assist BlockFills with its restructuring and financial reporting.

## III. Events Leading Up to the Chapter 11 Cases

### A. Exposure to Loan Counterparties

43. From 2022 through 2025, BlockFills was exposed to several counterparty bankruptcies and disputes from various industry relationships. BlockFills had constantly changing exposure to specific loan counterparties, as well as trading and lending partners. Most of BlockFills' lending activities in BlockFills' loan portfolio had reached maturity with success for both parties. However, as discussed in greater detail below, three loans were not successful.

44. One borrower, Babel Finance, engaged in active borrowing and lending transactions. BlockFills provided net 123 BTC, 500 ETH, and 5,000 USDC in loans to Babel Finance in 2022. Babel Finance filed for its own bankruptcy in Singapore on March 6, 2023 due to its exposure to bankrupt counterparties in 2022 and 2023. As a result, BlockFills' assets on loan to Babel Finance, valued at approximately $8.5 million, became tied up in the bankruptcy. BlockFills determined that Babel Finance would not be able to repay the loan.

45. Another borrower, Clark Sharp & Reynolds ("Coinsource"), was a bitcoin ATM company serving customers throughout the United States with access to buying and selling bitcoin and other digital assets. In 2022, BlockFills provided a 50 BTC loan to Coinsource, valued at approximately $1 million at the time. Coinsource defaulted on the loan. Although BlockFills obtained a judgment for $1.75 million, the judgement remains unsatisfied. The value of BlockFills' 50 Bitcoin at the time of the Petition Date is approximately $3.6 million.

46. Another loan was provided by BlockFills in partnership with Nexo Capital Inc. ("Nexo"). Nexo is a financing partner and equity shareholder in BlockFills. The proceeds of the loan were used by BlockFills in connection with an Equipment Loan for Lease to AEXA Digital Infrastructure ("AEXA"). AEXA was a cryptocurrency mining company, backed by multi-billion-dollar private equity investor RedBird Capital Partners ("RedBird"). Both BlockFills and its financing partner, Nexo, found this opportunity to be particularly interesting due to its 50% loan to value, the upfront capital commitment by AEXA, and AEXA's ability to call up to $100 million of capital from RedBird in its operating agreement. AEXA began experiencing financial hardship in 2022 due to the decreasing profitability of cryptocurrency mining and subsequent mining delays. At that time, AEXA began to miss the required weekly payments to BlockFills. BlockFills sought to work with AEXA and provided numerous periods for delayed payments and communication on

future financial health. After several calls and emails, BlockFills provided options for repayment. AEXA, as well as the directors of RedBird, agreed to pay the remaining principal without penalty or default interest accrual.

47. BlockFills was generally satisfied with this solution and requested AEXA make the payment in full by November 8, 2022. BlockFills expected to recoup approximately $8 million even though $14.75 million was owed for all remaining principal and interest payments. On November 8, 2022, AEXA informed BlockFills that it wished to pay only $3 million and terminate the agreement. BlockFills rejected AEXA's proposal, and AEXA subsequently filed for bankruptcy. Prior to filing for bankruptcy, AEXA provided $3 million in payments to vendors and director compensation. The trustee for the AEXA bankruptcy is investigating misappropriation of payments.

48. As a result of AEXA's inability to repay BlockFills, a dispute arose between Nexo and BlockFills with respect to BlockFills' obligations to repay Nexo. In late 2024, BlockFills settled with Nexo and paid approximately $12 million concerning the AEXA transaction, severely weakening BlockFills' balance sheet and liquidity.

**B. Celsius Transaction and Arbitration**

49. BlockFills engaged in a one-off transaction with Celsius, a now-bankrupt cryptocurrency company. BlockFills and Celsius had a borrowing and lending relationship starting in 2019. In late 2019, BlockFills was approached by Celsius to participate in a transaction where BlockFills borrowed Ethereum ("ETH"), collateralized by U.S. Dollars, for the purpose of then co-investing the ETH into the Grayscale Ethereum Trust. The parties executed a term sheet (the "Celsius Term Sheet").

50. The Grayscale Ethereum Trust product has lock-ups and pricing premiums, but if BlockFills and Celsius committed significant capital then there could be arbitrage opportunities if the market economics remained positive throughout the lock-up period.

