**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| RELIZ TECHNOLOGY GROUP HOLDINGS INC., *et al.*,[1] | Case No. 26-10371 (TMH) |
| | (Jointly Administered) |
| Debtors. | **Related to Docket Nos. 282, 335** |

**DEBTORS' OBJECTION TO (I) ARTHA INVESTMENT PARTNERS LLC'S
MOTION SEEKING APPOINTMENT OF AN INDEPENDENT EXAMINER
AND A CHAPTER 11 TRUSTEE AND (II) RELATED JOINDER**

Reliz Technology Group Holdings Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby submit this objection (the "Objection") to (i) Artha Investment Partners LLC's ("Artha") *Motion for (I) Appointment of an Independent Examiner and (II) Appointment of a Chapter 11 Trustee* [Docket No. 282] (the "Motion") and (ii) 1548199 Alberta Ltd. and Robert J. Bertram's *Joinder to Artha Investment Partners LLC's Motion for (I) Appointment of an Independent Examiner and (II) Appointment of a Chapter 11 Trustee* [Docket No. 335]. In support of this Objection, the Debtors respectfully represent as follows:

**PRELIMINARY STATEMENT[2]**

1. Artha alleges two facts in support of its request for a chapter 11 trustee: (1) that two lawsuits were filed against the Debtors prepetition in which certain unproven allegations were made by plaintiffs in those actions; and (2) that the Debtors' Chief Restructuring Officer does not

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are: Reliz Technology Group Holdings Inc. (6265); Reliz Technologies LLC (1968); Reliz LTD (N/A); and Reliz CI LTD (N/A). The Debtors' service address is 401 West Ontario St., Suite 400, Chicago, IL 60654.

[2] Capitalized terms used but not immediately defined shall have the meanings ascribed to them below.

know the precise date on which the Debtors became insolvent.  Neither of these facts come close to supporting the high bar for appointing a chapter 11 trustee.

2.  Artha is an unsecured creditor that refuses to accept it is in the same position as all of the Debtors' customers.  Artha loaned the Debtors 3,500 ETH prior to the Petition Date under a Master Loan Agreement.  The MLA contemplated that the Debtors would provide collateral to Artha.  Artha never requested such collateral, and the Debtors never provided any collateral.  In response to its oversight, Artha has sought to place blame on the Debtors rather than itself.

3.  In its Motion, Artha requests the Court enter an order appointing (i) an independent examiner and (ii) a chapter 11 trustee.  Neither of those requests are warranted by the circumstances of these Chapter 11 Cases, nor are they supported by the facts and law.

4.  As an initial matter, there are two parties already performing the roles that an examiner or a chapter 11 trustee would perform.  Specifically, the Debtors are already subject to independent investigations led by the Official Committee of Unsecured Creditors and the Debtors' independent Special Committee.  The Special Committee serves a role nearly identical to any role an examiner would serve, and is comprised of a disinterested director, Matthew Kahn.  The Special Committee is vested with the authority to, among other things, manage any potential conflict matters, including investigating, releasing, or settling certain potential claims or causes of action of the Debtors, and supervise the winddown and sale of the Debtors' assets.

5.  The appointment of an additional disinterested party to conduct the exact activities as the Special Committee would bring no benefit to the Debtors' estates, further deplete the Debtors' limited resources, and be highly duplicative.  In the event that this Court appoints an examiner, the scope and budget should be narrowly tailored as set forth in more detail below.

6.      Artha's request to appoint a chapter 11 trustee should be denied because Artha has not established (and cannot establish) that (i) "cause" exists for the appointment of a chapter 11 trustee or (ii) such relief is in the best interests of the Debtors' estates.  Indeed, Artha offers no evidence of any such "cause," and instead relies on generalized sweeping allegations that remain unproven (by other third parties or Artha).  Artha also contends that Berkeley Research Group ("BRG") was involved with the alleged prepetition conduct.  It was not.  Further, even if every allegation by Artha were taken as categorically true, it has no bearing on these Chapter 11 Cases because the Debtors are no longer operating.  The Debtors are only seeking to sell their assets and wind down their estates.

7.      The Debtors have already made substantial progress towards confirming a plan.  On April 7, 2026, the Debtors filed their Initial Plan and Initial Disclosure Statement.  Since the filing of the Initial Plan and the Initial Disclosure Statement, the Debtors have continuously engaged with their stakeholders, seeking to negotiate and incorporate comments.  The Debtors will be filing an amended plan (the "Amended Plan") and disclosure statement (the "Amended Disclosure Statement") in the coming days in order to keep the Debtors on track for their confirmation hearing, which is presently scheduled for July 13, 2026.

