## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RELIZ TECHNOLOGY GROUP HOLDINGS INC., *et al.*,[1] | Case No. 26-10371 (TMH) |
| Debtors. | (Jointly Administered) |

## AMENDED DISCLOSURE STATEMENT RELATING TO AMENDED JOINT CHAPTER 11 PLAN OF RELIZ TECHNOLOGY GROUP HOLDINGS INC. AND ITS DEBTOR AFFILIATES

David R. Hurst (I.D. No. 3743)
Andrew A. Mark (I.D. No. 6861)
**MCDERMOTT WILL & SCHULTE LLP**
The Brandywine Building
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
Email: dhurst@mcdermottlaw.com
　　　　amark@mcdermottlaw.com

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
R. Ethan Dover (admitted *pro hac vice*)
**MCDERMOTT WILL & SCHULTE LLP**
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
Email:  dazman@mcdermottlaw.com
　　　　jbevans@mcdermottlaw.com
　　　　edover@mcdermottlaw.com

Gregg Steinman (admitted *pro hac vice*)
**MCDERMOTT WILL & SCHULTE LLP**
333 SE 2nd Ave Suite 4500
Miami, Florida 33131
Telephone: (305) 358-3500
Email:  gsteinman@mcdermottlaw.com

---

[1]　The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are: Reliz Technology Group Holdings Inc. (6265); Reliz Technologies LLC (1968); Reliz LTD (N/A); and Reliz CI LTD (N/A).  The Debtors' service address is 401 West Ontario St., Suite 400, Chicago, IL 60654.

**TABLE OF CONTENTS**

**Page**

IMPORTANT INFORMATION REGARDING THIS DISCLOSURE
    STATEMENT ................................................................................................ 1

I.      INTRODUCTION............................................................................................ 8

II.     PRELIMINARY STATEMENT ..................................................................... 8

    A.     The Sale Transaction...................................................................... 8
    B.     The GUC Trust .............................................................................. 9

III.    BACKGROUND .............................................................................................. 9

    A.     The Committee's Appointment, Investigation, and Reservation of Rights
          as to the Plan. ................................................................................ 11

IV.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE
    STATEMENT AND THE PLAN ................................................................... 12

    A.     What is chapter 11?....................................................................... 12
    B.     Why are the Debtors sending me this Disclosure Statement? .............................. 13
    C.     Am I entitled to vote on the Plan? ................................................. 13
    D.     What will I receive from the Debtors if the Plan is consummated? ..................... 14
    E.     What will I receive from the Debtors if I hold an Allowed Administrative
          Claim?........................................................................................... 18
    F.     What are the sources of Consideration and other consideration required to
          fund the Plan? .............................................................................. 19
    G.     Are any regulatory approvals required to confirm the Plan?............................... 19
    H.     What happens to my recovery if the Plan is not confirmed or does not go
          effective?...................................................................................... 20
    I.     If the Plan provides that I get a distribution, do I get it upon Confirmation
          or when the Plan goes effective, and what is meant by "Confirmation,"
          "Effective Date," and "Consummation"? ...................................... 20
    J.     Do I need to submit any "Know Your Customer" information to receive a
          distribution under the Plan? ......................................................... 20
    K.     Is there potential litigation related to the Plan? ....................................... 20
    L.     Does the Plan provide for the subordination of any Claims? ............................. 21
    M.    Will there be releases and exculpation granted to parties in interest as part
          of the Plan? .................................................................................. 21
    N.     What is the deadline to vote on the Plan?............................................. 22
    O.     How do I vote for or against the Plan? ......................................... 22
    P.     Why is the Bankruptcy Court holding a Confirmation Hearing? ........................ 23
    Q.     When is the Confirmation Hearing set to occur?.................................... 23
    R.     What is the purpose of the Confirmation Hearing? ............................. 23
    S.     What steps did the Debtors take to evaluate alternatives to a chapter 11
          filing?........................................................................................... 23
    T.     Who do I contact if I have additional questions with respect to this
          Disclosure Statement or the Plan? ............................................... 23

| V. | THE DEBTORS' PLAN | 24 |
|---|---|---|
| | A. Vesting of Assets | 24 |
| | B. Sources of Consideration for Plan Distributions | 24 |
| | C. Authority to Act and Deliver Definitive Documents | 24 |
| | D. Release of Liens | 25 |
| | E. Corporate Action | 25 |
| | F. Corporate Existence | 26 |
| | G. Dissolution of the Board of Directors | 26 |
| | H. Effectuating Documents; Further Transactions | 27 |
| | I. Cryptocurrency Rebalancing and Distributions | 27 |
| | J. Vesting of Causes of Action in GUC Trust | 27 |
| | K. Preservation of Vested Causes of Action | 28 |
| | L. Post Effective Date Debtors | 28 |
| | M. GUC Trustee | 28 |
| | N. The GUC Trust | 29 |
| | O. Corporate Existence and Dissolution | 37 |
| | P. Cancellation of Notes, Instruments, Certificates, and Other Documents | 38 |
| | Q. Effectuating Documents; Further Transactions | 38 |
| | R. Section 1146(a) Exemption | 38 |
| | S. Preservation of Rights of Action | 39 |
| | T. Releases by the Debtors | 40 |
| | U. Releases by Holders of Claims and Interests | 41 |
| | V. Exculpation | 42 |
| | W. Injunction | 42 |
| | X. Closing the Chapter 11 Cases | 42 |
| VI. | THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE | 43 |
| | A. The Debtors' Corporate Structure and History. | 43 |
| | B. The Debtors' Assets and Operations. | 44 |
| | C. The Debtors' Capital and Equity Structure. | 46 |
| VII. | EVENTS LEADING TO THE CHAPTER 11 CASES | 47 |
| | A. Market and Industry-Specific Challenges. | 47 |
| | B. Corrective Efforts and Prepetition Prospects | 50 |
| | C. Retention of Restructuring Advisors and Prepetition Sale Process | 52 |
| | D. Governance Initiatives. | 53 |
| | E. BlockFills' Decision to Commence these Chapter 11 Cases. | 54 |
| VIII. | EVENTS OF THE CHAPTER 11 CASES | 54 |
| | A. The Non-Binding Term Sheet. | 54 |
| | B. First and Second Day Relief and Other Case Matters. | 54 |
| | C. Schedules and Statements. | 56 |
| | D. Bar Date Motion. | 56 |
| | E. Litigation Matters. | 56 |
| | F. The Post-Petition Sale Process. | 57 |

IX.    RISK FACTORS ............................................................................................................ **58**

    A.    Risks Related to the Restructuring. ................................................................. 58
    B.    Risks Related to Recoveries under the Plan. ................................................... 63
    C.    Disclosure Statement Disclaimer. ................................................................... 63
    D.    Miscellaneous Risk Factors and Disclaimers. ............................................... 65

X.    SOLICITATION AND VOTING PROCEDURES ..................................................... **67**

    A.    Classes Entitled to Vote on the Plan. .............................................................. 67
    B.    Votes Required for Acceptance by a Class. ..................................................... 67
    C.    Certain Factors to Be Considered Prior to Voting. ......................................... 68
    D.    Classes Not Entitled To Vote on the Plan. ...................................................... 68
    E.    Solicitation Procedures. .................................................................................. 69
    F.    Voting Procedures. .......................................................................................... 70
    G.    Voting Tabulation. ........................................................................................... 71
    H.    Ballots Not Counted. ....................................................................................... 72

XI.    CONFIRMATION OF THE PLAN ........................................................................... **72**

    A.    Requirements of Section 1129(a) of the Bankruptcy Code. ............................ 72
    B.    Best Interests of Creditors—Liquidation Analysis. ....................................... 73
    C.    Feasibility Analysis. ........................................................................................ 74
    D.    Acceptance by Impaired Classes. .................................................................... 74
    E.    Confirmation without Acceptance by All Impaired Classes. ........................... 75

XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX
    CONSEQUENCES OF THE PLAN ........................................................................... **76**

    A.    Introduction. .................................................................................................... 76
    B.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors. ........ 78
    C.    Certain U.S. Federal Income Tax Consequences of the Plan to U.S.
    Holders of Allowed Claims Entitled to Vote. .................................................. 80

XIII.    RECOMMENDATION OF THE DEBTORS ............................................................ **87**

**EXHIBITS**

EXHIBIT A    Plan

EXHIBIT B    Liquidation Analysis

**<u>IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT</u>**
DISCLOSURE STATEMENT, DATED MAY 28, 2026

**SOLICITATION OF VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11
PLAN OF RELIZ TECHNOLOGY GROUP HOLDINGS INC.
AND ITS DEBTOR AFFILIATES**

**YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING
MATERIALS BECAUSE AS OF THE VOTING RECORD DATE, YOU HELD A CLAIM
AGAINST THE DEBTORS IN ONE OF THE FOLLOWING CLASSES AND
THEREFORE YOU ARE ENTITLED TO VOTE ON THE PLAN:**

| VOTING CLASSES | NAME OF CLASS UNDER THE PLAN |
|---|---|
| 4 | Celsius Secured Claim |
| 5 | Convenience Claims |
| 6A | General Unsecured Claims Against TopCo |
| 6B | General Unsecured Claims Against Reliz Tech |
| 6C | General Unsecured Claims Against Reliz CI |
| 6D | General Unsecured Claims Against Reliz LTD |

| DELIVERY OF BALLOTS |
|---|
| 1.  Ballots must be actually received by Kurtzman Carson Consultants, LLC d/b/a Verita Global ("<u>Verita</u>" or the "<u>Claims, Noticing, and Solicitation Agent</u>") before the Voting Deadline (<u>4:00 p.m., prevailing Eastern Time, on July 1, 2026</u>). |
| 2.  Ballots may be returned by the following methods: <br><br> a) in the enclosed pre-paid, pre-addressed return envelope; <br><br> b) via first class mail, overnight courier, or hand delivery to the address set forth below; or <br><br> c) via the Claims, Noticing, and Solicitation Agent's online voting portal, available at https://eballot.veritaglobal.net/BlockFills. <br><br> BlockFills Ballot Processing Center <br> c/o KCC dba Verita <br> 222 N. Pacific Coast Highway, Suite 300 <br> El Segundo, CA 90245 <br> If you have any questions on the procedures for voting on the Plan, as defined herein, please contact the Claims, Noticing, and Solicitation Agent by submitting an inquiry at https://VeritaGlobal.net/BlockFills/inquiry or by calling (866) 554-5810 (USA or Canada) or (781) 575-2032 (International). |

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF RELIZ TECHNOLOGY GROUP HOLDINGS INC. AND ITS DEBTOR AFFILIATES.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.  IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR

WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, THOSE HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN, OR THOSE HOLDERS OF CLAIMS AND INTERESTS WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND

SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE IX, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.   THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY.  THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS DISCLOSURE STATEMENT, NOTHING IN THIS DISCLOSURE STATEMENT CONSTITUTES A

4

**FINDING UNDER U.S. FEDERAL SECURITIES LAWS, FOREIGN SECURITIES LAWS OR ANY STATE SECURITIES LAWS AS TO WHETHER CRYPTOCURRENCY OR TRANSACTIONS INVOLVING CRYPTOCURRENCY ARE SECURITIES.  THE SEC AND ITS STAFF HAVE TAKEN THE POSITION THAT CERTAIN CRYPTOCURRENCY ASSETS AND CERTAIN TRANSACTIONS INVOLVING CRYPTOCURRENCY ASSETS FALL WITHIN THE DEFINITION OF A "SECURITY" UNDER THE U.S. FEDERAL SECURITIES LAWS.  THE DETERMINATION AS TO WHETHER A CRYPTOCURRENCY ASSET OR A TRANSACTION INVOLVING CRYPTOCURRENCY MAY CONSTITUTE A "SECURITY" UNDER APPLICABLE LAWS IS A DETERMINATION FOR THE SEC, APPLICABLE STATE AND FOREIGN REGULATORY AUTHORITIES, AND COURTS WITH PROPER JURISDICTION.**

**THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING RISKS ASSOCIATED WITH THE FOLLOWING:**

- **THE OVERALL HEALTH OF THE CRYPTOCURRENCY INDUSTRY;**

- **POPULARITY AND RATE OF ADOPTION OF CRYPTOCURRENCIES;**

- **THE DEBTORS' REGULATORY LICENSES;**

- **THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS;**

- **THE DEBTORS' TECHNOLOGY AND ABILITY TO ADAPT TO RAPID TECHNOLOGICAL CHANGE;**

- **THE RELIABILITY, STABILITY, PERFORMANCE AND SCALABILITY OF THE DEBTORS' INFRASTRUCTURE AND TECHNOLOGY;**

- **THE DEBTORS' FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;**

- **THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;**

- **THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;**

- **GENERAL ECONOMIC AND BUSINESS CONDITIONS;**

- **EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;**

- **COUNTERPARTY CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**

- **EXCHANGE RATE FLUCTUATIONS AND CRYPTOCURRENCY PRICE FLUCTUATIONS;**

- **PLANS, OBJECTIVES, AND EXPECTATIONS;**

- **RISKS IN CONNECTION WITH DISPOSITIONS; AND**

- **RISK OF INFORMATION TECHNOLOGY OR DATA SECURITY BREACHES OR OTHER CYBERATTACKS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' FUTURE PERFORMANCE.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN OTHER THAN AS REQUIRED BY APPLICABLE LAW.   THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:**

- **THE RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO PURSUE THEIR BUSINESS STRATEGIES DURING THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO MAINTAIN COMPLIANCE WITH LAWS AND REGULATIONS OR THE INTERPRETATION OR APPLICATION OF SUCH LAWS THAT CURRENTLY APPLY OR MAY BECOME APPLICABLE TO THE DEBTORS' BUSINESS BOTH IN THE UNITED STATES AND INTERNATIONALLY;**

- **CHANGES TO A PARTICULAR CRYPTOCURRENCY ASSET'S OR PRODUCT OFFERING'S STATUS AS A "SECURITY" IN ANY RELEVANT JURISDICTION UNDER RELEVANT LAWS AND REGULATIONS OR REGULATORY INTERPRETATION THEREOF;**

- **THE DIVERSION OF MANAGEMENT'S ATTENTION AS A RESULT OF THE CHAPTER 11 CASES;**

- **INCREASED LEVELS OF EMPLOYEE ATTRITION AS A RESULT OF THE CHAPTER 11 CASES;**

6

- **CUSTOMER RESPONSES TO THE CHAPTER 11 CASES;**

- **THE IMPACT OF A PROTRACTED RESTRUCTURING ON THE DEBTORS' BUSINESS;**

- **THE DEBTORS' ABILITY TO CONFIRM OR CONSUMMATE THE PLAN;**

- **THE DEBTORS' INABILITY TO PREDICT THEIR LONG-TERM LIQUIDITY REQUIREMENTS AND THE ADEQUACY OF THEIR CAPITAL RESOURCES;**

- **THE AVAILABILITY OF CASH TO MAINTAIN THE DEBTORS' OPERATIONS AND FUND EMERGENCE COSTS;**

- **RISKS ASSOCIATED WITH WEAK OR UNCERTAIN GLOBAL ECONOMIC CONDITIONS AND THEIR IMPACT ON DEMAND FOR DIGITAL ASSETS;**

- **OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS;**

- **INDUSTRY CONDITIONS, INCLUDING COMPETITION AND TECHNOLOGICAL INNOVATION;**

- **FLUCTUATIONS IN OPERATING COSTS;**

- **LEGISLATIVE OR REGULATORY REQUIREMENTS; AND**

- **FLUCTUATIONS IN INTEREST RATES, EXCHANGE RATES, AND CURRENCY VALUES.**

**YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.   THE LIQUIDATION ANALYSIS AND OTHER PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.   ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

[*Remainder of page intentionally left blank*]

## I.    INTRODUCTION

Reliz Technology Group Holdings Inc. (along with its debtor affiliates, the "Debtors," the "Company," or "BlockFills") and its debtor affiliates submit this disclosure statement (including all exhibits hereto and as may be supplemented or amended from time to time, the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the Debtors' *Amended Joint Chapter 11 Plan of Reliz Technology Group Holdings Inc. and Its Debtor Affiliates* filed substantially contemporaneously herewith (as supplemented or amended from time to time, the "Plan").  A copy of the Plan is attached hereto as **Exhibit A** and is incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.[2]

**THE DEBTORS BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS.  THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

### A.    The Sale Transaction

The Debtors filed the Chapter 11 Cases in response to macroeconomic headwinds, deteriorating digital currency markets, and liquidity constraints caused by such downturn in the cryptocurrency industry generally.  Beginning even prior to the Petition Date, the Debtors have worked tirelessly to identify the most value-maximizing transaction for their customers and other creditors on an expedited timeline.  After consulting with their advisors, creditors, and other stakeholders, the Debtors believe that pursuing (a) a sale transaction in which the Debtors sell all or substantially all of the Debtors' assets, pursuant to the Bidding Procedures, (b) multiple sale transactions of subsets of the Debtors' assets, whether through the Bidding Procedures or private sales, and/or (c) liquidation and wind down of the Debtors' estates (collectively, a "Sale Transaction") is the best way to maximize the value of the Debtors' estates for the benefit of all stakeholders.

After a comprehensive marketing process, the Debtors selected the bid submitted by Keyrock S.A. (the "Keyrock Bid").  The Keyrock Bid contemplates, subject to certain regulatory approvals, a purchase price of up to $3,250,000 and the acquisition of substantially all of the Debtors' assets, including the Debtors' proprietary technology and intellectual property, customer list, equity interests in certain non-debtor entities, and the assumption of certain liabilities.  After consulting with the Consultation Parties, the Debtors determined that the Keyrock Bid constituted

---

[2]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan or Asset Purchase Agreement, as applicable.  Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan. **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan and the documents being summarized.  In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

a Qualified Bid, as required by the Bidding Procedures Order (defined herein).  The Debtors are still negotiating the Asset Purchase Agreement with Keyrock S.A. with the intention of finalizing such agreement as soon as possible.  There has not yet been a determination regarding the allocation of the sale proceeds between the Debtors, if any.  The Debtors will seek final approval for the sale of the Debtors' assets to Keyrock S.A. on June 16, 2026.

**B.      The GUC Trust**

As more fully set forth in this Disclosure Statement and the Plan, on the Effective Date, a trust (the "GUC Trust") shall be formed for the benefit of Holders of Allowed Claims in Class 6D (the "GUC Trust Beneficiaries").  The GUC Trust shall be formed and governed pursuant to the Liquidation Trust Agreement.  Certain assets (the "GUC Trust Assets") of the Debtors, including the Debtors' assets that are not transferred to a purchaser pursuant to a Sale Transaction, certain Causes of Action, as more fully set forth in Article IV.D of the Plan (the "Vested Causes of Action"), and an amount of cash necessary to fund the operations of the GUC Trust (the "GUC Trust Reserve") shall be transferred to the GUC Trust.  The GUC Trust shall be managed by a trustee (the "GUC Trustee") and subject to an oversight committee (the "GUC Trust Oversight Committee").  The GUC Trust will conduct no business operations and will be charged with administering the GUC Trust Assets in accordance with the Liquidation Trust Agreement and the Plan, including by making distributions to the GUC Trust Beneficiaries.

**III.     BACKGROUND**

Prior to the Petition Date, BlockFills operated proprietary trading technology that offered professional and institutional customers the ability to buy and sell cryptocurrency and cryptocurrency derivatives.  Customers could execute transactions using BlockFills' front-end trading platform, application programming interface connection, or through over-the-counter trades that linked with cryptocurrency liquidity providers and market makers.  Unlike many other cryptocurrency businesses, BlockFills focused solely on institutional, high net worth, and sophisticated traders.  BlockFills did not offer its services to retail traders.  Since 2018, BlockFills had been regarded as a reputable place to do such business and was respected by its institutional investors.  BlockFills provided market access 24 hours a day, 7 days a week, to many cryptocurrency native companies and high-net worth professional traders, as well as traditional financial firms including hedge funds, brokers/broker-dealers, exchanges, crypto mining companies, investment managers, and more.

In 2022, shortly after BlockFills' Series A Round, the industry experienced significant turmoil as a major algorithmic stablecoin, Terraform Labs' UST, de-pegged and lost essentially all of its value, leading to many individual investors and industry firms experiencing significant losses.  Subsequent to those events, several industry players experienced significant losses either directly or indirectly tied to UST, which had many downstream impacts such as bankruptcies and significant counterparty risk management issues from 2022 and into 2023.  Indeed, many well-known cryptocurrency businesses have ceased to exist after the de-pegging, including Voyager, Celsius, BlockFi, FTX, and Terraform Labs.  Despite BlockFills strategically operating in unique space in the cryptocurrency industry, it was not immune to the widespread damage done to the cryptocurrency industry.

BlockFills also suffered numerous losses on account of uncontrollable contract counterparty risk, contested litigation with a now-bankruptcy cryptocurrency company, Celsius, and a failed mining hardware investment, all as more fully described in Article VI herein.

Additionally, prior to the Petition Date, on March 12, 2026, the Debtors determined, in a sound exercise of their business judgment, that it was advisable and in the best interests of the Debtors and their stakeholders to establish a special committee of the board (the "Special Committee") and to appoint a disinterested director to serve thereon. The Special Committee was delegated certain rights, authority, and powers in connection with any matters in which a conflict of interest exists or is reasonably likely to exist between the Debtors, on the one hand, and any of their current or former directors, managers, officers, investment committee members, special or other committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, or any other professionals, advisors, or related entities on the other hand (each, a "Conflicts Matter"). The board appointed Matthew Kahn to serve as the Disinterested Director. Since its inception, the Special Committee has been tasked with reviewing, negotiating, evaluating, and approving, if applicable, any Conflicts Matter and exercising certain rights, authority, and powers in connection with any Conflicts Matter, as is necessary, in the Special Committee's sole discretion. The Special Committee is represented by independent counsel, Cole Schotz P.C. ("Cole Schotz"). To date, the Debtors have complied with all discovery requests related to investigations initiated and maintained by the Special Committee.

On the first day of the Chapter 11 Cases, the Debtors filed the First Day Declaration. The First Day Declaration included as an exhibit a non-binding term sheet outlining the framework for the "NewCo Transaction," a consensual restructuring proposed by the Debtors' largest clients (the "Ad Hoc Group"). Although the framework proposed under the term sheet was a viable option for the Debtors in the Chapter 11 Cases, the Debtors, in their business judgement, wished to explore any and all value-maximizing transactions that could benefit the Debtors' estates and their creditors. To that end, the Debtors, with the assistance of Berkeley Research Group, LLC ("BRG") and their other advisors, continued their prepetition marketing efforts during these Chapter 11 Cases to canvas the market and identify interest in a transaction with a third-party investor.

Shortly after commencing the Chapter 11 Cases, the Debtors filed the Bidding Procedures Motion, which set a timeline for interested parties to submit bids for an acquisition of the Debtors' assets and procedures for conducting an auction if multiple bids were received. On April 14, 2026, the Bankruptcy Court entered the *Order (I) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (II) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (III) Approving Assumption and Assignment Procedures, (IV) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief* [Docket No. 177] ((the "Bidding Procedures Order," and the procedures approved thereby, the "Bidding Procedures") which, among others, established the Bid Deadline (as defined in the Bidding Procedures) as May 8, 2026, at 4:00 p.m., prevailing Eastern Time and set the Auction (as defined in the Bidding Procedures) for May 13, 2026 at 10:00 a.m., prevailing Eastern Time. Throughout the Sale Process, the Debtors will continue to evaluate bids received from potential transaction parties, including any bid submitted by the Ad Hoc Group, in comparison to other bids received.

The Plan allows the Debtors to pursue a sale process and ultimately effectuate a Sale Transaction.  The Plan, among other things:

- contemplates payment in full of Administrative Claims, Secured Tax Claims, Other Priority Claims, and the Celsius Secured Claim.

- provides for the distribution of Cryptocurrency, Cash, and/or interests in the GUC Trust, to the extent applicable, to Holders of Allowed Claims or Allowed Interests entitled to receive distributions under the Plan.

- creates the GUC Trust, which shall be overseen by the GUC Trust Oversight Committee and administered according to the Liquidation Trust Agreement, to, among other things, commence, litigate and settle the Vested Causes of Action and make distributions pursuant to the terms of the Plan and the Liquidation Trust Agreement.

A.    **The Committee's Appointment, Investigation, and Reservation of Rights as to the Plan.**

On March 27, 2026, the United States Trustee for the District of Delaware appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code. Docket Nos. 104; 243 ¶ 12. The seven-member Committee is currently composed of the following members: SBI VC Trade Co., Ltd., Dominion Capital LLC, Karol Przybytkowski, Jeffrey Brandt, Tod Skarecky, Energy Conversion Group, and Fuel Labs Inc. On March 30, 2026, the Committee selected Morris James LLP as its counsel, and on April 1, 2026, the Committee selected FTI Consulting, Inc. as its financial advisor. Docket No. 243 ¶ 13.

Since its appointment, the Committee, as a statutory fiduciary, has actively investigated the Debtors' financial condition, prepetition conduct, handling of customer assets, lending activities, transfers of digital assets, improper mining equipment purchases, payment of bonuses, ineffective or deficient regulatory compliance counseling, and potential estate claims relating to the approximately $100 million shortfall reflected on the Debtors' balance sheet as of the Petition Date. The Committee's investigation and diligence efforts have been made known throughout these Chapter 11 Cases through numerous filings, including Docket Nos. 139, 233, 234, 241, 243, 262, 264, 318–319, 324–327, and 331–334. The Committee initially attempted to conduct this investigation informally through requests for information and discussions with the Debtors and the Special Committee. However, the Special Committee refused to permit the Committee to participate in its investigation on the basis that the Debtors controlled the assertion and preservation of privileges relating to the Special Committee's work and that the parties' interests had diverged. *See* Docket No. 243 ¶¶ 2–3, 22, 32. As a result, the Committee sought and obtained authority pursuant to Bankruptcy Rule 2004 to conduct discovery and witness examinations of current and former directors, officers, employees, investors, lenders, and other third parties. *See* Docket Nos. 243; 314 ¶¶ 2–7.

The Committee's investigation remains ongoing, and the Committee objects to the broad scope of releases currently contemplated under the Plan pending the outcome of that investigation. The Committee believes that the proposed releases may encompass potential estate claims and causes of action that remain under active review. Accordingly, the Committee reserves all rights

11

with respect to the proposed releases and the confirmation of the Plan, including the right to object to the scope of any releases or exculpation provisions following completion of its investigation.

Celsius Network Ltd. ("Celsius") asserts that it holds a secured claim against the Debtors arising from certain prepetition lending arrangements and a June 2024 settlement transaction entered into following arbitration proceedings between Celsius and the Debtors. As reflected in the Disclosure Statement and the Debtors' schedules, the Plan currently treats Celsius as a secured creditor and contemplates payment of the "Celsius Secured Claim" under the Plan. The Committee, however, has conducted a lien investigation and identified potential deficiencies with respect to Celsius' purported secured status with respect to certain assets. The Committee is also investigating the facts and circumstances surrounding the Celsius Promissory Notes and Celsius' asserted entitlement to default interest, among other things. Accordingly, the Committee expressly reserves all rights under the Bankruptcy Code, applicable Local Rules, and the interim cash collateral framework entered in these Chapter 11 Cases to challenge the amount, validity, priority, and extent of Celsius' alleged liens and secured claim.

The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases.  The Committee is still investigating this contention and reserves all rights.  The Debtors and the Committee are engaged in settlement discussions regarding the foregoing issues and are hopeful that they will be able to resolve any outstanding issues in advance of confirmation of the Plan. Accordingly, the Debtors urge all Holders of Allowed Claims entitled to vote to accept the Plan by returning their ballots so that Verita actually receives such ballots by July 1, 2026, at 4:00 p.m., prevailing Eastern Time (the "Voting Deadline").  Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at a hearing on July 13, 2026, at 10:00 a.m., prevailing Eastern Time (the "Confirmation Hearing").

## IV.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.      **Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

C.      **Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 4 | Celsius Secured Claim | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Entitled to Vote |
| 5 | Convenience Claims | Impaired | Entitled to Vote |
| 6A | General Unsecured Claims Against TopCo | Impaired | Entitled to Vote |
| 6B | General Unsecured Claims Against Reliz Tech | Impaired | Entitled to Vote |
| 6C | General Unsecured Claims Against Reliz CI | Impaired | Entitled to Vote |
| 6D | General Unsecured Claims Against Reliz LTD | Impaired | Entitled to Vote |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 10 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

13

**D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.  Amounts in the far right column under the heading "Liquidation Recovery" are estimates only and are based on certain assumptions described herein and set forth in greater detail in the liquidation analysis attached hereto as **Exhibit B** (the "Liquidation Analysis").

**In a hypothetical liquidation under chapter 7 of the Bankruptcy Code, Holders of Class 5, 6A, 6B, 6C, and 6D Claims would likely receive a significantly reduced recovery relative to what such Holders would receive under the Plan**.  In the event of a chapter 7 liquidation, the Bankruptcy Court may appoint a trustee (the "Liquidating Trustee") to oversee and effectuate the liquidation of the Debtors' assets.  The Liquidating Trustee's fees and expenses would be paid by the Debtors and would be paid prior to any Holders of Class 5, 6A, 6B, 6C, or 6D Claims.  Given the novelty and complexity of the Debtors' business and the strong likelihood that any Liquidating Trustee appointed by the Bankruptcy Court may have minimal cryptocurrency experience, the Liquidating Trustee's fees and expenses and the anticipated reduction in value obtained through the monetization of cryptocurrency by the Liquidating Trustee would likely result in Holders of Convenience Class and General Unsecured Claims receiving significantly reduced recoveries.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE BASED ON, AMONG OTHER THINGS, ALLOWED CLAIMS ARISING FROM THE REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES AND THE RESOLUTION OF DISPUTED CLAIMS.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]**

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm) | Projected Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|
| 1 | Secured Tax Claims | Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the GUC Trust, payment in full in Cash of such Holder's Allowed Secured | $0 | N/A | N/A |

---

[3]     The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm) | Projected Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|
| | | Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired. | | | |
| 2 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the GUC Trust, payment in full in Cash of such Holder's Allowed Other Secured Claim or such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired. | $0 | N/A | N/A |
| 3 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the GUC Trust, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. | $3.0 | 100% | 100% |
| 4 | Celsius Secured Claim | The Holder of the Allowed Celsius Secured Claim shall receive, in full and final satisfaction of such Allowed Celsius Secured Claim, at the option of the GUC Trust and subject to the terms of the Bidding Procedures Order and the Cash Collateral Order, payment in full in Cash of such Holder's Allowed Celsius Secured Claim or such other treatment rendering such Holder's Allowed Celsius Secured Claim Unimpaired, | $5.6 | 100% | 100% |

15

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm) | Projected Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|
| | | except to the extent that the Debtors and such Holder of an Allowed Celsius Secured Claim agree in writing to less favorable treatment; *provided*, the Holder of the Allowed Celsius Secured Claim shall first recover from the assets of TopCo and Reliz Tech before receiving any recovery from the assets of Reliz LTD. | | | |
| 5 | Convenience Claims | Each Holder of an Allowed Convenience Claim will receive in full and final satisfaction of such Holder's Allowed Convenience Claim, such Holder's Pro rata share of the Convenience Class Recovery Pool. | $1.1 | 78% | 10% |
| 6A | General Unsecured Claims Against TopCo | Each Holder of an Allowed General Unsecured Claim Against TopCo will receive, in full and final satisfaction of such Holder's General Unsecured Claim, such Holder's Pro Rata share of the TopCo Distributable Assets and the Series A GUC Trust Interests. | $7.2 | 0% | 0% |
| 6B | General Unsecured Claims Against Reliz Tech | Each Holder of an Allowed General Unsecured Claim Against Reliz Tech will receive, in full and final satisfaction of such Holder's General Unsecured Claim, such Holder's Pro Rata share of the Reliz Tech Distributable Assets and the Series B GUC Trust Interests. | $0.0 | 0% | 0% |
| 6C | General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim Against Reliz CI will receive, in | $0 | N/A | N/A |

16

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm) | Projected Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|
| | Against Reliz CI | full and final satisfaction of such Holder's General Unsecured Claim, such Holder's Pro Rata share of the Reliz CI Distributable Assets and the Series C GUC Trust Interests. | | | |
| 6D | General Unsecured Claims Against Reliz LTD | Each Holder of an Allowed General Unsecured Claim Against Reliz LTD will receive, in full and final satisfaction of such Holder's General Unsecured Claim, such Holder's Pro Rata share of the Reliz LTD Distributable Assets and the Series D GUC Trust Interests. | $174.3 | 12%–14% | 10% |
| 7 | Section 510(b) Claims | Each Section 510(b) Claim will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such 510(b) Claim. | $0 | N/A | N/A |
| 8 | Intercompany Claims | Each Allowed Intercompany Claim shall be Reinstated, distributed, contributed, set off, settled, cancelled or released, or otherwise addressed at the option of the GUC Trustee. | $0 | N/A | N/A |
| 9 | Intercompany Interests | On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled. | $0 | N/A | N/A |

17

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm) | Projected Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|
| 10 | Existing Equity Interests | Without the need for any further corporate or limited liability company action or approval or any board of directors, board of manager, members, shareholders, or officers of any Debtor, as appliable, all Existing Equity Interests shall be cancelled, released, and extinguished without any distribution, and will be of no further force or effect, and each Holder of an Existing Equity Interest shall not receive or retain any distribution, property, or other value on account of such Existing Equity Interest. | $0 | N/A | N/A |

E.   **What will I receive from the Debtors if I hold an Allowed Administrative Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  The chart below summarizes the various unclassified claims and provides the relevant section of the Plan that addresses their treatment:

| Claim | Description of Claim | Plan Section |
|---|---|---|
| Administrative Claims | A Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and on or before the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims.  For the avoidance of doubt, any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned in full to the sender. | Article II, Section A |
| Professional Fee Claims | Any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. | Article II, Section B |
| Priority Tax Claims | Any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code. | Article II, Section C |

F.    **What are the sources of Consideration and other consideration required to fund the Plan?**

The Debtors and GUC Trust, as applicable, will fund distributions under the Plan with (i) Cash on hand and Cryptocurrency on hand on the Effective Date; (ii) proceeds from the sale of the Debtors' assets pursuant to the Bidding Procedures and/or Asset Purchase Agreement, if any; (iii) the revenues and proceeds of all assets of the Debtors that are not transferred or assigned to the Purchaser, and (v) the GUC Trust Assets, including proceeds from all Causes of Action not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date; *provided*, that cash proceeds from the sale of the Debtors' assets pursuant to the Bidding Procedures shall be paid in accordance with the Bidding Procedures Order subject to the Cash Collateral Order.