51. BlockFills and Celsius elected to participate together, and the parties entered into a Digital Asset Lending Agreement on December 3, 2019 (the "Celsius Digital Asset Lending Agreement"). BlockFills created a brokerage account, borrowed ETH, and posted U.S. Dollars as collateral with Celsius. The ETH was then invested into the Grayscale Ethereum Trust in return for shares of the Trust. When the lock-up period was over, BlockFills and Celsius agreed to sell the Grayscale Ethereum Trust shares for a significant multi-million-dollar profit and settle the transaction. BlockFills followed such mutual instructions and contacted Celsius by email, asking if Celsius wanted to be compensated its portion of profits in U.S. Dollars or Ethereum.

52. Celsius did not reply for multiple weeks. Eventually, after BlockFills contacted Celsius again, a Celsius staff member responded and requested the return of the initial amount of ETH, in addition to Celsius' portion of the successful proceeds from selling the shares, which was inconsistent with the terms of the mutually executed term sheet. As a result, a dispute arose between the parties and in May 2021, Celsius and BlockFills commenced arbitration in the United Kingdom.

53. On July 13, 2022, Celsius and certain of its affiliates filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, jointly administrated under Case No. 22-10964 (MG).

54. The four-day arbitration commenced on January 9, 2023. At the conclusion of the arbitration, the arbitrator awarded Celsius the entire amount of the initial ETH plus proceeds from the transaction. In 2024, this award was upheld on appeal. Celsius demanded full payment of the

arbitrator's award. Due to the unforeseen outcome of this event, BlockFills negotiated a payment schedule pursuant to two promissory notes (the "Celsius Notes"), wherein BlockFills was to pay $3,602,140.82 upfront with the remaining $12,651,011.70 paid over time. The current principal amount outstanding on the Celsius Notes is approximately $4.8 million. BlockFills has not made a payment on the Celsius Notes since its monthly payment due in August 2025.

**C. Mining Hardware Investment**

55. In late 2021 and early 2022, following completion of BlockFills' Series A Round, the proceeds of the equity capital raise were deployed as planned and approved by the Board toward the acquisition of cryptocurrency mining hardware that would be placed at data sites.

56. Throughout 2022, the cryptocurrency mining industry experienced severe disruption, largely driven by a rapid decline in mining profitability. This decline resulted from several factors, including unhedged exposure to rising energy costs by mining firms, which led to significant financial impairment and multiple bankruptcy filings. These developments adversely affected nearly all industry participants because energy costs constitute a primary driver of cryptocurrency mining profitability. As profitability deteriorated, many mining companies were forced to sell their bitcoin holdings to finance operating losses.

57. Nevertheless, BlockFills was able to partner with a data site. However, when BlockFills intended to place the Bitcoin mining hardware at the data site, the data site was not ready to operate. As a result, BlockFills was unable to activate its full mining hardware capabilities as originally anticipated. This reduced expected revenue and extended the period before BlockFills could realize returns on its capital investment in the mining hardware, keeping liquidity tied to the mining business line for significantly longer than planned. As a result, BlockFills did not recoup its investment in the mining business line and suffered significant losses.

**D. Professional Services and One-Time Costs**

58. As a result of the numerous disputes, proceedings, arbitration, litigation, accounting advisory work, audit preparation, and other professional services, BlockFills incurred significant professional service expenses during the period from 2022 through 2026. These costs were necessary to assess, analyze, and validate BlockFills' financial condition and operational capabilities as time evolved.

**E. Operational Decisions**

59. As discussed in greater detail in Section I.B., BlockFills was a significant recipient of new business opportunities arising from the industry-wide downturn in the digital asset sector during 2022 and 2023. As a result, 2024 became a record year for BlockFills' business performance. With a new presidential administration entering office and increased clarity regarding future regulatory frameworks applicable to the cryptocurrency industry, BlockFills faced favorable conditions for growth.

60. In response, BlockFills undertook initiatives to expand its operations, including the hiring of key personnel, the pursuit of additional jurisdictional capabilities through new licensing applications, and increased investment in marketing efforts to position the business for its next stage of development.