8.      Put simply, the appointment of a chapter 11 trustee makes no economic or rational sense.  The Debtors' efforts are solely focused on the sale of their assets.  Further, the Debtors are already cooperating with two separate, independent investigations, led by the Committee and the Special Committee, to ensure that any potential causes of action are adequately identified and addressed.  The appointment of a chapter 11 trustee would offer no additional benefit to the Debtors' estates.

9.      Instead, appointment of a chapter 11 trustee would (a) delay the Debtors' progress towards selling their businesses, (b) install an individual inexperienced in the Debtors' businesses to assess bids for the Debtors' assets (after the sale process is completed or substantially completed), (c) distract the Debtors from progressing towards confirmation of the Amended Plan, and (d) drain the Debtors' limited assets on account of duplicative investigations and unnecessary professional fees and expenses.

## BACKGROUND

### I.      Artha and the Debtors' Relationship

10.     On November 14, 2022, Artha entered into a Master Loan Agreement (the "MLA") with Debtor Reliz Ltd., which governed digital asset lending between the parties.  Despite entering into the MLA in 2022, Artha did not loan any digital assets to the Debtors until November 2025.

11.     On November 26, 2025, Artha agreed to loan 2,000 ETH to the Debtors.  No collateral was provided by the Debtors to Artha to secure the loan.

12.     On December 10, 2025, Artha agreed to loan an additional 1,500 ETH to the Debtors.  No collateral was provided by the Debtors to Artha to secure the loan.

13.     The only employees with whom Artha engaged in connection with the two loans were John Divine, a trader, and Dan Schak, the Debtors' Head of Trading Operations and Chief Risk Officer.  Artha did not have any communications with any other employees or management of the Debtors, including the Debtors CRO or CFO (each as defined below) provided by BRG.

### II.     Facts Underlying the Motion

14.     The Motion presents a mischaracterization of the Debtors' prepetition conduct.  As reflected in the record, the facts underlying the Chapter 11 Cases remain subject to ongoing

investigation, and such investigation is being conducted by both the Committee and the Special Committee, with the full support and cooperation of the Debtors.

15.    Artha alleges that prepetition litigation against the Debtors confirms misconduct. *See* Motion ¶¶ 4–8.    However, the prepetition litigation consists solely of unsubstantiated allegations, and no court has ruled substantively on the issues.    Perhaps more importantly, Artha has failed to submit *any* evidence in support of these allegations.

16.    Artha also argues that BRG lacks credibility.[3]    *See* Motion ¶¶ 9–18.    However, this argument is based on Artha's dissatisfaction with testimony rather than any tangible evidence.    As outlined in the Debtors' application to employ BRG,[4]    BRG has extensive and significant experience providing the services they are rendering to the Debtors.    BRG's unwillingness to answer questions it has not yet had an opportunity to meaningfully analyze is indicative of BRG's thoroughness and commitment to providing accurate analysis.    *See* Application to Employ ¶¶ 10–15.

17.    Lastly, Artha alleges the Committee's *Motion for an Order Pursuant to Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004-1 Directing the Examination and Production of Documents* [Docket No. 245] (the "2004 Motion") confirms the absence of reliable records.    *See* Motion ¶¶ 19–23.    On the contrary and as outlined in the *Debtors' Objection to the Official Committee of Unsecured Creditors' Motion for an Order Pursuant to Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004-1 Directing the Examination and Production of Documents* [Docket

---

[3]    BRG has provided Mark Renzi and James Wilson, both of which are highly experienced individuals in the Debtors' industry and in the bankruptcy and restructuring industry, to serve in the roles of Chief Restructuring Officer (the "CRO") and Chief Financial Officer (the "CFO"), respectively.

[4]    *See Application of Debtors for Entry of an Order Authorizing the Retention and employment of Berkeley Research Group, LLC to Provide (A) Mark A. Renzi as Chief Restructuring Officer, (B) James Wilson as Chief Financial Officer, and (C) Additional Personnel for the Debtors Effective as of the Petition Date* [Docket No. 186] (the "Application to Employ").

No. 302] (the "2004 Objection"), the Debtors have worked tirelessly to procure and provide documents responsive to all Committee requests. Additionally, after the filing of the 2004 Motion and the 2004 Objection, the Debtors, along with other parties in interest, worked diligently with the Committee to craft a revised proposed order to the 2004 Motion that consensually provides the Committee with a framework for future document requests and interviews. On May 11, 2026, the Committee, with the support of the Debtors and other parties in interest, filed the *Certification of Counsel Regarding the Official Committee of Unsecured Creditors' Motion for an Order Pursuant to Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004-1 Directing the Examination and Production of Documents* [Docket No. 313], thereby seeking entry of the revised proposed order agreed by the parties (the "Revised 2004 Order"). On May 12, 2026, the Court entered the Revised 2004 Order.[5]

## III.    The Committee

18.    The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee") to represent the interests of the Debtors' unsecured creditors.[6] As part of this representation, the Committee is charged with investigating the acts, conduct, assets, liabilities, and financial condition of the Debtors and any other matter relevant to the Chapter 11 Cases or the formulation of the plan. The Committee is further empowered to "perform such other services as are in the interest of those represented." 11 U.S.C. § 1103(c)(5).