Notwithstanding anything to the contrary in the Plan or in the Asset Purchase Agreement, on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under the Plan on or prior to the Effective Date shall vest in the GUC Trust and shall be subject to administration by the GUC Trustee.

G.    **Are any regulatory approvals required to confirm the Plan?**

The Debtors are continuing to analyze whether regulatory approvals are required to consummate the Plan.  To the extent any such regulatory approvals or other authorizations,

consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

H.     **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to consummate any transaction contemplated herein.  It is possible that any alternative transaction may provide Holders of Allowed Claims and Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article XI.B of this Disclosure Statement, titled "Best Interests of Creditors—Liquidation Analysis" and the Liquidation Analysis attached hereto as **Exhibit B**.

I.     **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"— or as soon as practicable thereafter, as specified in the Plan.  *See* Article IX of the Plan for a description of the conditions precedent to consummation of the Plan.

J.     **Do I need to submit any "Know Your Customer" information to receive a distribution under the Plan?**

Distributions will ultimately be effectuated by the GUC Trustee.  As a result, to the extent any Know Your Customer ("KYC") information is needed to facilitate your distribution, the GUC Trustee will provide you advanced notice outlining what KYC information you must provide to receive your distribution.

K.     **Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which could potentially lead to litigation.

As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their business and could become parties to additional litigation in the future.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Holders of Class 5, 6A, 6B, 6C, or 6D Claims could change, and such changes could be material.

The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages.  An increase in the estimated

amount of rejection damages claims could result in reduced recoveries for Holders of Convenience Claims or General Unsecured Claims. Finally, the Debtors may object to certain Proofs of Claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change. These changes could affect recoveries to Holders of Allowed Convenience Claims or General Unsecured Claims, and such changes could be material.

**L.       Does the Plan provide for the subordination of any Claims?**

The Plan does not contemplate the subordination of any claims. However, the Debtors and the GUC Trust reserve the right to reclassify and/or subordinate any Allowed Claim or Allowed Interest, pursuant to section 510(b) of the Bankruptcy Code, in accordance with any contractual, legal, or equitable subordination, as outlined in Article III.F of the Plan.

**M.       Will there be releases and exculpation granted to parties in interest as part of the Plan?[4]**

Yes, Article VIII of the Plan proposes to provide certain releases to the Released Parties and also provides for exculpation of the Exculpated Parties. The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article V.K. and Article V.L of this Disclosure Statement.

Under Article I of the Plan, Released Parties are defined as follows:

"*Released Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Committee, and each of the members thereof in their capacity as such; (c) the Purchaser, if any, and only in Purchaser's capacity as such; and (d) the Related Parties of each of the foregoing Entities in clauses (a) through (c) of this definition to the fullest extent permitted by law; *provided that*, in each case, to the extent an Entity is entitled to vote on the Plan, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases described in Article VIII.B hereof or (y) timely objects to the releases contained in Article VIII.B hereof and such objection is not resolved before Confirmation; *provided further that*, any such inclusion of the foregoing Entities in clauses (a) through (d) of this definition is expressly subject to and dependent on the outcome of the ongoing Special Committee Investigation.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' chapter 11 process through, among other things, efforts to market and sell the Debtors' assets and negotiate and implement the Plan, which will maximize value for the benefit of all parties in interest.

---

[4]   The Special Committee's investigation is ongoing, and so is the Committee's investigation. The releases contemplated in the Plan, including without limitation the release of the Debtors and the scope of the Released Parties, is subject in all respect to the conclusion of the Special Committee's investigation, as well as the Commmittee's and the Special Committee's ultimate determination with respect to any potential Claims or Causes of Action, if any, identified therein, and the Debtors expressly reserve the right to determine prior to Confirmation of the Plan not to release and to bring any such Claims or Causes of Action. The Committee reserves all rights to object or otherwise participate in the evaluation of the same, upon the conclusion of its investigation.

You may have claims against certain of the foregoing parties that are not Debtors in the Chapter 11 Cases.  Article VIII of the Plan provides that you may not bring claims against these non-Debtor parties unless you affirmatively elect to opt out of the releases of the Plan by (a) checking the appropriate box on such Holder's timely and properly submitted applicable ballot or notice of non-voting status indicating that they opt not to grant the releases provided for in the Plan or (b) timely filing an objection to the Plan's release provisions, provided such objection is not resolved before Confirmation.

The Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

**ALL HOLDERS OF CLAIMS THAT (I) VOTE TO ACCEPT THE PLAN; (II) ARE DEEMED TO ACCEPT THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASE PROVIDED FOR IN THE PLAN BY CHECKING THE BOX ON THE APPLICABLE NOTICE OF NON-VOTING STATUS INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (III) ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED FOR IN THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED FOR IN THE PLAN; AND (IV) VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED FOR IN THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT OR NOTICE OF NON-VOTING STATUS INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED FOR IN THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES, INCLUDING THE DEBTORS OR THE POST EFFECTIVE DATE DEBTORS, AS APPLICABLE.**

N.      **What is the deadline to vote on the Plan?**

The Voting Deadline is July 1, 2026, at 4:00 p.m., prevailing Eastern Time.

O.      **How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  To be counted as votes to accept or reject the Plan, each ballot (a "Ballot") must be properly executed, completed, and delivered in accordance with the instructions provided such that a vote cast is **actually received** before the Voting Deadline by Verita.  *See* Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR**

**OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL NOT BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.**

**P.    Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**Q.    When is the Confirmation Hearing set to occur?**

The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing for July 13, 2026, at 10:00 a.m., prevailing Eastern Time. The Confirmation Hearing may be adjourned from time to time without further notice. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by July 1, 2026, at 4:00 p.m., prevailing Eastern Time in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, national edition of *The Wall Street Journal*, *The New York Times*, or *USA Today* to provide notification to those persons who may not receive notice by mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**R.    What is the purpose of the Confirmation Hearing?**

The confirmation of a plan by a bankruptcy court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

**S.    What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?**

As described in Article VII herein, as well as in the First Day Declaration, prior to the Petition Date, the Debtors evaluated numerous potential alternatives, including options relating to mergers, sales, capital raising, operational changes, and consensual recapitalizations, to provide stability and requisite capitalization to their business enterprise in light of significant market volatility.

**T.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims, Noticing, and Solicitation Agent:

By electronic mail at:
www.veritaglobal.net/BlockFills/inquiry.

By telephone at:
(866) 554-5810 (USA or Canada) or +1 (781)575-2032 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' Claims, Noticing, and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims, Noticing, and Solicitation Agent at https://www.veritaglobal.net/BlockFills (free of charge) or the Bankruptcy Court's website at https://www.deb.uscourts.gov/ (for a fee).

## V.    THE DEBTORS' PLAN

### A.    Vesting of Assets

Except as otherwise provided in the Plan, the Confirmation Order, the Asset Purchase Agreement (if any), or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, the assets of the Debtors that are not transferred to the Purchaser pursuant to the Asset Purchase Agreement, if any, shall vest in the GUC Trust free and clear of all Liens, Claims, charges, or other encumbrances.

### B.    Sources of Consideration for Plan Distributions

The Debtors and GUC Trust, as applicable, will fund distributions under the Plan with (i) Cash and Cryptocurrency on hand on the Effective Date; (ii) proceeds from the sale of the Debtors' assets pursuant to the Bidding Procedures and/or Asset Purchase Agreement, if any; (iii) the revenues and proceeds of all assets of the Debtors that are not transferred or assigned to the Purchaser, and (iv) the GUC Trust Assets, including proceeds from all Causes of Action not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date; *provided*, that cash proceeds from the sale of the Debtors' assets pursuant to the Bidding Procedures shall be paid in accordance with the Bidding Procedures Order subject to the Cash Collateral Order.

Notwithstanding anything to the contrary in the Plan or in the Asset Purchase Agreement (if any), on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under the Plan on or prior to the Effective Date shall vest in the GUC Trust and shall be subject to administration by the GUC Trustee.

### C.    Authority to Act and Deliver Definitive Documents

On or before the Effective Date, the applicable Debtors will take any action as may be necessary or advisable to effectuate the Sale Transaction and the other transactions described in

the Plan, including, as applicable: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Sale Transaction and the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Sale Transaction and the Plan; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) the transfer or distribution of any Cryptocurrency or Cash; (5) the execution and delivery of the Liquidation Trust Agreement; (6) any transactions necessary or appropriate to form the GUC Trust; (7) such other transactions that are required to effectuate the Sale Transaction, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (8) all transactions necessary to provide for the purchase of the Acquired Assets by Purchaser under the Asset Purchase Agreement; and (9) all other actions that the applicable Entities determine to be necessary or appropriate, or that are reasonably requested by the Purchaser in accordance with the Asset Purchase Agreement, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Sale Transaction.

#### D.      Release of Liens

Except as otherwise expressly provided herein or in the Confirmation Order, on the Effective Date, all Liens on any property of any Debtors, Post Effective Date Debtors shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any Debtors, Post Effective Date Debtors shall be automatically discharged and released; *provided*, that the release of liens shall not apply to any Lien on the proceeds of the sale of the Debtors' assets in accordance with the Bidding Procedures unless satisfied.

#### E.      Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including: (a) consummation of the Sale Transaction; and (b) all other actions contemplated under or necessary to implement the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or deemed necessary or desirable by the Debtors, Post Effective Date Debtors, of the GUC Trust, as applicable, before, on, or after the Effective Date involving the corporate structure of the Debtors, the Post Effective Date Debtors, or the GUC Trust, and any corporate action required by the Debtors, the Post Effective Date Debtors, or the GUC Trust in connection with the Plan or corporate structure of the Debtors, Post Effective Date Debtors, or GUC Trust shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors, the Post Effective Date Debtors, of the GUC Trust. Before, on, or after the Effective Date, the appropriate officers of the Debtors, the Post Effective Date

Debtors, or the GUC Trust, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtors or Post Effective Date Debtors.  The authorizations and approvals contemplated by Article IV.E of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### F.      Corporate Existence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Post Effective Date Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Post Effective Date Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

### G.      Dissolution of the Board of Directors

As of the Effective Date, the existing board of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor.

As of the Effective Date, the GUC Trustee shall serve as the sole shareholder of TopCo, and as the sole officer, director, and manager, as applicable, of the Post Effective Date Debtors. Subject in all respects to the terms of the Plan, the GUC Trustee shall have the power and authority to take any action necessary to wind down and dissolve any of the Post Effective Date Debtors, and shall:  (a) file a certificate of dissolution for any of the Post Effective Date Debtors, together with all other necessary corporate and company documents, to effect the dissolution of the Post Effective Date Debtors under the applicable laws of its state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors or Post Effective Date Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors, Post Effective Date Debtors, or their Estates for any tax incurred during the administration of such Debtor's or Post Effective Date Debtors' Chapter 11 Case, as determined under applicable tax laws.

The filing by the GUC Trustee of any of the Post Effective Date Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable

law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of the Post Effective Date Debtors or any of their affiliates.

### H.     Effectuating Documents; Further Transactions

Prior to the Effective Date, the Debtors and, on and after the Effective Date, the Post Effective Date Debtors and the GUC Trustee, and the officers and members thereof, are, authorized to and may issue, execute, deliver, file, or record to the extent not inconsistent with any provision of the Plan such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

### I.     Cryptocurrency Rebalancing and Distributions

Prior to the Effective Date, the Debtors shall be authorized to rebalance their Cryptocurrency portfolio to ensure that the Debtors can effectuate *pro rata* in-kind distributions of the Distributable Cryptocurrency to the extent possible and practicable according to Article III of the Plan.  Creditors entitled to receive distributions in cryptocurrency will have their claims valued in USD as of the Petition Date. Thereafter, the Debtors will determine each creditor's *pro rata* share of Distributable Assets based on the Petition Date valuation. On or prior to the Effective Date, the Debtors will rebalance their Cryptocurrency portfolio as of a date certain in order to effectuate in-kind distributions based on the *pro rata* calculation. The Debtors may effectuate such rebalancing by buying and selling Cryptocurrency and engaging in any other transaction necessary to accomplish such rebalancing.  Creditors entitled to receive Cryptocurrency will receive Cryptocurrency in the same form as the form(s) that comprises their Claim to the extent possible and practicable.  If the Debtors or Distribution Agent are unable to buy, sell, distribute, or otherwise transact with any Cryptocurrency that comprises a Claim such Claim and any distribution on such Claim will be made in Cash.[5]  The decision whether to make Distributions on account of Allowed Claims in cryptocurrency or U.S. Dollars shall be in the sole discretion of the GUC Trustee in his or her business judgment.

### J.     Vesting of Causes of Action in GUC Trust

Except as otherwise provided in the Plan, or in any agreement, instrument, or other document incorporated in the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting GUC Trust Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, transferred, or discharged pursuant to the Plan), and any property acquired by any of the Debtors under the Plan shall vest in the GUC Trust, free and clear of all Liens, Claims, charges, or other encumbrances.

---

[5]   If a Claim is asserted in currency other than U.S. Dollars (including in digital assets or Cryptocurrency), it will be deemed converted to the equivalent U.S. Dollar value: (i) in the case of foreign currency, using the conversion rate for the applicable currency at prevailing market prices as of 4:00 p.m. (prevailing Central Time) on the Petition Date; and (ii) in the case of digital assets or Cryptocurrency, using the prevailing market prices listed as of 4:00 p.m. (prevailing Central Time) on the Petition Date.

K.      **Preservation of Vested Causes of Action**

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors shall convey to the GUC Trustee all rights to commence, prosecute, or settle, as appropriate, any and all Vested Causes of Action, whether arising before or after the Petition Date, which shall vest in the GUC Trustee pursuant to the terms of the Plan. The GUC Trustee may enforce all rights to commence, prosecute, or settle, as appropriate, any and all Vested Causes of Action, whether arising before or after the Petition Date, and the GUC Trustee's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The GUC Trustee may, in its reasonable business judgment, pursue such Vested Causes of Action and may retain and compensate professionals in the analysis or pursuit of such Vested Causes of Action to the extent the GUC Trustee deems appropriate, including on a contingency fee basis.

No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the GUC Trustee will not pursue any and all available Causes of Action against them. The Debtors, Post Effective Date Debtors, and the GUC Trustee expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Vested Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the GUC Trustee expressly reserves all Vested Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Vested Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. The GUC Trustee reserves and shall retain the foregoing Vested Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. The GUC Trustee shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Vested Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to, or action, order, or approval of, the Bankruptcy Court; *provided, however,* that pursuant to Fed. R. Civ. P. 23.1, to the extent applicable through Bankruptcy Rule 7023.1, any derivative action may be settled, voluntarily dismissed, or compromised only with the Bankruptcy Court's approval.

L.      **Post Effective Date Debtors**

On and after the Effective Date, the Post Effective Date Debtors shall continue in existence for purposes of, among other things, complying with their continuing obligations under the Asset Purchase Agreement, if any.

M.      **GUC Trustee**

The GUC Trustee shall act for the Post Effective Date Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are

28

deemed amended by the Plan to permit and authorize the same). From and after the Effective Date, the GUC Trustee shall be the sole representative of, and shall act for, the Post Effective Date Debtors. The foregoing shall not limit the authority of the Post Effective Date Debtors or the GUC Trustee, as applicable, to continue the employment of any former manager, officer, or professional including pursuant to any transition services agreement entered into on or after the Effective Date by and between the Post Effective Date Debtors and the Purchaser.

### N.    The GUC Trust

On the Effective Date the GUC Trust shall be formed for the benefit of the GUC Trust Beneficiaries and each of the Debtors shall transfer the GUC Trust Assets for distribution in accordance with the terms of the Plan. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

#### 1.    *Establishment of a GUC Trust*

Pursuant to the Liquidation Trust Agreement, the GUC Trust will be established. The GUC Trust shall be a successor to the Debtors' rights, title, and interest to the GUC Trust Assets. Subject to Delaware law, the GUC Trust will be charged with administering the GUC Trust Assets in accordance with the Liquidation Trust Agreement and the Plan. The GUC Trust shall be managed by the GUC Trustee and shall be subject to the GUC Trust Oversight Committee. For the avoidance of doubt, the GUC Trust shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset. The GUC Trust shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the GUC Trust Assets shall, subject to the Liquidation Trust Agreement, be transferred to and vest in the GUC Trust. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the GUC Trust specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the GUC Trust and the GUC Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Liquidation Trust Agreement, compromise or settle any GUC Trust Assets transferred to the GUC Trust. On and after the Effective Date, the GUC Trust and the GUC Trustee may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any GUC Trust Assets transferred to the GUC Trust or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the GUC Trust and the GUC Trustee on or after the Effective Date, except as otherwise expressly provided herein and in the Liquidation Trust Agreement. The GUC Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

The GUC Trust shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors, as applicable, in any Causes of Action pending before the Bankruptcy Court or any other court that relate to a GUC Trust Asset without the need for filing any motion for such relief.  On the Effective Date, the Debtors and the GUC Trustee shall execute the Liquidation Trust Agreement and shall have established the GUC Trust pursuant hereto.  In the event of any conflict between the terms of Article IV.O of the Plan and the terms of the Liquidation Trust Agreement, the terms of the Liquidation Trust Agreement shall control.

### 2. *GUC Trust Assets*

Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional GUC Trust Assets become available, the Debtors shall be deemed, subject to the Liquidation Trust Agreement, to have automatically transferred to the GUC Trust all of their right, title, and interest in and to all of the GUC Trust Assets, in accordance with section 1141 of the Bankruptcy Code.  All such assets shall automatically vest in the GUC Trust free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Interests as set forth herein and the expenses of the GUC Trust as set forth herein and in the Liquidation Trust Agreement.  Thereupon, the Debtors shall have no interest in or with respect to the GUC Trust Assets or the GUC Trust.

### 3. *Treatment of GUC Trust for Federal Income Tax Purposes; No Successor-in-Interest*

The GUC Trust shall be established for the primary purpose of liquidating and distributing the GUC Trust Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the GUC Trust. Accordingly, the GUC Trustee may, in an expeditious but orderly manner, liquidate the GUC Trust Assets, make timely distributions to the GUC Trust Beneficiaries and not unduly prolong its duration.  The GUC Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the GUC Trust Agreement.  The record holders of beneficial interests shall be recorded and set forth in a register maintained by the GUC Trust expressly for such purpose.

The GUC Trust is intended to qualify as a "grantor trust" for federal income tax purposes to the extent reasonably practicable, with the GUC Trust Beneficiaries treated as grantors and owners of the GUC Trust.  However, with respect to any of the assets of the GUC Trust that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

**4.** *Appointment of GUC Trustee*

The GUC Trustee shall be selected by Debtors, in consultation with the Committee, and shall be identified in the Plan Supplement. The appointment of the GUC Trustee shall be approved in the Confirmation Order, and the GUC Trustee's duties shall commence as of the Effective Date. The GUC Trustee shall administer the distributions to the GUC Trust Beneficiaries and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Vested Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan.

In accordance with the Liquidation Trust Agreement, the GUC Trustee shall serve in such capacity through the earlier of (i) the date on which the GUC Trust is dissolved in accordance with the Liquidation Trust Agreement, and (ii) the date on which a GUC Trustee resigns, is terminated, or is otherwise unable to serve; *provided*, *however*, that, in the event that a GUC Trustee resigns, is terminated, or is otherwise unable to serve, the GUC Trust Oversight Committee shall appoint a successor to serve as a GUC Trustee in accordance with the Liquidation Trust Agreement. If the GUC Trust Oversight Committee does not appoint a successor within the time periods specified in the Liquidation Trust Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the GUC Trust, shall approve a successor to serve as a GUC Trustee.

**5.** *Responsibilities of GUC Trustee*

Responsibilities of the GUC Trustee shall be as identified in the Liquidation Trust Agreement and shall include, but are not limited to:

> **(a)** implementing implementing the GUC Trust, and making distributions contemplated by the Plan;

31

**(b)**    marshalling or marketing for sale any of the Debtors' assets constituting GUC Trust Assets;

**(c)**    overseeing the accounts of the Post Effective Date Debtors and the GUC Trust and the wind down and dissolution of the Post Effective Date Debtors and the GUC Trust;

**(d)**    receiving, maintaining, conserving, supervising, prosecuting, collecting, settling, managing, investing, protecting, and where appropriate, causing the GUC Trust to abandon the GUC Trust Assets, including causing the GUC Trust to invest any moneys held as GUC Trust Assets;

**(e)**    opening and maintaining bank accounts on behalf of or in the name of the Post Effective Date Debtors or the GUC Trust, including, in the GUC Trustee's discretion, separate bank accounts for each of the Post Effective Date Debtors;

**(f)**    entering into any agreement or executing any document or instrument required by or consistent with the Plan, the Confirmation Order, or the Liquidation Trust Agreement, and to perform all obligations thereunder;

**(g)**    collecting and liquidating all GUC Trust Assets, including the sale of any GUC Trust Assets;

**(h)**    protecting and enforcing the rights to the GUC Trust Assets (including any Vested Causes of Action) by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

**(i)**    investigating any GUC Trust Assets, and any other potential Vested Causes of Action;

**(j)**    reviewing, reconciling, compromising, settling, objecting, or prosecuting Claims or Interests of any kind;

**(k)**    seeking the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004;

**(l)**    retaining professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to the Liquidation Trust Agreement and paying the reasonable compensation thereof;

**(m)**    paying all lawful expenses, debts, charges, taxes, and other liabilities, and making all other payments relating to the GUC Trust Assets, solely out of GUC Trust Assets;

**(n)**    prosecuting and settling the Vested Causes of Action;

32

**(o)** reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Vested Causes of Action;

**(p)** acquiring litigation and other claims related to the Post Effective Date Debtors, and prosecuting such claims;

**(q)** reviewing and compelling turnover of the Post Effective Date Debtors' or the GUC Trust's property;

**(r)** calculating and making all distributions to the holders of Allowed Claims against each Debtor and, solely to the extent of payment in full of Allowed Claims, to holders of Allowed Interests, as provided for in, or contemplated by, the Plan and the Liquidation Trust Agreement; *provided* that because the Plan does not substantively consolidate the Debtors' Estates, the GUC Trustee shall make distributions from the GUC Trust Assets to the holders of Claims and Interests (if applicable) against that specific Debtor;

**(s)** establishing, administering, adjusting, and maintaining the GUC Trust Reserve and the Disputed Claims Reserve;

**(t)** withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the GUC Trustee has determined, based upon the advice of his agents or professionals, may be required to be withheld from such Distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

**(u)** in reliance upon the Debtors' Schedules, the official Claims Register maintained in the Chapter 11 Cases and the Debtors' filed lists of equity security holders, reviewing, and where appropriate, allowing or objecting to Claims and (if applicable) Interests, and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and (if applicable) Disputed Interests required to be administered by the GUC Trust;

**(v)**   making all tax withholdings, filing tax information returns, filing and prosecuting tax refunds claims, making tax elections by and on behalf of the Post Effective Date Debtors or the GUC Trust, and filing tax returns for the Post Effective Date Debtors or the GUC Trust pursuant to and in accordance with the Plan, and paying taxes, if any, payable for and on behalf of the Post Effective Date Debtors or the GUC Trust, as applicable; *provided, however*, the GUC Trustee shall not have any responsibility or personal liability in any capacity whatsoever for the signing or accuracy of the Post Effective Date Debtors' income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto;

**(w)**   abandoning or donating to a charitable organization qualifying under IRC section 501(c)(3) any GUC Trust Assets that the GUC Trustee determines to be too impractical to distribute or of inconsequential value;

**(x)**   seeking a determination of tax liability or refund under Bankruptcy Code section 505;

**(y)**   establishing reserves for taxes, assessments, and other expenses of administration of the Post Effective Date Debtors or the GUC Trust as may be necessary and appropriate for the proper operation of matters incident to the Post Effective Date Debtors or the GUC Trust;

**(z)**   paying GUC Trust Expenses;

**(aa)**   if the GUC Trustee deems appropriate in the GUC Trustee's sole discretion, seek to establish a bar date for filing proofs of Interest in any Post Effective Date Debtor or otherwise to determine the holders and extent of Allowed Interests in any Post Effective Date Debtor;

**(bb)**   purchasing and carrying all insurance policies that the GUC Trustee deems reasonably necessary or advisable and paying all associated insurance premiums and costs;

**(cc)**   undertaking all administrative functions remaining in the Chapter 11 Cases to the extent necessary to carry out the Post Effective Date Debtors', the GUC Trust's, or the GUC Trustee's duties under the Plan, including reporting and making required payments of fees to the U.S. Trustee and overseeing the closing of the Chapter 11 Cases;

**(dd)**   retaining, terminating, appointing, hiring, or otherwise employees, personnel, management, and directors at any of the Debtors to the extent necessary to carry out the purposes of this Agreement and the Plan, including, without limitation, to address any disputes between the Post Effective Date Debtors;

34

**(ee)** exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and the Liquidation Trust Agreement; and

**(ff)** taking all other actions consistent with the provisions of the Plan and the Liquidation Trust Agreement that the GUC Trustee deems reasonably necessary or desirable to administer the Post Effective Date Debtors and the GUC Trust.

### 6. *The GUC Trust Oversight Committee*

The GUC Trust Oversight Committee shall consist of those parties selected by the Committee, after consultation with the Debtors, and identified in the Plan Supplement, and which at no time shall consist of greater than three members.

The GUC Trust Oversight Committee shall have the responsibility to review and advise the GUC Trustee with respect to the liquidation and distribution of the GUC Trust Assets transferred to the GUC Trust in accordance herewith and the Liquidation Trust Agreement. For the avoidance of doubt, in advising the GUC Trustee, the GUC Trust Oversight Committee shall maintain the same fiduciary responsibilities as the GUC Trustee. Vacancies on the GUC Trust Oversight Committee shall be filled by a Person designated by the GUC Trustee, subject to the unanimous consent of the remaining member or members of the GUC Trust Oversight Committee. The GUC Trustee shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the GUC Trust Oversight Committee for cause. Members of the GUC Trust Oversight Committee shall not receive any compensation for their services, however, they shall be reimbursed for all actual, necessary expenses incurred in connection with their services provided to the GUC Trust Oversight Committee.

### 7. *Funding of the GUC Trust Reserve and Expenses of GUC Trust*

Prior to the Effective Date, the Debtors shall establish the GUC Trust Reserve funded with Cash.

The GUC Trust Expenses shall be paid from the GUC Trust Assets.

### 8. *Insurance; Bond*

The GUC Trustee may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the GUC Trustee and the GUC Trust Oversight Committee under the Liquidation Trust Agreement. Unless otherwise agreed to by the GUC Trust Oversight Committee, the GUC Trustee shall serve with a bond, the terms of which shall be agreed to by the GUC Trust Oversight Committee, and the cost and expense of which shall be paid by the GUC Trust.

### 9. *Fiduciary Duties of the GUC Trustee*

Pursuant to the Plan and the Liquidation Trust Agreement, the GUC Trustee shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims that will receive distributions pursuant to Plan.

### 10. *Termination of the GUC Trust*

The GUC Trust will terminate on the earlier of: (a) (i) the final liquidation, administration and distribution of the GUC Trust Assets in accordance with the terms of the Liquidation Trust Agreement and the Plan, and its full performance of all other duties and functions as set forth herein or in the Liquidation Trust Agreement and (ii) the Chapter 11 Cases of the Debtors have been closed; or (b) the GUC Trustee determines in its reasonable judgment that the GUC Trust lacks sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him or her under the Plan, the Confirmation Order and/or the Liquidation Trust Agreement. After (x) the final distributions pursuant to the Plan, (y) the Filing by or on behalf of the GUC Trust of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the GUC Trustee, the GUC Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

### 11. *Liability of GUC Trustee; Indemnification*

Subject to the Liquidation Trust Agreement, the GUC Trustee shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee. The GUC Trustee or the GUC Trust Oversight Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and may reasonably rely on the advice of counsel in connection therewith. Notwithstanding such authority, neither the GUC Trustee nor the GUC Trust Oversight Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the GUC Trustee, the GUC Trust Oversight Committee, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud. The GUC Trust shall indemnify and hold harmless the GUC Trust Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the GUC Trust or the Plan or the discharge of their duties hereunder; *provided*, *however*, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual fraud. Persons dealing or having any relationship with the GUC Trustee shall have recourse only to the GUC Trust Assets and shall look only to the GUC Trust Assets to satisfy any liability or other obligations incurred by the GUC Trust or the GUC Trust Oversight Committee to such Person in carrying out the terms of the Liquidation Trust Agreement, and neither the GUC Trustee nor the GUC Trust Oversight Committee, shall have any personal obligation to satisfy any such liability. The GUC Trustee and/or the GUC Trust Oversight Committee members shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no

implied covenants or obligations shall be read into the Liquidation Trust Agreement against any of them.  The GUC Trust shall promptly pay expenses reasonably incurred by the GUC Trustee, the GUC Trust Oversight Committee, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each a  "GUC Trust Party" and, collectively, the "GUC Trust Parties") in defending, participating in, or settling any action, proceeding or investigation in which such GUC Trust Party is a party or is threatened to be made a party or otherwise is participating in connection with the Liquidation Trust Agreement or the duties, acts or omissions of the GUC Trustee or otherwise in connection with the affairs of the GUC Trust, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise.  Each GUC Trust Party hereby undertakes, and the GUC Trust hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such exculpated party is not entitled to be indemnified therefor under the Liquidation Trust Agreement.  The foregoing indemnity in respect of any GUC Trust Party shall survive the termination of such GUC Trust Party from the capacity for which they are indemnified.