**F. Recent Lawsuits Filed Against Debtors**

61. In the weeks immediately preceding the commencement of these Chapter 11 Cases, certain Debtor entities and current or former directors and officers of the Debtors were named in two lawsuits (the "Customer Actions") asserting allegations including misappropriation of customer funds, conversion, breach of contract, and other fraud-based claims. *See Dominion Capital LLC v. Reliz Ltd.*, Case No. 1:26-cv-01672 (MSK) (VF) (S.D.N.Y. Feb. 27, 2026) and

*1548199 Alberta Ltd. and Robert J. Bertram v. Reliz Technology Group Holdings Inc., Reliz Technologies LLC, Reliz Ltd., Reliz CI Ltd., Joseph Patrick Perry, Nicholas Hammer, and Gordon Wallace*, Case No. 26-cv-02451 (MFK) (N.D. Ill. March 5, 2026). The Customer Actions seek, among other relief, recovery of assets that the Debtors believe constitute property of the Debtors' estates.

62. The plaintiffs in the Customer Actions also sought emergency injunctive relief, including temporary restraining orders ("TRO"). The courts presiding over those matters granted TROs that significantly restricted the Debtors' ability to conduct aspects of their business operations and exercise control over certain assets. The Debtors believe the restrictions imposed by the TROs created substantial operational and liquidity challenges. In particular, the Debtors faced increasing difficulty maintaining ordinary-course operations and managing their financial resources while simultaneously responding to expedited litigation demands. Among other benefits, the Debtors seek the protections afforded by the automatic stay under the Bankruptcy Code, which will halt further litigation activity against the Debtors and prevent piecemeal attempts by individual customers to obtain or control assets that the Debtors believe constitute property of the estates.

63. Without the protections of chapter 11, the Debtors' liquidity position and operational stability would likely continue to deteriorate as the Debtors would have diverted substantial resources to defend the Customer Actions and address the effects of the granted TROs. The Debtors believe that these Chapter 11 Cases will permit the orderly administration of claims relating to these assets and avoid the disruption that would result from multiple customers seeking to enforce rights outside of this process.

## IV. Corrective Efforts and Prepetition Prospects

### A. Organizational Reset and Operational Improvements

64. As discussed in greater detail above, in late summer 2025, BlockFills undertook a leadership and governance reset. The Board's goal was to add operational stability to BlockFills through risk management enhancements, a strategic refocus on the core business, and the implementation of financial controls and disciplines.

65. To achieve these goals, BlockFills, among other things:

(a) implemented daily reporting of BlockFills' assets;
(b) implemented tighter exposure oversight across lending and trading activities;
(c) initiated the wind down of certain businesses and entities;
(d) discontinued cryptocurrency mining activities;
(e) refocused on principal trading and the borrowing and lending business lines;
(f) introduced formal administrative processes;
(g) implemented cash conservation measures and liquidity forecasting;
(h) established enhanced measures to ensure accurate reporting; and
(i) reduced operating expenses.

### B. Prepetition Restructuring Efforts

66. In 2025, prior to the appointment of Mr. Perry as Interim CEO, BlockFills engaged in efforts to raise additional capital to support continued operations and growth. In connection with these efforts, BlockFills retained investment banking advisors and began preparations for a potential Series B equity financing.

67. As part of those preparations, management focused on organizing and presenting BlockFills' financial information in anticipation of commencing a formal Series B capital raise process. During this period, however, BlockFills' 2024 financial audit experienced delays. These delays materially impeded BlockFills' ability to access the capital markets.

68. In August 2025, BlockFills sought alternative strategic transactions, including a sale of BlockFills or a broader capital restructuring. At this time, BlockFills retained BRG and Katten Muchin Rosenman LLP to assist with those efforts.

69. In September 2025, BlockFills entered into discussions with a publicly traded participant in the cryptocurrency industry (the "Acquisition Counterparty") regarding a potential acquisition transaction. At the outset of discussions with the Acquisition Counterparty, BlockFills disclosed its financial position, and the Acquisition Counterparty elected to proceed. Over the course of the next approximately two months, the parties worked diligently to complete the deal, which included substantial due diligence, in-person meetings, preparation of go-forward business plans, and numerous rounds of negotiations. Unfortunately, in mid-November 2025, due to reasons outside of BlockFills' control, the Acquisition Counterparty's board of directors declined to proceed with the transaction.