---

[5]    *See Order Granting the Official Committee of Unsecured Creditors' Motion for an Order Pursuant to Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004-1 Directing the Examination and Production of Documents* [Docket No. 314].

[6]    *See Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 104].

19.     Despite the initial struggles between the Debtors and the Committee, as illustrated by the 2004 Motion and the 2004 Objection, the Debtors and the Committee have now reached a consensus on how to best facilitate the Committee's ongoing investigation, as evidenced by the Revised 2004 Order, which provides a framework for the Committee to receive information and conduct interviews of the Debtors' key managers, directors, and officers.  To date, the Debtors have produced (and continue to produce) responsive and relevant documents to the Committee, including the Debtors' financial records, client agreements, and employment records, among other categories of documents.  Additionally, the Debtors have made available for examination all individuals identified by the Committee for questioning.  The Debtors and the Committee continue to engage on an almost daily basis to ensure that the Committee is able to fulfill its fiduciary duties.

20.     The Committee is more than capable of fulfilling its investigation duties. The imposition of another investigation led by a chapter 11 trustee would only hinder the ability of the Debtors to engage with the Committee, resulting in further delays in the Committee's active investigation and potentially resulting in more costly discovery related disputes and litigation, such as the 2004 Motion.  Such delays would not only hinder the Committee's ability to conduct its investigation but would also result in additional and unnecessary administrative expenses that must be paid ahead of general unsecured creditors, further diluting the recoveries of such creditors. Indeed, it is highly likely that the appointment of a chapter 11 trustee would render the Debtors administratively insolvent.

### IV.    The Special Committee

21.     Shortly before the Petition Date, the Debtors formed the disinterested Special Committee and authorized it to investigate, and as appropriate, settle any potential claims or causes of action of the Debtors.  As a result, any potential causes of action against the Debtors' officers

and directors, among others, are being investigated by two disinterested, independent investigatory bodies.  The addition of a third investigatory body would create unnecessary distractions for the Debtors and their management team, further increase investigation-related costs, and disrupt the ongoing investigations.

22.     Put simply, the Special Committee already serves as a second line of defense for the protection of the Debtors' creditors and stakeholders.  Although the Debtors have full faith in the Committee's ability to conduct a thorough investigation of the Debtors, the Special Committee further obviates the need for any additional oversight of the Debtors and serves the exact purpose any examiner or trustee would serve.

**V.     The Plan**

23.     Finally, the Debtors have made substantial progress in the Chapter 11 Cases.  On April 7, 2026, the Debtors filed the *Joint Chapter 11 Plan of Reliz Technology Group Holdings Inc. and Its Debtor Affiliates* [Docket No. 128] (the "Initial Plan") and the corresponding *Disclosure Statement Relating to Joint Chapter 11 Plan of Reliz Technology Group Holdings Inc. and Its Debtor Affiliates* [Docket No. 129] (the "Initial Disclosure Statement").  Since the filing of the Initial Plan and the Initial Disclosure Statement, the Debtors have continuously engaged with their stakeholders, seeking to negotiate and incorporate comments received in response to the Initial Plan and the Initial Disclosure Statement.

24.     The Debtors will be filing the Amended Plan that maintains the current plan timeline and will allow the Debtors to seek confirmation of such Amended Plan on July 13, 2026.

**OBJECTION**

25.     The Debtors respectfully submit that the relief requested in the Motion is not appropriate or warranted under the circumstances of the Chapter 11 Cases.  The Motion fails to

account for the current governance structure and oversight mechanisms in place in the Chapter 11 Cases, including the Debtors' fiduciary duties, the role of BRG, and the ongoing investigations led by the Committee and the Special Committee, which collectively mitigate the concerns asserted by Artha.  Additionally, as further discussed herein, Artha fails to offer any concrete facts or evidence that substantiate its allegations in the Motion, instead relying on alleged prepetition bad acts, unproven conflicts of interest, and the mere existence of prepetition litigation that has yet to produce any findings.  Accordingly, the requested relief, if granted, would be baseless, duplicative, and disruptive.

## I.      The Appointment of an Examiner Is Not Appropriate

26.      The appointment of an examiner is not appropriate under the circumstances. Adding a third investigator would be duplicative and add to the already significant costs being borne by the Debtors and their estates in connection with the ongoing investigations by the Committee and the Special Committee.