### 12.    *No Liability of the GUC Trust*

On and after the Effective Date, the GUC Trust shall have no liability on account of any Claims or Interests except as set forth herein and in the Liquidation Trust Agreement.  All payments and all distributions made by the GUC Trustee hereunder shall be in exchange for all Claims or Interests against the Debtors.

### O.    Corporate Existence and Dissolution

Except as otherwise provided in the Plan, each Debtor, as a Post Effective Date Debtor, shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) in effect prior to the Effective Date, except to the extent such certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) are amended pursuant to the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings under applicable state or federal law).

On and after the Effective Date, the Post Effective Date Debtors or the GUC Trust (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and (2) shall be deemed to have cancelled pursuant to the Plan all Interests, except those Intercompany Interests necessary to maintain the Debtors' corporate organizational structure.

P.      **Cancellation of Notes, Instruments, Certificates, and Other Documents**

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Sale Transaction, as applicable, (including, without limitation, the Definitive Documents and the Asset Purchase Agreement), all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

Q.      **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Post Effective Date Debtors, and their directors, managers, partners, officers, authorized persons, and members thereof, and the GUC Trust and GUC Trustee are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Definitive Documents, and Asset Purchase Agreement, if applicable, in the name of and on behalf of the Debtors, the Post Effective Date Debtors, and GUC Trust, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

R.      **Section 1146(a) Exemption**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to the GUC Trust, the Purchaser, or to any other Entity) of property under the Plan, Definitive Documents, and Asset Purchase Agreement or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the GUC Trust; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Asset Purchase Agreement, shall not be subject to any stamp tax or similar tax, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax

38

or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### S.        Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, the GUC Trust shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred.  Such rights shall be preserved by the Debtors and GUC Trust and shall vest in the GUC Trust, with the GUC Trust's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and GUC Trust as of the Effective Date.

The GUC Trust may pursue such Causes of Action, as appropriate, in accordance with the best interests of the GUC Trust Beneficiaries and in accordance with the Liquidation Trust Agreement and the Plan.  **No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statements of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors or the GUC Trust, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The GUC Trust, on behalf of the Debtors and the GUC Trust, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan.**  Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the GUC Trust, on behalf of the Debtors and GUC Trust and in accordance with the Liquidation Trust Agreement, expressly reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The GUC Trust, on behalf of the Debtors, reserves and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the GUC Trust, except as otherwise provided in the Plan, including Article VIII of the Plan.  The GUC Trust, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The GUC Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan; *provided, however*, that pursuant to Fed. R. Civ. P. 23.1, to the extent applicable through Bankruptcy Rule 7023.1, any derivative action may be settled, voluntarily dismissed, or compromised only with the Bankruptcy Court's approval.

T.       **Releases by the Debtors**

**Notwithstanding anything contained in the Plan to the contrary and, in any case, subject to and dependent on the outcome of the ongoing Special Committee Investigation, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Post Effective Date Debtors, and their Estates, and in each case on behalf of themselves and their respective successors, assigns, and representatives, who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Post Effective Date Debtors, or their Estates, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, Post Effective Date Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, the Post Effective Date Debtors, or their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Post Effective Date Debtors, or their Estates (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or the Sale Transaction, any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Sale Transaction or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in Article VIII.A of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.A of the Plan:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) a bar to any of the Post Effective Date Debtors or GUC Trust or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

40

**Notwithstanding anything to the contrary contained herein, nothing in the Plan shall release, waive, or otherwise limit the rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement or the Definitive Documents.**

U.        **Releases by Holders of Claims and Interests**

**Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or Sale Transaction, any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Sale Transaction, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided that* nothing in Article VIII.B of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) a bar to any of the Releasing Parties or the Post Effective Date Debtors or the GUC Trust or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

41

V.    **Exculpation**

**Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or Sale Transaction, any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, malpractice, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

**The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan**

W.    **Injunction**

**The assets of the Post Effective Date Debtors and of the GUC Trust shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in the Plan and shall not be available for any other purpose. All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, Post Effective Date Debtors, the GUC Trust, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.**

X.    **Closing the Chapter 11 Cases**

On and after the Effective Date, the GUC Trust shall be permitted to close all of the Chapter 11 Cases of the Post Effective Date Debtors except for the Chapter 11 Case of Reliz Technology Group Holdings Inc. Once such cases are closed, all contested matters relating to any of the

Debtors or Post Effective Date Debtors, including objections to Claims or Interests and any adversary proceedings, may be administered and heard in the Chapter 11 Case of Reliz Technology Group Holdings Inc., irrespective of whether such Claims or Interests were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

## VI.    THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE

### A.    The Debtors' Corporate Structure and History.

BlockFills was founded in 2017 by Nicholas Hammer and Gordon Wallace as a digital asset brokerage services company. BlockFills started providing digital asset trading and fiat-on ramp trading access to the approximately top ten cryptocurrencies by market capitalization. With minimal capital to start the business, the primary entity in the corporate structure was Reliz Ltd., a Cayman Islands entity, which raised $250,000.00 of equity capital and a $750,000.00 line of credit for initial cryptocurrency trading operations and settlements.

As the industry grew rapidly, BlockFills expanded its services to accommodate additional digital assets that were increasing in market capitalization. BlockFills also introduced derivatives trading and collateralized lending of fiat currency and stablecoins with other digital assets pledged as collateral.

Due to the rapid expansion of the cryptocurrency industry and the many unique opportunities the industry offered, BlockFills, like many other companies in the sector, raised additional capital in 2021. In or around May 2021, BlockFills raised approximately $7 million of equity in a "Pre-Series A" round ("Pre-Series A Round"). And, in January 2022, BlockFills closed a Series A capital raise of approximately $36 million ("Series A Round"). BlockFills' Series A Round proceeds were expected to be invested largely in Bitcoin mining machines, which were to generate new bitcoin proceeds, which could be held by BlockFills or converted to U.S. Dollars, or similar, for the purposes of fulfilling daily transactional business with customers, while also obtaining a return on the invested capital.

A simplified version of the Debtors' current corporate structure is as follows:



B.    **The Debtors' Assets and Operations.**

Prior to the Petition Date, BlockFills operated proprietary trading technology that offered professional and institutional customers the ability to buy and sell cryptocurrency and cryptocurrency derivatives. Customers could execute transactions using BlockFills' front-end trading platform, application programming interface ("API") connection or through over-the-counter ("OTC") trades that linked with cryptocurrency liquidity providers. BlockFills focused solely on institutional, high net worth, and sophisticated traders. BlockFills did not offer its services to retail traders.

Since 2018, BlockFills had been regarded as a reputable place to do such business and respected for its institutional investors. BlockFills provided market access 24 hours a day and 7 days a week to many cryptocurrency native companies and high-net worth professional traders, as well as traditional financial firms including hedge funds, brokers/broker-dealers, exchanges, crypto mining companies, investment managers and more.

In 2022, shortly after BlockFills' Series A Round, the industry experienced significant turmoil as a major algorithmic stablecoin, Terraform Labs' UST, de-pegged and lost essentially all of its value, leading to many individual investors and industry firms experiencing significant losses. Subsequent to those events, several industry players experienced significant losses either directly or indirectly tied to UST, which had many downstream impacts such as bankruptcies and significant counterparty risk management issues from 2022-2023. Indeed, many well-known cryptocurrency businesses have ceased to exist after the de-pegging, including Voyager, Celsius, BlockFi, FTX, and Terraform Labs.

As a result of both the reduction in available options and overall concern with the industry, sophisticated investors were looking for a more professional platform to transact. BlockFills' reputation placed it in a unique position and in late 2023, new customers and business began to significantly increase. Prior to the Petition Date, BlockFills' suite of offerings included access to a trading platform for fiat on and off ramp settlement, cryptocurrency liquidity and trading services (including OTC), cryptocurrency options trading, collateralized lending and credit, and mining services, each as described in more detail below.

The management of cryptocurrency deposits, collateral and custody has had a number of solutions throughout BlockFills' history. BlockFills utilized, almost exclusively, Fireblocks custody technology for cryptocurrency deposits. Fireblock's infrastructure utilizes direct counterparty connectivity, whitelisting and enhanced security mechanisms, including no single-point-of-failure, which was ideal for BlockFills' security and operational needs.

1.    *Banking Rails for Fiat On and Off Ramp Settlement*

BlockFills utilized many different U.S. and non-U.S. fiat currency banking solutions. From 2018-2023, BlockFills used Silvergate Bank and Signature Bank, until their failures in March 2023. Thereafter, BlockFills sought numerous other banking solutions throughout the U.S. and abroad to ensure redundant capabilities in case further banking incidents occurred.

### 2.   *Cryptocurrency Liquidity and Trading Services*

BlockFills' proprietary and unique aggregation of liquidity capabilities created value in its trading ecosystem for customers. Aggregated liquidity refers to BlockFills' ability to consolidate order books from multiple exchanges and market makers into a unified, deep liquidity pool. BlockFills' smart order routing technology, based on building blocks from the traditional markets, sought out the best available prices across multiple exchanges and market makers so customers could execute trades optimally. Customers could also customize their liquidity providers based on their trading strategies.

BlockFills sourced cryptocurrency prices and liquidity from world-leading institutions who specialize in such offerings. Through BlockFills' proprietary technology, all market prices, feeds and liquidity were aggregated into one bespoke pricing mechanism, thus frequently offering the customer a better price and better liquidity than alternatives in the market. When the customer executed a trade, so long as the market price of the asset they were looking to transact was still available, the customer received a notification that the trade had been fully or partially executed along with any other customary transaction details.

Trades were primarily placed through BlockFills' front-end trading platform Vision Trader, which displayed a user interface with positions, credit utilization, available balances, and order controls. BlockFills also provided API access that allowed customers to connect their own platforms to integrate into BlockFills' liquidity and trading capabilities.

Each day, BlockFills fulfilled numerous settlements throughout different parts of the day. Various cryptocurrency liquidity providers have different operational procedures or settlement policies, thus only allowing settlement of transactions one or two times per day rather than bespoke settlements. Therefore, BlockFills had credit relationships with its liquidity providers, which were crucial to offer instantaneous transaction execution.

BlockFills maintained the practice of having all of the day's trading activities settled before the end of the day at 4:00 p.m. Central Time, each day, unless the trade was a derivatives trade or a borrowing and lending transaction that had a maturity in the future.

BlockFills facilitated its liquidity services by holding both cash and various cryptocurrencies. On the Petition Date, BlockFills held $29,032,742.38 in various cryptocurrencies and $291,767.62 in cash. As of the Voting Record Date (defined herein), May 21, 2026, BlockFills held $14,982,128.75 in various cryptocurrencies.

### 3.   *Derivatives Trading*

BlockFills also operated an OTC derivatives desk for qualified individuals and business entity customers in the United States (each a "Eligible Contract Participant" or "ECP"). An ECP must meet the definition under Section 1a(18) of the Commodity Exchange Act and related guidance. BlockFills also offered options products to certain non-United States professional customers.

### 4.    *Collateralized Lending and Credit Services*

Borrowing and lending cryptocurrency has been a BlockFills service offering since 2019. These loans were typically tied to lending agreements that allowed BlockFills to liquidate collateral in the event of default.

### 5.    *Crypto Mining*

BlockFills also offered services geared towards large-scale cryptocurrency miners for mining pool access, trading and OTC support, and treasury services.  Although no longer operational, debtor Reliz Technology Group Holdings, Inc. still holds an assortment of mining hardware, including the computers used to mine various cryptocurrencies, cooling equipment, and storage equipment.  The mining hardware is held in two locations in Texas and has a book value of approximately $3.2 million.[6]

### 6.    *Insurance*

BlockFills, to comply with certain regulations and to shield the Company from unexpected liability, maintains insurance policies in the ordinary course of business.  BlockFills carries one property and casualty insurance policy and two directors and officers policies.  The property and casualty insurance policy has a general liability limit of $2 million and a property limit of $551,250.  The director and officer policies have a combined policy limit of $10 million.

### C.    The Debtors' Capital and Equity Structure.

### 1.    *The Debtor's Prepetition Equity Structure.*

In May 2021, BlockFills launched the Pre-Series A Round. The Pre-Series A Round encompassed an approximately $7 million equity capital raise provided by seven (7) capital providers.

In October 2021, BlockFills began the Series A Round, with an objective to raise up to $50 million in proceeds to project BlockFills forward in its growth. At this time, peer cryptocurrency companies were raising hundreds of millions of dollars at industry-leading pace.  BlockFills closed the Series A Round in January 2022 after securing a total of approximately $36 million in proceeds across two closings dated December 2021 and January 2022.

### 2.    *The Debtors' Prepetition Capital Structure*

BlockFills entered into a settlement agreement regarding a dispute with Celsius Network Ltd. ("Celsius"), which included promissory notes to be paid consistent with a negotiated payment schedule.  The current amount outstanding to Celsius is approximately $5.6 million, which includes accrued interest.  Additionally, the Debtors have approximately $145 million of general unsecured debt.[7]

---

[6]    The fair market value of the mining equipment has not been determined, BlockFills has not solicited any equipment appraisals. Further, any appraisal would be highly speculative and depend on the state of various cryptocurrency markets.

[7]    The Debtors' description herein of the amounts owing to certain creditors is an approximation and is not an admission to the validity of such amounts

VII.    **EVENTS LEADING TO THE CHAPTER 11 CASES**

A.    **Market and Industry-Specific Challenges.**

1.    *Exposure to Loan Counterparties*

From 2022 through 2025, BlockFills was exposed to several counterparty bankruptcies and disputes from various industry relationships.  BlockFills had constantly changing exposure to specific loan counterparties, as well as trading and lending partners.  Most of BlockFills' lending activities in BlockFills' loan portfolio had reached maturity with success for both parties.  However, as discussed in greater detail below, three loans were not successful.

One borrower, Babel Finance, engaged in active borrowing and lending transactions.  BlockFills provided net 123 BTC, 500 ETH, and 5,000 USDC in loans to Babel Finance in 2022.  Babel Finance filed for its own bankruptcy in Singapore on March 6, 2023 due to its exposure to bankrupt counterparties in 2022 and 2023.  As a result, BlockFills' assets on loan to Babel Finance, valued at approximately $8.5 million, became tied up in the bankruptcy. BlockFills determined that Babel Finance would not be able to repay the loan.

Another borrower, Clark Sharp & Reynolds ("Coinsource"), was a bitcoin ATM company serving customers throughout the United States with access to buying and selling bitcoin and other digital assets. In 2022, BlockFills provided a 50 BTC loan to Coinsource, valued at approximately $1 million at the time.  Coinsource defaulted on the loan. Although BlockFills obtained a judgment for $1.75 million, the judgement remains unsatisfied.  The value of BlockFills' 50 Bitcoin at the time of the Petition Date is approximately $3.6 million.

Another loan was provided by BlockFills in partnership with Nexo Capital Inc. ("Nexo").  Nexo is a financing partner and equity shareholder in BlockFills.  The proceeds of the loan were used by BlockFills in connection with an Equipment Loan for Lease to AEXA Digital Infrastructure ("AEXA").  AEXA was a cryptocurrency mining company, backed by multi-billion dollar private equity investor RedBird Capital Partners ("RedBird").  Both BlockFills and its financing partner, Nexo, found this opportunity to be particularly interesting due to its 50% loan to value, the upfront capital commitment by AEXA, and AEXA's ability to call up to $100 million of capital from RedBird in its operating agreement.  AEXA began experiencing financial hardship in 2022 due to the decreasing profitability of cryptocurrency mining and subsequent mining delays.  At that time, AEXA began to miss the required weekly payments to BlockFills. BlockFills sought to work with AEXA and provided numerous periods for delayed payments and communication on future financial health.  After several calls and emails, BlockFills provided options for repayment.  AEXA, as well as the directors of RedBird, agreed to pay the remaining principal without penalty or default interest accrual.

BlockFills was generally satisfied with this solution and requested AEXA make the payment in full by November 8, 2022.  BlockFills expected to recoup approximately $8 million even though $14.75 million was owed for all remaining principal and interest payments.  On November 8, 2022, AEXA informed BlockFills that it wished to pay only $3 million and terminate the agreement.  BlockFills rejected AEXA's proposal, and AEXA subsequently filed for bankruptcy.  Prior to filing for bankruptcy, AEXA provided $3 million in payments to vendors and

director compensation.  The trustee for the AEXA bankruptcy is investigating misappropriation of payments.

As a result of AEXA's inability to repay BlockFills, a dispute arose between Nexo and BlockFills with respect to BlockFills' obligations to repay Nexo.  In late 2024, BlockFills settled with Nexo and paid approximately $12 million concerning the AEXA transaction, severely weakening BlockFills' balance sheet and liquidity.

## 2. *Celsius Transaction and Arbitration*

Additionally, BlockFills engaged in a one-off transaction with Celsius, a now-bankrupt cryptocurrency company. BlockFills and Celsius had a borrowing and lending relationship starting in 2019.  In late 2019, BlockFills was approached by Celsius to participate in a transaction where BlockFills borrowed Ethereum ("ETH"), collateralized by U.S. Dollars, for the purpose of then co-investing the ETH into the Grayscale Ethereum Trust. The parties executed a term sheet (the "Celsius Term Sheet").

The Grayscale Ethereum Trust product has lock-ups and pricing premiums, but if BlockFills and Celsius committed significant capital then there could be arbitrage opportunities if the market economics remained positive throughout the lock-up period.

BlockFills and Celsius elected to participate together, and the parties entered into a Digital Asset Lending Agreement on December 3, 2019 (the "Celsius Digital Asset Lending Agreement"). BlockFills created a brokerage account, borrowed ETH, and posted U.S. Dollars as collateral with Celsius.  The ETH was then invested into the Grayscale Ethereum Trust in return for shares of the Trust.  When the lock-up period was over, BlockFills and Celsius agreed to sell the Grayscale Ethereum Trust shares for a significant multi-million-dollar profit and settle the transaction. BlockFills followed such mutual instructions and contacted Celsius by email, asking if Celsius wanted to be compensated its portion of profits in U.S. Dollars or Ethereum.

Celsius did not reply for multiple weeks.  Eventually, after BlockFills contacted Celsius again, a Celsius staff member responded and requested the return of the initial amount of ETH, in addition to Celsius' portion of the successful proceeds from selling the shares, which was inconsistent with the terms of the mutually executed term sheet.  As a result, a dispute arose between the parties and in May 2021, Celsius and BlockFills commenced arbitration in the United Kingdom.

On July 13, 2022, Celsius and certain of its affiliates filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, jointly administered under Case No. 22-10964 (MG).

The four-day arbitration commenced on January 9, 2023. At the conclusion of the arbitration, the arbitrator awarded Celsius the entire amount of the initial ETH plus proceeds from the transaction.  In 2024, this award was upheld on appeal. Celsius demanded full payment of the arbitrator's award. Due to the unforeseen outcome of this event, BlockFills negotiated a payment schedule pursuant to the Celsius Note, wherein BlockFills was to pay $3,602,140.82 upfront with the remaining $12,651,011.70 paid over time.  The current principal amount outstanding on the Celsius Notes is approximately $4.8 million.  BlockFills has not made a payment on the Celsius Notes since its monthly payment due in August 2025.

48

### 3.    *Mining Hardware Investment*

In late 2021 and early 2022, following completion of BlockFills' Series A Round, the proceeds of the equity capital raise were deployed as planned and approved by the Board toward the acquisition of cryptocurrency mining hardware that would be placed at data sites.

Throughout 2022, the cryptocurrency mining industry experienced severe disruption, largely driven by a rapid decline in mining profitability.  This decline resulted from several factors, including unhedged exposure to rising energy costs by mining firms, which led to significant financial impairment and multiple bankruptcy filings.  These developments adversely affected nearly all industry participants because energy costs constitute a primary driver of cryptocurrency mining profitability.  As profitability deteriorated, many mining companies were forced to sell their bitcoin holdings to finance operating losses.

Nevertheless, BlockFills was able to partner with a data site.  However, when BlockFills intended to place the Bitcoin mining hardware at the data site, the data site was not ready to operate.  As a result, BlockFills was unable to activate its full mining hardware capabilities as originally anticipated.  This reduced expected revenue and extended the period before BlockFills could realize returns on its capital investment in the mining hardware, keeping liquidity tied to the mining business line for significantly longer than planned.  As a result, BlockFills did not recoup its investment in the mining business line and suffered significant losses.

### 4.    *Professional Services and One-Time Costs*

As a result of the numerous disputes, proceedings, arbitration, litigation, accounting advisory work, audit preparation, and other professional services, BlockFills incurred significant professional service expenses during the period from 2022 through 2026.  These costs were necessary to assess, analyze, and validate BlockFills' financial condition and operational capabilities as time evolved. Ultimately, traditional markets closed 2021 with double-digit growth. On the surface, it seemed like markets were beginning to recover from the COVID-19 pandemic and that the lingering effects of the pandemic would be minimal.  But discussions around a potential recession in 2022 began to materialize as inflation rose along with concerns over whether world governments could navigate a "soft landing" into a slower economic period in 2022.

### 5.    *Operational Decisions*

BlockFills was a significant recipient of new business opportunities arising from the industry-wide downturn in the digital asset sector during 2022 and 2023.  As a result, 2024 became a record year for BlockFills' business performance.  With a new presidential administration entering office and increased clarity regarding future regulatory frameworks applicable to the cryptocurrency industry, BlockFills faced favorable conditions for growth.

In response, BlockFills undertook initiatives to expand its operations, including the hiring of key personnel, the pursuit of additional jurisdictional capabilities through new licensing applications, and increased investment in marketing efforts to position the business for its next stage of development.

**6.      *Recent Lawsuits Filed Against Debtors***

In the weeks immediately preceding the commencement of these Chapter 11 Cases, certain Debtor entities and current or former directors and officers of the Debtors were named in two lawsuits (the "Customer Actions") asserting allegations including misappropriation of customer funds, conversion, breach of contract, and other fraud-based claims. *See Dominion Capital LLC v. Reliz Ltd.*, Case No. 1:26-cv-01672 (MSK) (VF) (S.D.N.Y. Feb. 27, 2026) and 1548199 Alberta Ltd. and Robert J. Bertram v. Reliz Technology Group Holdings Inc., Reliz Technologies LLC, Reliz Ltd., Reliz CI Ltd., Joseph Patrick Perry, Nicholas Hammer, and Gordon Wallace, Case No. 26-cv-02451 (MFK) (N.D. Ill. March 5, 2026).  The Customer Actions seek, among other relief, recovery of assets that the Debtors believe constitute property of the Debtors' estates.

The plaintiffs in the Customer Actions also sought emergency injunctive relief, including temporary restraining orders ("TRO").  The courts presiding over those matters granted TROs that significantly restricted the Debtors' ability to conduct aspects of their business operations and exercise control over certain assets.  The Debtors believe the restrictions imposed by the TROs created substantial operational and liquidity challenges. In particular, the Debtors faced increasing difficulty maintaining ordinary-course operations and managing their financial resources while simultaneously responding to expedited litigation demands.  Among other benefits, the Debtors seek the protections afforded by the automatic stay under the Bankruptcy Code, which will halt further litigation activity against the Debtors and prevent piecemeal attempts by individual customers to obtain or control assets that the Debtors believe constitute property of the estates.

Without the protections of chapter 11, the Debtors' liquidity position and operational stability would likely continue to deteriorate as the Debtors would have diverted substantial resources to defend the Customer Actions and address the effects of the granted TROs.  The Debtors believe that these Chapter 11 Cases will permit the orderly administration of claims relating to these assets and avoid the disruption that would result from multiple customers seeking to enforce rights outside of this process.

**B.      Corrective Efforts and Prepetition Prospects**

### 1.    *Organizational Reset and Operational Improvements*

In late summer 2025, BlockFills undertook a leadership and governance reset. The Board's goal was to add operational stability to BlockFills through risk management enhancements, a strategic refocus on the core business, and the implementation of financial controls and disciplines.

To achieve these goals, BlockFills, among other things:

> (a) implemented daily reporting of BlockFills' assets;
> (b) implemented tighter exposure oversight across lending and trading activities;
> (c) initiated the wind down of certain businesses and entities;
> (d) discontinued cryptocurrency mining activities;
> (e) refocused on principal trading and the borrowing and lending business lines;
> (f) introduced formal administrative processes;
> (g) implemented cash conservation measures and liquidity forecasting;
> (h) established enhanced measures to ensure accurate reporting; and
> (i) reduced operating expenses.

### 2.    *Prepetition Restructuring Efforts*

In 2025, prior to the appointment of Mr. Perry as Interim CEO, BlockFills engaged in efforts to raise additional capital to support continued operations and growth.  In connection with these efforts, BlockFills retained investment banking advisors and began preparations for a potential Series B equity financing.

As part of those preparations, management focused on organizing and presenting BlockFills' financial information in anticipation of commencing a formal Series B capital raise process.  During this period, however, BlockFills' 2024 financial audit experienced delays.  These delays materially impeded BlockFills' ability to access the capital markets.

In August 2025, BlockFills sought alternative strategic transactions, including a sale of BlockFills or a broader capital restructuring.  At this time, BlockFills retained BRG and Katten Muchin Rosenman LLP to assist with those efforts.

In September 2025, BlockFills entered into discussions with a publicly traded participant in the cryptocurrency industry (the "Acquisition Counterparty") regarding a potential acquisition transaction.  At the outset of discussions with the Acquisition Counterparty, BlockFills disclosed its financial position, and the Acquisition Counterparty elected to proceed.  Over the course of the next approximately two months, the parties worked diligently to complete the deal, which included substantial due diligence, in-person meetings, preparation of go-forward business plans, and numerous rounds of negotiations.  Unfortunately, in mid-November 2025, due to reasons outside of BlockFills' control, the Acquisition Counterparty's board of directors declined to proceed with the transaction.

Immediately thereafter, BlockFills and its advisors pivoted to pursue alternative strategic options.  In November 2025, BlockFills engaged with an existing investor (the "Potential Investor") that expressed an interest in a recapitalization that would provide a combination of new equity and debt financing (the "Recapitalization").  Over the course of the next month, BlockFills and the Potential Investor engaged collaboratively to understand the existing business and what a

go-forward business would look like, which included a presentation to a limited partner of the Potential Investor.

In early January 2026, the parties had made significant progress on the equity component of the Recapitalization. The parties then turned to the debt financing component of the Recapitalization, and BlockFills began contacting potential debt providers. However, the feedback that BlockFills received, which it shared with the Potential Investor, was that raising the debt portion would be exceedingly difficult. Although BlockFills intended to continue to work towards a successful Recapitalization, those efforts had to be stopped due to outside events.

Specifically, on February 2, 2026, following a crypto market crash that created mounting liquidity pressures and significant withdrawal requests that, if honored, would have materially impaired BlockFills' ability to continue operations, BlockFills temporarily suspended certain deposit and withdrawal activity. Initially, this measure was taken privately while BlockFills evaluated potential liquidity solutions. However, on February 6, 2026, BlockFills publicly announced a broader temporary suspension of deposits and withdrawals. At this time, BlockFills communicated with customers through written updates and video conferences to provide information regarding ongoing efforts to address liquidity constraints. Unfortunately, as a result of the suspension, the dynamics of ongoing discussions with the Potential Investor materially changed and the transaction was unable to be completed.

From the period preceding the suspension through the Petition Date, BlockFills, together with its shareholders, advisors, and potential investors and acquirers, continued to evaluate and pursue alternatives to stabilize the business outside of chapter 11. Despite these efforts, however, BlockFills was unable to secure sufficient liquidity or consummate a transaction that would address its near-term obligations and long-term capital structure. As a result, the Board determined that commencing these Chapter 11 Case was the best available path to preserve value and pursue a court-supervised restructuring or sale process.

### 3.    *Governance Initiatives*

BlockFills formed a special committee (the "Special Committee") on March 12, 2026, comprised of disinterested director Matthew Kahn. The Special Committee is vested with the authority to, among other things, manage any potential conflict matters, including investigating, releasing, or settling certain potential claims or causes of action of BlockFills, if any.

### C.    Retention of Restructuring Advisors and Prepetition Sale Process

In August of 2025 and February of 2026, respectively, the Debtors engaged BRG and McDermott Will & Schulte LLP ("McDermott") to advise the Debtors in navigating the challenges impacting the Debtors' businesses.

Beginning in August of 2025, BRG began assisting the Debtors in with, among other things: (a) analyzing and assisting in managing the Debtors' operations, (b) assisting the Debtors in assessing and managing their liquidity, and (c) aiding the Debtors in developing and refining their business plan and exploring strategic options. BRG developed a deeper understanding of the Debtors' businesses and began exploring strategic alternatives with the Debtors' management, board of directors, and equity holders.

With the assistance of BRG, the Debtors determined that facilitating a sale of the Debtors' assets could potentially offer the best path forward. Accordingly, prior to the filing of these Chapter 11 Cases, and beginning in September of 2025, the Debtors began soliciting third-party interest in an acquisition of the Debtors. The Debtors created a list of potential strategic partners, including institutions in the industry. These included entities with which the Debtors have established relationships through their ordinary course of business, as well as conventional financial institutions that might serve as prospective partners. Additionally, given the industry's insular nature, several firms also proactively approached the Debtors.

In connection with this solicitation, the Debtors and their advisors prepared, among other things, non-confidential marketing materials that could be shared with third parties prior to signing a confidentiality agreement, a management presentation that could be shared with third parties after signing a confidentiality agreement, and an electronic data room to provide potential investors and bidders with information upon which to make a proposal. As of the Petition Date, the Debtors had contacted at least 40 potential investors, including strategic and financial advisors, to solicit proposals to acquire the Debtors' businesses or assets. Of the parties contacted, 38 expressed initial interest and progressed to the discussion phase, which generally included introductory calls with the Debtors' management team to provide an overview of the business and its current conditions.

Parties that maintained interest were invited to execute non-disclosure agreements in order to access additional information, including information in the Debtors' data room. A total of 35 parties executed non-disclosure agreements and were given access to the data room as part of their diligence process. Ultimately, five parties advanced to more substantive discussions, including a private investment firm, an industry exchange, a publicly traded digital asset treasury company, and a market maker/trading firm.

Despite the best efforts of the Debtors, the sale process failed to advance as quickly as the Debtors' businesses deteriorated. As a result, the Debtors were forced to file the Chapter 11 Cases to pursue various in-court restructuring options, including a Court-supervised sale process.

In advance of filing the Chapter 11 Cases, the Debtors retained McDermott as legal counsel to assist with the preparation of these Chapter 11 Cases. In such role, McDermott immediately began preparing the Debtors for their bankruptcy filing, by, among other things: (a) analyzing the Debtors' organizational documents, (b) preparing corporate and board resolutions authorizing the filing of these Chapter 11 cases, (c) analyzing all outstanding litigation currently faced by the Debtors, (d) preparing the Debtors' bankruptcy petitions and accompanying first day motions, (e) connecting with legal counterparties of the Debtors, including litigants and potential claimants and/or lenders, and (f) working with BRG and the Debtors to ensure a smooth transition into chapter 11.

### D.   Governance Initiatives.

Prior to the Petition Date, the Debtors undertook several actions to strengthen the independence and experience of their boards of directors, including, among other things: (i) strengthening their management by hiring and appointing Joseph Perry as Interim Chief Executive Officer on July 23, 2025 and (ii) forming the Special Committee comprised of disinterested director Matthew Kahn to, among other things, manage any potential conflict matters, including

investigating, releasing, or settling certain potential claims or causes of action of BlockFills, if any, on March 12, 2026.

**E.    BlockFills' Decision to Commence these Chapter 11 Cases.**

As the general cryptocurrency market continued to decline, BlockFills, like other industry participants, began to analyze its strategic options forward.  BlockFills, with the assistance of BRG, reviewed all available paths possible to stave off bankruptcy, including, as discussed herein, selling their assets.   Although BlockFills continued to rigorously diligence all potential transactions and alternatives, it became clear that the most viable path forward would be to petition for chapter 11 relief.