70. Immediately thereafter, BlockFills and its advisors pivoted to pursue alternative strategic options. In November 2025, BlockFills engaged with an existing investor (the "Potential Investor") that expressed an interest in a recapitalization that would provide a combination of new equity and debt financing (the "Recapitalization").[3] Over the course of the next month, BlockFills and the Potential Investor engaged collaboratively to understand the existing business and what a go-forward business would look like, which included a presentation to a limited partner of the Potential Investor.

71. In early January 2026, the parties had made significant progress on the equity component of the Recapitalization. The parties then turned to the debt financing component of the Recapitalization, and BlockFills began contacting potential debt providers. However, the feedback

[3] Contemporaneously with the Recapitalization, BlockFills continued to engage with other potential partners, including potential strategic investments. However, those discussions did not materialize.

that BlockFills received, which it shared with the Potential Investor, was that raising the debt portion would be exceedingly difficult. Although BlockFills intended to continue to work towards a successful Recapitalization, those efforts had to be stopped due to outside events.

72. Specifically, on February 2, 2026, following a crypto market crash[4] that created mounting liquidity pressures and significant withdrawal requests that, if honored, would have materially impaired BlockFills' ability to continue operations, BlockFills temporarily suspended certain deposit and withdrawal activity. Initially, this measure was taken privately while BlockFills evaluated potential liquidity solutions. However, on February 6, 2026, BlockFills publicly announced a broader temporary suspension of deposits and withdrawals. At this time, BlockFills communicated with customers through written updates and video conferences to provide information regarding ongoing efforts to address liquidity constraints. Unfortunately, as a result of the suspension, the dynamics of ongoing discussions with the Potential Investor materially changed and the transaction was unable to be completed.

73. From the period preceding the suspension through the Petition Date, BlockFills, together with its shareholders, advisors, and potential investors and acquirers, continued to evaluate and pursue alternatives to stabilize the business outside of chapter 11. Despite these efforts, however, BlockFills was unable to secure sufficient liquidity or consummate a transaction that would address its near-term obligations and long-term capital structure. As a result, the Board determined that commencing these Chapter 11 Case was the best available path to preserve value and pursue a court-supervised restructuring or sale process.

[4] On February 2, 2026, BTC suffered a significant crash dropping below $80,000 for the first time since April 2025.

**C. Governance Initiatives**

74. BlockFills formed a special committee (the "Special Committee") on March 12, 2026 comprised of disinterested director Matthew Kahn. The Special Committee is vested with the authority to, among other things, manage any potential conflict matters, including investigating, releasing, or settling certain potential claims or causes of action of BlockFills, if any.

## V. Goals for These Chapter 11 Cases

75. BlockFills intends to use the Chapter 11 process to preserve value, continue the operation of its business, and pursue a chapter 11 plan centered around the structure provided for in the Term Sheet. BlockFills looks forward to continuing to engage with its stakeholders to build consensus for a path forward in these Chapter 11 Cases, maximize value for BlockFills' stakeholders, and position the reorganized Debtors for long-term success.

## VI. Evidentiary Support of the First Day Motions

76. The Debtors will file several First Day Motions seeking orders granting various forms of relief intended to facilitate the efficient administration of these Chapter 11 Cases and otherwise maximize and preserve the value of the estates. The First Day Motions will include:

- *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief*;
- *Application of Debtors for Entry of Order Appointing Kurtzman Carson Consultants, LLC, DBA Verita Global as Claims and Noticing Agent Effective as of the Petition Date*;
- *Motion of Debtors for Entry of an Order (I) Authorizing Debtors to File a Consolidated Creditor Matrix and Top 30 Creditors List; (II) Authorizing Redaction of Certain Personally Identifiable Information; (III) Authorizing the Debtors to Serve Certain Parties by Electronic May; (IV) Approving Certain Notice Procedures; and (V) Granting Related Relief;*
- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees, and (II) Granting Related Relief*;
- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Existing Insurance Policies and Pay All Insurance Obligations*

*Arising Thereunder, (B) Continue Pay Certain Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, (II) Authorizing Banks to Honor Related Checks and Transfers, and (III) Granting Related Relief*;

- *Debtors' Motion for Enty of Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief*; and
- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages and (B) Pay Expenses Arising Under Employee Benefits Programs and Pay Related Administrative Obligations, (II) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Obligations, and (III) Granting Related Relief.*