27.      Although the Debtors believe that Artha's request for an examiner is unwarranted, the Debtors are aware of the Third Circuit's recent ruling in *In re FTX Trading Ltd.*  As such, if an examiner is appointed, the Debtors request in the alternative that the Court appropriately limit the scope, degree, duration, and cost of any examiner and its related investigation, to avoid duplication and preserve estate resources.  *See In re FTX Trading Ltd.*, 91 F.4th 148, 153-54 (3d Cir. 2024). Bankruptcy Code section 1104(c)(2) governs the appointment of an "examiner to conduct such an investigation of the debtor *as is appropriate . . .*"  11 U.S.C. § 1104(c)(2) (emphasis added). Pursuant to the "as is appropriate" language, courts retain broad discretion "to direct the examiner's investigation, including its scope, degree, duration, and cost."  *FTX*, 91 F.4th at 156 (internal quotations omitted).  The purpose of empowering courts to direct the examiner's

investigation and set the investigation's parameters is to "ensure that the examiner is not duplicating the other parties' efforts and the investigation is not unnecessarily disrupting the reorganization process." *Id*.

28.     The Debtors are primarily concerned with preserving estate resources for the benefit of creditors.  A broad investigation that is duplicative of both the Committee's and the Special Committee's ongoing efforts would be inconsistent with the Debtors' fiduciary duties and serve only to diminish creditor recoveries.  Accordingly, if the Court is inclined to grant the request for an examiner, such appointment should be strictly limited.  *See* 7 Collier on Bankr. ¶ 1104.03[2][b] (16th ed. 2026) (explaining that "[t]he limitations and proscriptions regarding the scope of the investigation are subject only to the sound discretion of the bankruptcy judge"). Specifically, the examiner's scope should be (i) limited to evaluating the independence of the Special Committee; (ii) subject to a $75,000 budget; and (iii) required to be completed within the current confirmation timeline.  *See* 7 Collier on Bankr. ¶ 1104.03[2][b] (16th ed. 2026) ("Noting that "[i]n addition [to limiting the scope of an investigation] (or as an alternative), the court can limit in advance the compensation to be awarded to the examiner and limit the expenses as well"). The Debtors submit that such limitations are necessary and appropriate.

## II.     Artha Has Not Established Clear and Convincing Evidence That Appointment of a Chapter 11 Trustee Is Warranted

29.     The appointment of a chapter 11 trustee is appropriate only in those rare and exceptional circumstances where, unlike here, the record contains clear and convincing evidence (a) of fraud, dishonesty, incompetence, or gross mismanagement by the Debtors' current fiduciaries, or (b) that appointment of a trustee would be in the interest of all of the Debtors' various stakeholders.  Artha has not presented, and cannot present, sufficient evidence to meet the high burden and show "cause" for such extraordinary relief.  Nor can Artha prove that appointment

10

of a trustee would be in the best interest of the Debtors' creditors, equity holders, and other parties in interest.  Accordingly, Artha fails to satisfy either prong of Bankruptcy Code section 1104(a), and the Motion should be denied.

### A. Legal Standard

30. Bankruptcy Code section 1104(a) provides two bases for the appointment of a chapter 11 trustee: "(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management . . . ; or (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a).  Because section 1104(a) is phrased in the disjunctive, subsections (a)(1) and (a)(2) provide independent predicates for the appointment of a trustee.

31. Courts uniformly agree that "the standard for § 1104 appointment is very high." *In re Adelphia Commc'ns. Corp.*, 336 B.R. 610, 655 (Bankr. S.D.N.Y. 2006) (quoting *Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC)*, 423 F.3d 166, 176 (2d Cir. 2005)).  Thus, if there is any other option that will permit a bankruptcy proceeding to go forward without a trustee, a motion to appoint a trustee should be denied.  *See Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In Re W.R. Grace & Co.)*, 285 B.R. 148, 158 (Bankr. D. Del. 2002) (recognizing that "appointing a trustee must be considered a last resort").

32. Additionally, it is well established that the "appointment of a trustee should be the *exception*, rather than the rule" as there is a "*strong presumption against* appointing an outside trustee." *In re Marvel Entm't Grp.*, 140 F.3d 463, 471 (3d Cir. 1998) (quoting *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989)) (emphasis added); *Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 385 F.3d 313, 319 (3d Cir. 2004) ("heavy 'presumption' against the appointment of an outside trustee"); *see also* 7 Collier on Bankr.

¶ 1104.02[3][b][i] (16th ed. 2026) ("The appointment of a trustee in a chapter 11 case is an extraordinary remedy…[and] there is a strong presumption that the debtor should be permitted to remain in possession absent a showing of need for the appointment of a trustee[.]").  This presumption is premised on the notion that "the debtor-in-possession is the most knowledgeable about, and best able to run, the debtor's business." *In re Sundale, Ltd.*, 400 B.R. 890, 899 (Bankr. S.D. Fla. 2009); *see also* 7 Collier on Bankr. ¶ 1104.02[3][a] (16th ed. 2026) ("A trustee unfamiliar with the business and its creditors will usually cause delay and expense learning facts and circumstances that the trustee needs to know in order to facilitate the debtor's reorganization.").