**VIII.    EVENTS OF THE CHAPTER 11 CASES**

**A.    The Non-Binding Term Sheet.**

On March 15, 2026 (the "Petition Date"), the Debtors filed the First Day Declaration, which included, among other things, a framework, in the form of a term sheet (the "Term Sheet"), for a potential consensual path towards a viable restructuring led by the Ad Hoc Group.  The Term Sheet contemplated, among other things, a way for the Debtors to pass ownership to its largest creditor constituency in order to satisfy such creditors' claims.  Additionally, on March 26, 2026, the Debtors filed the Bidding Procedures Motion, alerting the court and creditors that the Debtors were pursuing any and all strategic alternatives to maximize the value of the Debtors' estates.  On April 14, 2026, the Bankruptcy Court entered the Bidding Procedures Order.

**B.    First and Second Day Relief and Other Case Matters.**

On and shortly after the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration.  Following a hearing on March 17, 2026 ("the First Day Hearing"), the Bankruptcy Court entered orders granting certain of the First Day Motions and applications on interim and final bases:

(i)    ***The Joint Administration Order*** authorizing the Debtors to jointly administer and maintain one docket for the chapter 11 cases of Reliz Technology Group Holdings Inc. and its Debtor affiliates [Docket No. 58];

(ii)    ***Order Retaining Verita as Noticing Agent*** authorizing the Debtors to retain Kurtzman Carson Consultants, LLC, d/b/a Verita as third-party claims and noticing agent [Docket No. 59];

(iii)    ***The Interim Insurance Order*** authorizing the Debtors to maintain and pay certain amounts related to the Debtors' insurance policies [Docket No. 60];

(iv)    ***The Interim Wages Order*** authorizing the Debtors to pay certain amounts related to prepetition wages and employee benefits programs [Docket No. 61];

54

(v)      ***The Interim Cash Collateral Order*** authorizing the Debtors' postpetition use of cash collateral and granting adequate protection to the prepetition secured party [Docket No. 62];

(vi)      ***The Creditor Matrix Order*** authorizing the Debtors to file a consolidated creditor matrix and top 30 creditors list as well as redact certain personally identifiable information related thereto [Docket No. 63];

(vii)      ***The Interim Taxes Order*** authorizing the Debtors to pay certain prepetition taxes and fees as well as taxes and fees that become due and payable in the ordinary course postpetition [Docket No. 64]; and

(viii)      ***The Interim Cash Management Order*** authorizing the Debtors to continue utilizing the Debtors' prepetition cash management system [Docket No. 76];

The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://veritaglobal.net/blockfills.

On March 30, 2026, the Bankruptcy Court entered the *Second Interim Order (I) Authorizing Postpetition Use of Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Party; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [Docket No. 119] further authorizing the Debtors to continue utilizing the Debtors' prepetition cash management system.  On April 17, 2026 the Bankruptcy Court entered the *Third Interim Order (I) Authorizing Postpetition Use of Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Party; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [Docket No. 232].  On April 27, 2026 the Bankruptcy Court entered the *Fourth Interim Order (I) Authorizing Postpetition Use of Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Party; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [Docket No. 248], which was subsequently amended in the *Amended Fourth Interim Order (I) Authorizing Postpetition Use of Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Party; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [Docket No. 266].  On May 11, 2026, the Bankruptcy Court entered the *Fifth Interim Order (I) Authorizing Postpetition Use of Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Party; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [Docket No. 311].  Finally, on May 27, 2026, the Bankruptcy Court entered the *Final Order (I) Authorizing Postpetition Use of Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Party; and (III) Granting Related Relief* [Docket No. 379].

Shortly after the First Day Hearing, the Debtors also filed (a) the Bidding Procedures Motion [Docket No. 101], which sought to approve certain procedures related to the Debtors' Sale Process, including the scheduling and procedures related to an auction for the Debtors' assets, if necessary, (b) the *Motion of Debtors for Entry of Order Authorizing the Employment and Payment of Professionals Used in the Ordinary Course of Business* [Docket No. 100] (the "OCP Motion"), seeking authority to continue paying ordinary course professionals in the ordinary course of business, and (c) the *Motion of Debtors for Entry of Order (I) Establishing Bar Dates to File Proofs of Claim; (II) Approving Procedures for Filing Proofs of Claim; (III) Approving Form and*

*Manner of Notice of Bar Dates; and (IV) Granting Related Relief* [Docket No. 93] (the "Bar Date Motion, and with the Bidding Procedures Motion and the OCP Motion, the "Second Day Motions").

C.      **Schedules and Statements.**

On April 11, 2026, the Debtors filed their Schedules and Statements [Docket Nos. 143-150]. On April 28, 2026, the Debtors filed their Amended Schedules and Statements [Docket Nos. 252-256]. Interested parties may review the Schedules and Statements and any amendments thereto free of charge at https://veritaglobal.net/blockfills.

D.      **Bar Date Motion.**

On March 25, 2026, the Debtors filed the Bar Date Motion seeking court approval to establish the last date for certain persons and entities to file Proofs of Claim in these Chapter 11 Cases. On April 14, 2026, the Bankruptcy Court entered the *Order (I) Establishing Bar Dates to File Proofs of Claim; (II) Approving Procedures for Filing Proofs of Claim; (III) Approving Form and Manner of Notice of Bar Dates; and (IV) Granting Related Relief* [Docket No. 176], establishing May 14, 2026, at 4:00 p.m., prevailing Eastern Time as the general claims bar date (the "General Claims Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases as September 11, 2026, at 4:00 p.m., prevailing Eastern Time (the "Governmental Bar Date").

E.      **Litigation Matters.**

1.      *Certain Non-Bankruptcy Litigation Matters*

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. The filing of the Chapter 11 Cases likewise generally stays any legal proceedings commenced to obtain possession of, or to exercise control over, the property of the Debtors' bankruptcy estate.

Further, the Debtors are party to various other legal proceedings (including individual, class and putative class actions as well as federal and state governmental investigations) covering a wide range of matters and types of claims including, but not limited to, securities laws, contracts, and trademark disputes. Such matters are subject to uncertainty and the outcome of individual matters is not predictable.

2.      *Debtors' Injunction Efforts (Adversary Proceeding Case No. 26-50224)*

Prior to the Petition Date and continuing postpetition, the Debtors' directors and officers faced extensive litigation. This litigation meaningfully detracted from the Debtors' ability to focus on the Chapter 11 Cases and maximize the value of the Debtors' estates and the recoveries of the Debtors' creditors. As a result, on March 25, the Debtors filed the *Verified Adversary Complaint for Temporary Restraining Order and Preliminary Injunction (I) Enjoining Continuation of*

56

*Certain Prepetition Litigation Against Directors and Officers or (II) In the Alternative, Extending the Automatic Stay to Such Directors and Officers to Prevent Continued Prosecution of Prepetition Litigation Against Them* [Docket No. 1] and the *Motion of Debtors for Entry of a Temporary Restraining Order and Preliminary Injunction (I) Enjoining Continuation of Certain Prepetition Litigation Against Directors and Officers or (II) In the Alternative, Extending the Automatic Stay to Such Directors and Officers to Prevent Continued Prosecution of Prepetition Litigation Against Them* [Docket No. 3].

In support of the Adversary Proceeding Papers, the Debtors filed the *Memorandum of Law in Support of Motion of Debtors for Entry of Temporary Restraining Order and Preliminary Injunction (I) Enjoining Continuation of Certain Prepetition Litigation Against Directors and Officers or (II) in the Alternative, Extending the Automatic Stay to Such Directors and Officers to Prevent Continued Prosecution of Prepetition Litigation Against Them* [Docket No. 4] and the *Declaration of David Hurst in Support of Motion of Debtors for Entry of Temporary Restraining Order and Preliminary Injunction (I) Enjoining Continuation of Certain Prepetition Litigation Against Directors and Officers or (II) in the Alternative, Extending the Automatic Stay to Such Directors and Officers to Prevent Continued Prosecution of Prepetition Litigation Against Them* [Docket No. 5 (Sealed) and 6] (collectively, with Docket Nos. 1 and 3, the "Injunction Pleadings").

After a hearing held on March 26, 2026, the Bankruptcy Court entered the *Order Granting the Motion of Debtors for Entry of Temporary Restraining Order and Preliminary Injunction (I) Enjoining Continuation of Certain Prepetition Litigation Against Directors and Officers or (II) in the Alternative, Extending the Automatic Stay to Such Directors and Officers to Prevent Continued Prosecution of Prepetition Litigation Against Them* [Docket No. 12] (the "Preliminary Injunction Order"), which enjoined such litigation until a final hearing can be held on the issue. The Preliminary Injunction Order remains in effect until April 16, 2026, on which date the Bankruptcy Court shall have a final hearing on the Injunction Pleadings.

On March 23, 2026, movants (the "Movants") 1548199 Alberta Ltd. And Robert J. Bertram filed the *Motion of 1548199 Alberta Ltd. And Robert J. Bertram for Relief from Stay Pursuant to 11 U.S.C. § 362* [Docket No. 81] (the "Motion for Relief from Stay").[8] As of the date hereof, the Bankruptcy Court has not yet ruled on the Movants' Motion for Relief from Stay.

F.    **The Post-Petition Sale Process**

Beginning even prior to the Petition Date, the Debtors have worked tirelessly to identify the most value-maximizing transaction. As discussed herein, on March 26, 2026, the Debtors filed the Bidding Procedures Motion, seeking to establish procedures and deadlines related to facilitating the Sale Process postpetition. On April 14, 2026, the Bankruptcy Court entered the Bidding Procedures Order. The Debtors, along with their advisors, have already begun to work with potential bidders and interested investors to facilitate information sharing, answering of questions, and all other steps necessary to ultimately consummate a sale of the Debtors' assets on the deadlines proposed by the Debtors in the Bidding Procedures Motion. In order to maximize the value of the Debtors' estates, the Committee required that the Bidding Procedures require any Qualified Bid, including any bid by the Ad Hoc Group, to include a $3,000,000 Minimum Cash

---

[8]    The Motion for Relief from Stay was filed on the Debtors' main docket, Case No. 26-10371 (TMH) and not the adversary proceeding docket.

Requirement.  The Debtors remain resolute in their search for a viable bidder to consummate the Sale Transaction that will maximize the value of the Debtors' estates and assets for the benefit of the Debtors' creditors.

**IX.    RISK FACTORS**

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES.  THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN.  EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE POST EFFECTIVE DATE DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

A.    **Risks Related to the Restructuring.**

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors or the Plan and its implementation.

1.    *The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions Are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors*

If the Restructuring Transactions are not implemented, the Debtors will consider all other restructuring alternatives available, which may include the filing of an alternative chapter 11 plan, conversion to chapter 7, or any other transaction that would maximize the value of the Debtors' estates.  Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would also have other adverse effects on the Debtors.  For example, it would also adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' ability to retain key employees;

- the Debtors' ability to retain account holders;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, and lenders; and

- the Debtors' enterprise value.

### 2.    *Certain Bankruptcy Law Considerations*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### (a)    **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. As provided in the Plan and this Disclosure Statement, the Debtors are not seeking to substantively consolidate and recoveries on account of Claims against or Interests in any Debtor shall be determined on a Debtor-by-Debtor basis. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims and Interests that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### (b)    **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

### (c)    **Failure to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### (d)    **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by the Bankruptcy Court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures, and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. If a chapter 11 plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to consummate the Sale and what, if anything, Holders of Allowed Claims against them would ultimately receive with respect to their Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### (e) Nonconsensual Confirmation.

In the event that any Impaired Class of Claims or Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements, and the Debtors will request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Professional Fee Claims.

### (f) Continued Risk After Consummation.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as increasing expenses and further industry deterioration or other changes in economic conditions. Some of these concerns and

60

effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan reflecting the Plan will achieve the Debtors' stated goals.

### (g)    Filing of a Competing Plan.

At the outset of the Chapter 11 cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors have retained the exclusive right to propose the Plan since filing their chapter 11 petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan in order to achieve the Debtors' stated goals because creditors and others may propose a plan.

### (h)    The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### (i)    The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### (j)    Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will in fact occur.

### (k)    Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies could affect distributions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

**(l)      The Debtors' Rights to Property of the Estates Could Be Challenged**

The Plan as well as the currently contemplated sale of the Debtors' assets is predicated on the fact that cryptocurrency on the Debtors' platform is property of the Debtors' bankruptcy estates and not that of customers.  If any non-appealable, Final Order is entered holding to the contrary, the Debtors' estates may be seriously harmed and the distribution schemes contemplated in the Plan and described herein may be materially altered.

**(m)      Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including releases by third parties of claims that may otherwise be asserted against the Debtors, the Post Effective Date Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

**3.      *The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims against or Interests in the Debtors***

The Debtors have not obtained or requested a fairness opinion from any banking or other firm as to the fairness of the consideration under the Plan.

**4.      *Governmental Approvals May Not Be Granted***

Consummation of the Restructuring Transactions may depend on obtaining approvals of certain Governmental Units that may be necessary or advisable.  Failure by any Governmental Unit to grant an approval could prevent or impose limitations or restrictions on Consummation of the Restructuring Transactions and Confirmation of the Plan.

B.      **Risks Related to Recoveries under the Plan.**

1.      *The Debtors Cannot Guarantee Recoveries or the Timing of Such Recoveries*

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims and Allowed Interests, it is possible that the actual amount of such Allowed Claims and Allowed Interests is materially different than the Debtors' estimates.  Creditor recoveries could be materially reduced or eliminated in this instance.  In addition, the timing of actual distributions to Holders of Allowed Claims and Allowed Interests may be affected by many factors that cannot be predicted.  Therefore, the Debtors cannot guaranty the timing or amount of any recovery on an Allowed Claim or an Allowed Interest.

2.      *The Debtors Are Subject to the Volatility of Cryptocurrency*

The volatility of cryptocurrency may adversely affect the fair market value of BlockFills' businesses, which could result in lower recoveries for creditors than the Debtors' current estimates.

3.      *The Tax Implications of the Debtors' Bankruptcy and Restructuring Are Highly Complex*

Holders of Allowed Claims and Allowed Interests should carefully review Article XII of this Disclosure Statement, entitled "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

4.      *The Closing Conditions of the Alternative Transaction May Not Be Satisfied*

It is possible that the Debtors may not satisfy the closing conditions of the Alternative Transaction, if applicable.  A failure to satisfy any of the closing conditions of the Alternative Transaction could prevent the Alternative Transaction and the Plan from being consummated, which could lead to the Chapter 11 Cases being converted to cases under chapter 7.

C.      **Disclosure Statement Disclaimer.**

1.      *The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed*

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

**2.**      *No Legal or Tax Advice Is Provided By This Disclosure Statement*

This Disclosure Statement is not legal advice to any person or Entity.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each reader should consult their own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation of the Plan.

**3.**      *No Admissions Made*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

**4.**      *Failure to Identify Litigation Claims or Projected Objections*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims and Interests after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims and Interests.

**5.**      *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors*

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

**6.**      *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Furthermore, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

**7.**      *No Representations Outside This Disclosure Statement Are Authorized*

**NO REPRESENTATIONS CONCERNING OR RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE VOTING HOLDERS' ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY VOTING HOLDERS IN ARRIVING AT THEIR DECISION. VOTING HOLDERS SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE DISTRICT OF DELAWARE.**

D.    **Miscellaneous Risk Factors and Disclaimers.**

1.    ***The Debtors are Subject to an Extensive and Highly Evolving Regulatory Landscape and Any Adverse Changes to, or Their Failure to Comply with, any Laws and Regulations Could Adversely Affect Their Brand, Reputation, Business, Assets, Operating Results, and Financial Condition***

The Debtors' business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which the Debtors operate, including those governing money transmission, financial services, banks and trust companies, securities, broker-dealers and alternative trading systems, or ATS, commodities and commodities interests such as derivatives, credit, cryptocurrency asset custody, exchange, and transfer, cross-border and domestic money and cryptocurrency asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, retail protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing, among others. Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, cryptocurrency assets, and related technologies. As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptocurrency economy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions. These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another and may conflict with one another. Moreover, the complexity and evolving nature of the Debtors' business and the significant uncertainty surrounding the regulation of the cryptocurrency economy require the Debtors to exercise their judgment as to whether certain laws, rules, and regulations apply to the Debtors, and it is possible that governmental bodies and regulators may disagree with their conclusions. To the extent the Debtors have not complied with such laws, rules, and regulations, the Debtors could be subject to significant fines, revocation of licenses (including Money Transmission Licenses as described in Article IV), limitations on their products and services, cease and desist orders in one or more states, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect their business, operating results, and financial condition.

Additionally, economic and trade sanctions, anti-money laundering, and anti-terrorism laws in the United States and other jurisdictions may restrict the Debtors' business from engaging in transactions in or relating to certain countries, individuals, and entities. The imposition of sanctions and related restrictions by different jurisdictions have been evolving quickly, including in response to the military conflict between Russia and Ukraine, and the ultimate impact on global economic and commercial activity as well the financial condition and performance of the Debtors' business and assets is difficult to predict.

2.      ***The Post Effective Date Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations***

The Debtors are currently subject to or interested in certain legal proceedings, some of which may adversely affect the Debtors. In the future, the Debtors may become parties to additional litigation, including enforcement actions brought by state banking departments with respect to BlockFills' historical compliance with money transmission laws, which could result in significant fines. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect recoveries to creditors in these Chapter 11 cases. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Debtors, however, could be material.

3.      ***The Loss of Key Personnel Could Adversely Affect the Debtors' Ability to Consummate the Sale and Plan***

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. Because competition for experienced personnel in the cryptocurrency and financial industries can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to consummate the Sale and the Plan.

4.      ***Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition***

Section 1141(d)(3) of the Bankruptcy Code limits a debtor's ability to discharge Claims in certain circumstances. Any Claims not ultimately discharged through a Plan could be asserted against the Post Effective Date Debtors and may have an adverse effect on the Debtors' financial condition.

X.      SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.   The procedures and instructions for voting and related deadlines are set forth in the Solicitation Package.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
>
> PLEASE REFER TO THE SOLICITATION PROCEDURES ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

A.      **Classes Entitled to Vote on the Plan.**

The following Classes are entitled to vote to accept or reject the Plan (collectively, the "Voting Classes"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 5 | Convenience Claims | Impaired |
| 6A | General Unsecured Claims Against TopCo | Impaired |
| 6B | General Unsecured Claims Against Reliz Tech | Impaired |
| 6C | General Unsecured Claims Against Reliz CI | Impaired |
| 6D | General Unsecured Claims Against Reliz LTD | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined below).  If you are a Holder of a Claim in one or more of the Voting Classes, you should read your Ballot(s) and carefully follow the instructions included in the Ballot(s).   Please use only the Ballot(s) that accompanies this Disclosure Statement or the Ballot(s) that the Debtors, or the Claims, Noticing, and Solicitation Agent on behalf of the Debtors, otherwise provided to you.  If you are a Holder of a Claim in more than one of the Voting Classes, you will receive a Ballot for each such Claim.

To the extent that the Celsius Secured Claim is determined to be impaired, the holder of the Celsius Secured Claim shall be entitled to vote on the Plan on account of such claim.  In this event, the vote of the Celsius Secured Claim shall be counted in Class 4 at each Debtor.

B.      **Votes Required for Acceptance by a Class.**

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims is determined by calculating the amount and number of allowed claims voting to accept, as a percentage of the allowed claims that have voted.  Acceptance of a chapter 11 plan by a class of interests is determined by calculating the amount of allowed interests voting to accept, as a percentage of the allowed interests that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.

Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

### C.       Certain Factors to Be Considered Prior to Voting.

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor guarantee that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a resolicitation of the votes of Holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article IX of this Disclosure Statement.

### D.       Classes Not Entitled To Vote on the Plan.

Under the Bankruptcy Code, holders of claims or interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan.  Accordingly, the following Classes of Claims against and Interests in the Debtors are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|---|---|---|
| 1 | Secured Tax Claims | Unimpaired |
| 2 | Other Secured Claims | Unimpaired |
| 3 | Other Priority Claims | Unimpaired |
| 4 | Celsius Secured Claim | Unimpaired / Impaired |
| 7 | Section 510(b) Claims | Impaired |
| 8 | Intercompany Claims | Unimpaired / Impaired |
| 9 | Intercompany Interests | Unimpaired / Impaired |
| 10 | Existing Equity Interests | Impaired |

E.      **Solicitation Procedures.**

1.      *Claims, Noticing, and Solicitation Agent*

The Debtors have retained Verita to act, among other things, as Claims, Noticing, and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

2.      *Solicitation Package*

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

- the Confirmation Hearing Notice (as defined in the Solicitation Procedures Order);

- this Disclosure Statement (and exhibits thereto, including the Plan);

- a copy of the order approving the Disclosure Statement (without exhibits) (*i.e.*, the Solicitation Procedures Order);

- a pre-addressed return envelope; and

- such other materials as the Bankruptcy Court may direct or approve.

3.      *Distribution of the Solicitation Package and Plan Supplement*

The Claims, Noticing, and Solicitation Agent shall distribute the Solicitation Package to Holders of Claims in the Voting Classes on June 3, 2026 or as soon as reasonably practicable thereafter (the "Solicitation Launch").

The Solicitation Package (without Ballots, unless you are an eligible voting party) may also be obtained from the Claims, Noticing, and Solicitation Agent by:  (a) calling the Claims, Noticing, and Solicitation Agent at (866) 554-5810 (USA or Canada) or +1 (781) 575-2032 (International) and asking for the "Solicitation Group" or (b) submitting an inquiry to the Claims, Noticing, and Solicitation Agent at https://veritaglobal.net/BlockFills/inquiry.  You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://veritaglobal.net/blockfills, or the Bankruptcy Court's website at https://www.deb.uscourts.gov/ (for a fee).  Holders that have more than one option to return a Ballot should choose only one method to return their Ballot.

On or before June 24, 2026, the Debtors will file all Plan Supplement documents, which may include, as applicable, the (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Retained Causes of Action; (c) the Liquidation Trust Agreement; (d) documents identifying the individual to serve as GUC Trustee to the extent not identified in the Liquidation Trust Agreement; (e) documents identifying the individuals who will serve on the GUC Trust Oversight Committee; (f) the GUC Trust Budget; and (g) any additional documents necessary to effectuate or that is contemplated by the Plan.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.  The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims, Noticing, and Solicitation Agent by:

(a) calling the Claims, Noticing, and Solicitation Agent at the telephone number set forth above; (b) visiting the Debtors' restructuring website, https://veritaglobal.net/blockfills, or (c) submitting an inquiry to the Claims, Noticing, and Solicitation Agent at https://veritaglobal.net/blockfills/inquiry.

F.    **Voting Procedures.**

May 21, 2026 (the "Voting Record Date"), is the date that will be used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim in the Voting Classes to have its Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by (i) using the enclosed pre-paid, pre-addressed return envelope, (ii) via first class mail, overnight courier, or hand delivery to BlockFills Ballot Processing Center, c/o KCC dba Verita, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245, or (iii) accessing the Claims, Noticing, and Solicitation Agent's online voting portal at https://eballot.veritaglobal.net/blockfills, so that such Holder's Ballot is actually received by the Claims, Noticing, and Solicitation Agent on or before the Voting Deadline on July 1, 2026, at 4:00 p.m., prevailing Eastern Time.

For purposes of the Voting Record Date, the Debtors propose that no transfer of claims pursuant to Bankruptcy Rule 3001 will be recognized unless either (a)(i) documentation evidencing such transfer was filed with the Court on or before 21 days prior to the Voting Record Date and (ii) no timely objection with respect to such transfer was filed by the transferor; or (b) the parties to such transfer waived the 21-day period in the evidence of transfer and the evidence of transfer was docketed prior to the Voting Record Date.

If you hold Claims in more than one Voting Class under the Plan, you should receive a separate Ballot for each Class of Claims, coded by Class number, and a set of solicitation materials.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS. NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.

G. **Voting Tabulation.**

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. A Ballot will be deemed delivered only when the Claims, Noticing, and Solicitation Agent actually receives the executed Ballot as instructed in the applicable voting instructions. No Ballot should be sent to the Debtors, the Debtors' agents (other than the Claims, Noticing, and Solicitation Agent) or the Debtors' financial or legal advisors.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to Confirmation of the Plan. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

In the event that a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Debtors will file with the Bankruptcy Court, as soon as practicable after the Voting Deadline, the voting report prepared by the Claims, Noticing, and Solicitation Agent (the "Voting Report"). The Voting Report shall, among other things, provide the votes received to accept or reject the Plan and Holders of Claims and Interests that have opted into the third-party releases or Contributed Third-Party Claims, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each an "Irregular Ballot"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged. The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots. Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification.

71

### H.   Ballots Not Counted.

No Ballot will be counted toward Confirmation if, among other things:  (1) such Ballot is received after the Voting Deadline (as extended by the Debtors as provided herein); (2) such Ballot is illegible or contains insufficient information to permit the identification of the claim holder; (3) such Ballot is cast by a person or entity that does not hold a claim in a class that is entitled to vote to accept or reject the Plan; (4) such Ballot is cast for a claim which is listed in the Debtors' Schedules as contingent, unliquidated, or disputed or as zero or unknown in amount and (i) which is not the subject of a timely-filed proof of claim and (ii) for which no Rule 3018(a) Motion has been filed by the Rule 3018(a) Motion Deadline; (5) such Ballot is cast for a claim that was filed in a zero dollar amount; (6) such Ballot indicates neither an acceptance nor a rejection, or indicates both an acceptance and rejection, of the Plan; (7) such Ballot casts part of its vote in the same class to accept the Plan and part to reject the Plan; (8) it is any form of Ballot other than the official form sent by the Voting Agent, or a copy thereof; (9) the Voting Agent cannot match to an existing database record; (10) such Ballot does not contain an original signature; *provided*, *however*, that for the avoidance of doubt, a Ballot submitted via the Voting Agent's Ballot portal will be deemed to contain an original signature; or (11) such Ballot is submitted by facsimile, email, or by other electronic means other than through the Voting Agent's Ballot portal.  Please refer to the Solicitation Procedures Order for additional requirements with respect to voting to accept or reject the Plan.

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT TOLL-FREE NUMBER AT (866) 554-5810 (USA OR CANADA) OR (781) 575-2032 (INTERNATIONAL)**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION PROCEDURES ORDER WILL <u>NOT</u> BE COUNTED.**

---

## XI.   CONFIRMATION OF THE PLAN

### A.   Requirements of Section 1129(a) of the Bankruptcy Code.

Among the requirements for Confirmation are the following:  (i) the Plan is accepted by all impaired Classes of Claims and Interests or, if the Plan is rejected by an Impaired Class, at least one Impaired Class of Claims has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Impaired Claims or Interests (*i.e.*, Holders of Class 5 Convenience Claims, Holders of Class 6A, 6B, 6C, and 6D General Unsecured Claims, Holders of Class 7 Section 510(b) Claims, Holders of Class 8 Intercompany Claims, Holders of Class 9 Intercompany Interests, and Holders of Class 10 Existing Equity Interests).

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy

72

Code.  Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment:  (i) made before Confirmation will be reasonable or (ii) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims will be paid in full on the Effective Date or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class.  Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

**B.**     **Best Interests of Creditors—Liquidation Analysis.**

73

As noted above, even if the Plan is accepted by the Holders of each class of Claims and Interests, the Bankruptcy Code requires a bankruptcy court to determine that the Plan is in the best interests of all Holders of Claims or Interests that are impaired by that Plan and that have not accepted the Plan. The "best interests" test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of Claims or Interests have accepted the Plan or that the Plan will provide a member who has not accepted the Plan with a recovery of property of a value, as of the effective date of the Plan, that is not less than the amount that such Holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

As described in the hypothetical liquidation analysis attached to this Disclosure Statement as **Exhibit B**, the Debtors submit that because of, among other things, (1) discounts to asset values caused in part by the forced nature of a sale of the Debtors' assets in a chapter 7 liquidation scenario, (2) loss of value from sales caused by, among other things, business discontinuity and loss of employee knowledge, (3) the illiquid nature of certain of the assets and dis-synergies associated with a piecemeal liquidation, (4) associated delays in connection with a chapter 7 liquidation and (5) the incurrence of additional priority claims such as, among other things, the costs of payment of a statutorily allowed commission to the chapter 7 trustee and the costs of counsel and other professionals retained by the trustee, Holders of Impaired Claims and Interests will receive at least as great of a recovery under the proposed Plan as in a chapter 7 liquidation. The Debtors therefore believe that the Plan satisfies the Best Interests Test under Section 1129(a)(7) of the Bankruptcy Code. The Debtors caution that the assumptions used in the Liquidation Analysis may ultimately vary and actual recoveries in a chapter 7 liquidation could be substantially less than recoveries set forth in the Liquidation Analysis.

### C.      Feasibility Analysis.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successors to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  Payments under the Plan are to be made from the Distributable Assets stemming primarily from the Sale Transaction and do not depend on future earnings of the Debtors. Accordingly, the Debtors believe that they will have sufficient resources to make all payments required pursuant to the Plan and that the Plan is feasible and meets the requirements of Section 1129(a)(11) of the Bankruptcy Code.

### D.      Acceptance by Impaired Classes.

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required.  A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or,

with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled or any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

### E.   Confirmation without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class of Claims or Interests rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor. The Debtors submit that, based on the recoveries described herein and set forth in the Plan, the Plan does not discriminate unfairly.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

### 1.   *No Unfair Discrimination*

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that the treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain

75

circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

## 2.      *Fair and Equitable Test*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class.  The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan.  There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

### (a)      Unsecured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

### (b)      Interests.

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of:  (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

## XII.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.      Introduction.

The following discussion is an overview of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the GUC Trust, and to Holders entitled to vote to accept or reject the Plan.  This overview is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

The application of Applicable Tax Law to numerous material aspects of the transactions contemplated by the Plan, and to cryptocurrency in general, is subject to an unusually high level of uncertainty. No opinion of counsel has been or will be obtained, and the Debtors have not requested, and do not expect to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan. No portion of this discussion is binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position that the Debtors or GUC Trust take.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances. This discussion also does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in Section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Purchaser, Persons liable for alternative minimum tax, Persons (other than, if applicable, the Debtors) using a mark-to-market method of accounting, Holders who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, non-income, or non-U.S. taxation is addressed (including, for the avoidance of doubt, the application of Canadian tax law to Holders or to the Debtors, which issues are under further review). Furthermore, this preliminary overview assumes that a Holder holds only Claims or Interests in a single Class and, except as set forth below, holds such Claims or Interests only as "capital assets" (within the meaning of section 1221 of the IRC). This preliminary overview also assumes that the various debt and other arrangements to which the Debtors and GUC Trust are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This preliminary overview does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, GUC Trust, and Holders of Claims and Interests described below also may vary depending on the ultimate nature of any Restructuring Transactions that the Debtors and/or the GUC Trust engage in. This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that for U.S. federal income tax purposes is: (1) an individual who is a citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The below discussion assumes that the Debtors obtained tax ownership of cryptocurrency deposits when customers made such deposits. The Debtors believe that position is the right one based on, among other things, the fact that the Debtors had the right to transfer, rehypothecate, and otherwise deal in deposited cryptocurrency. If the Debtors were determined to not have tax ownership of the cryptocurrency, the consequences of the Plan to Holders of Claims and the Debtors would vary significantly from the discussion below.

**ACCORDINGLY, THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

B.      **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.**

1.      *In General*

The Debtors expect that the Plan would be structured such that there would be taxable sale of certain assets of the Debtors to the Purchaser (a "Taxable Transaction") and, potentially, a deemed "in-kind" distribution of cryptocurrency to customers in exchange for Claims related to deposits of such cryptocurrency (the "In-Kind Distribution"). As a result and in connection therewith, the Debtors would realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets. Gain would be reduced by the amount of tax attributes (if any) available for use by the Debtors, and any remaining gain would be recognized

78

by the Debtors and result in a cash tax obligation. Amounts subject to the In-Kind Distribution may or may not be treated as a non-taxable transaction with respect to the underlying cryptocurrency, combined with incurrence of income or cancellation of indebtedness income related to any difference between the value of what customers receive in exchange for their Claims and the amount of their Claims (determined without regard to "dollarization" of such Claims). The treatment of the In-Kind Distribution for claimants is further discussed below.