77. In my capacity as CRO, I believe that the relief requested in the First Day Motions is necessary to ensure that the Debtors' immediate needs are met, and that the Debtors (and other constituencies) will not suffer any immediate and irreparable harm as a result of the commencement of the Chapter 11 Cases. This opinion is based upon my firsthand experience as CRO and my review of various materials and information provided to me by, and discussions with personnel familiar with the Debtors' operations, as well as the Debtors' restructuring advisors. In considering the necessary first-day relief, the Debtors' advisors and I were cognizant of the limitations imposed by the Debtors' liquidity situation and, in light of those limitations, narrowed the relief requested at the outset of the Chapter 11 Cases to only those matters that require urgent relief to preserve value during the pendency of the Chapter 11 Cases.

78. I am familiar with each First Day Motion, and I believe that the relief sought in each First Day Motion (i) is necessary to minimize disruption due to the commencement of the Chapter 11 Cases and to permit the Debtors to administer the Chapter 11 Cases smoothly, (ii) constitutes a critical element in the Debtors' achievement of the goals in this chapter 11 process, and (iii) best serves the Debtors' estates and their stakeholders' interests. I have reviewed each First Day Motion, and the facts and descriptions of the relief set forth therein are true and correct

to the best of my information and belief with appropriate reliance on the Debtors' relevant advisors and are incorporated herein in their entirety by reference. If asked to testify as to the facts supporting each of the First Day Motions, I would testify as to such facts.

79. It is my belief that the relief sought in each of the First Day Motions is necessary to the success of the Debtors' chapter 11 efforts and the maximization of the value of the Debtors' estates through a restructuring process. It is my further belief that, with respect to those First Day Motions requesting the authority to pay specific prepetition claims, the relief requested is essential to the Debtors' chapter 11 efforts and necessary to avoid immediate and irreparable harm to the Debtors' estates.

[*Remainder of Page Left Intentionally Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: March 15, 2026
Boston, Massachusetts

*/s/ Mark Renzi*
Mark Renzi
*Chief Transformation Officer of the Debtors*
*Managing Director at BRG*

# EXHIBIT A

## Organizational Chart


Reliz Technology Group Holdings Inc. (DE)
100%
BlockFills Digital Markets EU Limited (Ireland)
100%
BlockFills AMS LTDA (Brazil)
100%
Reliz Technologies LLC (WY)
100%
Reliz Technologies LLC (IL)
100%
Reliz CI LTD (Cayman)
100%
Reliz LTD (Cayman)
100%
Basis Group Holdings Inc.
92%
Basis Capital Markets UK Limited (UK)
100%
Blockfills Digital Markets Ltd. (Cayman)
90%
BlockFills Advisory FZCO (UAE)
100%
Cerus Digital Asset Management LLC
100%
Cerus Digital Master Fund SPC (Cayman)
100%
Cerus Digital Offshore Fund SPC (Cayman)
70%
UAB "Pirmasis blokas"
Legend
Ownership
Debtor Entity
Non-Debtor Entity

# EXHIBIT B

## Term Sheet

**TERM SHEET**

*Customer-Led Acquisition of the BlockFills Business*

This non-binding term sheet (the "Term Sheet") sets forth a summary of the main terms and conditions for the potential restructuring of the obligations of Reliz Technology Group Holdings Inc. and its subsidiaries (together, "BlockFills" or the "Company") and acquisition of its business by certain of its customers and new money investors (the "Transaction"). This Term Sheet is not based on any binding agreement existing among the parties as of the date hereof, but it is intended to serve as a summary of terms and conditions for the Transaction. For the avoidance of doubt, the Transaction remains subject to agreement and definitive documentation. Nothing in this Term Sheet shall constitute an admission or representation of any fact or circumstance or an admission of any liability or waiver of any right or claim, and nothing contained herein may be used or offered into evidence in any arbitration or legal, administrative, or other proceeding. Nothing herein shall prevent the customers of BlockFills (the "Customers") from exercising their rights arising from their claims, in compliance with applicable law. This Term Sheet remains subject to ongoing due diligence by the Customers that are members of the Ad-Hoc Group of BlockFills Clients and their advisors. This Term Sheet is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and similar laws and regulations in effect in any relevant jurisdiction. This Term Sheet is not an offer with respect to any securities or a solicitation of votes to accept a plan of reorganization within the meaning of the U.S. Bankruptcy Code. Any such offer or solicitation will comply with all applicable securities laws and/or the provisions of Title 11 of the United States Code §§ 101-1532.