33.     In operating as a "debtor in possession," a debtor owes certain fiduciary duties to the bankruptcy estate, such as a "duty of care to protect the assets, a duty of loyalty, and duty of impartiality." *In re Ford Steel, LLC*, 629 B.R. 871, 889 (Bankr. S.D. Tex. 2021).  The fiduciary duties of the debtor in possession, like the trustee, extend to all parties interested in the bankruptcy estate. *See Commodity Futures Trading Comm'n. v. Weintraub,* 471 U.S. 343, 354–55 (1985); *Ford Steel*, 629 B.R. at 889.  When a debtor is incapable of performing its fiduciary duties, a chapter 11 trustee may be appointed pursuant to Bankruptcy Code section 1104(a). *See Ford Steel*, 629 B.R. at 889.

34.     Furthermore, the strong presumption of debtor control means that the party moving for the appointment of a trustee has a "heavy burden of persuasion" and "must prove the need for a trustee . . . by clear and convincing evidence." *G-I Holdings*, 385 F.3d at 319.  For evidence to be "clear and convincing" it must "produce[] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Official Comm. of Asbestos Claimants v. G-I*

*Holdings, Inc. (In re G-I Holdings, Inc.)*, 295 B.R. 502, 508 (D.N.J. 2003) (citing *Cruzan v. Dir. Mo. Dep't of Health*, 497 U.S. 261, 285 n.11 (1990)), *aff'd*, 385 F.3d 313 (3d Cir. 2004). Determining whether Artha has satisfied its burden of persuasion is within the Court's discretion. *See G-I Holdings*, 385 F.3d at 318.

35.     As set forth below, Artha fails to meet its burden to justify appointment of a chapter 11 trustee under either Bankruptcy Code section 1104(a)(1) or (a)(2), and the Debtors respectfully request the Court deny the Motion.

B.     **Artha Fails to Demonstrate Any of the Statutory Grounds for "Cause" Under Section 1104(a)(1)**

36.     Under Bankruptcy Code section 1104(a)(1), on request of a party in interest, and after notice and a hearing, "the court shall order the appointment of a trustee for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause…" 11 U.S.C. § 1104(a)(1).  This list is non-exhaustive, and courts retain discretion to determine that other forms of misconduct may constitute cause for such an appointment. *See Marvel,* 140 F.3d at 472; *Sharon Steel*, 871 F.2d at 1226.

37.     Moreover, "section 1104(a)(1) is not intended to suggest that a court should order the appointment of a trustee whenever management has, to any degree, mismanaged the debtor's affairs." 7 Collier on Bankr. ¶ 1104.02[3][c][i] (16th ed. 2026).  Rather, the statute's use of "gross mismanagement" acknowledges that "some degree of mismanagement exists in virtually every insolvency case." *See In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990); *see also* 7 Collier on Bankr. ¶ 1104.02[3][c][i] (16th ed. 2026) ("[M]ere mismanagement does not, by itself, constitute cause.").  As such, courts require "a finding more than simple mismanagement or incompetence" for appointment of a trustee under Bankruptcy Code section 1104(a)(1). *In re*

*Evans*, 48 B.R. 46, 47 (Bankr. W.D. Tex. 1985); *In re LHC, LLC*, 497 B.R. 281, 309 (Bankr. N.D. Ill. 2013) ("Because one would expect to find some degree of incompetence or mismanagement in most businesses which have been forced to seek the protections of chapter 11, the Court must find something more aggravated that simple mismanagement in order to appoint a trustee.") (quoting *Midlantic Nat'l Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat Sales, Inc.),* 4 B.R. 635, 645 (Bankr.E.D.N.Y.1980). Gross mismanagement depends on the facts of each case "but often include elements that hint at fraud, in addition to negligence." *Sundale*, 400 B.R. at 907; *see In re Royal Alice Props., LLC*, No. 19-12337, 2020 WL 5357795, at **9–11 (Bankr. E.D. La. Sept. 4, 2020) (finding gross mismanagement, where, among other things, managers were depositing rent owed to the debtor into a personal bank account instead of conducting operations of the debtor through its DIP account).