Thus, the U.S. federal income tax consequences of the Taxable Transaction to the Debtors would in large part be a function of the Debtors' tax basis in their assets that the Debtors transfer or are deemed to have transferred, including the Debtors' cryptocurrency. There is generally no direct guidance under Applicable Tax Law on how to treat a customer's transfer of cryptocurrency to a business like the Debtors' (and as a result there is significant (and unusual) uncertainty with respect to the Debtors' tax basis in such cryptocurrency) or the transferee's utilization of the transferred cryptocurrency (for example, and without limitation, holding it and doing nothing more, lending it, staking it, selling it, or using it in a short sale). Accordingly, there is significant uncertainty with respect to the tax consequences of a Taxable Transaction to the Debtors.

It is possible that the IRS or a court could disagree with the Debtors' determination of their basis in their assets, including the Debtors' cryptocurrency. Any such disagreement could lead to a redetermination of the Debtors' basis in their assets and a resultant increase in the Debtors' tax liability from a Taxable Transaction, potentially in a way that would have a materially adverse impact on the Debtors. The Debtors, together with their advisors, continue to study this issue.

As discussed above, if the transactions undertaken pursuant to the Plan are structured in whole or in part as a Taxable Transaction involving the transfer (or deemed transfer) of the Debtors' assets, the Debtors generally would realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (which generally should equal the fair market value of the assets transferred (or deemed to be transferred) by the Debtors) and the Debtors' tax basis in such assets. Realized gains, if any, may be offset by current-year losses and deductions and certain other tax attributes, which may include interest deductions that may be (or become) available under section 163(j) of the IRC, and NOLs from prior years; provided that any such gain that is ordinary in nature may not be offset by capital losses.

The Debtors also continue to evaluate how "dollarization" of Claims as of the Effective Date may modify the above analysis, either with respect to the implementation of the Plan itself or with respect to any administrative tax period more generally. The Debtors currently cannot say with certainty that there will not be material administrative income tax liabilities that must be satisfied under the Plan.

### 2. *Cancellation of Debt and Reduction of Tax Attributes*

In general, absent an exception, a taxpayer will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price

of the indebtedness satisfied over (b) the amount of Cash and fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the IRC, however, a taxpayer is not required to include any amount of COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. For this purpose, a debtor which is a partnership or disregarded entity is not a taxpayer that is directly eligible for the exclusion from COD Income, and instea the partners or owners of such entities would be eligible for the exclusion if they are under the jurisdiction of the ocourt in the chapter 11 proceeding. Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the Post Effective Date Debtors remain subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers. 163(j) Deductions are not subject to reduction under these rules. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC.

As noted above, in connection with the Sale Transaction, the Debtors expect to realize COD Income. The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan because the amount of COD Income will depend, in part, on the fair market value of the Debtors' assets and any other consideration, none of which can be determined until after the Plan is consummated.

C. **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders[9] of Allowed Claims Entitled to Vote.**

Before discussing the consequences to any particular Class of Claims entitled to vote, we discuss certain U.S. federal income tax considerations that are relevant to any U.S. Holder of such a Claim which U.S. Holder will or may receive an in-kind distribution of Distributable Cryptocurrency pursuant to the Plan.

There is material risk that U.S. Holders of Convenience Claims and General Unsecured Claims, as applicable, will have a taxable event in connection with the consummation of the Plan or the "dollarization" of Claims (or separate taxable events for one or both events). To the extent any taxable event occurs, tax liability would be based on the difference between the Holder's tax basis in its Claim compared to the value it receives in respect of such Claim, with such gain or loss generally being capital in nature.

---

[9]   Based on the Debtors' understanding of the residence of Holders, the Debtors do not discuss any U.S. federal income tax consequences of the consummation of the Plan to Non-U.S.-Holders.

The tax treatment of Holders under the Plan depends significantly on the tax treatment of customer deposits in the first instance. There is uncertainty with respect to whether deposits are taxable when they occur, but the Debtors generally expect that most customers have taken the position that the act of depositing cryptocurrency with the Debtors is not a taxable event. While there is substantial theoretical debate regarding that position, it is a position that has some level of support in the idea that the exchange of cryptocurrency for a contractual right to the return of such cryptocurrency is not a transaction that results in a realization event under section 1001 of the IRC because it does not involve an exchange of property "differing materially either in kind or in extent." Such position relies, among other things, on caselaw that pre-dates the enactment of section 1058 of the IRC and analogies to the treatment afforded to securities lending under section 1058. On the other hand, there is also support for the position that the initial deposit of cryptocurrency is a taxable event.

To the extent an initial deposit of cryptocurrency was not taxable, there is an argument that the same position could be taken with respect to the return by the Debtors of such cryptocurrency to customers, because the exchange of the contractual right to the return of such cryptocurrency for the underlying cryptocurrency would itself not be an exchange of property "differing materially either in kind or in extent." Though, if the Distributable Cryptocurrency were a different type of cryptocurrency than the cryptocurrency that the customer originally deposited on the BlockFills platform (because of, for example, rebalancing), then the ability to rely on such argument would be greatly impaired because the property withdrawn would differ "materially either in kind or in extent," likely leading to a taxable event (and in any event, for the avoidance of doubt, the receipt of cash or property other than cryptocurrency in exchange for deposited cryptocurrency should generally result in a taxable event).

The Debtors continue to study whether the above arguments, when combined with a general "bifurcation" approach that separates the recovery Holders receive into multiple components (*i.e.*, the type of cryptocurrency the customer had deposited on the platform, other cryptocurrencies, cash, and recoveries in respect of the GUC Trust), may permit Holders to take the position that Holders retain the portion of their recovery taking the form of the type of cryptocurrency that the customer had deposited on the platform even if the receipt of other consideration constitutes a taxable exchange as to such other cash and/or property. The Debtors emphasize that these positions are unclear.

The ability to take the position that an in-kind distribution is not taxable to Holders is subject to increased risk as a result of the "dollarization" of Claims. As noted above, it may be the case that "dollarization" resulted, or will result, in a taxable event to customers. If such a taxable event were determined to have occurred, it would be because the contract to receive particular cryptocurrency was modified, as a result of dollarization, to have an economic "cap." In light of this, it is unclear whether the arguments described above that support tax-free treatment with respect to the receipt of cryptocurrency under the Plan could still apply. Such a "capped" contract arguably "differ[s] materially either in kind or in extent" from the underlying cryptocurrency. However, the Debtors also believe it would be reasonable to assert that this is not a material enough change to customers' underlying entitlements.

**The Debtors emphasize in the strongest possible terms that the law applicable to deposits and withdrawals of cryptocurrency from the Debtors, "dollarization," and the consummation of the Plan is subject to extreme uncertainty. There is effectively no**

81

"controlling" authority on any of these issues. Accordingly, there is a material risk that the positions described above may not be sustained. The concept of a non-taxable in-kind distribution rests in large part on the theory that the property that the Debtors would distribute in-kind to a Holder would be in respect of an obligation that does not differ "materially either in kind or in extent" from the obligation that arose when the Holder deposited property with the Debtors. Given the structure of the Plan, and in particular the way in which the Debtors have valued Claims as of the Petition Date, there is a significant risk that the Claim that a Holder has against the Debtors as of the Petition Date is with respect to property that differs "materially either in kind or in extent" from the property that the Holder previously deposited with the Debtors, such that the Debtors would be distributing property in respect of an obligation that differs "materially either in kind or in extent" from the one that existed when the Holder deposited property with the Debtors (and thus tax-free treatment would likely be unavailable).

Very generally, to the extent any form of transaction is taxable to a Holder (which, for the avoidance of doubt, would include any Holder who receives only Cash and/or GUC Trust Interests under the Plan), each such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash, Cryptocurrency, and/or GUC Trust Interests) received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the GUC Trust Interests and any Cryptocurrency received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

As noted repeatedly herein, nothing in this disclosure constitutes tax or legal advice to Holders. However, the Debtors wish to highlight one area of tax consideration that has been the subject of significant speculation in online resources and similar. The above language indicates that customers may be able to take a loss in connection with the consummation of the Plan. The Debtors generally expect such loss would arise *when the Plan is consummated*, and not before. There has been significant speculation in various sources with respect to whether a customer can take a loss, potentially under section 166 of the Tax Code (related to bad debts, including non-business bad debts). There are significant timing limitations on the ability to claim a loss under section 166 of the Tax Code. In particular, other than with respect to certain types of taxpayers that can take partial bad debt deductions in connection with a "charge-off" under section 166(a)(2) of the Tax Code, most taxpayers can only take a deduction under 166 when a debt has become entirely worthless. As set forth in the Plan, the Debtors do not believe customer claims will ever be entirely worthless, as all transactions under contemplation by the Debtors contemplate that there will be some form of recovery received by customers in respect of their claims. Accordingly, the Debtors are of the view that the overwhelming majority of customers are not able to take a section 166 loss with respect to their claims prior to the consummation of the Plan. However, in the event "dollarization" of Claims results in a taxable event to customers, customers likely can claim a loss in connection with such "dollarization."

### 1. *Sale Transaction*

#### (a) U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 5 Claims (Convenience Claims).

Each Holder of an Allowed Convenience Claim will receive in exchange for such Allowed Convenience Class Claim, such Holder's Pro Rata Share of the Convenience Class Recovery Pool.

The exchange will be taxable to the U.S. Holder. The U.S. Holder will recognize gain or loss in an amount equal to the difference between the amount of such cash received under the Plan and such U.S. Holder's adjusted tax basis in the Claim. The character of any such gain or loss as capital or ordinary will be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder has previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.

#### (b) U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 6A, 6B, 6C, 6D Claims (General Unsecured Claims).

Each Holder of an Allowed General Unsecured Claim will receive in exchange for such Allowed General Unsecured Claim such Holder's Pro Rata share of the Distributable Assets and its Pro Rata share of its applicable series of distributable GUC Trust Interests.

There is a material risk that U.S. Holders of General Unsecured Claims will have a taxable event in connection with the consummation of the Plan or the "dollarization" of Claims (or separate taxable events for one or both events).

If the distribution of Distributable Assets is with Cash, the exchange will be taxable to the U.S. Holder. The U.S. Holder will recognize gain or loss in an amount equal to the difference between the amount of such cash received under the Plan and such U.S. Holder's adjusted tax basis in the Claim. The character of any such gain or loss as capital or ordinary will be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder has previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.

#### (c) Net Investment Income Tax.

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

**(d)    Limitations on Use of Capital Losses.**

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

**2.    *Certain U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Cryptocurrency Received Under the Plan***

The U.S. federal income tax consequences to a U.S. Holder of owning and disposing of Cryptocurrency received under the Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors.  U.S. Holders are urged to consult their own tax advisors regarding the proper characterization of such relationship and the tax consequences that may result therefrom.

**3.    *The GUC Trust***

The Plan provides that, on the Effective Date, the GUC Trust will be established to commence, litigate and settle the Vested Causes of Action and make distributions pursuant to the terms of the Plan and the Liquidation Trust Agreement.

**(a)    Classification of the GUC Trust.**

The GUC Trust is intended to qualify as liquidating trusts for federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity).  The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  The GUC Trust has been structured with the intention of complying with such general criteria.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the GUC Trustee and the Holders of GUC Trust Interests) are required to treat for United States federal income tax purposes the GUC Trust as a grantor trust of which the Holders of Allowed Class 6D General Unsecured Claims Against Reliz LTD are the owners and grantors.  While the following discussion assumes that the GUC Trust would be so treated for United States federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the GUC Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC Trust as a grantor trust.  If the IRS were to challenge successfully such classification, the United States federal income tax consequences to the GUC Trust and the Holders General Unsecured Claims Against Reliz LTD could vary from those discussed herein.

84

**(b)    General Tax Reporting by the GUC Trust and GUC Trust Beneficiaries.**

For all United States federal income tax purposes, all parties (including the GUC Trustee and the Holders of GUC Trust Interests) will be required to treat the transfer of assets to the GUC Trust, in accordance with the terms of the Plan, as a transfer of those assets directly to the Holders of Claims followed by the transfer of such assets by such Holders to the GUC Trust. Consistent therewith, all parties are required to treat the GUC Trust as a grantor trust of which such Holders are to be owners and grantors. Thus, such Holders (and any subsequent Holders of GUC Trust Interests) will be treated as the direct owners of an undivided beneficial interest in the assets of the GUC Trust for all federal income tax purposes. Accordingly, each Holder of a GUC Trust Interest will be required to report on its federal income tax return(s) the Holder's allocable share of all income, gain, loss, deduction, or credit recognized or incurred by the GUC Trust.

The United States federal income tax reporting obligation of a Holder of a GUC Trust Interest is not dependent upon the GUC Trust distributing any Cash or other proceeds. Therefore, a Holder of a GUC Trust Interest may incur a United States federal income tax liability although the GUC Trust has not made, or will not make, any concurrent or subsequent Distributions to the Holder. If a Holder incurs a federal tax liability but does not receive Distributions commensurate with the taxable income allocated to it in respect of its GUC Trust Interests, the Holder may be allowed a subsequent or offsetting loss.

The GUC Trustee will file tax returns with the IRS for the GUC Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The GUC Trustee will also send to each Holder of a GUC Trust Interest a separate statement setting forth the Holder's share of items of income, gain, loss, deduction, or credit and will instruct the Holder to report such items on its federal income tax return.

All payments to Holders of Claims are subject to any applicable withholding (including employment tax withholding). Under the Tax Code, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" then in effect. Backup withholding generally applies if the holder (a) fails to furnish his or her social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails to properly report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct number and that he is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax if an appropriate refund claim is filed with the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**(c)    Allocations of Taxable Income and Loss.**

Allocations of taxable income of the GUC Trust among Holders of General Unsecured Claims will be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the GUC Trust had distributed all of its respective assets to the Holders of the GUC Trust Interests adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the GUC Trust. Similarly, taxable

85

loss of the GUC Trust will be allocated by reference to the way an economic loss would be borne immediately after a liquidating Distribution of the remaining GUC Trust Assets.

After the Effective Date, any amount a Holder receives as a Distribution from the GUC Trust in respect of its beneficial Interests therein should not be included, for United States federal income tax purposes, in the Holder's amount realized in respect of its Allowed Claim but should be separately treated as a Distribution received in respect of such Holder's beneficial GUC Trust Interest(s).

In general, a Holder's aggregate tax basis in its undivided beneficial interest in the assets transferred to the GUC Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date and the Holder's holding period in such assets will begin the day following the Effective Date.  Distributions to any Holder of an Allowed Claim will be allocated first to the original principal portion of such Claim as determined for United States federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim.  However, there is no assurance that the IRS will respect such allocation for United States federal income tax purposes.

The tax book value of the GUC Trust Assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.  Uncertainties with regard to United States federal income tax consequences of the Plan may arise due to the inherent nature of estimates of value that will impact tax liability determinations.

As soon as practicable after the Effective Date, the GUC Trustee (to the extent that it deems necessary or appropriate in the reasonable exercise of its discretion) will, in good faith, value the GUC Trust Assets, and, as appropriate, will apprise the Holders of the GUC Trust Interests of such valuation.  The valuation is required to be used consistently by all parties (including the Debtors, the GUC Trustee, and the Holders of GUC Trust Interests) for all United States federal income tax purposes.  The Bankruptcy Court will resolve any dispute regarding the valuation of the assets. No valuation will be deemed an admission or be admissible in any cause of action.

The GUC Trust's taxable income will be allocated to the Holders of beneficial GUC Trust Interests in accordance with each such Holder's pro rata share of such beneficial GUC Trust Interests.  The character of items of income, deduction, and credit to any Holder and the ability of such Holder to benefit from any deductions or losses may depend on the particular situation of such Holder.

Events subsequent to the date of the Disclosure Statement, such as the enactment of additional tax legislation, could also change the United States federal income tax consequences of the Plan and the transactions contemplated thereunder.

### 4.    *U.S. Information Reporting and Withholding*

The Debtors and the GUC Trust, as applicable, intend to withhold all amounts required under the IRC with respect to distributions made under the Plan and to comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim or Interest under the Plan, as well as future payments made with respect to consideration received under the Plan.

Backup withholding is not an additional tax.  Any amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

### 5.    *FATCA*

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account Holders and investors or be subject to withholding on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of interest on certain types of obligations.  FATCA withholding may apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.  U.S. Holders that hold Claims through foreign financial institutions and Non-U.S. Holders are encouraged to consult their tax advisors regarding the possible implications of these rules on their Claim.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.  THE FOREGOING SUMMARY DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.

### XIII.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote to accept or reject the Plan support Confirmation and vote to accept the Plan.

Dated:  May 28, 2026

**RELIZ TECHNOLOGY HOLDINGS, INC**.
on behalf of itself and all other Debtors


*/s/ Mark Renzi*
Mark Renzi
Chief Restructuring Officer
Reliz Technology Holdings, Inc.


**MCDERMOTT WILL & SCHULTE LLP**

*/s/ David R. Hurst*
David R. Hurst (I.D. No. 3743)
Andrew A. Mark (I.D. No. 6861)
The Brandywine Building
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
Email:      dhurst@mcdermottlaw.com
               amark@mcdermottlaw.com

-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
R. Ethan Dover (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
Email:      dazman@mcdermottlaw.com
               jbevans@mcdermottlaw.com
               edover@mcdermottlaw.com

-and-

Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131

88

Telephone: (305) 358-3500
Email: gsteinman@mcdermottlaw.com

*Counsel for Debtors*
*and Debtors in Possession*

**EXHIBIT A**

**<u>Plan</u>**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| RELIZ TECHNOLOGY GROUP HOLDINGS INC., *et al.*,[1] | Case No. 26-10371 (TMH) |
| | (Jointly Administered) |
| Debtors. | |

**AMENDED JOINT CHAPTER 11 PLAN OF RELIZ
TECHNOLOGY GROUP HOLDINGS INC. AND ITS DEBTOR AFFILIATES**

David R. Hurst (I.D. No. 3743)
Andrew A. Mark (I.D. No. 6861)
**MCDERMOTT WILL & SCHULTE LLP**
The Brandywine Building
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
Email: dhurst@mcdermottlaw.com
        amark@mcdermottlaw.com

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
R. Ethan Dover (admitted *pro hac vice*)
**MCDERMOTT WILL & SCHULTE LLP**
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
Email:  dazman@mcdermottlaw.com
        jbevans@mcdermottlaw.com
        edover@mcdermottlaw.com

Gregg Steinman (admitted *pro hac vice*)
**MCDERMOTT WILL & SCHULTE LLP**
333 SE 2nd Ave Suite 4500
Miami, Florida 33131
Telephone: (305) 358-3500
Email:  gsteinman@mcdermottlaw.com

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are: Reliz Technology Group Holdings Inc. (6265); Reliz Technologies LLC (1968); Reliz LTD (N/A); and Reliz CI LTD (N/A).  The Debtors' service address is 401 West Ontario St., Suite 400, Chicago, IL 60654.

**TABLE OF CONTENTS**

**Page**

Introduction ...................................................................................................................................... 1

**Article I. Defined Terms, Rules of Interpretation, Computation of Time, Governing Law, and Other References** ....................................................................................................... 1

    A.    Defined Terms ................................................................................................. 1
    B.    Rules of Interpretation .................................................................................. 13
    C.    Computation of Time ..................................................................................... 14
    D.    Governing Law ............................................................................................. 14
    E.    Reference to Monetary Figures ..................................................................... 14
    F.    Reference to the Post Effective Date Debtors or the GUC Trust ................... 14
    G.    Nonconsolidated Plan ................................................................................... 14

**Article II. Administrative and Priority Claims** ....................................................................... 15

    A.    Administrative Claims .................................................................................. 15
    B.    Professional Fee Claims ............................................................................... 16
    C.    Priority Tax Claims ...................................................................................... 17

**Article III. Classification, Treatment, and Voting of Claims and Interests** ......................... 17

    A.    Classification of Claims and Interests .......................................................... 17
    B.    Summary of Classification ............................................................................ 17
    C.    Treatment of Classes of Claims and Interests .............................................. 18
    D.    Special Provision Governing Unimpaired Claims ........................................ 22
    E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes .............. 23
    F.    Subordinated Claims .................................................................................... 23
    G.    Intercompany Interests ................................................................................. 23
    H.    Controversy Concerning Impairment ........................................................... 23
    I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ..................... 23

**Article IV. Provisions for Implementation of the Plan** ........................................................... 24

    A.    Vesting of Assets .......................................................................................... 24
    B.    Sources of Consideration for Plan Distributions .......................................... 24
    C.    Authority to Act and Deliver Definitive Documents ..................................... 24
    D.    Release of Liens ........................................................................................... 25
    E.    Corporate Action .......................................................................................... 25
    F.    Corporate Existence ..................................................................................... 25
    G.    Dissolution of the Board of the Debtors ....................................................... 26
    H.    Effectuating Documents; Further Transactions ........................................... 26
    I.    Cryptocurrency Rebalancing and Distributions ........................................... 26
    J.    Vesting of Causes of Action in GUC Trust ................................................... 27
    K.    Preservation of Vested Causes of Action ...................................................... 27
    L.    Post Effective Date Debtors .......................................................................... 28
    M.    GUC Trustee ................................................................................................. 28
    N.    The GUC Trust ............................................................................................. 28
    O.    Corporate Existence and Dissolution ........................................................... 35

i

P.    Cancellation of Notes, Instruments, Certificates, and Other Documents ........................ 35
Q.    Effectuating Documents; Further Transactions .................................................. 35
R.    Section 1146(a) Exemption................................................................... 36
S.    Preservation of Rights of Action............................................................. 36
T.    Closing the Chapter 11 Cases ............................................................... 37

**Article V. Treatment of Executory Contracts and Unexpired Leases .................................... 37**

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases...................... 37
B.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired
      Leases ................................................................................... 37
C.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ..................... 38
D.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ................... 38
E.    Insurance Policies ....................................................................... 39
F.    Reservation of Rights..................................................................... 40
G.    Nonoccurrence of Effective Date........................................................... 40

**Article VI. Provisions Governing Distributions ..................................................... 40**

A.    Timing and Calculation of Amounts to Be Distributed ..................................... 40
B.    Rights and Powers of Distribution Agent .................................................. 41
C.    Delivery of Distributions and Undeliverable or Unclaimed Distributions .................. 41
D.    Compliance Matters....................................................................... 42
E.    Claims Paid or Payable by Third Parties .................................................. 43
F.    Setoffs and Recoupment ................................................................... 43
G.    Allocation between Principal and Accrued Interest......................................... 44

**Article VII. Procedures for Resolving Disputed, Contingent, and Unliquidated Claims................. 44**

A.    Disputed Claims Process .................................................................. 44
B.    Objections to Claims...................................................................... 45
C.    Estimation of Claims ..................................................................... 45
D.    No Distributions Pending Allowance ....................................................... 45
E.    Distributions After Allowance ............................................................ 46
F.    No Interest............................................................................... 46
G.    Adjustment to Claims without Objection ................................................... 46
H.    Time to File Objections to Claims......................................................... 46
I.    Disallowance of Claims ................................................................... 46
J.    Amendments to Proofs of Claim............................................................. 46

**Article VIII. Effect of Confirmation of the Plan ................................................... 47**

A.    Releases by the Debtors................................................................... 47
B.    Releases by Holders of Claims and Interests............................................... 48
C.    Exculpation............................................................................... 48
D.    Injunction................................................................................ 49
E.    Release of Liens.......................................................................... 49
F.    Protection against Discriminatory Treatment .............................................. 50
G.    Document Retention ....................................................................... 50
H.    Reimbursement or Contribution ............................................................ 50
I.    Term of Injunctions or Stays.............................................................. 50

ii

**Article IX. Conditions Precedent to the Effective Date** ...................................................................**50**

    A.    Conditions Precedent to the Effective Date ........................................................ 50
    B.    Waiver of Conditions Precedent .......................................................................... 51
    C.    Effect of Non-Occurrence of Conditions to Effective Date.............................. 51

**Article X. Modification, Revocation, or Withdrawal of the Plan** .......................................**51**

    A.    Modification of Plan ............................................................................................. 51
    B.    Effect of Confirmation on Modifications ........................................................... 52
    C.    Substantial Consummation .................................................................................. 52
    D.    Revocation or Withdrawal of Plan...................................................................... 52

**Article XI. Retention of Jurisdiction** ................................................................................**52**

**Article XII. Miscellaneous Provisions** ..............................................................................**54**

    A.    Immediate Binding Effect.................................................................................... 54
    B.    Additional Documents ......................................................................................... 54
    C.    Payment of Statutory Fees .................................................................................. 55
    D.    Dissolution of Statutory Committees.................................................................. 55
    E.    Reservation of Rights........................................................................................... 55
    F.    Successors and Assigns ....................................................................................... 55
    G.    Post-Effective Date Service of Documents......................................................... 55
    H.    Entire Agreement; Controlling Document.......................................................... 57
    I.    Plan Supplement ................................................................................................. 57
    J.    Non-Severability................................................................................................... 57
    K.    Votes Solicited in Good Faith.............................................................................. 58
    L.    Waiver or Estoppel .............................................................................................. 58

**INTRODUCTION**

Reliz Technology Group Holdings Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each, a "Debtor" and, collectively, the "Debtors") propose this joint plan (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**

**DEFINED TERMS, RULES OF INTERPRETATION,
COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

**A.      Defined Terms**

Capitalized terms used in this Plan have the meanings ascribed to them below.

1.      "*Acquired Assets*" has the meaning ascribed to it in the Asset Purchase Agreement.

2.      "*Administrative Claim*" means a Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and on or prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims.

3.      "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

4.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

5.      "*Allowed*" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim timely Filed by the Bar Date or a request for payment of Administrative Claim timely Filed by the Administrative Claims Bar Date (or a Claim for which a Proof of Claim or a request for payment of Administrative Claim is not or shall not be required to be Filed under the

1

Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; (c) a Claim Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court, or (d) a Claim as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; *provided that*, with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed (or, for Claims listed in the Schedules for which no Proof of Claim has been timely Filed, the Schedules have not been amended with respect to such Claim) by the Claims Objection Bar Date or such other period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed (or the Schedules amended), such Claim shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. A Proof of Claim Filed after and subject to the Bar Date or a request for payment of an Administrative Claim Filed after and subject to the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow" and "Allowing" shall have correlative meanings.

6. "*Asset Purchase Agreement*" means any definitive purchase agreement for all or substantially all of the Debtors' assets, including all exhibits and schedules thereto, as may be amended, modified, or supplemented in accordance with the terms thereof.

7. "*Assumed Liabilities*" has the meaning ascribed to it in the Asset Purchase Agreement.

8. "*Ballot*" means the ballot, approved pursuant to the Disclosure Statement Order, distributed to Holders of Impaired Claims entitled to vote on the Plan, on which such Holders desiring to vote shall indicate acceptance or rejection of the Plan and, as applicable, make any additional settlement and treatment elections contained in such ballot.

9. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

10. "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the District of Delaware.

11. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

12. "*Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

2

13.    "*Bar Date Order*" means the *Order (I) Establishing Bar Dates to File Proofs of Claim; (II) Approving Procedures for Filing Proofs of Claim; (III) Approving Form and Manner of Notice of Bar Dates; and (IV) Granting Related Relief* [Docket No. 176].

14.    "*Bidding Procedures*" means the *Bidding Procedures*, attached as <u>Exhibit 1</u> to the Bidding Procedures Order, as may be amended or modified pursuant to its terms.

15.    "*Bidding Procedures Order*" means the *Order (I) Approving Bidding Procedures for the Sale of Substantially all of the Debtors' Assets, (II) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (III) Approving Assumption and Assignment Procedures, (IV) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief* [Docket No. 177].

16.    "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

17.    "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

18.    "*Cash Collateral Order*" means the *Final Order (I) Authorizing Postpetition Use of Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Party; and (III) Granting Related Relief* [Docket No. 379].

19.    "*Causes of Action*" mean any action, Claim, cross-claim, third-party claim, damage, judgment, cause of action, controversy, demand, right, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, interest, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law in accordance with applicable law.  For the avoidance of doubt, "Causes of Action" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim arising from any contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

20.    "*Celsius*" means Celsius Network Ltd. and any of its Affiliates.

21.    "*Celsius Claim*" means the Claim of Celsius on account of the Celsius Note.

22.    "*Celsius Note*" means that certain promissory note between Celsius and TopCo, Reliz Tech, Reliz LTD and non-Debtors Reliz Technologies LLC (a Wyoming limited liability company), Basis Group Holdings Inc., Basis Capital Markets UK Limited, BlockFils Digital Markets LTD, Cerus Digital Master Fund SPC, Cerus Digital Offshore Fund SPC, and Cerus Digital Asset Management LLC,  entered into on June 14, 2024 with a maturity date of March 31, 2026 (the other Celsius promissory note, with a maturity date of September 30, 2024, having been timely paid off and satisfied).

23.    "*Celsius Secured Claim*" means any portion of the Celsius Claim that is a Secured Claim.

3

24.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated cases filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

25.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

26.     "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a)(i) with respect to Administrative Claims (other than Professional Fee Claims and Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), 60 days after the Administrative Claims Bar Date or (ii) with respect to all other Claims (other than Professional Fee Claims), 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the GUC Trust, as applicable, as approved by an order of the Bankruptcy Court for objecting to such Claims.

27.     "*Claims Register*" means the official register of Claims against the Debtors maintained by the Clerk of the Bankruptcy Court or the Claims, Noticing, and Solicitation Agent.

28.     "*Claims, Noticing, and Solicitation Agent*" means Kurtzman Carson Consultants, LLC dba Verita Global, in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

29.     "*Class*" means a class of Claims against or Interests in the Debtors as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

30.     "*Committee*" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases.

31.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

32.     "*Confirmation Date*" means the date on which Confirmation occurs.

33.     "*Confirmation Hearing*" means the hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code at which the Debtors will seek Confirmation of the Plan.

34.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to the Debtors.

35.     "*Consummation*" means the occurrence of the Effective Date.

36.     "*Convenience Claim*" means any General Unsecured Claim valued at less than or equal to the Convenience Claim Threshold; *provided,* that Holders of Allowed General Unsecured Claims that exceed the Convenience Claim Threshold may irrevocably elect through the Convenience Claim Election to have their Claims reduced to the Convenience Claim Threshold and treated as Convenience Claims. No Holder of an Allowed General Unsecured Claim that is filed in an unliquidated amount may elect to be treated as a Convenience Claim.

37.     "*Convenience Claim Election*" means the election through a Ballot, in accordance with the procedures set forth in the Disclosure Statement Order, pursuant to which Holders of General Unsecured

4

Claims, whose claims exceed the Convenience Claim Threshold, irrevocably elect to have their Claims reduced to the Convenience Claim Threshold and treated as Convenience Claims; *provided*, any General Unsecured Claim cannot be the subject of a partial election (*i.e.,* the Claim must be in either Class 5 or Class 6A, 6B, 6C, and 6D (as applicable) in its entirety), and no Holder of a General Unsecured Claim that is filed in an unliquidated amount may elect to be treated as a Convenience Claim.

38.    "*Convenience Claim Threshold*" means $45,000.

39.    "*Convenience Class Recovery Pool*" means a pool of $850,000.

40.    "*Cryptocurrency*" means a digital currency, digital asset, or crypto asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a centralized authority, including stablecoins, digital coins and tokens, such as security tokens, utility tokens and governance tokens.

41.    "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

42.    "*D&O Carriers*" means the insurance carriers of the D&O Liability Insurance Policies.

43.    "*D&O Liability Insurance Policies*" means all unexpired insurance policies maintained by the Debtors, the GUC Trust, or the Estates as of the Effective Date that have been issued (or provide coverage) regarding directors', managers', officers', members', and trustees' liability (including any "tail policy"), and all agreements, documents, or instruments relating thereto.

44.    "*Debtors*" means, collectively, each of the following: Reliz Technology Group Holdings Inc.; Reliz Technologies LLC; Reliz LTD; and Reliz CI LTD.