*1. Transaction Overview*...................

1.1 Participating Customers (as defined below) and new money investors will acquire certain assets of BlockFills, including its liquid assets, tangible assets (including but not limited to office supplies, fixtures, and equipment), technology platform, intellectual property, and related operating assets.

1.2 A newly formed entity ("NewCo") will acquire the equity of certain affiliates of BlockFills (the "Transaction"). The Transaction will be implemented through a Chapter 11 plan or a sale under Section 363 of the U.S. Bankruptcy Code.

*2. Customer Recoveries* ................

2.1 Each Customer of BlockFills with an Allowed Claim, as applicable, shall receive the following in consideration for such Claim in BlockFills:

- A pro rata share of interests in a post-confirmation trust (the "Trust Portion"); and
- A pro rata share of BlockFills' liquid assets as provided below (the "Liquid Portion").

For the Liquid Portion, each Participating Customer (as defined below) may elect one (1) of the following options:

- Payment of the full value of the Liquid Portion in digital assets and/or cash in U.S. dollars on a pro rata basis;
- Full conversion of the Liquid Portion into equity of NewCo ("Equity") on a pro rata basis (the "Full Conversion Option"); or

- Conversion of the Liquid Portion into any proportion of Equity and cash/digital asset consideration on a pro rata basis.

2.2 For the purposes of calculating such Transaction consideration:

"Allowed" shall mean, with respect to any Claim, a Claim expressly allowed under the Plan, under the U.S. Bankruptcy Code, or by a Final Order, as applicable.

"Claim" shall mean any claim, as defined in section 101(5) of the U.S. Bankruptcy Code, against BlockFills.

*3. Convenience Class* 3.1 Eligible Customers shall receive payments in cash or digital assets up to an aggregate amount of $[1,000,000].

3.2 For the purposes of this Term Sheet, "<u>Eligible Customers</u>" shall mean those [807] Customers with the lowest individual amounts of exposure to BlockFills according to BlockFills' books and records. Customers that are not Eligible Customers shall be "<u>Participating Customers</u>." The Convenience Class is meant to ease the administrative burden on the estates.

*4. Trade Claims* 4.1 Holders of Ongoing Trade Claims (as defined below) shall receive [a distribution of the Liquid Portion].

4.2 Holders of OldCo Trade Claims shall receive [interests in a post-confirmation trust].

"<u>Ongoing Trade Claims</u>" are those certain general unsecured claims held by BlockFills' vendors and suppliers of goods and services that (A) NewCo has determined are essential to the continued operation of NewCo and (B) have agreed to provide goods or services (as applicable) to NewCo on substantially the same or more favorable terms as those that exist on the Petition Date. Trade claims that are not Ongoing Trade Claims shall be "<u>OldCo Trade Claims</u>."

*5. Acquired Assets* ..... 5.1 NewCo shall acquire, free and clear of all liens, claims and encumbrances, the following assets of the BlockFills business, subject to ongoing due diligence:

- current operating cash and digital assets;
- current tangible assets, including but not limited to fixtures, furniture, equipment, and office supplies;
- customer accounts and related data;
- technology platform and all related software, source code, repositories, documentation, credentials, and intellectual property and proprietary systems, including all rights to modify, sublicense,

commercialize, and further develop such technology, intellectual property, and systems;

- brand assets;
- all regulatory licenses and approvals, to the extent transferable; and
- entities holding assets, such as the equity in the company that owns the Brazil vehicle.