38.     The allegations proffered by Artha fail to demonstrate any of the statutory grounds for "cause." Specifically, the Motion does not provide—nor does the record reflect—*any* evidence of fraud, dishonesty, incompetence, or gross mismanagement by the Debtors' current directors and officers. Instead, Artha relies on alleged prepetition bad acts, alleged conflicts of interest, and the existence of prepetition litigation. *See* Motion ¶¶ 4–8, 35–36. These unproven allegations misconstrue the facts and mischaracterize the record of the Chapter 11 Cases, neither of which justify appointment of a chapter 11 trustee. Put simply, Artha alleges that the Debtors acted fraudulently when engaging in business as usual with Artha (namely, participating in crypto lending). The reality is that every business that has weathered and attempted to rectify financial difficulties has continued to obtain credit from vendors and customers during such efforts; the alternative to doing so would be to immediately shutter the debtor's operations and file for bankruptcy protection. Here, the Debtors' choice to engage in business as usual under strained

14

circumstances is the opposite of fraud—it is the Debtors using their best efforts to continue to operate in the ordinary course and restore their businesses to their former profitability. Moreover, Artha is a sophisticated creditor in the crypto space and could have obtained diligence from the Debtors at the time of its transaction if it wanted to do so—and it did not.

39.    Artha also points to certain prepetition litigation filed by Dominion Capital LLC, 1548199 Alberta Ltd., and Robert J. Bertram. Motion ¶¶ 5-7. However, such litigation has failed to produce any substantive findings, and instead consists entirely of unsubstantiated allegations that lack concrete evidence. Artha relies on the mere *existence* of this prepetition litigation to further its claims because Artha is unable to produce any concrete evidence on its own—and that is because none exists.

40.    Although the requisite bad acts used as a basis for the appointment of a chapter 11 trustee can occur "either before or after the commencement of the case," *see* 11 U.S.C. § 1104(a)(1), "on a motion for the appointment of a trustee, the focus is on the debtor's current activities, not past misconduct." *See In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) (citing 7 Collier on Bankr. ¶ 1104.02[3][c][i] (15th ed.)). Here, even if every allegation lodged by Artha was substantiated with evidence (none are), Artha's request for a chapter 11 trustee would still be baseless because the Debtors' estates are no longer at risk of suffering any harm on account of such allegations or alleged behavior given the new state of affairs. Namely, the Debtors are no longer operating, and the only "current activities" of the Debtors are entirely focused on liquidating their assets and confirming the Amended Plan. In other words, the Debtors' current activities are completely different from and unrelated to their prepetition operations that serve as the basis for the Motion. Artha has not alleged *any* postpetition activity that suggests misconduct.

15

41.     Also noteworthy is that Artha's allegations do not implicate any individual that is presently managing the Debtors' limited operations.  In the declaration submitted by Artha's CEO (the "Jindal Declaration"),[7] Artha admits that its transactions with the Debtors were solicited by an *employee* of the Debtors—not a member of the Debtors' management team.  *See* Jindal Declaration ¶¶ 7, 15.  Additionally, although Artha contends that the term sheets that governed Artha's transaction with the Debtors were negotiated and executed by a member of the Debtors' management team, noting that such term sheets were "personally negotiated and signed by Dan Schak, who signed as 'Head of Trading Operations,'" Mr. Schak no longer performs any material management duties for the Debtors because the Debtors are no longer operating.  *Id*. ¶ 14.  Artha attempts to implicate Mark Renzi, the Debtors' CRO, and Joe Perry, the Debtors' Interim CEO, in the transaction, but does not state any tangible involvement with such individuals.  By Artha's own recollection of the facts, Artha engaged only with an *employee* of the Debtors and the Debtors' Head of Trading Operations/Chief Risk Officer.

42.     As a result, Artha's allegations not only lack merit, but also fail to substantiate the need for a chapter 11 trustee to displace the Debtors' management team.  Artha has failed to identify any conduct suggesting that the Debtors' estates are better off being wound down and sold by a chapter 11 trustee instead of the Debtors' own experienced managers and advisors.

43.     Finally, the Debtors retained, and presently rely on the advice of, a suite of experienced and disinterested restructuring professionals, operate with transparency, comply with all applicable orders of this Court, and work collaboratively with the Committee and the Special Committee on matters of oversight.  Such conduct does not illustrate any failure to satisfy the Debtors' fiduciary duties, and the evidence does not suggest or demonstrate any fraud, dishonesty,

---

[7]     *Declaration of Prince Jindal* [Docket No. 242-1].

incompetence, or gross mismanagement by the Debtors, their professionals, or current management. Without more, Artha simply cannot overcome the strong presumption that the Debtors should be permitted to remain in possession, nor can it justify why this drastic remedy is necessary. For these reasons, the Motion should be denied.