45.    "*Definitive Documents*" means:  (a) the Plan (and any and all exhibits, annexes, and schedules thereto); (b) the Confirmation Order; (c) the Disclosure Statement and the other Solicitation Materials; (d) the Disclosure Statement Order; (e) all pleadings filed by the Debtors in connection with the Chapter 11 Cases (or related orders); (f) the Plan Supplement; (g) the Asset Purchase Agreement (if any); and (h)  any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments or other documents reasonably desired or necessary to consummate and document the transactions contemplated by the Sale Transaction (including any exhibits, amendments, modifications, or supplements made from time to time thereto).

46.    "*Disclosure Statement*" means the *Amended Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Reliz Technology Group Holdings Inc. and Its Debtor Affiliates*, as may be amended, supplemented, or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan.

47.    "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement.

48.    "*Disputed*" means, with respect to any Claim, a Claim that (a)(i) is evidenced by a Proof of Claim timely Filed by the Bar Date or a request for payment of Administrative Claim timely Filed by the Administrative Claims Bar Date (or a Claim for which a Proof of Claim or a request for payment of Administrative Claim is not or shall not be required to be Filed under the Plan, the Bankruptcy Code, or a

Final Order of the Bankruptcy Court) or (ii) is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; and (b) is not (i) Allowed or (ii) disallowed under the Plan, the Bankruptcy Code, or a Final Order.

49. "*Disputed Claims Reserve*" means an appropriate reserve in an amount to be determined by the GUC Trust for distributions on account of Disputed Claims that are subsequently Allowed after the Effective Date, in accordance with Article VII.E hereof.

50. "*Distributable Assets*" means, as of the Effective Date, (i) all Distributable Cryptocurrency and (ii) cash on hand after (x) payment in full of, or reserve for, all Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, Other Secured Claims, Other Priority Claims, Convenience Claims and the Celsius Secured Claim in accordance with the terms of the Plan and (y) funding in cash of the GUC Trust Reserve.

51. "*Distributable TopCo Assets*" means all Distributable Assets belonging to TopCo.

52. "*Distributable Reliz Tech Assets*" means all Distributable Assets belonging to Reliz Tech.

53. "*Distributable Reliz CI Assets*" means all Distributable Assets belonging to Reliz CI.

54. "*Distributable Reliz LTD Assets*" means all Distributable Assets belonging to Reliz LTD.

55. "*Distributable Cryptocurrency*" means all Cryptocurrency held by the Debtors or that is otherwise property of any Debtor on the Effective Date.

56. "*Distribution Agent*" means, as applicable, the Debtors, the Post Effective Date Debtors, the GUC Trust, or any Entity or Entities designated by the Debtors or the GUC Trust to make or to facilitate distributions that are to be made pursuant to the Plan, Definitive Documents, and/or Asset Purchase Agreement.

57. "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the GUC Trust, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

58. "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims against the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date, or such other date as is determined by the Debtors or designated by an order of the Bankruptcy Court.

59. "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.

60. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

61. "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

62.     "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors and their current directors and officers; (b) the Committee, and each of the members thereof, solely in their capacity as such; (c) each Professional employed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code; and (d) the Independent Director.

63.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

64.     "*Existing Equity Interests*" means any Interest in TopCo existing immediately prior to the occurrence of the Effective Date.

65.     "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

66.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing, respectively, in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee, or, with respect to the filing of a Proof of Claim or Proof of Interest, file, filed, or filing, respectively, with the Claims, Noticing, and Solicitation Agent.

67.     "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

68.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal that has been or may be taken or any petition for certiorari or any motion for a new trial, reargument, reconsideration, or rehearing that has been or may be made or filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the motion for a new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order (if any such motion has been or may be granted), or have otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

69.     "*General Unsecured Claim*" means any Claim against any of the Debtors that is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) an Other Secured Claim; (g) a Celsius Secured Claim; (h) a Convenience Claim; (i) an Intercompany Claim; or (j) a Section 510(b) Claim.

70.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

71.     "*Government Bar Date*" means the applicable deadline by which Proofs of Claim by a Governmental Unit must be Filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

72.     "*GUC Trust*" means the trust established on the Effective Date to, among other things, commence, litigate and settle the Vested Causes of Action and make distributions pursuant to the terms of the Plan and the Liquidation Trust Agreement.

7

73.     "*GUC Trust Assets*" means (a) the GUC Trust Reserve, (b) the Vested Causes of Action, and (c) any of the Debtors' assets that are not transferred to the Purchaser.

74.     "*GUC Trust Beneficiaries*" means the Holders of Allowed Claims in Classes 6A, 6B, 6C, and 6D, which are entitled to receive GUC Trust Interests pursuant to Article III of the Plan.

75.     "*GUC Trust Budget*" means the budget to fund the GUC Trust, which will be included in the Plan Supplement.

76.     "*GUC Trust Expenses*" means all actual and necessary costs and expenses incurred by the GUC Trust or GUC Trustee in connection with carrying out the obligations of the GUC Trust pursuant to the terms of the Plan and the Liquidation Trust Agreement.

77.     "*GUC Trust Interests*" means the beneficial interests in the GUC Trust issued as of the Effective Date to all GUC Trust Beneficiaries in accordance with the Plan, including the (a) Series A GUC Trust Interests, (b) Series B GUC Trust Interests, (c) Series C GUC Trust Interests, and (d) Series D GUC Trust Interests.

78.     "*GUC Trust Oversight Committee*" means the oversight committee tasked with overseeing the GUC Trust in accordance with the Plan and the Liquidation Trust Agreement which shall consist of no more than three members to be selected by the Committee after consultation with the Debtors.

79.     "*GUC Trust Reserve*" means the amount set forth in the GUC Trust Budget to fund the GUC Trust.

80.     "*GUC Trustee*" means the individual designated in the Plan Supplement in accordance with the terms of the Plan to serve as trustee of the GUC Trust subject to the terms of the Liquidation Trust Agreement.

81.     "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

82.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

83.     "*Independent Director*" means Matthew Kahn, solely in his capacity as disinterested director of TopCo.

84.     "*Insurance Policies*" means any and all insurance policies entered into by the Debtors, including the D&O Liability Insurance Policies.

85.     "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor.

86.     "*Intercompany Interest*" means, other than an Interest in TopCo, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

87.     "*Interest*" means any equity security (as such term is defined in section 101(16) of the Bankruptcy Code) including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity in a Debtor, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights,

8

convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in a Debtor whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, and including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

88.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001 and the rules and regulations promulgated thereunder, as applicable to the Chapter 11 Cases.

89.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

90.    "*Liquidation Trust Agreement*" means the agreement to be included in the Plan Supplement which shall govern the rights, duties, obligations, and governance of the GUC Trust, the GUC Trustee, the GUC Trust Beneficiaries, the GUC Trust Oversight Committee, and all other matters relating to the GUC Trust in accordance with the Plan.

91.    "*Other Priority Claim*" means any Claim against a Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

92.    "*Other Secured Claim*" means any Secured Claim that is not a Secured Tax Claim or the Celsius Secured Claim.

93.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

94.    "*Petition Date*" means March 15, 2026.

95.    "*Plan*" means this joint chapter 11 plan and all exhibits, supplements, appendices, and schedules hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with Article X.A hereof, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

96.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may thereafter be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Plan, the Bankruptcy Code, the Bankruptcy Rules, and applicable law), to be Filed by the Debtors no later than seven days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement. The Plan Supplement may include the following, as applicable:  (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Retained Causes of Action; (c) the Liquidation Trust Agreement; (d) documents identifying the individual to serve as GUC Trustee to the extent not identified in the Liquidation Trust Agreement; (e) documents identifying the individuals who will serve on the GUC Trust Oversight Committee; (f)  the GUC Trust Budget; and (g) any additional documents necessary to effectuate or that is contemplated by the Plan.

97.    "*Post Effective Date Debtors*" means, collectively, all Debtors and successors thereto after the Effective Date that are not acquired by the Purchaser (if any) or any of its Affiliates.

98.     "*Priority Tax Claim*" means any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

99.     "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, unless otherwise indicated.

100.     "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and/or 363 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

101.     "*Professional Fee Claim*" means any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

102.     "*Professional Fee Escrow Account*" means an escrow account funded by the Debtors with Cash no later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

103.     "*Professional Fee Escrow Amount*" means the aggregate amount of quarterly U.S. Trustee fees, Professional Fee Claims, and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services in connection with the Chapter 11 Cases on or before the Effective Date projected to be outstanding as of the anticipated Effective Date, which shall be estimated pursuant to the method set forth in Article II.B of the Plan.

104.     "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

105.     "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

106.     "*Purchaser*" means shall have the meaning ascribed to such term in the Asset Purchase Agreement.

107.     "*Reinstated*" or "*Reinstatement*" means, with respect to Claims, that the Claim shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

108.     "*Related Party*" or "*Related Parties*" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

109.     "*Released Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Committee, and each of the members thereof in their capacity as such; (c) the

10

Purchaser, if any, and only in Purchaser's capacity as such; and (d) the Related Parties of each of the foregoing Entities in clauses (a) through (c) of this definition to the fullest extent permitted by law; *provided that*, in each case, to the extent an Entity is entitled to vote on the Plan, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases described in Article VIII.B hereof or (y) timely objects to the releases contained in Article VIII.B hereof and such objection is not resolved before Confirmation; *provided further that*, any such inclusion of the foregoing Entities in clauses (a) through (d) of this definition is expressly subject to and dependent on the outcome of the ongoing Special Committee Investigation.

110.    "*Releasing Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Committee, and each of the members thereof; (c) any Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (d) all Holders of Claims that vote to accept the Plan and who do not affirmatively opt out of the releases provided for in this Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided for in this Plan; (e) all Holders of Claims who vote to reject this Plan and who do not affirmatively opt out of the releases provided for in this Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided for in this Plan; and (f) to the maximum extent permitted by Law, each Related Party of each Entity in clause (a) through (e); *provided that*, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in Article VIII.B hereof; or (y) timely objects to the releases contained in Article VIII.B hereof and such objection is not resolved before Confirmation.

111.    "*Reliz CI*" means Debtor, Reliz CI Ltd.

112.    "*Reliz CI Recoveries*" means any proceeds arising from (a) Vested Causes of Action belonging to Reliz CI and (b) any other assets belonging to Reliz CI that are not transferred to the Purchaser.

113.    "*Reliz LTD Recoveries*" means any proceeds arising from (a) Vested Causes of Action belonging to Reliz LTD and (b) any other assets belonging to Reliz LTD that are not transferred to the Purchaser.

114.    "*Reliz Tech*" means Debtor, Reliz Technologies LLC.

115.    "*Reliz Tech Recoveries*" means any proceeds arising from (a) Vested Causes of Action belonging to Reliz Techs and (b) any other assets belonging to Reliz Tech that are not transferred to the Purchaser.

116.    "*Sale Transaction*" means the sale of all or substantially all of the Debtors' assets pursuant to the Bidding Procedures, or any combination of sales of subsets of the Debtors' assets, whether through the Bidding Procedures or private sales.

117.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or GUC Trust, as applicable, in accordance with the Plan.

118.    "*Schedule of Retained Causes of Action*" means any and all Causes of Action of the Debtors that, for the avoidance of doubt, are not released, waived, settled, compromised, or transferred pursuant to the Plan.  For the avoidance of doubt, any failure to specifically list any Causes of Action on the Schedule of Retained Causes of Action shall not be deemed a waiver or admission that any such Cause of Action does not constitute a Vested Causes of Action.

11

119. "*Schedules*" means, collectively, the schedules of assets and liabilities and statement of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may have been or may be amended, modified, or supplemented from time to time.

120. "*SEC*" means the United States Securities and Exchange Commission.

121. "*Section 510(b) Claim*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code.

122. "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan as a secured Claim.

123. "*Secured Claim*" means a Claim that is Secured.

124. "*Secured Tax Claim*" means any Secured Claim against a Debtor that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

125. "*Securities Act*" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

126. "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

127. "*Series A GUC Trust Interests*" means beneficial interests in the GUC Trust entitling each Holder thereof to receive its Pro Rata share of distributions of the TopCo Recoveries pursuant to Article III of the Plan.

128. "*Series B GUC Trust Interests*" means beneficial interests in the GUC Trust entitling each Holder thereof to receive its Pro Rata share of distributions of the Reliz Tech Recoveries pursuant to Article III of the Plan.

129. "*Series C GUC Trust Interests*" means beneficial interests in the GUC Trust entitling each Holder thereof to receive its Pro Rata share of distributions of the Reliz CI Recoveries pursuant to Article III of the Plan.

130. "*Series D GUC Trust Interests*" means beneficial interests in the GUC Trust entitling each Holder thereof to receive its Pro Rata share of distributions of the Reliz LTD Recoveries pursuant to Article III of the Plan.

131. "*Solicitation Materials*" means all solicitation materials with respect to the Plan.

132. "*Special Committee*" means the special committee established at TopCo, comprised of the Independent Director.

133. "*Special Committee Investigation*" means that certain investigation undertaken by the Special Committee into certain historical transactions and conduct.

134.   "*TopCo*" means, Debtor Reliz Technology Group Holdings Inc., a Delaware corporation.

135.   "*TopCo Recoveries*" means any proceeds arising from (a) Vested Causes of Action belonging to TopCo and (b) any other assets belonging to TopCo that are not transferred to the Purchaser.

136.   "*U.S. Trustee*" means the Office of the United States Trustee for Region 3.

137.   "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that, after the expiration of 180 days after the Effective Date, has not:  (a) accepted a distribution, (b) given notice to the GUC Trust of an intent to accept a particular distribution, (c) responded to the Debtors' or GUC Trust's requests for information necessary to facilitate a particular distribution, or (d) taken any other action necessary to facilitate such distribution.

138.   "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

139.   "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

140.   "*Vested Causes of Action*" means the Causes of Action that will vest in the GUC Trust pursuant to Article IV.N of the Plan, including, but not limited to, those Causes of Action enumerated on the Schedule of Retained Causes of Action, which shall be included in the Plan Supplement and in all respects consistent with the terms of the Asset Purchase Agreement.

141.   "*Voting Deadline*" means June 15, 2026, or such other date established by the Disclosure Statement Order or other order of the Bankruptcy Court.

## B.   Rules of Interpretation

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (3) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (4) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter have been or may thereafter be validly amended, amended and restated, supplemented, or otherwise modified; (5) unless otherwise specified, any reference to an Entity as a Holder of a Claim or Interest, includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) unless otherwise specified, all references to

13

statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases; (14) any effectuating provisions may be interpreted by the Debtors or the GUC Trust in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (15) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (16) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (18) the use of "include" or "including" is without limitation unless otherwise stated.

## C.     Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## D.     Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control); *provided that*, corporate, limited liability company, or partnership governance matters relating to the Debtors or the GUC Trust, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or the GUC Trust, as applicable.

## E.     Reference to Monetary Figures

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

## F.     Reference to the Post Effective Date Debtors or the GUC Trust

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Post Effective Date Debtors or to the GUC Trust mean the Post Effective Date Debtors and the GUC Trust, as applicable, to the extent the context requires.

## G.     Nonconsolidated Plan

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

14

# ARTICLE II.

## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

**A.      Administrative Claims**

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), unless previously Filed, requests for payment of Allowed Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code) must be Filed and served on the GUC Trust pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied as of the Effective Date without the need for any objection from the GUC Trust or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  Objections to such requests, if any, must be Filed and served on the GUC Trust and the requesting party by the Claims Objection Bar Date for Administrative Claims.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive an amount of Cash equal to the amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the GUC Trust, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Objections to requests for payment of such Administrative Claims, if any, must be Filed with the Bankruptcy Court and served on the GUC Trust and the requesting Holder no later than the Claims Objection Bar Date for Administrative Claims.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

15

**B.** **Professional Fee Claims**

    1.    <u>Final Fee Applications and Payment of Professional Fee Claims</u>

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred on or before the Effective Date must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules. The GUC Trust shall pay Professional Fee Claims in Cash to such Professionals in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided that*, the Debtors' and the GUC Trust's obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

    2.    <u>Professional Fee Escrow Account</u>

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and the U.S. Trustee and for no other Entities until all quarterly U.S. Trustee fees and all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the U.S. Trustee or to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the GUC Trust. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, and all U.S. Trustee quarterly fees plus statutory interest, if any, have been paid in full, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the GUC Trust without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

    3.    <u>Professional Fee Escrow Amount</u>

The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided* that the GUC Trust shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

    4.    <u>Post-Confirmation Date Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, on and after the Confirmation Date the GUC Trust may, in the ordinary course of business and without any further notice to or action, order, or approval

of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the GUC Trust.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Post Effective Debtors and GUC Trust may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## C.      Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.

## CLASSIFICATION, TREATMENT,
## AND VOTING OF CLAIMS AND INTERESTS

### A.      Classification of Claims and Interests

The Plan constitutes a separate Plan for each Debtor. Except for the Claims addressed in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

### B.      Summary of Classification

A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is set forth in the following chart. The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below applies separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.E hereof. Voting tabulations for recording acceptances or rejections of the Plan will be conducted on a Debtor-by-Debtor basis as set forth above.[2]

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

---

[2]      The Debtors reserve the right to separately classify Claims or Interests to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

17

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 4 | Celsius Secured Claim | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Entitled to Vote |
| 5 | Convenience Claims | Impaired | Entitled to Vote |
| 6A | General Unsecured Claims Against TopCo | Impaired | Entitled to Vote |
| 6B | General Unsecured Claims Against Reliz Tech | Impaired | Entitled to Vote |
| 6C | General Unsecured Claims Against Reliz CI | Impaired | Entitled to Vote |
| 6D | General Unsecured Claims Against Reliz LTD | Impaired | Entitled to Vote |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 10 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

## C.      Treatment of Classes of Claims and Interests

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or GUC Trust, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable.  In no event shall any Holder of a Claim receive more than such Holder's Allowed amount on account of such Claim.

18

1.      <u>Class 1 —Secured Tax Claims</u>

   (d)      *Classification*:  Class 1 consists of all Secured Tax Claims.

   (e)      *Treatment*:  Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the GUC Trust, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired.

   (f)      *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Secured Tax Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Secured Tax Claims are not entitled to vote to accept or reject the Plan.

2.      <u>Class 2 —Other Secured Claims</u>

   (a)      *Classification*:  Class 2 consists of all Other Secured Claims.

   (b)      *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the GUC Trust, payment in full in Cash of such Holder's Allowed Other Secured Claim or such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

   (c)      *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan

3.      <u>Class 3 — Other Priority Claims</u>

   (a)      *Classification*:  Class 3 consists of all Other Priority Claims.

   (b)      *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the GUC Trust, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

   (c)      *Voting*:  Class 3 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

4.      <u>Class 4 — Celsius Secured Claim</u>

   (a)      *Classification*:  Class 4 consists of the Celsius Secured Claim.

   (b)      *Treatment*: The Holder of the Allowed Celsius Secured Claim shall receive, in full and final satisfaction of such Allowed Celsius Secured Claim, at the option of the

GUC Trust and subject to the terms of the Bidding Procedures Order and the Cash Collateral Order, payment in full in Cash of such Holder's Allowed Celsius Secured Claim or such other treatment rendering such Holder's Allowed Celsius Secured Claim Unimpaired, except to the extent that the Debtors and such Holder of an Allowed Celsius Secured Claim agree in writing to less favorable treatment; *provided*, the Holder of the Allowed Celsius Secured Claim shall first recover from the assets of TopCo and Reliz Tech before receiving any recovery from the assets of Reliz LTD.

(c)     *Voting:*  Class 4 is either Impaired or Unimpaired under the Plan.  In the event the Holder of the Allowed Celsius Secured Claim is Unimpaired, such Holder is conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, the Holder of the Allowed Celsius Secured Claim would not be entitled to vote to accept or reject the Plan.  In the event the Holder of the Allowed Celsius Secured Claim is Impaired, such Holder will be entitled to vote to accept or reject the Plan.

5.     <u>Class 5 — Convenience Claims</u>

(a)     *Classification*:  Class 5 consists of all Convenience Claims.

(b)     *Treatment*:  Each Holder of an Allowed Convenience Claim will receive, in full and final satisfaction of such Holder's Allowed Convenience Claim, such Holder's Pro Rata share of the Convenience Class Recovery Pool.

(c)     *Voting*:  Class 5 is Impaired under the Plan.  Holders of Allowed Convenience Claims are entitled to vote to accept or reject the Plan.

6.     <u>Class 6A —General Unsecured Claims Against TopCo</u>

(a)     *Classification*:  Class 6A consists of all General Unsecured Claims against TopCo.

(b)     *Treatment:* Each Holder of an Allowed General Unsecured Claim against TopCo will receive, in full and final satisfaction of such Holder's General Unsecured Claim, such Holder's Pro Rata share of the Distributable TopCo Assets and the Series A GUC Trust Interests.

(c)     *Voting*:  Class 6A is Impaired under the Plan.  Holders of Allowed General Unsecured Claims against TopCo in Class 6A are entitled to vote to accept or reject the Plan.

7.     <u>Class 6B —General Unsecured Claims Against Reliz Tech</u>

(a)     *Classification*:  Class 6B consists of all General Unsecured Claims against Reliz Tech.

(b)     *Treatment:* Each Holder of an Allowed General Unsecured Claim against Reliz Tech will receive, in full and final satisfaction of such Holder's General Unsecured Claim, such Holder's Pro Rata share of the Distributable Reliz Tech Assets and the Series B GUC Trust Interests.

20

(c) *Voting*: Class 6B is Impaired under the Plan. Holders of Allowed General Unsecured Claims against Reliz Tech in Class 6B are entitled to vote to accept or reject the Plan.

8. Class 6C —General Unsecured Claims Against Reliz CI

(a) *Classification*: Class 6C consists of all General Unsecured Claims against Reliz CI.

(b) *Treatment:* Each Holder of an Allowed General Unsecured Claim against Reliz CI will receive, in full and final satisfaction of such Holder's General Unsecured Claim, such Holder's Pro Rata share of the Distributable Reliz CI Assets and the Series C GUC Trust Interests.

(c) *Voting*: Class 6C is Impaired under the Plan. Holders of Allowed General Unsecured Claims against Reliz CI in Class 6C are entitled to vote to accept or reject the Plan.

9. Class 6D —General Unsecured Claims Against Reliz LTD

(a) *Classification*: Class 6D consists of all General Unsecured Claims against Reliz Ltd.

(b) *Treatment:* Each Holder of an Allowed General Unsecured Claim against Reliz LTD will receive, in full and final satisfaction of such Holder's General Unsecured Claim, such Holder's Pro Rata share of the Distributable Reliz LTD Assets and the Series D GUC Trust Interests.

(c) *Voting*: Class 6D is Impaired under the Plan. Holders of Allowed General Unsecured Claims against Reliz LTD in Class 6D are entitled to vote to accept or reject the Plan

10. Class 7 — Section 510(b) Claims

(a) *Classification*: Class 7 consists of all Section 510(b) Claims.

(b) *Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Section 510(b) Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

(c) *Treatment*: Each Section 510(b) Claim will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such 510(b) Claim.

(d) *Voting*: Class 7 is Impaired under the Plan. Holders (if any) of Allowed Section 510(b) Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders (if any) of Allowed Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

21

11.   Class 8 — Intercompany Claims

    (a)   *Classification*:  Class 8 consists of all Intercompany Claims.

    (b)   *Treatment*:  Each Allowed Intercompany Claim shall be Reinstated, distributed, contributed, set off, settled, cancelled or released, or otherwise addressed at the option of the GUC Trustee.

    (c)   *Voting*:  Holders of Intercompany Claims are either Unimpaired or Impaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code or rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

12.   Class 9 — Intercompany Interests

    (a)   *Classification*:  Class 9 consists of all Intercompany Interests.

    (b)   *Treatment*:  On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled.

    (c)   *Voting*:  Holders of Intercompany Interests are either Unimpaired or Impaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code or rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

13.   Class 10 — Existing Equity Interests

    (a)   *Classification*:  Class 10 consists of all Existing Equity Interests.

    (b)   *Treatment*:  Without the need for any further corporate or limited liability company action or approval or any board of directors, board of manager, members, shareholders, or officers of any Debtor, as appliable, all Existing Equity Interests shall be cancelled, released, and extinguished without any distribution, and will be of not further force or effect, and each Holder of an Existing Equity Interest shall not receive or retain any distribution, property, or other value on account of such Existing Equity Interest.

    (c)   *Voting*:  Class 10 is Impaired under the Plan.  Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

**D.**   **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors', Post Effective Date Debtors', or the GUC Trust's rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**E.      Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes**

Any Class of Claims or Interests that does not have a Holder of an allowed Claim or allowed Interest or a Claim or Interest temporarily allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**F.      Subordinated Claims**

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the GUC Trust reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**G.      Intercompany Interests**

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience in order to maintain the Debtors' organization structure. For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Post Effective Date Debtor, unless such Interest is transferred pursuant to the Sale Transaction.

**H.      Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**I.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims or Interests.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE IV.

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

**A.      Vesting of Assets**

Except as otherwise provided in the Plan, the Confirmation Order, the Asset Purchase Agreement (if any), or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, the assets of the Debtors that are not transferred to the Purchaser pursuant to the Asset Purchase Agreement, if any, shall vest in the GUC Trust free and clear of all Liens, Claims, charges, or other encumbrances.

**B.      Sources of Consideration for Plan Distributions**

The Debtors and GUC Trust, as applicable, will fund distributions under the Plan with (i) Cash and Cryptocurrency on hand on the Effective Date; (ii) proceeds from the sale of the Debtors' assets pursuant to the Bidding Procedures and/or Asset Purchase Agreement, if any; (iii) the revenues and proceeds of all assets of the Debtors that are not transferred or assigned to the Purchaser, and (iv) the GUC Trust Assets, including proceeds from all Causes of Action not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date; *provided*, that cash proceeds from the sale of the Debtors' assets pursuant to the Bidding Procedures shall be paid in accordance with the Bidding Procedures Order and subject to the Cash Collateral Order.

Notwithstanding anything to the contrary in the Plan or in the Asset Purchase Agreement (if any), on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under the Plan on or prior to the Effective Date shall vest in the GUC Trust and shall be subject to administration by the GUC Trustee.

**C.      Authority to Act and Deliver Definitive Documents**

On or before the Effective Date, the applicable Debtors will take any action as may be necessary or advisable to effectuate the Sale Transaction and the other transactions described in the Plan, including, as applicable:  (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Sale Transaction and the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Sale Transaction and the Plan; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) the transfer or distribution of any Cryptocurrency or Cash; (5) the execution and delivery of the Liquidation Trust Agreement; (6) any transactions necessary or appropriate to form the GUC Trust; (7) such other transactions that are required to effectuate the Sale Transaction, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (8) all transactions necessary to provide for the purchase of the Acquired Assets by Purchaser under the Asset Purchase Agreement; and (9) all other actions that the applicable Entities determine to be necessary or appropriate, or that are reasonably requested by the Purchaser in accordance with the Asset Purchase Agreement, including making filings or recordings that may be required by applicable law.

24

The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Sale Transaction.

### D.      Release of Liens

Except as otherwise expressly provided herein or in the Confirmation Order, on the Effective Date, all Liens on any property of any Debtors or Post Effective Date Debtors shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any Debtors or Post Effective Date Debtors  shall be automatically discharged and released; *provided*, that the release of Liens shall not apply to any Lien on the proceeds of the sale of the Debtors assets in accordance with the Bidding Procedures unless satisfied.

### E.      Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including: (a) consummation of the Sale Transaction; and (b) all other actions contemplated under or necessary to implement the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan or deemed necessary or desirable by the Debtors, Post Effective Date Debtors, of the GUC Trust, as applicable, before, on, or after the Effective Date involving the corporate structure of the Debtors, the Post Effective Date Debtors, or the GUC Trust, and any corporate action required by the Debtors, the Post Effective Date Debtors, or the GUC Trust in connection with the Plan or corporate structure of the Debtors, Post Effective Date Debtors, or GUC Trust shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors, the Post Effective Date Debtors, of the GUC Trust.  Before, on, or after the Effective Date, the appropriate officers of the Debtors, the Post Effective Date Debtors, or the GUC Trust, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtors or Post Effective Date Debtors. The authorizations and approvals contemplated by this Article IV.E shall be effective notwithstanding any requirements under non-bankruptcy law.

### F.      Corporate Existence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Post Effective Date Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Post Effective Date Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

**G.      Dissolution of the Board of the Debtors**

As of the Effective Date, the existing board of directors or managers, as applicable, of each of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be deemed to have resigned without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor.

As of the Effective Date, the GUC Trustee shall serve as the sole shareholder of TopCo, and as the sole officer, director, and manager, as applicable, of each of the Post Effective Date Debtors.  Subject in all respects to the terms of this Plan, the GUC Trustee shall have the power and authority to take any action necessary to wind down and dissolve any of the Post Effective Date Debtors, and shall:  (a) file a certificate of dissolution for any of the Post Effective Date Debtors, together with all other necessary corporate and company documents, to effect the dissolution of the Post Effective Date Debtors under the applicable laws of its state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors or Post Effective Date Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors, Post Effective Date Debtors, or their Estates for any tax incurred during the administration of such Debtor's or Post Effective Date Debtors' Chapter 11 Case, as determined under applicable tax laws.

The filing by the GUC Trustee of any of the Post Effective Date Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of the Post Effective Date Debtors or any of their affiliates.

**H.      Effectuating Documents; Further Transactions**

Prior to the Effective Date, the Debtors and, on and after the Effective Date, the Post Effective Date Debtors and the GUC Trustee, and the officers and members thereof, are authorized to and may issue, execute, deliver, file, or record to the extent not inconsistent with any provision of this Plan such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

**I.      Cryptocurrency Rebalancing and Distributions**

Prior to the Effective Date, the Debtors shall be authorized to rebalance their Cryptocurrency portfolio to ensure that the Debtors can effectuate *pro rata* in-kind distributions of the Distributable Cryptocurrency to the extent possible and practicable according to Article III of this Plan.  Creditors entitled to receive distributions in cryptocurrency will have their claims valued in USD as of the Petition Date. Thereafter, the Debtors will determine each creditor's *pro rata* share of Distributable Assets based on the Petition Date valuation. As necessary to effectuate distributions, the Debtors or GUC Trust, as applicable, will rebalance their Cryptocurrency portfolio as of a date certain in order to effectuate in-kind distributions based on the *pro rata* calculation. The Debtors may effectuate such rebalancing by buying and selling Cryptocurrency and engaging in any other transaction necessary to accomplish such rebalancing. Creditors entitled to receive Cryptocurrency will receive Cryptocurrency in the same form as the form(s) that comprises their Claim to the extent possible and practicable. If the Debtors or Distribution Agent are unable to buy, sell, distribute, or otherwise transact with any Cryptocurrency that comprises a Claim, such Claim

26

and any distribution on such Claim will be made in Cash.[1]  The decision whether to make Distributions on account of Allowed Claims in cryptocurrency or U.S. Dollars shall be in the sole discretion of the GUC Trustee in his or her business judgment.

## J.      Vesting of Causes of Action in GUC Trust

Except as otherwise provided in the Plan, or in any agreement, instrument, or other document incorporated in the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting GUC Trust Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, transferred, or discharged pursuant to the Plan), and any property acquired by any of the Debtors under the Plan shall vest in the GUC Trust, free and clear of all Liens, Claims, charges, or other encumbrances.

## K.      Preservation of Vested Causes of Action

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors shall convey to the GUC Trustee all rights to commence, prosecute, or settle, as appropriate, any and all Vested Causes of Action, whether arising before or after the Petition Date, which shall vest in the GUC Trustee pursuant to the terms of the Plan.  The GUC Trustee may enforce all rights to commence, prosecute, or settle, as appropriate, any and all Vested Causes of Action, whether arising before or after the Petition Date, and the GUC Trustee's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The GUC Trustee may, in its reasonable business judgment, pursue such Vested Causes of Action and may retain and compensate professionals in the analysis or pursuit of such Vested Causes of Action to the extent the GUC Trustee deems appropriate, including on a contingency fee basis.