5.2 For the avoidance of doubt, NewCo shall not acquire or assume any pre-closing liabilities of BlockFills, except as otherwise provided in any definitive documentation for the purchase of the Equity of affiliates of BlockFills. In connection with the Transaction, Participating Customers shall waive any and all claims against NewCo related to the business and conduct of BlockFills and its affiliates.

| | |
|---|---|
| *6. New Money Investment.................* | 6.1 Until NewCo has raised $15,000,000 in capital, Participating Customers may invest additional capital on a pro rata basis in exchange for Equity at a valuation of the lower of $15,000,000 and the amount raised. Such additional capital will be invested at the same terms as the initial valuation.<br><br>6.2 After NewCo has raised at least $15,000,000 in capital, existing Customers may invest additional capital up to $25,000,000 on a pro rata basis in exchange for Equity at a valuation that is the lower of $30,000,000 or the valuation established by the market. |
| *7. Trust Portion, Litigation, and Recoveries ................* | 7.1 All assets of BlockFills other than the assets acquired through the Transaction, including, without limitation, all estate causes of action and claims that are included on the schedule of retained causes of action filed as a plan supplement to the chapter 11 plan that are not otherwise specifically released, settled, compromised, transferred, or assigned under the Plan or any other order of the Bankruptcy Court, shall vest in a post-confirmation trust overseen by an advisory of Customers selected by the Ad-Hoc Group of BlockFills Clients for the benefit of the Customers of BlockFills, for application pro rata in satisfaction of the respective Trust Portion of each Customer. |
| *8. Celsius Claim* | 8.1 To the extent that Celsius has an Allowed Claim that is secured and properly perfected, such claim shall be treated in accordance with the Bankruptcy Code. |
| *9. Capitalization of NewCo......................* | 9.1 All Equity in NewCo shall be owned by no more than five hundred (500) entities. Anyone purchasing or receiving Equity must be an “accredited investor.” |

| | |
|---|---|
| *10. Asset Segregation and Custody*............... | 10.1 NewCo shall maintain its banking relationships with a United States-regulated bank, including separate accounts for operating capital, the Settlement Facility, and proprietary trading, as well as segregated customer accounts, subject to customary onboarding and compliance approvals. All customer funds held by NewCo and its affiliates shall be maintained in segregated accounts which, for the avoidance of doubt, shall be separate from any other accounts and corporate funds of NewCo. For the further avoidance of doubt, the assets of customers may not be borrowed, pledged, hypothecated, or otherwise employed for any purpose without the prior express written consent of such customers.<br><br>10.2 Additionally, all digital assets shall be maintained with a qualified institutional custodian. NewCo shall implement the daily reconciliation of customer balances and trading positions.<br><br>10.3 NewCo will operate in accordance with proper licensing and regulatory infrastructure, including Money Transmitter License coverage where required.<br><br>10.4 NewCo will operate within the $8 billion swap dealer exemption threshold until a swap dealer license is required and then will attain the necessary regulatory coverage. |
| *11. Governance* ......... | 11.1 NewCo shall adopt and implement corporate governance policies and procedures that reflect leading standards for companies of a similar size and shall at all times operate in compliance with such policies and procedures and applicable law.<br><br>11.2 The initial Board shall consist of five (5) to seven (7) members. [The initial Board shall be elected by the holders of the Equity of NewCo; provided, however, that representatives of the Participating Customers shall comprise a majority of the Board,] and provided further that the Board shall include at least one (1) independent member with recognized expertise in restructuring, financial services, or financial regulation (the "<u>Financial Expert Director</u>"). |
| *12. Management*........ | 12.1 The initial Board shall appoint a Chief Compliance Officer responsible for anti-money laundering, know-your-customer, and other regulatory compliance and internal controls.<br><br>12.2 The initial Board shall adopt a management incentive plan, with an incentive pool for management representing [ten percent (10%)] to [fifteen percent (15%)] of the Equity (the "<u>Incentive Pool</u>"), subject to customary vesting requirements. |
| *13. Employees*............ | 13.1 In connection with the Transaction, BlockFills shall agree to a release and waiver of existing employee restrictive covenants in order to permit NewCo |

to solicit and hire selected employees from BlockFills; provided, however, that NewCo shall not be obligated to hire any specific employee of BlockFills.

*14. Licenses* ............... [14. 1 BlockFills AMS - Central Bank Approved Money Service

14.2 Basis Capital Markets UK Limited - FCA (UK); Exempt Foreign Firm (NFA);

14.3 Blockfills Digital Markets Ltd - CIMA SIBA Registered Person & Broker Dealer

14.4 Reliz LTd. FinCEN MSB

14.5 Reliz Technologies LLC (Illinois) - FinCEN MSB][1]

[1] Note to Draft: Subject to ongoing diligence.