C.    **Appointing a Chapter 11 Trustee Under Bankruptcy Code Section 1104(a)(2) Would Not Be in the Best Interests of the Debtors' Various Stakeholders**

44.    Artha also fails to demonstrate that the appointment of a trustee is "in the interests of creditors, any equity security holders, and other interests of the estate[,]" pursuant to Bankruptcy Code section 1104(a)(2). Like section 1104(a)(1), section 1104(a)(2) is difficult to satisfy, and requires a showing that the appointment of a trustee is in the interests of all interested constituencies—*i.e.*, the appointment must benefit the estate generally, and not merely one constituency such as a creditor group. *See* 7 Collier on Bankr. ¶ 1104.02[3][d][i] (16th ed. 2026); *Sletteland*, 260 B.R. at 672 ("[A] creditor group, no matter how dominant, cannot justify the appointment of a trustee or examiner simply by alleging that it would be in its interests. It must show that the appointment is in the interests of all those with a stake in the estate, which in this case would include the Debtor."). The statute's "[u]se of the word 'and' suggests that creditors cannot on their own obtain the appointment of a trustee under the provision in order to disenfranchise equity security holders or other interests." *Id.* (quoting 7 Collier on Bankr. ¶ 1104.02[3][d][i] (15th ed.)). Thus, the party seeking appointment of a trustee under Bankruptcy Code section 1104(a)(2) "must show that the appointment is in the interests of all those with a stake in the estate," including the debtor, other creditors, and its equity holders. *Id.*; 7 Collier on Bankr. ¶ 1104.02[3][d][i] (16th ed. 2026) ("[I]t is important to remember that the 'interests' standard requires a finding that appointment of a trustee would be in the interest of essentially all interested constituencies.").

17

45.    Among the factors to be considered by the Court are (i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence—or lack thereof—of the business community and of creditors in present management, and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment.  *See Ionosphere Clubs*, 113 B.R. at 168.  Furthermore, the debtor's ability to propose a confirmable plan, the existence of independent governance, and the preservation of value are all factors courts weigh against displacing debtor management.  *See Sundale*, 400 B.R. at 899–901 (noting also that the analysis is conducted on a case-by-case basis and courts should consider the totality of the circumstances).

46.    Bankruptcy Code section 1104(a)(2) creates a flexible standard, and decisions to appoint a trustee must be made on a case-by-case basis.  *See Sharon Steel*, 871 F.2d at 1226; *In re Vascular Access Centers, L.P.*, 611 B.R. 742, 765 (Bankr. E.D. Pa. 2020) (stating that the factors considered in appointing a trustee under Bankruptcy Code section 1104(a)(2) should not be applied mechanically or formalistically) (citing *Ionosphere Clubs*, 113 B.R. at 168).  Therefore, to determine whether appointment is in the interests of stakeholders under Bankruptcy Code section 1104(a)(2), the Court should engage in a cost-benefit analysis.  *See Ford Steel*, 629 B.R. at 890 ("Ultimately, the court should consider the practical realities, necessities of the case, and the totality of the circumstances in determining whether to appoint a trustee."); *Ionosphere Clubs*, 113 B.R. at 168 (court weights "the benefits derived by the appointment of a trustee, balanced against the cost of the appointment"); *In re Cardinal Indus.*, 109 B.R. 755, 766 (Bankr. S.D. Ohio 1990) ( "[T]he cost of a trustee to the estate, when compared with the benefit sought to be derived" is a significant aspect in determining whether to appoint a chapter 11 trustee); *In re Microwave Prods. of Am., Inc.*, 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989) (same).  Engaging in a cost-benefit

analysis, the Court must take into account the "immense costs" associated with appointing a chapter 11 trustee. *See Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 577 (3d Cir. 2003); H.R. Rep. No. 95-595, at 403 (1977) (The court "may order appointment *only if* the protection afforded by a trustee is needed and the costs and expenses of a trustee would not be disproportionately higher than the value of the protection afforded.") (emphasis added).

47.    In addition to acting in good faith throughout the restructuring process, the Debtors have appointed a CRO and CFO to effectuate the winddown and sale of the Debtors' businesses. Furthermore, the Debtors have already filed the Initial Plan and will be filing the Amended Plan, along with the corresponding disclosure statement, demonstrating concrete steps towards confirming an acceptable plan, and are now entirely focused on confirming the Amended Plan and liquidating the Debtors' assets. The appointment of a trustee will delay this process, as the trustee and its new professionals would need to spend significant time becoming familiar with the Debtors' businesses to adequately solicit and analyze bids for such businesses. Moreover, the costs associated with a trustee's "catch-up" efforts would be borne by the estates to the detriment of all creditors.

48.    In addition to delaying the reorganization process and draining estate resources, any investigation completed by a chapter 11 trustee would be duplicative and result in significant delays of the two investigations that are presently being led by the Committee and the Special Committee.

49.    For these reasons, the Motion falls short of the clear-and-convincing standard required to overcome the governing presumption and justify appointment of a trustee and thus, it should be denied.