No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the GUC Trustee will not pursue any and all available Causes of Action against them.  The Debtors, Post Effective Date Debtors, and the GUC Trustee expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.  Unless any Vested Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the GUC Trustee expressly reserves all Vested Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Vested Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  The GUC Trustee reserves and shall retain the foregoing Vested Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  The GUC Trustee shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Vested Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to, or action, order, or approval of, the Bankruptcy Court; *provided, however,* that pursuant to Fed.

---

[1]   If a Claim is asserted in currency other than U.S. Dollars (including in digital assets or Cryptocurrency), it will be deemed converted to the equivalent U.S. Dollar value: (i) in the case of foreign currency, using the conversion rate for the applicable currency at prevailing market prices of as 4:00 p.m. (prevailing Central Time) on the Petition Date; and (ii) in the case of digital assets or Cryptocurrency, using the prevailing market prices listed as of 4:00 p.m. (prevailing Central Time) on the Petition Date.

27

R. Civ. P. 23.1, to the extent applicable through Bankruptcy Rule 7023.1, any derivative action may be settled, voluntarily dismissed, or compromised only with the Bankruptcy Court's approval.

**L.      Post Effective Date Debtors**

On and after the Effective Date, the Post Effective Date Debtors shall continue in existence for purposes of, among other things, complying with their continuing obligations under the Asset Purchase Agreement, if any.

**M.      GUC Trustee**

The GUC Trustee shall act for the Post Effective Date Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  From and after the Effective Date, the GUC Trustee shall be the sole representative of, and shall act for, the Post Effective Date Debtors.  The foregoing shall not limit the authority of the Post Effective Date Debtors or the GUC Trustee, as applicable, to continue the employment of any former manager, officer, or professional including pursuant to any transition services agreement entered into on or after the Effective Date by and between the Post Effective Date Debtors and the Purchaser.

**N.      The GUC Trust**

On the Effective Date, the GUC Trust shall be formed for the benefit of the GUC Trust Beneficiaries and each of the Debtors shall transfer the GUC Trust Assets for distribution in accordance with the terms of the Plan.  The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

1.      Establishment of a GUC Trust

Pursuant to the Liquidation Trust Agreement, the GUC Trust will be established.  The GUC Trust shall be a successor to the Debtors' rights, title, and interest to the GUC Trust Assets.  Subject to Delaware law, the GUC Trust will be charged with administering the GUC Trust Assets in accordance with the Liquidation Trust Agreement and the Plan.  The GUC Trust shall be managed by the GUC Trustee and shall be subject to the GUC Trust Oversight Committee.  For the avoidance of doubt, the GUC Trust shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset.  The GUC Trust shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the GUC Trust Assets shall, subject to the Liquidation Trust Agreement, be transferred to and vest in the GUC Trust.  For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the GUC Trust specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the GUC Trust and the GUC Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Liquidation Trust Agreement, compromise or settle any GUC Trust Assets transferred to the GUC Trust. On and after the Effective Date, the GUC Trust and the GUC Trustee may, without further Bankruptcy Court approval,

28

commence, litigate, and settle any Vested Causes of Action or Claims relating to any GUC Trust Assets transferred to the GUC Trust or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the GUC Trust and the GUC Trustee on or after the Effective Date, except as otherwise expressly provided herein and in the Liquidation Trust Agreement. The GUC Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

The GUC Trust shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors, as applicable, in any Causes of Action pending before the Bankruptcy Court or any other court that relate to a GUC Trust Asset without the need for filing any motion for such relief. On the Effective Date, the Debtors and the GUC Trustee shall execute the Liquidation Trust Agreement and shall have established the GUC Trust pursuant hereto. In the event of any conflict between the terms of this Article IV.N and the terms of the Liquidation Trust Agreement, the terms of the Liquidation Trust Agreement shall control.

### 2. GUC Trust Assets

Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional GUC Trust Assets become available, the Debtors shall be deemed, subject to the Liquidation Trust Agreement, to have automatically transferred to the GUC Trust all of their right, title, and interest in and to all of the GUC Trust Assets, in accordance with section 1141 of the Bankruptcy Code. All such assets shall automatically vest in the GUC Trust free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Interests as set forth herein and the expenses of the GUC Trust as set forth herein and in the Liquidation Trust Agreement. Thereupon, the Debtors shall have no interest in or with respect to the GUC Trust Assets or the GUC Trust.

### 3. Treatment of GUC Trust for Federal Income Tax Purposes; No Successor-in-Interest

The GUC Trust shall be established for the primary purpose of liquidating and distributing the GUC Trust Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the GUC Trust. Accordingly, the GUC Trustee may, in an expeditious but orderly manner, liquidate the GUC Trust Assets, make timely distributions to the GUC Trust Beneficiaries and not unduly prolong its duration. The GUC Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the GUC Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the GUC Trust expressly for such purpose.

The GUC Trust is intended to qualify as a "grantor trust" for federal income tax purposes to the extent reasonably practicable, with the GUC Trust Beneficiaries treated as grantors and owners of the GUC Trust. However, with respect to any of the assets of the GUC Trust that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

29

4.      Appointment of GUC Trustee

The GUC Trustee shall be selected by the Debtors, in consultation with the Committee, and shall be identified in the Plan Supplement.  The appointment of the GUC Trustee shall be approved in the Confirmation Order, and the GUC Trustee's duties shall commence as of the Effective Date.  The GUC Trustee shall administer the distributions to the GUC Trust Beneficiaries and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Vested Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan.

In accordance with the Liquidation Trust Agreement, the GUC Trustee shall serve in such capacity through the earlier of (i) the date on which the GUC Trust is dissolved in accordance with the Liquidation Trust Agreement, and (ii) the date on which a GUC Trustee resigns, is terminated, or is otherwise unable to serve; *provided*, *however*, that, in the event that a GUC Trustee resigns, is terminated, or is otherwise unable to serve, the GUC Trust Oversight Committee shall appoint a successor to serve as a GUC Trustee in accordance with the Liquidation Trust Agreement.  If the GUC Trust Oversight Committee does not appoint a successor within the time periods specified in the Liquidation Trust Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the GUC Trust, shall approve a successor to serve as a GUC Trustee.

5.      Responsibilities of GUC Trustee

Responsibilities of the GUC Trustee shall be as identified in the Liquidation Trust Agreement and shall include, but are not limited to:

(a)     implementing the GUC Trust, and making distributions contemplated by the Plan;

(b)     marshalling or marketing for sale any of the Debtors' assets constituting GUC Trust Assets;

(c)     overseeing the accounts of the Post Effective Date Debtors and the GUC Trust and the wind down and dissolution of the Post Effective Date Debtors and the GUC Trust;

(d)     receiving, maintaining, conserving, supervising, prosecuting, collecting, settling, managing, investing, protecting, and where appropriate, causing the GUC Trust to abandon the GUC Trust Assets, including causing the GUC Trust to invest any moneys held as GUC Trust Assets;

(e)     opening and maintaining bank accounts on behalf of or in the name of the Post Effective Date Debtors or the GUC Trust, including, in the GUC Trustee's discretion, separate bank accounts for each of the Post Effective Date Debtors;

(f)     entering into any agreement or executing any document or instrument required by or consistent with the Plan, the Confirmation Order, or the Liquidation Trust Agreement, and to perform all obligations thereunder;

(g)     collecting and liquidating all GUC Trust Assets, including the sale of any GUC Trust Assets;

30

(h)     protecting and enforcing the rights to the GUC Trust Assets (including any Vested Causes of Action) by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

(i)     investigating any GUC Trust Assets, and any other potential Vested Causes of Action;

(j)     reviewing, reconciling, compromising, settling, objecting, or prosecuting Claims or Interests of any kind;

(k)     seeking the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004;

(l)     retaining professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to the Liquidation Trust Agreement and paying the reasonable compensation thereof;

(m)    paying all lawful expenses, debts, charges, taxes, and other liabilities, and making all other payments relating to the GUC Trust Assets, solely out of GUC Trust Assets;

(n)     prosecuting and settling the Vested Causes of Action;

(o)     reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Vested Causes of Action;

(p)     acquiring litigation and other claims related to the Post Effective Date Debtors, and prosecuting such claims;

(q)     reviewing and compelling turnover of the Post Effective Date Debtors' or the GUC Trust's property;

(r)     calculating and making all distributions to the holders of Allowed Claims against each Debtor and, solely to the extent of payment in full of Allowed Claims, to holders of Allowed Interests, as provided for in, or contemplated by, the Plan and the Liquidation Trust Agreement; *provided* that because the Plan does not substantively consolidate the Debtors' Estates, the GUC Trustee shall make distributions from the GUC Trust Assets to the holders of Claims and Interests (if applicable) against that specific Debtor;

(s)     establishing, administering, adjusting, and maintaining the GUC Trust Reserve and the Disputed Claims Reserve;

(t)     withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the GUC Trustee has determined, based upon the advice of his agents or professionals, may be required to be withheld from such Distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

31

(u)     in reliance upon the Debtors' Schedules, the official Claims Register maintained in the Chapter 11 Cases and the Debtors' filed lists of equity security holders, reviewing, and where appropriate, allowing or objecting to Claims and (if applicable) Interests, and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and (if applicable) Disputed Interests required to be administered by the GUC Trust;

(v)     making all tax withholdings, filing tax information returns, filing and prosecuting tax refunds claims, making tax elections by and on behalf of the Post Effective Date Debtors or the GUC Trust, and filing tax returns for the Post Effective Date Debtors or the GUC Trust pursuant to and in accordance with the Plan, and paying taxes, if any, payable for and on behalf of the Post Effective Date Debtors or the GUC Trust, as applicable; *provided, however*, the GUC Trustee shall not have any responsibility or personal liability in any capacity whatsoever for the signing or accuracy of the Post Effective Date Debtors' income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto;

(w)     abandoning or donating to a charitable organization qualifying under IRC section 501(c)(3) any GUC Trust Assets that the GUC Trustee determines to be too impractical to distribute or of inconsequential value;

(x)     seeking a determination of tax liability or refund under Bankruptcy Code section 505;

(y)     establishing reserves for taxes, assessments, and other expenses of administration of the Post Effective Date Debtors or the GUC Trust as may be necessary and appropriate for the proper operation of matters incident to the Post Effective Date Debtors or the GUC Trust;

(z)     paying GUC Trust Expenses;

(aa)    if the GUC Trustee deems appropriate in the GUC Trustee's sole discretion, seek to establish a bar date for filing proofs of Interest in any Post Effective Date Debtor or otherwise to determine the holders and extent of Allowed Interests in any Post Effective Date Debtor;

(bb)    purchasing and carrying all insurance policies that the GUC Trustee deems reasonably necessary or advisable and paying all associated insurance premiums and costs;

(cc)    undertaking all administrative functions remaining in the Chapter 11 Cases to the extent necessary to carry out the Post Effective Date Debtors', the GUC Trust's, or the GUC Trustee's duties under the Plan, including reporting and making required payments of fees to the U.S. Trustee and overseeing the closing of the Chapter 11 Cases;

(dd)    retaining, terminating, appointing, hiring, or otherwise employees, personnel, management, and directors at any of the Debtors to the extent necessary to carry out the purposes of this Agreement and the Plan, including, without limitation, to address any disputes between the Post Effective Date Debtors;

32

(ee)    exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and the Liquidation Trust Agreement; and

(ff)    taking all other actions consistent with the provisions of the Plan and the Liquidation Trust Agreement that the GUC Trustee deems reasonably necessary or desirable to administer the Post Effective Date Debtors and the GUC Trust.

6.    <u>The GUC Trust Oversight Committee</u>

The GUC Trust Oversight Committee shall consist of those parties selected by the Committee, after consultation with the Debtors, and identified in the Plan Supplement, and which at no time shall consist of greater than three members.

The GUC Trust Oversight Committee shall have the responsibility to review and advise the GUC Trustee with respect to the liquidation and distribution of the GUC Trust Assets transferred to the GUC Trust in accordance herewith and the Liquidation Trust Agreement.  For the avoidance of doubt, in advising the GUC Trustee, the GUC Trust Oversight Committee shall maintain the same fiduciary responsibilities as the GUC Trustee.  Vacancies on the GUC Trust Oversight Committee shall be filled by a Person designated by the GUC Trustee, subject to the unanimous consent of the remaining member or members of the GUC Trust Oversight Committee.  The GUC Trustee shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the GUC Trust Oversight Committee for cause. Members of the GUC Trust Oversight Committee shall not receive any compensation for their services, however, they shall be reimbursed for all actual, necessary expenses incurred in connection with their services provided to the GUC Trust Oversight Committee.

7.    <u>Funding of GUC Trust Reserve and Expenses of GUC Trust</u>

Prior to the Effective Date, the Debtors shall establish the GUC Trust Reserve funded with Cash. The GUC Trust Expenses shall be paid from the GUC Trust Assets.

8.    <u>Insurance; Bond</u>

The GUC Trustee may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the GUC Trustee and the GUC Trust Oversight Committee under the Liquidation Trust Agreement.  Unless otherwise agreed to by the GUC Trust Oversight Committee, the GUC Trustee shall serve with a bond, the terms of which shall be agreed to by the GUC Trust Oversight Committee, and the cost and expense of which shall be paid by the GUC Trust.

9.    <u>Fiduciary Duties of the GUC Trustee</u>

Pursuant to this Plan and the Liquidation Trust Agreement, the GUC Trustee shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims that will receive distributions pursuant to Plan.

10.    <u>Termination of the GUC Trust</u>

The GUC Trust will terminate on the earlier of:  (a)(i) the final liquidation, administration and distribution of the GUC Trust Assets in accordance with the terms of the Liquidation Trust Agreement and the Plan, and its full performance of all other duties and functions as set forth herein or in the Liquidation Trust Agreement and (ii) the Chapter 11 Cases of the Debtors have been closed; or (b) the GUC Trustee determines in its reasonable judgment that the GUC Trust lacks sufficient assets and financial resources,

after reasonable collection efforts, to complete the duties and powers assigned to him or her under the Plan, the Confirmation Order and/or the Liquidation Trust Agreement. After (x) the final distributions pursuant to the Plan, (y) the Filing by or on behalf of the GUC Trust of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the GUC Trustee, the GUC Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

11.     Liability of GUC Trustee; Indemnification

Subject to the Liquidation Trust Agreement, the GUC Trustee shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee. The GUC Trustee or the GUC Trust Oversight Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and may reasonably rely on the advice of counsel in connection therewith. Notwithstanding such authority, neither the GUC Trustee nor the GUC Trust Oversight Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the GUC Trustee, the GUC Trust Oversight Committee, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud. The GUC Trust shall indemnify and hold harmless the GUC Trust Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the GUC Trust or the Plan or the discharge of their duties hereunder; *provided*, *however*, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual fraud. Persons dealing or having any relationship with the GUC Trustee shall have recourse only to the GUC Trust Assets and shall look only to the GUC Trust Assets to satisfy any liability or other obligations incurred by the GUC Trust or the GUC Trust Oversight Committee to such Person in carrying out the terms of the Liquidation Trust Agreement, and neither the GUC Trustee nor the GUC Trust Oversight Committee shall have any personal obligation to satisfy any such liability. The GUC Trustee and/or the GUC Trust Oversight Committee members shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein and in the Liquidation Trust Agreement, and no implied covenants or obligations shall be read into the Liquidation Trust Agreement against any of them. The GUC Trust shall promptly pay expenses reasonably incurred by the GUC Trustee, the GUC Trust Oversight Committee, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each a "GUC Trust Party" and collectively the "GUC Trust Parties") in defending, participating in, or settling any action, proceeding or investigation in which such GUC Trust Party is a party or is threatened to be made a party or otherwise is participating in connection with the Liquidation Trust Agreement or the duties, acts or omissions of the GUC Trustee or otherwise in connection with the affairs of the GUC Trust, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each GUC Trust Party hereby undertakes, and the GUC Trust hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such exculpated party is not entitled to be indemnified therefor under the Liquidation Trust Agreement. The foregoing indemnity in respect of any GUC Trust Party shall survive the termination of such GUC Trust Party from the capacity for which they are indemnified.

12.     No Liability of the GUC Trust

On and after the Effective Date, the GUC Trust shall have no liability on account of any Claims or Interests except as set forth herein and in the Liquidation Trust Agreement. All payments and all

34

distributions made by the GUC Trustee hereunder shall be in exchange for all Claims or Interests against the Debtors.

## O.      Corporate Existence and Dissolution

Except as otherwise provided in the Plan, each Debtor, as a Post Effective Date Debtor, shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) in effect prior to the Effective Date, except to the extent such certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) are amended pursuant to the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings under applicable state or federal law).

On and after the Effective Date, the Post Effective Date Debtors or the GUC Trust (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and (2) shall be deemed to have cancelled pursuant to this Plan all Interests, except those Intercompany Interests necessary to maintain the Debtors' corporate organizational structure.

## P.      Cancellation of Notes, Instruments, Certificates, and Other Documents

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Sale Transaction, as applicable (including, without limitation, the Definitive Documents and the Asset Purchase Agreement), all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

## Q.      Effectuating Documents; Further Transactions

On and after the Effective Date, the Post Effective Date Debtors, and their directors, managers, partners, officers, authorized persons, and members thereof, and the GUC Trust and GUC Trustee are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Definitive Documents, and Asset Purchase Agreement, if applicable, in the name of and on behalf of the Debtors, the Post Effective Date Debtors, and GUC Trust, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

35

**R.      Section 1146(a) Exemption**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to the GUC Trust, the Purchaser (if any), or to any other Entity) of property under the Plan, Definitive Documents, and Asset Purchase Agreement or pursuant to:   (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the GUC Trust; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Asset Purchase Agreement, shall not be subject to any stamp tax or similar tax, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**S.      Preservation of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the GUC Trust shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred.  Such rights shall be preserved by the Debtors and GUC Trust and shall vest in the GUC Trust, with the GUC Trust's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and GUC Trust as of the Effective Date.

The GUC Trust may pursue such Causes of Action, as appropriate, in accordance with the best interests of the GUC Trust Beneficiaries and in accordance with the Liquidation Trust Agreement and the Plan.  **No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statements of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors or the GUC Trust, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The GUC Trust, on behalf of the Debtors and the GUC Trust, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan.**  Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the GUC Trust, on behalf of the Debtors and GUC Trust and in accordance with the Liquidation Trust Agreement, expressly reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

36

The GUC Trust, on behalf of the Debtors, reserves and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the GUC Trust, except as otherwise provided in the Plan, including Article VIII of the Plan.  The GUC Trust, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The GUC Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan; *provided, however,* that pursuant to Fed. R. Civ. P. 23.1, to the extent applicable through Bankruptcy Rule 7023.1, any derivative action may be settled, voluntarily dismissed, or compromised only with the Bankruptcy Court's approval.

## T.    Closing the Chapter 11 Cases

On and after the Effective Date, the GUC Trust shall be permitted to close all of the Chapter 11 Cases of the Post Effective Date Debtors except for the Chapter 11 Case of Reliz Technology Group Holdings Inc.  Once such cases are closed, all contested matters relating to any of the Debtors or Post Effective Date Debtors, including objections to Claims or Interests and any adversary proceedings, may be administered and heard in the Chapter 11 Case of Reliz Technology Group Holdings Inc., irrespective of whether such Claims or Interests were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

## ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## A.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the any sale transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

## B.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors, Post Effective Date Debtors, or the GUC Trust, as applicable, under such Executory Contract or Unexpired Lease.  Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors,

the Post Effective Date Debtors, and GUC Trust expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

C.      **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Counterparties to Executory Contracts or Unexpired Leases subject to rejection under the Plan shall be served with a notice of rejection of Executory Contracts and Unexpired Leases with the Plan Supplement. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims, Noticing, and Solicitation Agent and served on the Debtors or GUC Trust, as applicable, no later than thirty days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Unless the Bankruptcy Court orders otherwise, any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, or the GUC Trust, the Estates, or their property without the need for any objection by the GUC Trust or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed released, and be subject to the permanent injunction set forth in Article VIII.D of the Plan.** All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims in accordance with Article III.C of the Plan.

D.      **Cure of Defaults for Executory Contracts and Unexpired Leases Assumed**

The Debtors, the GUC Trust, or the Purchaser (if any), as applicable, shall pay Cures, if any, on the Effective Date. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors, the GUC Trust, or the Purchaser shall be dealt with in the ordinary course of business and, if needed, shall be Filed with the Claims, Noticing, and Solicitation Agent on or before thirty days after the Effective Date. **If any counterparty to an Executory Contract or Unexpired Lease does not receive a notice of assumption and applicable cure amount, such counterparty shall have until on or before thirty days after the Effective Date to bring forth and File a request for payment of Cure.** Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or the GUC Trust, without the need for any objection by the GUC Trust or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied and released upon payment by the Debtors or the GUC Trust or the Purchaser of the Cure in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty); *provided*, *however*, that nothing herein shall prevent the GUC Trust or the Purchaser (if any), as applicable, from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure. The GUC Trust or the Purchaser (if any) may also settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' first scheduled omnibus hearing for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

38

In the event of a dispute regarding: (1) the amount of any Cure Claim, (2) the ability of the Debtors, the Post Effective Date Debtors, the GUC Trust, Purchaser (if any), or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed (or assumed and assigned, as applicable), or (3) any other matter pertaining to assumption or assignment, then any disputed Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made as soon as reasonably practicable following, and in accordance with, the entry of a Final Order of the Bankruptcy Court resolving such dispute or as may be agreed upon by the Debtors, the GUC Trust, or Purchaser (if any), as applicable, and the counterparty to the Executory Contract or Unexpired Lease, and any such unresolved dispute shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise or assignment of any Executory Contract or Unexpired Lease to the Purchaser and full payment of any applicable Cure pursuant to this Article V.D, or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assumed and assigned in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.D, in the amount and at the time in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and applicable proposed Cure amount, and disputes the Debtors' proposed Cure amount, such party shall not be required to File a Proof of Claim with respect to such dispute. Any counterparty to an Executory Contract or Unexpired Lease that does not receive a notice or applicable proposed Cure amount, and believes a Cure amount is owed, shall have thirty days after the Effective Date to File a Proof of Claim with respect to such alleged Cure amount, which Claim shall not be expunged until such Cure dispute is resolved.**

### E.    Insurance Policies

To the extent that the D&O Liability Insurance Policies (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Debtors shall be deemed to have assumed all D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or before the Petition Date pursuant to section 365(a) of the Bankruptcy Code, and coverage for defense and indemnity under any of the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in any of the D&O Liability Insurance Policies. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors or Post Effective Date Debtors under the Plan as to which

39

no Proof of Claim need be Filed.  All beneficiaries under the D&O Insurance Policies reserve their rights under such D&O Insurance Policies subject to the limitations set forth in this Plan.

The Debtors or the GUC Trust, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date, and any current or former directors, officers, managers, and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date.  Notwithstanding anything to the contrary in the Plan, the Debtors or the GUC Trust shall retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or GUC Trust may deem necessary, subject to the prior written consent of the GUC Trust.

The Debtors shall continue to satisfy their obligations under their insurance policies in full and continue such policies in the ordinary course of business.  Each of the Debtors' insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan.  On the Effective Date: (a) the Debtors shall be deemed to have assumed all such insurance policies and any agreements, documents, and instruments relating thereto in their entirety; and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the applicable Debtors or the GUC Trust unaltered.

## F.      Reservation of Rights

Nothing contained in the Plan or the Plan Supplement (unless otherwise explicitly provided) shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or the GUC Trust has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the GUC Trust, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease effective as of the Confirmation Date.

## G.      Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

## A.      Timing and Calculation of Amounts to Be Distributed

Except (1) as otherwise provided herein, (2) upon a Final Order, or (3) as otherwise agreed to by the Debtors or the GUC Trust, as the case may be, and the Holder of the applicable Claim, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the next Distribution Date after such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of distributions that the Plan provides for Allowed Claims in the applicable Class from the Distribution Agent.  In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a

40

Business Day, then the making of such payment or distribution may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

**B.      Rights and Powers of Distribution Agent**

      1.      Powers of the Distribution Agent

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities and powers; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

      2.      Expenses Incurred on or after the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including reasonable attorney and/or other professional fees and expenses) made by such Distribution Agent shall be paid in Cash by the GUC Trust.

**C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions**

      1.      Distributions Generally

Except as otherwise provided in the Plan, the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.

      2.      Record Date of Distributions

After the Distribution Record Date, there shall be no further changes in the record Holders of Claims. The Distribution Agent shall have no obligation to recognize any transfer of Claims occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

      3.      Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the GUC Trust, on the one hand, and the Holder of a Disputed Claim, on the other hand, or as set forth in a Final Order, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all of the Disputed Claim has become an Allowed Claim or has otherwise been resolved by settlement or Final Order; *provided that*, if the GUC Trust does not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim, the Distribution Agent may make a partial distribution on account of that

41

portion of such Claim that is not Disputed at the time and in the manner that the Distribution Agent makes distributions to similarly situated Holders of Allowed Claims pursuant to the Plan. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

4. <u>De Minimis Distributions; Minimum Distributions</u>

The Distribution Agent shall not make any Cash distributions to any Holder of an Allowed Claim pursuant to Article III.C of this Plan on account of such Allowed Claim if such distribution is valued, in the reasonable discretion of the Distribution Agent, at less than $50.00, and each Holder of an Allowed Claim to which this limitation applies shall not be entitled to any distributions under the Plan.

5. <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that either (a) a distribution to any Holder is returned as undeliverable or (b) the Holder of an Allowed Claim does not respond to a request by the Debtors or the Distribution Agent for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, all unclaimed property or interests in property shall revert to the GUC Trust automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall not be entitled to any distributions under the Plan.

6. <u>Manner of Payment Pursuant to the Plan</u>

The decision whether to make Distributions on account of Allowed Claims in cryptocurrency or U.S. Dollars shall be in the sole discretion of the GUC Trustee in his or her business judgment. In the event that the GUC Trustee elects to make Distributions in U.S. Dollars, the Distribution Agent may elect to make such Cash payment by check, wire transfer, automated clearing house, credit card, or as otherwise provided in applicable agreements.

**D.   Compliance Matters**

In connection with the Plan, to the extent applicable, the Debtors, the Post Effective Date Debtors, the GUC Trust, any Distribution Agent, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Post Effective Date Debtors, the GUC Trust, the Distribution Agent, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including witholding a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the GUC Trust and the Distribution Agent, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable

amount of time to respond.  The Debtors, the Post Effective Date Debtors, the GUC Trust, the Distribution Agent, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

## E.    Claims Paid or Payable by Third Parties

### 1.    Claims Paid by Third Parties

In the event and to the extent that the Holder of a Claim receives a payment on account of such Claim from a party that is not a Debtor, a Post Effective Date Debtor, or the GUC Trust (or other Distribution Agent), as applicable, including any payments made in connection with the Sale Transaction, the Debtors or the GUC Trust, as applicable, may reduce such Claim (or portion thereof) as disallowed after filing and service of a notice and an opportunity for hearing.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Post Effective Date Debtor, or the GUC Trust (or other Distribution Agent), including payments made in connection with the Sale Transaction, as applicable, on account of such Claim, such Holder shall, within ten Business Days of receipt thereof, repay, return, or deliver any distribution held by or transferred to the Holder to the GUC Trust to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay, return, or deliver such distribution shall result in the Holder owing the GUC Trust annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the ten-Business Day grace period specified above until the amount is repaid.

### 2.    Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such payment, such Claim may be expunged or reduced on the Claims Register by the Claims, Noticing, and Solicitation Agent to the extent of any such payment without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3.    Applicability of Insurance Policies

Except as otherwise provided herein, payments to Holders of Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any rights, defenses, or Cause of Action that the Debtors, the Post Effective Date Debtors, the GUC Trust or any other Entity may hold against any other Entity, including insurers, under any policies of insurance, agreements related thereto, or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the applicable insurance policies, agreements related thereto, and applicable non-bankruptcy law.

## F.    Setoffs and Recoupment

Except as otherwise expressly provided for herein, each Debtor, the Post Effective Date Debtors, the GUC Trust, or such Entity's designee as instructed by such Debtor, Post Effective Date Debtor, or the GUC Trust, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy

Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, set off against or recoup from an Allowed Claim any distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature whatsoever that the Debtor, the Post Effective Date Debtors, or the GUC Trust, as applicable, may have against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise). Notwithstanding the foregoing, except as expressly stated in Article VIII of this Plan, neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors, the Post Effective Date Debtors, or the GUC Trust of any such Claims, rights, or Causes of Action the Debtors or the GUC Trust may possess against such Holder.

### G.   Allocation between Principal and Accrued Interest

Except as otherwise provided herein, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Claims, to the remaining portion of such Allowed Claim if any.

### ARTICLE VII.

### PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS

### A.   Disputed Claims Process

After the Effective Date, the Post Effective Date Debtors, the GUC Trust, and any party-in-interest, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

Notwithstanding anything in this Plan to the contrary: (1) all Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease; (2) Claims filed to dispute the amount of any proposed Cure pursuant to section 365 of the Bankruptcy Code; and (3) Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court, if not otherwise resolved through settlement with the applicable claimant.

On the Effective Date, the Debtors, Post Effective Date Debtors, or GUC Trustee, as applicable, may establish one or more accounts or funds to hold and dispose of certain assets, pursue certain litigation (including the Causes of Action preserved under the Plan or otherwise vesting in the GUC Trust), and/or satisfy certain Claims (including Claims that are contingent or have not yet been Allowed). For any such account or fund, the Debtors, Post Effective Date Debtors, or the GUC Trustee, as applicable, may take the position that grantor trust treatment applies in whole or in part. To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. If such rules apply, such assets would be subject

44

to entity-level taxation, and the Debtors and the GUC Trust would be required to comply with the relevant rules.

## B.   Objections to Claims

Except as otherwise specifically provided in the Plan, after the Effective Date, the GUC Trustee shall have the sole authority on behalf of the Debtors or Post Effective Date Debtors to: (1) File, withdraw, or litigate to judgment, any objections to Claims; and (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the GUC Trust shall have and retain any and all rights and defenses each such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim, including the Causes of Action retained pursuant to Article IV.S of the Plan.

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date. For the avoidance of doubt, the Bankruptcy Court may, after notice and an opportunity for a hearing, extend the time period to object to Claims set forth in this paragraph at any time, including before or after the expiration of one hundred eighty days after the Effective Date, in its discretion or upon request by the GUC Trust or any party in interest.

## C.   Estimation of Claims

Before or after the Effective Date, the Debtors, Post Effective Date Debtors, or the GUC Trust, as applicable, may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Disputed Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Disputed Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Debtors, Post Effective Date Debtors, or the GUC Trust may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Disputed Claim is estimated.

## D.   No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim; *provided* that if only a portion of a Claim is Disputed, such Claim shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

**E.      Distributions After Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Allowed Claim unless required under applicable bankruptcy law.

**F.      No Interest**

Unless otherwise specifically provided for herein or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**G.      Adjustment to Claims without Objection**

Any Claim that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged on the Claims Register at the direction of the GUC Trust after notice and an opportunity for a hearing.

**H.      Time to File Objections to Claims**

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

**I.      Disallowance of Claims**

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the GUC Trust, as applicable.

**Except as otherwise provided herein or as agreed to by the Debtors, Post Effective Date Debtors, or the GUC Trust, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date subject to the approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

**J.      Amendments to Proofs of Claim**

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Proof of Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court after notice and an opportunity for a hearing or the GUC Trust, and any such new or amended Proof of Claim Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the

46

Bankruptcy Court after notice and an opportunity for a hearing; *provided, however,* that notwithstanding the foregoing, nothing herein shall preclude or enjoin any governmental unit from filing or asserting a proof of claim on or before the Governmental Bar Date, nor disallow, expunge, release, or discharge any claim so filed or asserted.