19

D.      **The Committee Already Represents the Creditors' Interests**

50.      In addition to the reasons stated above, the Bankruptcy Code provides that the official creditors' committee, rather than a trustee, serves as the appropriate fiduciary to represent creditors. *See* 11 U.S.C. § 1102(a)(1) (requiring the appointment of an official committee in every chapter 11 case). The Bankruptcy Code requires the establishment of a creditors' committee for the express purpose of protecting the rights of its constituents and similarly situated creditors. *See In re Garden Ridge Corp.*, No. 04-10324 (DDS), 2005 Bankr. LEXIS 323, at *9 (Bankr. D. Del. Mar. 2, 2005) ("An official committee of unsecured creditors has a duty to represent all general unsecured creditors" and "members of an official committee owe a fiduciary duty to the committee's constituents, i.e., the entire class of general unsecured creditors.").

51.      When evaluating whether the appointment of a trustee is appropriate, courts consider whether a committee is available to supervise the debtor's administration of the bankruptcy estate and whether the committee itself supports the appointment of a trustee. *See, e.g., In re The 1031 Tax Grp., LLC*, 374 B.R. 78, 91 ("Where a case has an active creditors committee functioning effectively and working well with the debtors, as it does here, there is little benefit in appointing a trustee."); *In re Gen. Oil Distributors, Inc.*, 42 B.R. 402, 410 (Bankr. E.D.N.Y. 1984) (citing the creditors committee's opposition to the motion to appoint a trustee and "the various methods by which the committee has and will continue to supervise the management of the debtors[]" as factors in denying appointment of a trustee).

52.      Here, the Committee, the appropriate fiduciary to represent creditors, has already been appointed and dedicated an extensive amount of time and effort to investigating the Debtors. Similarly, the Debtors have expended extensive time and effort engaging with the Committee to ensure that the Committee is able to adequately fulfill its duties, including those related to the

investigation.  Put simply, the Debtors are already subject to extensive oversight between the combination of the Committee and the Special Committee.  Artha has failed to offer any evidence as to why the Committee, especially when taken in combination with the Special Committee, cannot fulfill such oversight and investigatory duties.

### E.    Artha's Actions Demonstrate a Pattern of Acting in its Own Self-Interest

53.    It's also worth noting that throughout these Chapter 11 Cases, Artha has demonstrated a disregard for the Debtors' financial well-being and a willingness to upend the Debtors' efforts for Artha's personal gain.  Specifically, Artha (i) filed *Artha Investment Partners LLC's Objection to Entry of the Proposed Fourth Interim Cash Collateral Order* [Docket No. 242], in which Artha  attempted to (incorrectly) argue that Artha is a secured creditor, (ii) filed *Artha Investment Partners LLC's Motion for Relief from the Automatic Stay, to the Extent Applicable* [Docket No. 286], in which Artha attempts to access and deplete the Debtors' insurance policies for Artha's own benefit, and (iii) threatened a prospective bidder.

54.    Indeed, the threatened bidder informed the Debtors that it did not submit a bid due to Artha's threats of litigation.  Specifically, such bidder informed the Debtors that it no longer intended to bid after a call with Artha's counsel during which Artha stated that it would oppose any bid submitted by such bidder "no matter what/regardless of [the] offer," as well as references to other possible civil actions.  The correspondence from such prospective bidder is attached hereto as **Exhibit A**.

55.    The Debtors have been forced to commit extensive time and resources to respond to Artha's uninformed actions in these cases.  As a result of the Debtors' efforts, and only after significant expenditure of estate resources, the Debtors have managed to both progress the Chapter

11 Cases, including by forcing Artha to (belatedly) send a retraction of its statement threatening the prospective bidder.

56.     Put simply, Artha made a mistake—it failed to require the Debtors to put up the collateral it alleges it was owed under the MLA.  Instead of taking accountability for this mistake, Artha has forced the Debtors to pay the price (through the expenditure of professional fees) for Artha's mistake.  The present Motion is a continuation of that effort.

*[Remainder of Page Intentionally Left Blank]*

## **CONCLUSION**

WHEREFORE, based upon the foregoing, the Committee respectfully requests that the Court deny the relief requested in the Motion and related joinder.

Dated:  May 19, 2026
       Wilmington, Delaware

**MCDERMOTT WILL & SCHULTE LLP**

*/s/ David R. Hurst*
David R. Hurst (I.D. No. 3743)
Andrew A. Mark (I.D. No. 6861)
The Brandywine Building
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
Email:    dhurst@mcdermottlaw.com
            amark@mcdermottlaw.com

-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
R. Ethan Dover (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
Email:    dazman@mcdermottlaw.com
            jbevans@mcdermottlaw.com
            edover@mcdermottlaw.com

-and-

Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone: (305) 358-3500
Email:    gsteinman@mcdermottlaw.com

*Counsel for Debtors and Debtors in Possession*