## ARTICLE VIII.

## EFFECT OF CONFIRMATION OF THE PLAN

**A.      Releases by the Debtors**

**Notwithstanding anything contained in the Plan to the contrary and, in any case, subject to and dependent on the outcome of the ongoing Special Committee Investigation, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Post Effective Date Debtors, and their Estates, and in each case on behalf of themselves and their respective successors, assigns, and representatives, who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Post Effective Date Debtors, or their Estates, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, Post Effective Date Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, the Post Effective Date Debtors, or their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Post Effective Date Debtors, or their Estates (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or the Sale Transaction, any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Sale Transaction or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in this Article VIII.A by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.A is:   (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) a bar to any of the Post Effective Date Debtors or GUC Trust or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

47

**Notwithstanding anything to the contrary contained herein, nothing in this Plan shall release, waive, or otherwise limit the rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement or the Definitive Documents.**

B.      **Releases by Holders of Claims and Interests**

**Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or Sale Transaction, any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Sale Transaction, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided that* nothing in this Article VIII.B shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.B, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.B is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) a bar to any of the Releasing Parties or the Post Effective Date Debtors or the GUC Trust or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

C.      **Exculpation**

**Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or Sale Transaction, any**

48

**contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, malpractice, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

**The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan**

### D.     Injunction

**The assets of the Post Effective Date Debtors and of the GUC Trust shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in this Plan and shall not be available for any other purpose.  All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, Post Effective Date Debtors, the GUC Trust, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.**

### E.     Release of Liens

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or Confirmation Order, on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Post Effective Date Debtor or the GUC Trust, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Post Effective Date Debtors.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Post Effective Date Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as requested by the Post Effective Date Debtors or GUC Trust to evidence the release of such Lien, including the execution, delivery, and filing or recording of such documents evidencing such releases.  The presentation or filing of the Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

**F.**     **Protection against Discriminatory Treatment**

As provided by section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Entity, including Governmental Units, shall discriminate against any Debtor, Post Effective Date Debtor, or the GUC Trust or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, any Debtor, Post Effective Date Debtor, or the GUC Trust, or any Entity with which a Debtor, Post Effective Date Debtor, or the GUC Trust has been or is associated, solely because any Debtor was a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**G.**     **Document Retention**

On and after the Effective Date, the Post Effective Date Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Post Effective Date Debtors or the GUC Trust.

**H.**     **Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**I.**     **Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  **All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

**ARTICLE IX.**

**CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

**A.**     **Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1. The Bankruptcy Court shall have entered the Confirmation Order, which shall be in a form and substance reasonably satisfactory to the Debtors and the Committee, and such order shall be a Final Order and in full force and effect.

50

2.  If a Sale Transaction pursuant to the Bidding Procedures occurs, all conditions precedent to effectiveness of the Asset Purchase Agreement shall have been satisfied or duly waived.

3.  The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Definitive Documents.

4.  Each Definitive Document and each other document contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all respects with the Plan, and shall not have been modified in a manner inconsistent therewith;

5.  The Professional Fee Escrow Account shall have been established and funded with Cash in accordance with Article II.B.2 of the Plan and, to the extent that all Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, Other Secured Claims, and Other Priority Claims are not to be paid in full on the Effective Date, the Debtors shall have established an account funded with Cash to pay such amounts.

6.  The GUC Trust Reserve shall have been established and funded based upon the GUC Trust Budget with Cash in accordance with the Plan.

7.  The Plan shall have been substantially consummated or shall be anticipated to be substantially consummated concurrently with the occurrence of the Effective Date.

**B.      Waiver of Conditions Precedent**

Except as otherwise specified in this Plan, any one or more of the conditions to the Effective Date set forth in Article IX.A of the Plan may be waived by the Debtors in consultation with the Committee, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

**C.      Effect of Non-Occurrence of Conditions to Effective Date**

If the Effective Date does not occur, then the Plan will be null and void in all respects, any and all compromises or settlements not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including with respect to the fixing, limiting, or treatment of any Claim or Interest), shall be deemed null and void, and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims, Interests, or Causes of Action held by any Debtor or any other Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity in any respect.

**ARTICLE X.**

**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

**A.      Modification of Plan**

Subject to the limitations and terms contained in the Plan, the Debtors reserve the right to (1) amend or modify the Plan before the entry of the Confirmation Order, in accordance with the Bankruptcy Code and the Bankruptcy Rules and (2) after the entry of the Confirmation Order but before substantial

51

consummation of the Plan, the Debtors or the GUC Trust, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, to remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

**B.      Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications or amendments to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**C.      Substantial Consummation**

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

**D.      Revocation or Withdrawal of Plan**

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (1) the Plan will be null and void in all respects; (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Classes of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.

### RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if

52

necessary, liquidate, any Cure Claims or other Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court;

7.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.      hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) anything that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan and the Confirmation Order; or (d) related to section 1141 of the Bankruptcy Code;

11.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.      adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

13.      consider any modifications of the Plan to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

14.      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Entity, and resolve any cases,

53

controversies, suits, or disputes that may arise in connection with any Entity's rights arising from or obligations incurred in connection with the Plan;

15. hear and determine matters concerning local, state, federal, and foreign taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

16. enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17. enforce all orders previously entered by the Bankruptcy Court; and

18. hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or the Judicial Code.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

### A. Immediate Binding Effect

Notwithstanding Bankruptcy Rules 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Post Effective Date Debtors, the GUC Trust, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims against and Interests in the Debtors or the Post Effective Date Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

### B. Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Post Effective Date Debtors, the GUC Trust, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from

time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### C.      Payment of Statutory Fees

All fees under 28 U.S.C. § 1930 and any interest thereon under 31 U.S.C. § 3717 (together, the "Statutory Fees") outstanding as of the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date.  On and after the Effective Date, the Post Effective Date Debtors and GUC Trust shall be jointly and severally liable for paying any and all Statutory Fees in full in Cash when due in each Chapter 11 Case for each quarter (including any fraction thereof) until the earliest of such Chapter 11 Case being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.  The Debtors shall file all monthly operating reports due before the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Post Effective Date Debtors and GUC Trust shall each file with the Bankruptcy Court a post-confirmation quarterly report for each Chapter 11 Case for each quarter (including any fraction thereof) such case is pending, using UST Form 11-PCR.  Notwithstanding anything to the contrary in the Plan, (i) Statutory Fees are Allowed; (ii) the U.S. Trustee shall not be required to file any proof of claim or any other request(s) for payment with respect to Statutory Fees; and (iii) the U.S. Trustee shall not be treated as providing any release under the Plan.

### D.      Dissolution of Statutory Committees

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, however, that such committees will remain in existence for the limited purposes of (a) pursuing, supporting, or otherwise participating in, any outstanding appeals in the Chapter 11 Cases; and (b) filing, objecting, or otherwise participating in, any final fee applications of Professionals.

### E.      Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests, unless and until the Effective Date has occurred.

### F.      Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Entity.

### G.      Post-Effective Date Service of Documents

Pursuant to Bankruptcy Rule 2002 and any applicable local rule, notice of all post-Confirmation matters for which notice is required to be given shall be deemed sufficient if served upon counsel for the U.S. Trustee, counsel to the Debtors, counsel to the GUC Trust, and all entities on the Bankruptcy Rule 2002 service list, as well as any parties who may be affected by the relief sought.  With the exception of the Debtors and the U.S. Trustee, any Person desiring to remain on the Bankruptcy Rule 2002 service list shall be required to file a request for continued service and to serve such request upon counsel to the GUC Trust within thirty (30) days after the Effective Date.  Persons shall be notified of such continued notice

requirements in the notice of entry of the Confirmation Order.  **Persons who do not file a request for continued service within thirty (30) days after the Effective Date shall be removed from the Bankruptcy Rule 2002 service list;** *provided, however*, **that nothing herein shall affect or impair the obligation of any movant to serve notice upon any party whose rights will be directly affected or impaired by the relief sought.**

Notwithstanding the foregoing, after the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Post Effective Date Debtors or the GUC Trust shall be served on:

| | |
|---|---|
| Post Effective Date Debtors | **Reliz Technology Group Holdings Inc.**<br>33 Irving Place<br>Chicago, Illinois 10003<br>Attention:  Joe Perry<br>Interim Chief Executive Officer,<br>E-mail address:  joe.perry@blockfills.com<br><br>with copies for information only (which shall not constitute notice) to: |
| Counsel to the<br>Post Effective Date Debtors | **MCDERMOTT WILL & SCHULTE LLP**<br>David R. Hurst (I.D. No. 3743)<br>Andrew A. Mark (I.D. No. 6861)<br>The Brandywine Building<br>1000 N. West Street, Suite 1400<br>Wilmington, Delaware 19801<br>Telephone: (302) 485-3900<br>Email:  dhurst@mcdermottlaw.com<br>          amark@mcdermottlaw.com<br>-and-<br><br>Darren Azman (admitted *pro hac vice*)<br>Joseph B. Evans (admitted *pro hac vice*)<br>R. Ethan Dover (admitted *pro hac vice*)<br>One Vanderbilt Avenue<br>New York, New York 10017<br>Telephone: (212) 547-5400<br>Email:  dazman@mcdermottlaw.com<br>          jbevans@mcdermottlaw.com<br>          edover@mcdermottlaw.com<br><br>-and-<br><br>Gregg Steinman (admitted *pro hac vice*)<br>333 SE 2nd Avenue, Suite 4500<br>Miami, Florida 33131<br>Telephone: (305) 358-3500<br>Email:  gsteinman@mcdermottlaw.com |

GUC Trust                              **[TBD]**

                                       with copies for information only (which shall not constitute
                                       notice) to:

Counsel to the GUC Trust               **[TBD]**

                                       with copies for information only (which shall not constitute
                                       notice) to:

**H.      Entire Agreement; Controlling Document**

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan; *provided, however*, that notwithstanding the foregoing or anything to the contrary herein, to the extent there is any conflict between the Plan and the Confirmation Order, on the one hand, and the Asset Purchase Agreement, on the other hand, the Plan and Confirmation Order shall control.  Except as set forth in the Plan, in the event that any provision of the Disclosure Statement, the Plan Supplement, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

**I.      Plan Supplement**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Claims, Noticing, and Solicitation Agent at https://www.veritaglobal.net/BlockFills or the Bankruptcy Court's website at https://www.deb.uscourts.gov/.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

**J.      Non-Severability**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it

57

may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

**K.      Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes to accept or reject the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such parties nor individuals or the Debtors or the GUC Trust will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

**L.      Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, or as Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation Date; *provided,* this Article XII.L shall not apply to any Governmental Unit.

Dated:  May 28, 2026

**RELIZ TECHNOLOGY HOLDINGS INC**.
on behalf of itself and all other Debtors


*/s/ Mark Renzi*

Mark Renzi
Chief Restructuring Officer
Reliz Technology Holdings Inc.


**MCDERMOTT WILL & SCHULTE LLP**

*/s/ David R. Hurst*
David R. Hurst (I.D. No. 3743)
Andrew A. Mark (I.D. No. 6861)
The Brandywine Building
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
Email:  dhurst@mcdermottlaw.com
        amark@mcdermottlaw.com


-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
R. Ethan Dover (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
Email:  dazman@mcdermottlaw.com
        jbevans@mcdermottlaw.com
        edover@mcdermottlaw.com


-and-

Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone: (305) 358-3500
Email:  gsteinman@mcdermottlaw.com

*Counsel for Debtors and Debtors in Possession*

**EXHIBIT B**

**<u>Liquidation Analysis</u>**

**<u>INTRODUCTION</u>**

Often referred to as the "best interests of creditors" test, section 1129(a)(7) of the Bankruptcy Code requires that each holder of a claim or interest in each impaired class either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the confirmed plan, that is not less than the amount such holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the Plan satisfies the best interests test, the Debtors, with the assistance of their financial advisors, have prepared this hypothetical liquidation analysis (the "<u>Liquidation Analysis</u>") and have taken the following steps:

1) estimated the cash proceeds that a chapter 7 trustee (a "<u>Trustee</u>") would generate if each Debtor's chapter 11 case was converted to a chapter 7 case on the Effective Date and the assets of such Debtor's estate were liquidated (the "<u>Liquidation Proceeds</u>");
2) determined the distribution that each Holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme set forth in chapter 7 of the Bankruptcy Code (the "<u>Liquidation Distribution</u>"); and
3) compared each Holder's Liquidation Distribution to the distribution such Holder would receive under the Debtors' Plan if the Plan were confirmed and consummated.

To account for multiple potential case outcomes in a chapter 11 process, the Debtors prepared multiple chapter 11 recovery analyses. These scenarios include:

1) A Sale scenario where the Debtors are acquired by a buyer for cash or equity consideration
2) A Chapter 11 Liquidation scenario where the Debtors are not sold or reorganized, but conduct a liquidation through the chapter 11 process, instead of chapter 7

This Liquidation Analysis represents an estimate of cash distributions and recovery percentages based on a hypothetical chapter 7 liquidation of the Debtors' assets. It is, therefore, a hypothetical analysis based on certain assumptions discussed herein and in the Disclosure Statement. As such, asset values and claims discussed herein may differ materially from amounts referred to in the Plan and Disclosure Statement. This Liquidation Analysis should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety, as well as the notes and assumptions set forth below.

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case involves the use of estimates and assumptions that, although considered reasonable by the Debtors based on their business judgment and input from their advisors, are subject to significant business, legal, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. This Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith comparison of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code versus under the Plan. The Liquidation Analysis is not intended, and should not be used, for any other purpose.

All limitations and risk factors set forth in the Disclosure Statement are applicable to this Liquidation Analysis and are incorporated by reference herein. The underlying financial information in the Liquidation Analysis was not compiled or examined by independent accountants and was not prepared to comply with Generally Accepted Accounting Principles or SEC reporting requirements.

Based on this Liquidation Analysis, the Debtors, with the assistance of their advisors, believe the Plan satisfies the best interests test and that each Holder of an Impaired Claim or Interest will receive value under the Plan on the Effective Date that is not less than the value such Holder would receive if the Debtors liquidated under chapter 7 of

the Bankruptcy Code. The Debtors believe that this Liquidation Analysis and the conclusions set forth herein are fair and represent the Debtors' best judgment regarding the results of a hypothetical liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

THE DEBTORS AND THEIR ADVISORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES CONTAINED HEREIN OR A CHAPTER 7 TRUSTEE'S, A PLAN ADMINISTRATOR'S, OR A WIND-DOWN TRUSTEE'S ABILITY TO ACHIEVE THE ILLUSTRATED RESULTS. ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES SET FORTH IN THIS LIQUIDATION ANALYSIS.

**BASIS OF PRESENTATION**

The Liquidation Analysis has been prepared assuming that the Debtors' chapter 7 liquidation commences on or about the targeted Effective Date (the "Liquidation Date"). The pro forma values referenced herein are projected as of the Liquidation Date and utilize (i) input from the Debtors' management team and advisors and (ii) projected results of operations and cash flows over the period from approximately April 15, 2026 to the Liquidation Date (the "Projection Period").

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based on scheduled liabilities as of the Petition Date. However, to the extent that a Holder of a General Unsecured Claim submitted a proof of claim with an amount different than the scheduled claim, the Debtors utilized such unreconciled General Unsecured Claim amount in the Liquidation Analysis.[1] The Debtors also made certain assumptions around the application and valuation of collateral securing certain borrowings. As a result, certain secured claims have been reduced with corresponding reductions in assets available for distribution. In other cases, claims scheduled as secured, were assumed to be unsecured in this analysis due to insufficient expected collateral value. The Debtors' estimates of Allowed Claims set forth in the Liquidation Analysis should not be relied on for the purpose of determining the value of any distribution to be made on account of Allowed Claims or Interests under the Plan.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM OR INTEREST BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS AND INTERESTS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

**DECONSOLIDATED LIQUIDATION**

The Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered, but not substantively consolidated proceeding. The results of this analysis have been consolidated for convenience.

Chapter 7 administrative expense claims that arise in a liquidation scenario would be paid in full from the Liquidation Proceeds prior to proceeds being made available for distribution to Holders of Allowed Claims. Under the "absolute priority rule," no junior creditor may receive any distributions until all senior creditors are paid in full, and no equity holder may receive any distribution until all creditors are paid in full. The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule. The commencement

---

[1]    Although the Debtors used such unreconciled General Unsecured Claims in the preparation of the Liquidation Analysis, the Debtors dispute the amounts set forth in certain proofs of claims and thus, reserve all rights to object to such claims.

of chapter 7 liquidation may trigger certain additional claims that would otherwise not exist under the Plan. Additionally, the Liquidation Analysis does not estimate contingent, unliquidated claims, or regulatory claims. Finally, the Liquidation Analysis does not include estimates for the tax consequences that may be triggered upon the liquidation and sale of assets. Such tax consequences could be material.

**CHAPTER 7 LIQUIDATION PROCESS**

As part of a hypothetical chapter 7 Trustee's liquidation process, the initial step would be to develop a liquidation plan designed to generate proceeds from the sale of assets that the Trustee would then distribute to creditors. The Liquidation Analysis assumes all liquid cryptocurrency is sold. This liquidation process would have three major components:

1) Cash proceeds from asset sales, including the sale of all cryptocurrency and illiquid assets ("Gross Liquidation Proceeds");

2) Costs to liquidate the business and administer the Estates under chapter 7 ("Liquidation Expenses"); and

3) Remaining proceeds available for distribution to claimants ("Net Liquidation Proceeds Available for Distribution").

**Gross Liquidation Proceeds**

The Gross Liquidation Proceeds reflect the estimated proceeds the Trustee would generate from a hypothetical chapter 7 liquidation. Under section 704 of the Bankruptcy Code, a Trustee must, among other duties, collect and convert property of the Estates as expeditiously as is compatible with the best interests of parties in interest, which could result in potentially distressed recoveries.

The Debtors' estimates of proceeds set forth in the Liquidation Analysis reflect a number of simplifying assumptions, including complicated legal questions, and are illustrative for the purposes of comparing liquidation under the Plan to chapter 7. These estimates should not be relied on for any reason, including for the purpose of determining the value of any distribution to be made on account of Allowed Claims or Interests under the Plan.

**Liquidation Expenses**

Liquidation Expenses reflect the costs the Trustee would incur to monetize the assets and wind down the Estates in chapter 7 and include the following:

- Expenses necessary to efficiently and effectively monetize the assets (the "Liquidation Costs");
- Chapter 7 professional fees (lawyers, financial advisors, and brokers to support the sale and transition of assets over the liquidation period); and
- Chapter 7 Trustee fees.

**Net Liquidation Proceeds Available for Distribution**

The Net Liquidation Proceeds Available for Distribution reflect estimated amounts available to Holders of Claims and Interests after the Liquidation Expenses are netted against the Gross Liquidation Proceeds. Under this analysis, the Liquidation Proceeds are distributed to Holders of Claims against, and Interests in, the Debtors in accordance with the Bankruptcy Code's priority scheme.

3

**CONCLUSION**

The Debtors have determined, as summarized in the table below, on the Effective Date, that the Plan will provide all Holders of Allowed Claims and Interests with a recovery that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code. Accordingly, the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

4

**SPECIFIC NOTES TO THE LIQUIDATION ANALYSIS**

**Gross Liquidation Proceeds**

A.  <u>Cash</u>

Consists of all unrestricted cash deposits in bank accounts, money service accounts, and brokerage accounts on hand as of April 15, 2026 per the Debtors' books and records. Operating and administration expenses are assumed to be funded by the sale of cryptocurrency during the pendency of the case and, as a result, bank balances are assumed to be unchanged as of the liquidation date.

B.  <u>Cash – Transaction / Equity</u>

Liquidation Analysis assumes $3.0M in proceeds under the sale scenario, consistent with the minimum bid under the Bid Procedures. Chapter 11 and chapter 7 liquidation scenarios assume no sale proceeds. In chapter 11 and chapter 7 liquidation scenarios, no proceeds are assumed from the sale of intellectual property or other intangible assets.

C.  <u>Cryptocurrencies</u>

The Liquidation Analysis includes the estimated value of all spot cryptocurrency held by the Debtors on various platforms, primarily Fireblocks. The cryptocurrency portfolio also includes immaterial positions in derivative cryptocurrency instruments. The estimated value of the cryptocurrency portfolio is based on the dollarized value of the underlying assets using market prices as of April 15, 2026.

In all scenarios, cryptocurrency on-hand is presented at its estimated net realizable value, which reflects the gross value minus estimated costs to convert cryptocurrency to cash.

In chapter 11 scenarios, all pre and post-effective date expenses are assumed to be funded with cryptocurrency conversions and assumed to incur 0.5% in trading costs. Since distributions to creditors are assumed to be primarily in-kind, no additional trading costs are assumed beyond those needed to fund expenses.

In the chapter 7 liquidation scenario, pre-Liquidation Date cryptocurrency conversions are assumed to incur 0.5% in trading costs, while all post-Liquidation Date cryptocurrency conversions are assumed to incur 2.0% in trading costs. The difference in trading costs reflects the impact of timing, volatility, and loss of in-house expertise and trading relationships upon the dismissal of employees in a hypothetical chapter 7 liquidation.

D.  <u>Loans Receivable</u>

Reflects principal balances owed by customers of the Debtors lending business. All outstanding loans receivable as of the Petition Date were collateralized or overcollateralized. Any collateral corresponding to these loans are assumed to be unsecured and included within the general unsecured claims pool. 100% of loans receivable are assumed collected in the analysis. To the extent certain loans are uncollectable, this would likely have an equal impact across all scenarios. Consistent with cryptocurrency holdings, loans receivable are valued as of April 15, 2026 to the extent they are denominated in digital assets.

E.        Excess Collateral Receivable

In certain situations, the Debtors posted collateral in excess of loans payable. In these situations, it is  assumed that the excess collateral is returned and the loan is closed out. The corresponding scheduled secured claim is not included in this analysis as it is assumed to be fully satisfied by collateral in the possession of the lender.

F.        Accounts Receivable

Includes accrued interest receivable related to the lending business, payroll tax receivable, and accounts receivable related to technology licensing. 80%+ of the accounts receivable value has been outstanding for at least 90 days. In all scenarios, recovery of accounts receivable value is assumed to be 5% of the amount owed given the uncertainty of collecting on these accounts.

G.        Other Receivables

Includes litigation, arbitration, and bankruptcy claims owed to the Debtors. Amounts reflect both awarded judgments and pending actions. Assumptions regarding the uncertain collectability of these receivables have been made based on the most current information available.

H.        Venture Investments

The Debtors hold one venture investment. Chapter 11 scenarios assume 75% recovery of the amount on the Debtor's books and records while Chapter 7 assumes 25%. The difference in recovery reflects the flexibility provided by a chapter 11 process to find an optimal buyer compared to a chapter 7 where a sale would likely be consummated more quickly.

I.        Fixed Assets

The Debtors own fixed assets, including cryptocurrency mining equipment, furniture and fixtures, computers, and other office equipment. Certain assets that are no longer used in operations have been marketed by the Debtors, but to date no material sales have taken place. In all scenarios, no recovery is assumed from the sale of these assets.

J.        Prepayments and Deposits

The Debtors have prepaid certain expenses, including but not limited to, professional fee retainers, licenses, engineering, software, and various other contractual obligations. This Liquidation Analysis assumes that prepaid amounts will continue to be consumed during the liquidation period to offset against potential liabilities.

K.        Preference Recoveries

The Liquidation Analysis illustratively assumes 1.5% of gross transfers (of fiat and cryptocurrency) made in the 90-day period prior to the Petition Date are recovered as preferences.

Although the Liquidation Analysis does not illustrate different preference recoveries between chapter 7 and chapter 11, recoveries may vary in the different scenarios. Notably in chapter 11, certain smaller potential preferences, or potential preferences against customers with unsecured claims may be released and therefore recoveries may be slightly lower than in a chapter 7. On the other hand, the Debtors are working diligently to minimize disruption to their books and records and ability to access information in the winddown, which efforts may be disrupted in the event

6

of a conversion to a chapter 7. Such a disruption could increase the difficulty in successfully pursuing litigation and potentially reduce recoveries from preferences in a chapter 7 vs. a chapter 11 liquidation.

L.      Proceeds from Non-Debtors

All scenarios assume estimated cash balances to be returned from non-Debtors, reflecting cash and other liquid assets held by these entities.

M.      Litigation Recoveries

The Debtors' investigation into potential claims is ongoing. Although potentially significant claims may exist, at this point it would be speculative to project recoveries. Therefore, the Liquidation Analysis illustratively does not reflect any recovery from litigation in either a chapter 7 or a chapter 11 scenario. The Debtors do believe, however, that potential disruption from a conversion to chapter 7 could make it harder to access information and records. The Debtors' record keeping systems are highly technical and require specialized expertise. Thus, the Debtors' ability to effectively prosecute claims in a chapter 11 liquidation is likely significantly greater.

**Liquidation Costs**

N.      Chapter 7 Trustee Fees

Pursuant to section 326(a) of the Bankruptcy Code, under a chapter 7 liquidation, the Bankruptcy Court may allow reasonable compensation for the Trustee's services, not to exceed 25% on the first $5,000 or less, 10% on any amount in excess of $5,000 but not in excess of $50,000, 5% on any amount in excess of $50,000 but not in excess of $1 million, and reasonable compensation not to exceed 3% of such moneys in excess of $1 million, upon all moneys disbursed or turned over in the chapter 7 cases by the Trustee to parties in interest. For the purpose of the Liquidation Analysis the Trustee fees are estimated to be 3% of proceeds available for distribution to creditors.

Under a chapter 11 liquidation, there are no Chapter 7 Trustee Fees; however, under a chapter 11 liquidation, there will be fees associated with the trustee entrusted to administer the GUC Trust.

O.      Professional Fees

All scenarios presented in the Liquidation Analysis assume the payment of professional fees incurred to date and continuation of professional fee run-rates through the anticipated Effective Date. All pre-Effective Date fees are assumed to be fully funded into an escrow account. A conversion to chapter 7 is assumed to occur near the target Effective Date.

P.      Operating Expenses

All scenarios presented in the Liquidation Analysis assume consistent pre-Effective Date operating expenses, reflecting the assumption that a chapter 7 conversion would occur near the targeted Plan Effective date. Operating expenses reflect estimated employees, software, occupancy, contractors, and other normal course expenses.

Q.      Wind Down Costs

All scenarios presented in the Liquidation Analysis include reserves for costs expected to be incurred after the Effective Date to wind down the Debtors' estates. Wind-down costs include, among other items, personnel, technology,

7

vendor expenses, and professional fees necessary to complete the wind-down and make distributions to creditors. All chapter 11 scenarios assume consistent Wind-down costs, reflecting comparable levels of complexity across those scenarios. The chapter 7 liquidation scenario assumes higher wind-down costs, reflecting the cost to retain terminated employees as contractors to assist with, among other things, the sale of any assets, finalization of employee benefit matters, cash collections, payroll and tax reporting, accounts payable and other books and records, and responding to certain legal and regulatory matters related to the wind-down of the Debtors' affairs. Additionally, the chapter 7 scenario assumes engagement of new advisors who will require additional time and expense to become familiar with the Debtors' business, assets, and operations. In all scenarios, the wind-down period is assumed to be approximately 20 weeks; however, there can be no assurance that the liquidation would be completed within this limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.

**Claims**

R.        Secured Tax Claims

The Debtors are not aware of any secured tax claims against the Estate, and none are assumed in the analysis.

S.        Other Secured Claims

No other secured claims are assumed for this analysis. While certain secured claims have been scheduled, these claims are either assumed to have been fully satisfied with collateral held (refer to Note E) by the relevant lender or the collateral is assumed to be worthless and classified as a general unsecured claim in this analysis.

T.        Other Priority Claims

Liquidation Analysis assumes $1.0M of other priority claims. Though to date no such claims have been filed, the $1.0M is assumed in all chapter 11 and chapter 7 scenarios to account for potential claims filed. There can be no assurances whether other priority claims filed, if any, would be consistent with this assumption.

U.        Priority Tax Claims

Liquidation Analysis assumes $2.0M of priority tax claims. Though to date no such claims have been filed, the $2.0M is assumed in all chapter 11 and chapter 7 scenarios to account for potential claims filed. There can be no assurances whether priority tax claims filed, if any, would be consistent with this assumption.

V.        Celsius Secured Claims

$5.6M Celsius claim is assumed to be fully secured and receive 100% recovery on its scheduled claim in all scenarios. If it is determined that liens in certain assets are not properly perfected, the assumptions in the Liquidation Analysis would change, potentially impacting Celsius recoveries.

W.        Convenience Claims

The liquidation analysis reflects a Convenience Class in all chapter 11 scenarios, pursuant to the Plan. The Convenience Class Recovery Pool is assumed to be $850,000, payable to all claimants with claims below approximately $45,000.  The Convenience Class is estimated to be $1.1M of claims in chapter 11 scenarios. In a chapter 7 liquidation, no Convenience Class would be established.

X.      <u>Unsecured Claims</u>

Unsecured claims include all participating customer claims, trade claims, and unsecured notes. Unsecured claims are estimated to be $181.5M in chapter 11 scenarios and $182.6M in a chapter 7 liquidation. The difference in claims pool sizes is driven by the inclusion of approximately $1.1M of convenience claims in the unsecured claims pool in a chapter 7 liquidation.

Y.      <u>Intercompany Claims</u>

Intercompany claims are assumed to receive no recoveries under any scenario. Under the Plan, Intercompany Claims are junior to General Unsecured Claims. Each Allowed Intercompany Claim shall be reinstated, distributed, contributed, set off, settled, cancelled, or released, or otherwise addressed at the option of the Post Effective Date Debtors or GUC Trust, as applicable.

Z.      <u>Intercompany Interests</u>

Intercompany interests are assumed to receive no recoveries under any scenario.

AA.     <u>Existing Equity Interests</u>

Equity interests are assumed to receive no recoveries under any scenario.

**EXHIBIT – Ch. 11 Scenarios vs. Ch. 7**

| | | Claims[i] | Sale | | Ch.11 Liquidation | | Ch.7 Liquidation | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| $ in millions | | All Scenarios | Plan | Recovery | Plan | Recovery | Plan | Recovery |
| CLASS | TOTAL ESTIMATED PROCEEDS (NET) | | 33.0 | | 30.0 | | 26.5 | |
| 1 | Secured Tax Claims | - | - | 0% | - | 0% | - | 0% |
| 2 | Other Secured Claims | - | - | 0% | - | 0% | - | 0% |
| 3 | Other Priority Claims | 3.0 | 3.0 | 100% | 3.0 | 100% | 3.0 | 100% |
| 4 | Celsius Secured Claim | 5.6 | 5.6 | 100% | 5.6 | 100% | 5.6 | 100% |
| 5 | Convenience Claims (ii) | 1.1 | 0.9 | 78% | 0.9 | 78% | 0.1 | 10% |
| 6A | General Unsecured Claims Against TopCo | 7.2 | - | 0% | - | 0% | - | 0% |
| 6B | General Unsecured Claims Against Reliz Tech | - | - | 0% | - | 0% | - | 0% |
| 6C | General Unsecured Claims Against Reliz CI | - | - | 0% | - | 0% | - | 0% |
| 6D | General Unsecured Claims Against Reliz LTD | 174.3 | 23.6 | 14% | 20.6 | 12% | 17.8 | 10% |
| 7 | Section 510(b) Claims | - | - | 0% | - | 0% | - | 0% |
| 8 | Intercompany Claims (iii) | - | - | 0% | - | 0% | - | 0% |
| 9 | Intercompany Interests | - | - | 0% | - | 0% | - | 0% |
| 10 | Existing Equity Interests | - | - | 0% | - | 0% | - | 0% |

(i) Claims in all scenarios are estimated based on scheduled and filed claims, and are subject to material change

(ii) While a Convenience Class does not exist in a chapter 7 conversion, this class is presented for illustrative/comparative purposes and would receive recoveries consistent with the other GUC classes

(iii) Under the Plan, Intercompany Claims are junior to General Unsecured Claims. Each Allowed Intercompany Claim shall be reinstated, distributed, contributed, set off, settled, cancelled, or released, or otherwise addressed at the option of the Post Effective Date Debtors or GUC Trust, as applicable. For the purposes of the table above, these claims have illustratively been reduced to $0

10