# EXHIBIT A

## Asset Purchase Agreement

# SHARE AND ASSET PURCHASE AGREEMENT

**by and among**

**RELIZ TECHNOLOGY GROUP HOLDINGS INC.,**

**BASIS GROUP HOLDINGS INC.,**

**RELIZ TECHNOLOGIES LLC,**

**RELIZ LTD,**

**and**

**RELIZ CI LTD,**

**as Sellers,**

**and**

**KEYROCK S.A**

**as Buyer**

**June [________], 2026**

# TABLE OF CONTENTS

**Page**


| | | |
|---|---|---|
| ARTICLE I | DEFINITIONS | 2 |
| Section 1.1 | Definitions | 2 |
| ARTICLE II | PURCHASE AND SALE | 13 |
| Section 2.1 | Purchase and Sale of Transferred Assets | 13 |
| Section 2.2 | Purchase and Sale of Transferred Equity Interests. | 14 |
| Section 2.3 | Excluded Assets | 14 |
| Section 2.4 | Assumption of Assumed Liabilities | 15 |
| Section 2.5 | Excluded Liabilities | 16 |
| Section 2.6 | Consideration. | 16 |
| Section 2.7 | Assumption and Assignment of Contracts; Excluded Locations. | 17 |
| Section 2.8 | Closing. | 18 |
| Section 2.9 | Deliveries at the Initial Closing and UK Equity Closing. | 19 |
| Section 2.10 | Allocation | 22 |
| ARTICLE III | SELLERS' REPRESENTATIONS AND WARRANTIES | 22 |
| Section 3.1 | Organization of Sellers; Good Standing. | 22 |
| Section 3.2 | Authorization of Transaction | 22 |
| Section 3.3 | Non-Contravention | 23 |
| Section 3.4 | Title to Transferred Assets | 23 |
| Section 3.5 | Formation and Qualification of the Transferred Entities | 24 |
| Section 3.6 | Capital Structure of the Transferred Entities | 24 |
| Section 3.7 | Contracts | 24 |
| Section 3.8 | Intellectual Property | 24 |
| Section 3.9 | Litigation | 25 |
| Section 3.10 | Compliance with Laws. | 25 |
| Section 3.11 | Absence of Certain Developments; No Undisclosed Liabilities; No Material Adverse Effect. | 25 |
| Section 3.12 | Anti-Bribery Compliance | 26 |
| Section 3.13 | Compliance with Trade Restrictions. | 26 |
| Section 3.14 | Personal Data; Data Security | 27 |
| Section 3.15 | Taxes. | 27 |

**TABLE OF CONTENTS**
(continued)

**Page**


| | | |
|---|---|---|
| Section 3.16 | UK Regulated Entity. | 27 |
| Section 3.17 | Cayman Regulated Entity.. | 29 |
| Section 3.18 | Financial Statements | 30 |
| Section 3.19 | No Undisclosed Liabilities of the Transferred Entities. | 30 |
| Section 3.20 | Material Contracts of the Transferred Entities. | 30 |
| Section 3.21 | No Other Representations or Warranties | 31 |
| ARTICLE IV | BUYER’S REPRESENTATIONS AND WARRANTIES | 32 |
| Section 4.1 | Organization of Buyer. | 32 |
| Section 4.2 | Authorization of Transaction. | 32 |
| Section 4.3 | Non-Contravention | 32 |
| Section 4.4 | Financial Capacity. | 33 |
| Section 4.5 | Litigation. | 33 |
| Section 4.6 | Adequate Assurances Regarding Executory Contracts. | 33 |
| Section 4.7 | Good Faith Purchaser. | 33 |
| Section 4.8 | Brokers’ Fees | 33 |
| Section 4.9 | Condition of Business | 33 |
| ARTICLE V | CERTAIN COVENANTS | 34 |
| Section 5.1 | Certain Efforts; Cooperation. | 34 |
| Section 5.2 | Notices and Consents. | 35 |
| Section 5.3 | Bankruptcy Actions. | 36 |
| Section 5.4 | Certain Restricted Conduct | 37 |
| Section 5.5 | Contracts | 37 |
| Section 5.6 | Wrong Pockets. | 38 |
| Section 5.7 | Due Diligence and Integration Cooperation. | 39 |
| Section 5.8 | Notification of Certain Events. | 40 |
| ARTICLE VI | OTHER COVENANTS | 40 |
| Section 6.1 | Cooperation. | 40 |
| Section 6.2 | Further Assurances. | 40 |
| Section 6.3 | Availability of Business Records. | 41 |
| Section 6.4 | Use of Name and Marks | 41 |

**TABLE OF CONTENTS**
(continued)

**Page**


| | | |
|---|---|---|
| Section 6.5 | Data Privacy Protection | 41 |
| Section 6.6 | UK Regulated Entity Conduct | 42 |
| Section 6.7 | Key Employees & Employee Matters | 44 |
| Section 6.8 | Cayman Notification. | 44 |
| Section 6.9 | Other Regulatory Filings | 44 |
| Section 6.10 | Change in Control Condition. | 45 |
| Section 6.11 | Non-Competition | 45 |
| Section 6.12 | Exclusivity | 46 |
| ARTICLE VII | CONDITIONS TO CLOSING | 46 |
| Section 7.1 | Conditions to Buyer's Obligations | 46 |
| Section 7.2 | Conditions to Sellers' Obligations. | 47 |
| Section 7.3 | Other Closing Conditions | 48 |
| Section 7.4 | No Frustration of Closing Conditions | 48 |
| Section 7.5 | Change in Control Condition | 48 |
| ARTICLE VIII | TERMINATION | 49 |
| Section 8.1 | Termination of Agreement | 49 |
| Section 8.2 | Procedure Upon Termination | 50 |
| Section 8.3 | Effect of Termination. | 50 |
| ARTICLE IX | MISCELLANEOUS | 50 |
| Section 9.1 | Remedies | 50 |
| Section 9.2 | Expenses | 51 |
| Section 9.3 | Entire Agreement | 51 |
| Section 9.4 | Incorporation of Schedules, Exhibits and Disclosure Schedule | 51 |
| Section 9.5 | Amendments and Waivers | 51 |
| Section 9.6 | Succession and Assignment | 52 |
| Section 9.7 | Notices | 52 |
| Section 9.8 | Governing Law; Jurisdiction | 53 |
| Section 9.9 | Severability | 54 |
| Section 9.10 | No Third-Party Beneficiaries | 54 |
| Section 9.11 | No Survival of Representations, Warranties and Agreements | 54 |

**TABLE OF CONTENTS**
(continued)

**Page**


| | | |
|---|---|---|
| Section 9.12 | Construction | 54 |
| Section 9.13 | Computation of Time | 54 |
| Section 9.14 | Mutual Drafting | 55 |
| Section 9.15 | Disclosure Schedule | 55 |
| Section 9.16 | Non-Recourse | 55 |
| Section 9.17 | Headings; Table of Contents | 55 |
| Section 9.18 | Counterparts; Email Signatures | 55 |
| Section 9.19 | Time of Essence | 55 |

**EXHIBITS**

| | |
|---|---|
| EXHIBIT A | FORM OF BILL OF SALE |
| EXHIBIT B | FORM OF ASSUMPTION AND ASSIGNMENT AGREEMENT |
| EXHIBIT C | NON-FOREIGN STATUS AFFIDAVIT |
| EXHIBIT D | ALLOCATION SCHEDULE |
| EXHIBIT E, PART 1 | STOCK TRANSFER FORM (MINORITY SALE DOCUMENTS) |
| EXHIBIT E, PART 2 | CAYMAN STOCK TRANSFER FORM |
| EXHIBIT F | BLOCKFILLS TRADEMARK LICENSE AGREEMENT |

**CONFIDENTIAL**

# SHARE AND ASSET PURCHASE AGREEMENT

This **SHARE AND ASSET PURCHASE AGREEMENT** (this "Agreement") by and among Reliz Technology Group Holdings Inc., a Delaware corporation (the "Parent"); Reliz Technologies LLC, an Illinois limited liability company; Basis Group Holdings Inc., a [●] ("BGH"); Reliz LTD, an exempted company incorporated under the laws of the Cayman Islands; Reliz CI LTD, an exempted company incorporated under the laws of the Cayman Islands (collectively, the "Sellers" and each individually, a "Seller"), and Keyrock S.A., a public limited liability company (*naamloze vennootschap/société anonyme*) incorporated and existing under the laws of the Kingdom of Belgium (the "Buyer"), is dated effective as of June [__], 2026 (the "Effective Date"). Sellers and Buyer are referred to herein collectively as the "Parties" and each individually a "Party".

## RECITALS

**WHEREAS**, certain terms used in this Agreement are defined in ARTICLE I;

**WHEREAS**, Sellers own and operate a crypto trading solutions and financial technology firm dedicated to the provision of bespoke end-to-end solutions to participants in the cryptocurrency market worldwide (the "Business");

**WHEREAS**, Parent owns all of the issued and outstanding shares of BlockFills Digital Markets Ltd (the "Cayman Regulated Entity") (such equity interests, the "Transferred Cayman Equity Interests"), and BGH owns [92]% of the issued and outstanding shares of Basis Capital Markets UK Ltd (the "UK Regulated Entity" and, together with the Cayman Regulated Entity, the "Transferred Entities") (such equity interests, the "Transferred UK Equity Interests" and, together with the Transferred Cayman Equity Interests, the "Transferred Equity Interests");

**WHEREAS**, concurrently with the execution and delivery of this Agreement and as a condition and inducement to Buyer's willingness to enter into this Agreement, Sellers have procured that each UK Regulated Entity Minority Shareholder has executed the Minority Sale Documents (including the stock transfer forms substantially in the form attached hereto as Exhibit E Part 1), automatically effective upon the UK Equity Closing;

**WHEREAS**, concurrently with the execution and delivery of this Agreement and as a condition and inducement to Buyer's willingness to enter into this Agreement, the Sellers shall have used commercially reasonable efforts to, and shall have used commercially reasonable efforts to cooperate with Buyer to, cause the Key Employees to have entered into Key Employee Offer Letters;

**WHEREAS**, concurrently with the execution and delivery of this Agreement and as a condition and inducement to Buyer's willingness to enter into this Agreement, the Cayman Notification was submitted on the date of this Agreement;

**WHEREAS**, on March 15, 2026 (the "Petition Date"), Sellers filed voluntary petitions for relief (the "Chapter 11 Cases") under chapter 11, title 11 of the United States Code, 11 U.S.C. § 101 *et seq*. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of

Delaware (the "Bankruptcy Court") where the Sellers' Chapter 11 Cases are jointly administered under Case No. 26-10371 (TMH);

**WHEREAS**, this Agreement is subject to approval of the Bankruptcy Court and on the terms and subject to the conditions set forth herein and pursuant to the Bidding Procedures set forth in the *Order (I) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (II) Scheduling an Auction Date and Approving the Form and Manner of Notice Thereof, (III) Approving Assumption and Assignment Procedures, (IV)Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief* [Docket No. 177] entered by the Bankruptcy Court on April 14, 2026 (the "Bidding Procedures Order");

**WHEREAS**, in accordance with the Bidding Procedures, on March 26, 2026, Sellers filed a notice cancelling the Auction;

**WHEREAS**, the Contemplated Transactions are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order to be entered by the Bankruptcy Court;

**WHEREAS**, subject to approval of the Bankruptcy Court, Sellers wish to sell, transfer and assign to Buyer, and Buyer wishes to purchase, acquire and assume from Sellers, pursuant to Sections 105, 363, 365, and other applicable provisions of the Bankruptcy Code, the Transferred Assets and the Assumed Liabilities as of the relevant Closing; and

**WHEREAS**, subject to approval of the Bankruptcy Court, on each of the Initial Closing Date and the UK Equity Closing Date Buyer will acquire certain assets and assume certain liabilities of the Business of Sellers in accordance with the terms of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the Parties agree as follows:

## AGREEMENT

## ARTICLE I
## DEFINITIONS

**Section 1.1 Definitions**.

The following terms have the meanings specified or referred to in this ARTICLE I:

"Accounts Receivable" means (a) all accounts, accounts receivable, contractual rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor rebates of Sellers, and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"Affiliate" when used with reference to another Person means any Person, directly or indirectly, through one or more intermediaries, Controlling, Controlled by, or under common

Control with, such other Person, including those Persons defined and described as an Affiliate or "insider" in Section 101(31) of the Bankruptcy Code.

"Agreement" has the meaning set forth in the first paragraph of this Agreement.

"Allocation Schedule" has the meaning set forth in Section 2.10.

"Alternate Agreement" means one or more definitive agreements with respect to one or more Alternate Transactions.

"Alternate Transaction" means a transaction or series of related transactions pursuant to which Sellers, consistent with the Bidding Procedures Order, (a) accept a Qualified Bid other than that of Buyer, as the highest or best offer, or (b) sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Sellers or otherwise), including pursuant to a Plan or refinancing, all or substantially all of the Transferred Assets or the equity interests of either Seller (or agree to do any of the foregoing) in a transaction or series of transactions to a Person or Persons other than Buyer.

"Assigned Contract" has the meaning set forth in Section 2.1(a).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumption and Assignment Agreement" has the meaning set forth in Section 2.8(a)(ii).

"Auction" means an auction for the sale and assumption of the Transferred Assets and the Assumed Liabilities.

"Authorization" means any authorization, license, registration, permission, approval, consent or designation granted to the UK Regulated Entity by or from the FCA which is required for the conduct of its business in the ordinary course or any material part thereof.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Bid Deadline" has the meaning set forth in the Bidding Procedures Order.

"Bidder" and "Bidder" means each party submitting a qualified bid in the Action, as set forth in the Bidding Procedures Order

"Bidding Procedures" means the procedures approved pursuant to the Bidding Procedures Order establishing the bidding and auction procedures to be followed by Sellers and all potential bidders in connection with the Debtors' marketing and sale process.

"Bidding Procedures Order" has the meaning set forth in the Recitals.

"Bill of Sale" has the meaning set forth in Section 2.8(a)(i).

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in Houston, Texas shall be authorized or required by Law to close.

"Buyer" has the meaning set forth in the first paragraph of this Agreement.

"Cash" means all cash and cash equivalents (including cryptocurrency) of Sellers as of the Closing.

"Cayman Notification" has the meaning set forth in Section 6.8(a).

"Certified Function" means any function designated as a certification function under the FCA Handbook.

"Certified Person" means any individual who performs or is required to perform a Certified Function for the UK Regulated Entity.

"Change in Control Condition" has the meaning given in Section 7.5(a)(iii).

"Chapter 11 Cases" has the meaning set forth in the Recitals.

"Claim" or "claim" means a "claim" as defined in Section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" means the Initial Closing and/or the UK Equity Closing, as context may so require.

"Closing Date" means the Initial Closing Date and/or the UK Equity Closing Date, as context may so require.

"Committee" means the Official Committee of Unsecured Creditors, if any, appointed in the Chapter 11 Cases.

"Consent" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

"Contemplated Transactions" means the Initial Closing Transactions and the UK Equity Closing Transactions.

"Contract" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement, collective bargaining agreement, or other arrangement, understanding, permission or commitment that, in each case, is legally binding.

"Control" means, when used with reference to any Person, the power to direct the management or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency or otherwise, or pursuant to or in connection with any Contract; and the terms "Controlling" and "Controlled" shall have meanings correlative to the foregoing.

"Cure Costs" means, for only the Assigned Contracts, all amounts that are determined by a Final Order of the Bankruptcy Court must be paid, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assigned Contracts to Buyer as provided herein.

"Cure Schedule" has the meaning set forth in Section 2.6(a)(i).

"Debtors" means Sellers, as debtors and debtors in possession in the Chapter 11 Cases.

"Deposit" has the meaning set forth in Section 2.5(b).

"Disclosure Schedules" has the meaning set forth in ARTICLE III.

"Effective Date" has the meaning set forth in the introductory paragraph to this Agreement.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" has the meaning set forth in Section 2.6(a)(ii).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"FCA" means the UK Financial Conduct Authority.

"FCA Rules" means the rules, regulations, principles, codes of conduct, guidance and other requirements made or issued by the FCA from time to time, including those contained in the FCA Handbook.

"FSMA" means the UK Financial Services and Markets Act 2000 (as amended, restated, or re-enacted from time to time).

"Final Order" means an order, an order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction or other similar determination or finding by, before, or under the supervision of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, (i) which has not been reversed, stayed, modified, amended, enjoined, set aside, annulled or suspended and (ii) with respect to which no stay shall have been issued in connection with any notice of appeal or petition for certiorari filed within any deadline provided by applicable Law and any deadline provided by applicable Law to file any such a notice of appeal or petition for certiorari shall have passed without any such a notice of appeal or petition for certiorari having been filed.

"Fraud" means actual and intentional common law fraud under the Laws of the State of Delaware.

"Governmental Authority" means any governmental entity, including the United States federal, state, local or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"Indebtedness" of any Person means, without duplication, (i) the principal, interest and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds, or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property (other than for services or goods acquired in the Ordinary Course of Business), all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable arising in the Ordinary Course of Business); (iii) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance, or similar credit transaction; (iv) all obligations of the type referred to in clauses (i) through (iii) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (v) all obligations of the type referred to in clauses (i) through (iv) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person); provided, however, for the avoidance of doubt "Indebtedness" shall not include any obligations of such Person under leases required to be capitalized in accordance with GAAP.

"Initial Closing" has the meaning set forth in Section 2.8(a).

"Initial Closing Date" has the meaning set forth in Section 2.8(a).

"Initial Closing Minimum Cash" means cash in an amount equal to the UK Regulated Entity's Own Funds Threshold Requirement held in a bank account owned by the UK Regulated Entity, and which is not permitted to be applied toward any other item or expense (including any operational expenses) of the UK Regulated Entity (or any other entity), and which shall include, for avoidance of doubt, any cash which the UK Regulated Entity holds in accordance with the Liquid Asset Threshold Requirement.

"Initial Closing Transactions" means the sale, conveyance, assignment, transfer and delivery of the Transferred Assets and Transferred Cayman Equity Interests by the Sellers to Buyer (or its nominated Affiliates) pursuant to Section 2.2(a), the assumption by Buyer of the Assumed Liabilities, and all other transactions contemplated by this Agreement to be consummated at the Initial Closing.

"Insurance Policy" means each primary, excess and umbrella insurance policy, bond and other form of insurance owned or held by or on behalf of Sellers and their operations, properties and assets, or providing insurance coverage to the Business.

"Intellectual Property" has the meaning set forth in Section 2.1(c).

"IRS" means the Internal Revenue Service.

"Key Employees" means up to 15 current employees of the Sellers, including the individuals set forth on Schedule 6.7.

"Key Employee Offer Letters" means offer letters in the agreed form prior to the Initial Closing sent to the Key Employees.

"Knowledge of Buyer" or "Buyer's Knowledge" or any other similar knowledge qualification, means the actual knowledge of any Representative of Buyer.

"Knowledge of Sellers" or "Sellers' Knowledge" or any other similar knowledge qualification, means the actual knowledge of any Representative of any Seller.

"Law" means any federal, state, provincial, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance (including with respect to zoning or other land use matters), code, treaty, convention, rule, regulation, requirement, edict, directive, pronouncement, determination, proclamation or Order of any Governmental Authority.

"Liability" means all Indebtedness, losses, claims, damages, expenses, fines or other penalties, costs, royalties, proceedings, deficiencies, duties, obligations, and other liabilities (including those arising out of any Litigation, such as any settlement or compromise thereof or judgment or award therein) of a Person (whether absolute, accrued, contingent, fixed, liquidated or unliquidated, or otherwise, and whether known or unknown, and whether due or to become due, and whether in contract, tort, strict liability, or otherwise, and whether or not resulting from third-party claims).

"Licenses" means any approval, authorization, consent, license, order, permit, waiver, easement, qualification, grant, concession, exception, ruling, waiver, variance, registration, provider number, certificate or other form of permission, or similar right issued, granted, given or otherwise obtained from or by any Governmental Authority, under the authority thereof or pursuant to any applicable Law.

"Lien" as applied to any Person means, with respect to any property or asset, any mortgage, deed of trust, lien (statutory or otherwise), encumbrance, interest, charge, security interest, put, call, other option, right of first refusal, right of first offer, servitude, right of way, easement, conditional sale or installment contract, finance Lease involving substantially the same effect, security agreement or other encumbrance or restriction on the use, transfer or ownership of any property of any type (including real property, tangible property and intangible property and including any "Lien" as defined in the Bankruptcy Code).

"Liquid Assets" has the meaning given in the MIFIDPRU sourcebook in the FCA Handbook.

"Liquid Assets Threshold Requirement" has the meaning given in the MIFIDPRU sourcebook in the FCA Handbook.

"Litigation" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at Law or in equity and whether before any Governmental Authority or arbitrator.

"Material Adverse Effect" means any event, occurrence, fact, condition, or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to

the Transferred Assets or the Transferred Equity Interests, in each case taken as a whole, but excluding (a) any change or effect to the extent that it results from or arises out of (i) the pendency of the Chapter 11 Cases or the financial condition of Sellers; (ii) the execution and delivery of this Agreement or the announcement thereof or consummation of the Contemplated Transactions; (iii) changes in (or proposals to change) Law, generally accepted accounting principles, or other accounting regulations or principles, or (iv) any action contemplated by this Agreement or taken at the request of Buyer; (b) any change or effect generally applicable to (i) the industries and markets in which Sellers operate; (ii) the Business in the ordinary course; or (iii) economic or political conditions or the securities or financial markets in any country or region; (c) any outbreak or escalation of hostilities or war or any act of terrorism; (d) any occurrence, threat, or effects of a disease outbreak, epidemic, pandemic, or similar widespread public health concern, which results in recommendations or mandates from governmental authorities to reduce travel, avoid large gatherings, self-quarantine, or extended shutdown of certain businesses; (e) any objections in the Bankruptcy Court to (i) this Agreement and the Related Agreements and the transactions contemplated hereby and thereby, (ii) the reorganization of Sellers and any related plan of reorganization or disclosure statement, or (iii) the Bidding Procedures Order or Sale Order; (f) the assumption or rejection of any Assigned Contract; (g) any failure by the Business to meet any internal or published projections, forecasts or revenue or earnings predictions (provided that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded); (h) any Order of the Bankruptcy Court or any actions or omissions of Sellers in compliance therewith; (i) any action taken by Sellers at the request of, or with the consent of, Buyer; (j) any of the matters disclosed on any Exhibit, Annex, Schedule, or Disclosure Schedules to this Agreement; (k) any change of which Buyer has Knowledge as of the date hereof; (l) any action required to be taken or not taken pursuant to this Agreement; and (m) any action taken or not taken by or on behalf of Buyer or at Buyer's direction.

"Minority Sale Documents" means the Stock Transfer Forms in substantially the form attached hereto as Exhibit E Part 1 and executed powers of attorney (pursuant to which such Stock Transfer Forms may be dated and signatures released upon the UK Equity Closing), executed by each of the UK Regulated Entity Minority Holders.

"Order" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order issued, made or rendered by any Governmental Authority.

"Ordinary Course of Business" means the ordinary and usual course of operations of the Business of Sellers (including acts and omissions of Sellers in the ordinary and usual course), subject to any modifications of such practice as a result of the filing of the Chapter 11 Cases, through the date hereof, consistent with past customer and practice, and operations in a bankruptcy.

"Own Funds" has the meaning given in the MIFIDPRU sourcebook in the FCA Handbook.

"Own Funds Threshold Requirement" has the meaning given in the MIFIDPRU sourcebook in the FCA Handbook.

"Parties" has the meaning set forth in the first paragraph of this Agreement.

"Permitted Liens" means: (a) Liens for Taxes, assessments and other governmental levies, fees and charges not yet delinquent or which are being contested in good faith by appropriate proceedings, with any such contests and the amounts at issue with respect thereto described on Schedule 1, and (b) with respect to leased or licensed personal property, the terms and conditions of the leases or licenses applicable thereto to the extent constituting an Assigned Contract.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Authority or any group or syndicate of any of the foregoing.

"Petition Date" means March 15, 2026, the date of the filing of the Chapter 11 Cases.

"PII" has the meaning set forth in Section 6.5.

"Plan" means the *Joint Chapter 11 Plan of Reliz Technology Group Holdings Inc. and Its Debtor Affiliates*, as supplemented or amended from time to time.

"Purchase Price" has the meaning set forth in Section 2.5.

"Transferred Assets" has the meaning set forth in Section 2.1; provided, however, that, for the avoidance of doubt, notwithstanding anything in this Agreement to the contrary, the Transferred Assets shall not include any Excluded Assets.

"Purchased Intellectual Property" means any and all Intellectual Property owned by any Seller or its Affiliates or Subsidiaries, including all rights of action and remedies for past, present and future infringements thereof.

"Qualified Bid" has the meaning set forth in the Bidding Procedures Order.

"Qualified Bidder" has the meaning set forth in the Bidding Procedures Order.

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

"Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Authority or domain name registrar.

"Related Agreements" means the Bill of Sale, the Assumption and Assignment Agreement, the Settlement Statement, IRS Forms W-9, any stock transfer forms and any other instruments of transfer and conveyance as may be required under applicable Law to convey valid title of the Transferred Assets and the Transferred Equity Interests to Buyer.

"Representative" of a Person means such Person's Subsidiaries and the officers, directors, managers, employees, advisors, partners, representatives (including its legal counsel and its accountants) and agents of such Person or its Subsidiaries, as of the Effective Date.

"Sale Hearing" means the hearing scheduled by the Bankruptcy Court in the Bidding Procedures Order to consider the sale of the Debtors' assets to a Successful Bidder.

"Sale Order" means an Order of the Bankruptcy Court in the Chapter 11 Cases approving the sale to Buyer consistent with the terms of this Agreement and otherwise acceptable to Buyer and Sellers.

"Section 178 Notice" has the meaning given in Section 7.5(c).

"Seller" or "Sellers" has the meaning set forth in the first paragraph of this Agreement.

"Seller Transaction Expenses" means the collective amounts payable by Sellers for all out-of-pocket fees and expenses incurred in connection with the preparation, negotiation, execution and consummation of the Contemplated Transactions.

"Senior Management Function" means any function designated as a senior management function under FSMA and the SM&CR, as set out in the FCA Handbook, as applicable.

"SM&CR" means the UK Senior Managers & Certification Regime implemented through FSMA and the rules in the FCA Handbook, and as amended or replaced from time to time.

"SMF Holder" means an individual who has been approved by the FCA to perform a Senior Management Function in respect of the UK Regulated Entity.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. A Person or Persons own a majority ownership interest in a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all direct or indirect Subsidiaries of such Person.

"Successful Bid" has the meaning set forth in the Bidding Procedures Order.

"Successful Bidder" has the meaning set forth in the Bidding Procedures Order.

"Tax" or "Taxes" means any United States federal, state or local or non-United States taxes, including income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, sales, use, liquor, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"UK Capital Regulations" means the rules set out in the MIFIDPRU Sourcebook in the FCA Handbook, as amended from time to time.

"UK Equity Closing" has the meaning set forth in Section 2.8(b).

"UK Equity Closing Date" has the meaning set forth in Section 2.8(b).

"UK Equity Closing Minimum Cash" means cash in an amount equal to the UK Regulated Entity's Own Funds Threshold Requirement plus any additional amount that Sellers may be required to hold at the direction of the FCA to the UK Regulated Entity's regulatory capital under UK Capital Regulations in the period between the Effective Date and the UK Equity Closing Date, such amount to be solely in the form of Cash held in a bank account owned by the UK Regulated Entity and which is not permitted to be applied toward operational expenses of the UK Regulated Entity (or any other entity), and which shall include, for avoidance of doubt, any cash which the UK Regulated Entity holds in accordance with the Liquid Asset Threshold Requirement.

"UK Equity Closing Transactions" means the sale, conveyance, assignment, transfer and delivery of the Transferred UK Equity Interests by the Sellers to Buyer (or its nominated Affiliates) pursuant to Section 2.2(b), and all other transactions contemplated by this Agreement to be consummated at the UK Equity Closing.

"UK Regulated Entity Minority Holder" means each of Anders Henrikson and Philip Millar (collectively, the "UK Regulated Entity Minority Holders").

"UK Regulatory Capital Confirmation" means evidence, which may be or include a bank statement dated no more than three (3) Business Days as of the UK Equity Closing Date, demonstrating that the UK Regulated Entity holds Own Funds, Liquid Assets and capital resources required under UK Capital Regulations.

"UK Regulatory Material Adverse Event" means any decision, order, direction, requirement, condition, undertaking, restriction, variation, sanction, imposition or other action imposed, requested or required by the FCA or other regulatory authority, governmental body, agency or commission which, individually or in the aggregate, would be materially adverse to the business, assets, liabilities, financial condition, results of operations, Authorizations or prospects of the UK Regulated Entity. A UK Regulatory Material Adverse Event shall include, but not be

limited to, the occurrence of any of the following: (a) the FCA giving notice in writing in accordance with section 189(5) of FSMA that it approves the Buyer acquiring control of the UK Regulated Entity subject to a condition (other than an immaterial or a *de minimis* condition) that the Buyer, acting reasonably and in its sole discretion, determines would have an adverse impact in a material respect on the business, operations, financial condition and/or reputation of the Buyer's business following the UK Equity Closing; (b) the failure of the UK Regulated Entity to be duly authorized and regulated by the FCA or hold all Authorizations required to carry on its business in the ordinary course; (c) the failure of the UK Regulated Entity's Authorizations to be in full force and effect, or a suspension, restriction, variation, cancelation or revocation, whether in whole or in part, of the UK Regulated Entity's Authorizations, or the existence of any pending action by the FCA to suspend, restrict, vary, cancel or revoke any of the UK Regulated Entity's Authorizations as of the UK Equity Closing; (d) the UK Regulated Entity engaging in any regulated activity within the meaning of FSMA or any other regulated activity under applicable UK law without the necessary permissions (other than activities that fall within the scope of its Authorizations or activities carried out subject to and reliant upon an applicable exemption); (e) the failure of the UK Regulated Entity to be compliant in all material respects with all applicable laws, regulation and regulatory rules including the FCA Rules, requirements, and guidance issued by the FCA from time to time; (f) the failure of the UK Regulated Entity to hold and maintain Own Funds, Liquid Assets and capital resources of a type and in amount sufficient to satisfy all requirements imposed on it under UK Capital Regulations; (g) if a regulatory authority, governmental body, agency or commission (i) commences, threatens to commence any investigation, enquiry, review, disciplinary action, or enforcement action against the UK Regulated Entity or any of its directors, officers, employees or contractors, (ii) issues any warning notice, decision notice, final notice, supervisory notice, variation of permissions notice, or requirement notice to the UK Regulated Entity, or (iii) imposes any financial penalty, censure, restriction, or sanction on the UK Regulated Entity or any of its directors, officers, employees or contractors; (h) [reserved]; (i) [reserved]; (k) the occurrence of any regulatory investigation, disciplinary action, or disqualification proceedings by any regulatory authority, governmental body, agency or commission in relation to any SMF Holder or Certified Person of the UK Regulated Entity or the occurrence of circumstances that are reasonably likely to give rise to any such proceedings; (l) in relation to the UK Regulated Entity or any of its directors, officers, employees or contractors, a conviction of or investigation for any offense under any applicable anti-money laundering, anti-bribery, financial crime, or sanctions legislation; (m) any increase required by the FCA to the UK Regulated Entity's minimum regulatory capital exceeding £140,000; and (n) Buyer's discovery of the failure of the UK Regulated Entity to be compliant in all material respects with all applicable laws, regulation and regulatory rules that was not disclosed in a Disclosure Schedule by Sellers to Buyer prior to the date of the Agreement; provided, that a "UK Regulatory Material Adverse Effect" for the purpose of this limb (n) only shall not in any event include the fact that the UK Regulated Entity, as of or prior to the date of this Agreement, may not be, or may not have been (as applicable), in compliance in all respects with its regulatory capital requirements under applicable UK Capital Regulations ("Regulatory Capital Risk"); <u>provided</u>, <u>further</u>, <u>however</u>, that the foregoing proviso shall not restrict the applicability in any respect for the Buyer to use limbs (a) to (m) inclusive of this definition of UK Regulatory Material Adverse Effect including due the existence of the Buyer's knowledge of any such Regulatory Capital Risk on or prior to the date of this Agreement.

"UK Voting Power of Attorney" means a power of attorney, in form and substance reasonably acceptable to Buyer, granted by the relevant Seller(s) in favor of Buyer (or its designated Affiliate) authorizing Buyer (or such Affiliate) to exercise all voting and other rights attaching to the Transferred UK Equity Interests during the period from and including the UK Equity Closing until such time as legal title to the Transferred UK Equity Interests has been registered in the name of Buyer (or its designated Affiliate) following the stamping of the applicable stock transfer form(s) by His Majesty's Revenue and Customs.

"VASP Act Liabilities" means any costs and expenses reasonably incurred by Buyer determined in (or converted into, if applicable) US Dollars, including the Buyer's professional advisors, to investigate and remediate any liabilities, claims or other matters related to the disclosures on Schedule 3.17(f), including costs and expenses related to communications with CIMA and undertaking any additional actions, including any actions requested or required by CIMA; provided, however, that the aggregate amount of VASP Act Liabilities shall in no event exceed [$125,000].

## ARTICLE II
## PURCHASE AND SALE

**Section 2.1 Purchase and Sale of Transferred Assets**. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Initial Closing, Buyer shall purchase, acquire, and accept from Sellers, on an "as is, where is" basis (except with respect to the representations and warranties made in ARTICLE III) and without any representation or warranty on the part of Sellers as to fitness, merchantability, or otherwise, and Sellers shall sell, transfer, assign, convey and deliver to Buyer, all of Sellers' rights, title and interests in and to tangible and intangible real and personal property assets used or held for use by Sellers in the operation of the Business (the "Transferred Assets"), excluding the Excluded Assets, free and clear of all Liens (other than the Permitted Liens) and Liabilities (other than the Assumed Liabilities), for the consideration specified in Section 2.5. Without limiting the generality of the foregoing, the Transferred Assets shall include, without limitation, the following (except for the Excluded Assets):

**(a)** Assigned Contracts. All Assigned Contracts designated as assigned to Buyer in Schedule 3.7 including Contracts associated with Sellers' active customer lists and trading books, alongside all relevant compliance and onboarding files required to migrate such customers to Buyer; provided, that "Assigned Contract" shall in no event include any contract to which a Transferred Entity is a party.

**(b)** Personal Property. All of Sellers' right, title, and interest in and to all tangible personal property, including furniture, fixtures, equipment and other personal property of every kind, character and description located on, attached to, and used in connection with the Business (collectively, the "Personal Property"), which includes, but shall not be limited to, the personal property described in Schedule 2.1(b)(1); provided, that Personal Property shall exclude (i) any personal property owned by any tenants under the Leases and (ii) any personal property described in Schedule 2.1(b)(2) attached hereto and made a part hereof (collectively, the "Excluded Personal Property").

**(c)** Intangibles. All of Sellers' right, title, and interest in and to (i) all trademarks, trade names, logos, patents, copyrights, applications for any of the aforementioned, and other similar intellectual property rights (but excluding the BlockFills brand and BLOCKFILLS trademarks) (collectively, the "Intellectual Property") and (ii) the Intellectual Property items set forth on Schedule 2.1(c).

**(d)** Data. Copies of all customer lists, banking relationships and any data relating to the Transferred Assets, which includes, but is not limited to, the items set forth in Schedule 2.1(d) (collectively, the "Transferred Data").

**Section 2.2 Purchase and Sale of Transferred Equity Interests.**

**(a)** On the terms and subject to the conditions set forth in this Agreement, at and effective upon the Initial Closing, each Seller shall (or shall cause at least one Affiliate to) sell, convey, assign, transfer and deliver to Buyer or its nominated Affiliates, and Buyer shall (or shall cause at least one Affiliate to) purchase, acquire and accept from each such Seller (or Affiliate of a Seller, as the case may be), all of such Seller's right, title and interest in and to the Transferred Cayman Equity Interests.

**(b)** On the terms and subject to the conditions set forth in this Agreement, at and effective upon the UK Equity Closing, each Seller shall (or shall cause at least one Affiliate to) sell, convey, assign, transfer and deliver to Buyer or its nominated Affiliates, and Buyer shall (or shall cause at least one Affiliate to) purchase, acquire and accept from each such Seller (or Affiliate of a Seller, as the case may be), all of such Seller's (or such Affiliate's) right, title and interest in and to the Transferred UK Equity Interests.

**Section 2.3 Excluded Assets.** Notwithstanding Section 2.1, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and Sellers are not selling or assigning, any assets, properties and rights of Sellers that are not Transferred Assets or (for the avoidance of doubt) any assets, properties or rights of the Transferred Entities (the "Excluded Assets"). Excluded Assets include, but are not limited to, the following:

**(a)** Cash and Cash equivalents;

**(b)** all bank accounts of Sellers, safety deposit boxes, lock boxes and other cash management accounts (including cash amounts in any accounts against which outstanding bank drafts have been written, to the extent of the amount of such bank drafts);

**(c)** all Accounts Receivable;

**(d)** Vested Causes of Action (as defined in the Plan);

**(e)** Sellers' articles of incorporations, bylaws, and other organizational documents, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of any Seller as a corporation or other legal entity;

**(f)** all equity securities of any Seller and all net operating losses of any Seller;

**(g)** all Excluded Contracts;

**(h)** any (1) confidential personnel and medical Records pertaining to any current employees or former employees to the extent the disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client privilege; provided, that Buyer shall have the right to make copies of any portions of such retained Records referenced in subsection (2) solely to the extent that such portions relate to the Business or any Purchased Asset;

**(i)** all Permits other than the Assumed Permits;

**(j)** any claim, right, or interest to any Tax refund or reimbursement due to Sellers or their Affiliates, except to the extent relating to any Tax period or portion of a Tax period for which Buyer is responsible for the applicable Tax under this Agreement;

**(k)** all Insurance Policies (including with respect to directors and officers liability insurance) and all rights, claims and proceeds payable thereunder, except to the extent included in the Transferred Assets, including rights to discounts, credits and refunds arising from such Insurance Policies;

**(l)** any other assets, properties and rights which are not Transferred Assets;

**(m)** the Excluded Personal Property;

**(n)** all retainers held by Debtors' professionals;

**(o)** the rights of Sellers under this Agreement and the Related Agreements and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement;

**(p)** Cerus Digital Asset Management LLC, its associated Cayman SPC funds or its CFTC/NFA registrations;

**(q)** the "BlockFills" brand and trademarks; and

**(r)** obligations arising and accruing prior to the Initial Closing with respect to any employees (which, for avoidance of doubt includes the Key Employees) of the Sellers.

**Section 2.4** **Assumption of Assumed Liabilities**. On the terms and subject to the conditions of this Agreement, at the Closing (or, with respect to Assumed Liabilities under Assigned Contracts or Assumed Permits that are assumed by Buyer after the Closing, such later date of assumption as provided in Section 2.6), Buyer shall only assume Liabilities arising from, related to or associated with the Transferred Assets or the Business that arise on or after the Closing Date including the following (the "Assumed Liabilities"):

**(a)** All Liabilities arising under the Assigned Contracts that become due and payable from and after Closing;

**(b)** all Cure Costs, if any, payable with respect to the Assigned Contracts;

**(c)** any and all costs and expenses necessary in connection with providing "adequate assurance of future performance" with respect to the Assigned Contracts (as contemplated by Section 365 of the Bankruptcy Code);

**(d)** all Taxes owed to any Tax authority assessed with respect to the Transferred Assets for any period ending after the Closing Date; and

**(e)** any applicable transfer Tax in respect of the acquisition of the UK Regulated Entity under applicable law.

**Section 2.5** **Excluded Liabilities**. Notwithstanding anything herein to the contrary, except for the Assumed Liabilities, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers whatsoever that are not Assumed Liabilities (collectively, the "Excluded Liabilities"), including but not limited to any of the following Liabilities which, in each case, Sellers shall expressly retain:

**(a)** all Taxes owed by Sellers to any Tax authority for any period or portion thereof ending on or prior to the Initial Closing Date (except to the extent such Taxes are expressly provided as Assumed Liabilities pursuant to Section 2.3);

**(b)** all Liabilities of Sellers related to the Excluded Assets, whether such Liabilities arise before or after the Closing Date;

**(c)** all Liabilities or obligation of Sellers and their respective Affiliates under any Indebtedness, including any Indebtedness owed to any stockholder, member, Affiliate, or Subsidiary of Sellers, and any Contract evidencing any such financing arrangement unless such Contract is an Assigned Contract;

**(d)** all Liabilities under the WARN Act or any mass separation or any similar law relating to any termination of any of the Key Employees (or other Seller employees who may become employed by Buyer) from employment with the Seller and its Affiliates occurring prior to the Initial Closing Date, whether or not in connection with the transactions contemplated hereby;

**(e)** all Liabilities with respect to Seller Transaction Expenses; and

**(f)** all Liabilities under the Assumed Permits arising from or related to the period of time prior to the Initial Closing Date.

**Section 2.6** **Consideration**.

**(a)** In consideration of the sale of the Transferred Assets and Cayman Equity Interests to Buyer, and in reliance upon the representations, warranties, covenants and agreements

of Sellers set forth herein, and upon the terms and subject to the conditions set forth herein, the aggregate consideration for sale and transfer of the Transferred Assets and Cayman Equity Interests (which for avoidance of doubt shall include all Cash or Cash equivalents, liquid assets and capital resources required solely with respect to the Cayman Regulated Equity under UK Capital Regulation) (the "Initial Purchase Price") shall be composed of the following:

**(i)** $2,150,000 dollars, *plus*

**(ii)** the Cure Costs, if any, *plus*

**(iii)** the assumption of the Assumed Liabilities, *minus*

**(iv)** any Indebtedness of the Cayman Equity.

**(b)** In consideration of the sale of the Transferred UK Equity Interests to Buyer (i) by the Sellers pursuant to the terms of this Agreement, (ii) by the other applicable Transferred UK Equity Interests holders pursuant to Minority Sale Documents, and in reliance upon the representations, warranties, covenants and agreements of Sellers set forth herein, and upon the terms and subject to the conditions set forth herein, the aggregate consideration for sale and transfer of the Transferred UK Equity Interests (which for avoidance of doubt shall include all Cash or Cash equivalents, Own Funds, Liquid Assets and capital resources required with respect to the UK Regulated Equity under UK Capital Regulation) shall be equal to $1,100,000 dollars *minus* any VASP Act Liabilities *plus* the positive difference between the UK Equity Closing Minimum Cash and the Initial Closing Minimum Cash in an amount of up to a maximum of $270,000 (converted from UK Sterling to US Dollars at the prevailing exchange rate used by [●] on the Business Day prior to UK Equity Closing) from cash contributed by Seller to the UK Regulated Entity after June 3, 2026; *provided*, *however,* that if Seller contributes such cash to the UK Regulated Entity before the Initial Closing, then the Initial Closing Minimum Cash shall not include such contributed amounts (collectively, the "UK Equity Purchase Price," and together with the Initial Purchase Price, the "Purchase Price").

**(c)** Prior to the execution and delivery of this Agreement, Buyer shall deliver to Sellers an amount equal to $300,000 (the "Deposit"), which Sellers shall hold subject to the terms of this Agreement.

**Section 2.7 Assumption and Assignment of Contracts; Excluded Locations.**

**(a)** Assumption and Assignment of Contracts at Initial Closing.

**(i)** Schedule 2.7(a)(i) attached hereto sets forth (x) each Contract to which either Seller is a party or by which either Seller is bound and that is used in or related to the Transferred Assets, (y) Cure Costs, if any, for each such Contract, and (z) a description of each such Contract (such schedule is referred to herein as the "Cure Schedule").

**(ii)** No later than three (3) Business Days prior to the Sale Hearing, Buyer shall have delivered notice to Sellers (including by e-mail notice from Buyer's legal counsel to Sellers' legal counsel), which Sellers shall then file with the Bankruptcy Court, designating each Contract on the Cure Schedule as "Included" or "Excluded." Subject to Buyer's rights to modify

the Cure Schedule at or before Initial Closing, each Contract so designated as "Included" is referred to herein as an "Assigned Contract" and each Contract not assumed by Sellers and assigned to Buyer as Assigned Contracts so designated as "Rejected" or "Excluded" is referred to herein as an "Excluded Contract". Notwithstanding the foregoing, Buyer shall have the right (in its sole and absolute discretion) to change any such designation and to notify Sellers in writing of any such change until the Initial Closing in which case such Contract shall become an Assigned Contract or an Excluded Contract as indicated by such changed designation.

**(iii)** Sellers shall provide timely and proper written notice of the procedures for the assumption and assignment of Contracts to counterparties to all Contracts, in accordance with the Bidding Procedures Order, and will take all other actions necessary to cause all Assigned Contracts to be assumed by Sellers (to the extent not already assumed pursuant to a Final Order of the Bankruptcy Court) and assigned to Buyer. Buyer shall, at or prior to Initial Closing, comply with all requirements under Section 365 of the Bankruptcy Code necessary to assign to Buyer the Assigned Contracts.

**(iv)** Sellers shall be responsible for the verification of all Cure Costs for each Assigned Contract, in accordance with the Bidding Procedures Order, and shall use commercially reasonable efforts to correctly calculate the proper Cure Costs, if any, for each Assigned Contract. To the extent that any Assigned Contract requires the payment of Cure Costs in order to be assumed pursuant to Section 365 of the Bankruptcy Code, whether determined prior to or after the Initial Closing, the Cure Costs related to such Assigned Contract, or any portion thereof, shall be paid by Buyer on such date that the Assigned Contract is assumed by the applicable Seller and assigned to Buyer or on such other date as agreed to between the applicable Buyer and the counterparty to such Assigned Contract.

**(v)** At Initial Closing, Sellers shall, pursuant to the Sale Order and the Assumption and Assignment Agreement(s) and other transfer and assignment documents requested by Buyer assign to Buyer (the consideration for which is included in the Purchase Price), and Buyer shall assume from Sellers (to the extent not already assumed pursuant to a Final Order of the Bankruptcy Court), each of the Assigned Contracts.

**(b)** Assigned Contracts. Unless otherwise agreed by Sellers and Buyer, the Sale Order shall provide that all Excluded Contracts as of the Initial Closing shall remain with the Debtors and such Excluded Contracts shall be treated in accordance with the Plan and Section 365 of the Bankruptcy Code. Upon Initial Closing, or on such other date that any applicable Contract is assumed and assigned to Buyer pursuant to this Section 2.6, such Contract shall constitute an Assigned Contract for all purposes under this Agreement; provided, that no Assigned Contract shall be assigned or transferred pursuant to this Agreement unless the Bankruptcy Court has approved the assumption and assignment thereof to Buyer.

**Section 2.8 Closing.**

**(a)** The closing of the transactions contemplated in connection with the sale of the Transferred Assets and Transferred Cayman Equity Interests (the "Initial Closing") shall take place remotely by electronic exchange of counterpart signature pages on the first Business Day on which all conditions to the obligations of Sellers and Buyer to consummate the Initial Closing

Transactions set forth in ARTICLE VII shall have been satisfied or waived (other than conditions with respect to actions Sellers and/or Buyer will take at the Initial Closing itself, but subject to the satisfaction or waiver of those conditions) provided that the Initial Closing shall take place on or before the Outside Date (the "Initial Closing Date"), subject to extension by agreement of Buyer and Seller (such agreement not to be unreasonably withheld or conditioned) to effect the transaction contemplated herein.

**(b)** The closing of the transactions contemplated in connection with the sale of the Transferred UK Equity Interests (the "UK Equity Closing") shall take place remotely by electronic exchange of counterpart signature pages on the first Business Day on which all conditions to the obligations of Sellers and Buyer to consummate the UK Equity Closing set forth in ARTICLE VII shall have been satisfied or waived (other than conditions with respect to actions Sellers and/or Buyer will take at the UK Equity Closing itself, but subject to the satisfaction or waiver of those conditions) or such other date that the Parties may agree in writing, provided that the UK Equity Closing shall take place on or before the Outside Date (the "UK Equity Closing Date"), subject to extension by agreement of Buyer and Seller (such agreement not to be unreasonably withheld or conditioned) to effect the transaction contemplated herein. For the avoidance of doubt, the Parties recognize and agree that the Closing of the Contemplated Transaction as it relates to the Transferred UK Equity Interests is in all instances subject to the Change of Control Condition being satisfied.

**Section 2.9 Deliveries at the Initial Closing and UK Equity Closing.**

**(a)** At the Initial Closing, Sellers shall deliver to Buyer and/or its designees the following documents and other items, duly executed by Sellers, as applicable:

**(i)** a Bill of Sale substantially in the form attached hereto as Exhibit A (the "Bill of Sale");

**(ii)** an Assumption and Assignment Agreement substantially in the form attached hereto as Exhibit B (the "Assumption and Assignment Agreement");

**(iii)** all original (or confirmed copies of) the Leases and all Contracts together with all warranties, guarantees, and other similar documents being assigned to Buyer;

**(iv)** a non-foreign status affidavit in the form of Exhibit C attached hereto and made a part hereof, fully executed and acknowledged by each Seller, providing each Sellers' U.S. taxpayer identification number and stating that each Seller is not a "foreign person" as defined in 26 U.S.C. Section 1445;

**(v)** such information as the Escrow Agent may reasonably require in order to prepare a closing statement showing the Purchase Price, the Deposit plus accrued interest, and any adjustments thereto (collectively, the "Settlement Statement"), together with a counterpart duly executed by Seller. Seller shall deliver or cause to be delivered to Buyer a draft of the Settlement Statement at least five (5) days prior to the Closing;

**(vi)** a completed and duly executed IRS Form W-9 from each Seller;

**(vii)** physical possession of all of the Transferred Assets capable of passing by delivery with the intent that title in such Transferred Assets shall pass by and upon delivery;

**(viii)** undated, executed stock transfer forms in substantially the form attached hereto as Exhibit E Part 1, executed by each of the UK Regulated Entity Minority Holders, with signatures to be released concurrently with and conditioned upon the UK Equity Closing;

**(ix)** stock transfer forms, with respect to the Transferred Cayman Equity Interests, duly executed by Buyer in substantially the form attached hereto as Exhibit E Part 2, as required by applicable Law or otherwise required to validly transfer title in and to the Transferred Cayman Equity Interests to Buyer;

**(x)** to the extent the Transferred Cayman Equity Interests are certificated, certificates evidencing the Transferred Cayman Equity Interests (duly endorsed in property in favor of Buyer and any of its Affiliates, as designated by Buyer) and a stock power (or other foreign equivalent) assigning the Transferred Cayman Equity Interests to Buyer;

**(xi)** evidence of resolutions passed by the applicable governing body of each Seller, authorizing the execution and delivery of this Agreement and the performance of such Seller's obligations hereunder;

**(xii)** evidence of resolutions passed either (i) at a duly convened board meeting of the directors of Cayman Regulated Entity or (ii) by a unanimous written resolution of all of the directors of the Cayman Regulated Entity, pursuant to which:

**(A)** the transfer of the Transferred Cayman Equity Interests pursuant to this Agreement is approved for registration, together with the issuance of new share certificates (if any) in the name of the Buyer and the cancellation of the existing share certificates (if any) of the Seller;

**(B)** the name of the Buyer (or its designated Affiliate) is entered into the Cayman Regulated Entity's register of members as the holder of the Transferred Cayman Equity Interests;

**(C)** (if required by the Seller) the resignations of outgoing directors are accepted and new directors nominated by the Buyer are appointed with effect from Closing; and

**(D)** any preemptive rights or transfer restrictions in the Articles (including the directors' discretionary power to refuse to register transfers under article 12.1 of the articles of association of the Cayman Regulated Entity) are waived in respect of the Transferred Cayman Equity Interests;

**(xiii)** subject to receiving all relevant approvals from CIMA, a copy of the Cayman Regulated Entity's updated register of members reflecting the Buyer (or its designated Affiliate) as the sole holders of the Transferred Cayman Equity Interests;

**(xiv)** evidence that (a) the Cayman Regulated Entity holds the minimum cash and capital resources of a type and in amount sufficient to satisfy all minimum capital requirements imposed on it under applicable law and (b) that the director of the Cayman Regulated Entity remains in such director's role as of the Initial Closing;

**(xv)** payoff letter(s) in form satisfactory to Buyer for any Indebtedness owed by the Cayman Regulated Entity to any third party (including Seller or any Affiliate of the Seller), which is required only to demonstrate that the relevant Indebtedness is waived, satisfied, or cancelled such that the Cayman Regulated Entity no longer has any obligation; and

**(xvi)** an executed license and assignment agreement entered into by P3K and the Sellers for the benefit of the Buyer.

**(b)** At the Initial Closing, Buyer shall deliver to, or for the benefit of, Sellers the following documents, cash amounts and other items, duly executed by Buyer, as applicable:

**(i)** the Initial Purchase Price, less the Deposit by wire transfer of immediately available funds to an account designated in writing by Seller to Buyer;

**(ii)** the Bill of Sale;

**(iii)** the Assumption and Assignment Agreement;

**(iv)** A counterpart of the Settlement Statement; and

**(v)** [Cure Costs, if any, which shall be paid by Buyer directly to the applicable counterparties to the applicable Assigned Contracts by wire transfer of immediately available funds to the accounts designated by such counterparties].

**(c)** At the UK Equity Closing, Sellers shall deliver to Buyer and/or its designees the following documents and other items, duly executed by Sellers, as applicable:

**(i)** Evidence, which may be or include in the form of a bank statement, that the UK Regulated Entity holds and maintains minimum cash, liquid assets and capital resources of a type and in amount sufficient to satisfy all requirements imposed on it under UK Capital Regulations;

**(ii)** to the extent the Transferred UK Equity Interests are certificated, certificates evidencing the Transferred UK Equity Interests (duly endorsed in property in favor of Buyer and any of its Affiliates, as designated by Buyer) and a stock power (or other foreign equivalent) assigning the Transferred UK Equity Interests to Buyer;

**(iii)** evidence of the approval of the UK Equity Closing Transactions on behalf of the UK Regulated Entity and the waiver by each partner or shareholder, as applicable, of any preemptive rights (or similar rights), to acquire the Transferred UK Equity Interests;

**(iv)** payoff letter(s) in form satisfactory to Buyer for any Indebtedness owed by the UK Regulated Entity to any third party (including Seller or any Affiliate of the Seller),

which is required only to demonstrate that the relevant Indebtedness (including in respect of any guarantor obligations under any third party promissory notes) is waived, satisfied, or cancelled such that the UK Regulated Entity no longer has any obligation;

**(v)** the UK Voting Power of Attorney, duly executed by the relevant Seller(s) (or applicable Affiliate(s), as the case may be); and

**(vi)** the BLOCKFILLS Trademark License Agreement substantially in the form attached hereto as Exhibit F, duly executed by the Parties.

**(d)** At the UK Equity Closing, Buyer shall deliver to, or for the benefit of, Sellers the UK Equity Purchase Price, by wire transfer of immediately available funds to an account designated in writing by Sellers to Buyer.

**Section 2.10 Allocation**. Seller and Buyer agree that the Purchase Price and the Assumed Liabilities (plus other relevant items) shall be allocated among the Transferred Assets for all purposes (including Tax and financial accounting) in accordance with Section 1060 of the Code as shown on the allocation schedule attached hereto (the "Allocation Schedule") as Exhibit D. Seller and Buyer each agree to prepare and file an IRS Form 8594 on the Closing Date and consistent with the allocation determined pursuant to the Allocation Schedule.

## ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES

Each Seller, solely with respect to itself, jointly and not severally, represents and warrants to Buyer that, except as set forth in the correspondingly numbered section and subsection of the disclosure schedules accompanying this Agreement (the "Disclosure Schedules"), the statements in this ARTICLE III are true and correct as of the date hereof:

**Section 3.1 Organization of Sellers; Good Standing**.

**(a)** Each Seller is duly formed or incorporated, validly existing and in good standing under the Laws of its state of formation and has all necessary power and authority to own, lease, and operate the Business in the manner in which it is currently being conducted. Each Seller has all requisite corporate power and authority to own, lease, and operate the Transferred Assets and to carry on the Business in the Ordinary Course of Business.

**(b)** Each Seller is duly authorized to conduct their Business and is in good standing as a foreign entity in each jurisdiction where the ownership or operation of the Transferred Assets or the conduct of the Business requires such qualification, except for failures to be so authorized or be in such good standing, as would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 3.2 Authorization of Transaction**. Subject to the Sale Order having been entered and being a Final Order at the time of Closing:

**(a)** each Seller has all requisite power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations

hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which such Seller is a party have been duly authorized by such Seller and no other action on the part of such Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the Contemplated Transactions; and

**(b)** this Agreement has been duly and validly executed and delivered by each Seller, and, upon its execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which each Seller is a party will have been duly and validly executed and delivered by each such Seller, as applicable. Assuming this Agreement constitutes a valid and legally binding obligation of Buyer, this Agreement constitutes the valid and legally binding obligations of Sellers, enforceable against Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that a Seller is a party thereto, that each Related Agreement constitutes a valid and legally binding obligation of Buyer, each Related Agreement to which either Seller is a party, when executed and delivered, constituted or will constitute the valid and legally binding obligations of such Seller, as applicable, enforceable against each such Seller, as applicable, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.3** **<u>Non-Contravention</u>**. Except for the Change in Control Condition, the Cayman Notification and as set forth in Schedule 3.3, neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements), will, subject to the Sale Order having been entered and being a Final Order at the time of Closing, (a) conflict with or result in a breach of the certificate of formation, articles of organization, operating agreement, company agreement, memorandum of association, articles of association, or other organizational documents of any Seller, (b) violate any Law to which any Seller is, or its respective assets or properties are, subject, or (c) subject to the entry of the Sale Order, to Sellers' Knowledge, conflict with, any Assigned Contract, and, in the case of clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a Material Adverse Effect. No Seller is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the Contemplated Transactions, except as set forth on Schedule 3.3 and except, in any case, as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.

**Section 3.4** **<u>Title to Transferred Assets</u>**. Sellers have good and marketable title to, or, in the case of leased assets, have good and valid leasehold interests in, the Transferred Assets, free and clear of all Liens (except for Permitted Liens) and Liabilities (other than Assumed Liabilities), subject to entry of the Sale Order. At the Initial Closing, Sellers will transfer, sell, assign and convey, subject to the Sale Order having been entered and still being a Final Order at such time, good and marketable title to, or valid leasehold interests in, all of the Transferred Assets, free and clear of all Liens (except for Permitted Liens) and Liabilities (other than Assumed Liabilities), to the fullest extent permissible under Section 363(f) of the Bankruptcy Code and subject to the rights of licensees under Section 365(n) of the Bankruptcy Code.

**Section 3.5** **Formation and Qualification of the Transferred Entities**. Each Transferred Entity is duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization and has the requisite corporate or other appropriate power and authority to operate its portion of the Business as now conducted. Each Transferred Entity is duly qualified as a foreign corporation or other organization to do business, and, to the extent legally applicable, is in good standing, in each jurisdiction in which the character of its owned, operated or leased properties or the nature of its activities makes such qualification necessary, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 3.6** **Capital Structure of the Transferred Entities**. The authorized capital stock or other equity interests (if applicable) and the number of issued and outstanding shares or other equity interests of each Transferred Entity is set forth on Schedule 3.6 of the Disclosure Schedules. The applicable Sellers own all of the Transferred Equity Interests, subject to the entry of the Sale Order, free and clear of all Liens, except (a) any Lien arising out of, under or in connection with the Securities Act or any other applicable securities Laws, (b) any Lien arising out of, under or in connection with this Agreement or any Related Agreement, (c) any Lien created by or through, or resulting from any facts or circumstances relating to, Buyer or its Affiliates, (d) any Permitted Lien or (e) as otherwise set forth on Schedule 3.6 of the Disclosure Schedules. All of the Transferred Equity Interests have been duly authorized and validly issued, are, as applicable, fully paid and nonassessable and were not issued in violation of any preemptive rights, purchase or call rights, rights of first refusal, or subscription rights. There are no options, warrants, redemption or repurchase rights, stock appreciation rights, stock-based performance units, or rights of conversion or other similar rights, agreements, arrangements or commitments obligating any Transferred Entity to issue or sell any shares of its capital stock, other equity interests or securities convertible into or exchangeable for its shares or other equity interests, other than as provided in this Agreement or on Schedule 3.6 of the Disclosure Schedules. There are no voting trusts, stockholder or shareholder agreements, registration rights agreements, proxies or other agreements in effect with respect to the voting or transfer of the Transferred Equity Interests of any Transferred Entity. No Transferred Entity has any Subsidiaries.

**Section 3.7** **Contracts**. Schedule 3.7 of the Disclosure Schedules attached hereto includes each Assigned Contract. Each Assigned Contract is valid and binding on a Seller in accordance with its terms and is in full force and effect. Except as otherwise implicated or stated herein, such Seller is not, and to Sellers' Knowledge, no other party thereto, is in breach of or default under or is alleged to be in breach of or default under, or has provided or received any notice of any intention to terminate, any Assigned Contract.

**Section 3.8** **Intellectual Property**. Schedule 3.8 of the Disclosure Schedules sets forth a true and complete list of (a) all material items of Intellectual Property that are owned by each Seller, (b) all material Contracts pursuant to which each Seller obtains the right to use any Intellectual Property, excluding licenses for off-the-shelf software, and (c) all material Contracts pursuant to which each Seller grants to any other Person the right to use any Intellectual Property. To Sellers' Knowledge, Sellers own or have a valid right to use all such Intellectual Property necessary for the Transferred Assets, and all such Intellectual Property is valid, subsisting, and, to

Sellers' Knowledge, enforceable, and is not subject to any outstanding Order adversely affecting Sellers' use thereof or rights thereto.

**Section 3.9** **Litigation**. Except for the Chapter 11 Cases or as set forth in Section 3.9 of the Disclosure Schedules, there is no Litigation or Order pending or, to the Knowledge of Sellers, threatened, before any Governmental Body brought by or against any Seller or Transferred Entity or affects any of the Transferred Assets that, if adversely determined, would be, individually or in the aggregate, material to the Business, taken as a whole, or materially impair Sellers' ability to consummate the Transactions.

**Section 3.10** **Compliance with Laws**.

**(a)** The Business is being, and at all times for the five (5) year period prior to the Effective Date has been, conducted in material compliance with, and Sellers and the Transferred Entities have in all material respects complied with, all applicable Laws relating to the operation of the Business and the Transferred Assets. There are no pending or, to the Knowledge of Sellers, threatened, Litigation relating to any material non-compliance of the Business, the Transferred Entities or the Transferred Assets with any applicable Laws.

**(b)** Sellers and the Transferred Entities are in possession of all material Permits required or necessary for them to own, lease and operate their assets and properties and to carry on the Business as currently conducted. All such Permits are valid and in full force and effect, and have not lapsed, expired, or been cancelled, terminated or withdrawn. Each Seller and Transferred Entity is and has been for the five (5) year period prior to the Effective Date in compliance in all material respects with all such Permits and, to the Knowledge of Sellers, no event has occurred which, with notice or the lapse of time or both, would constitute a default under or violation in any material respect of any term thereunder. To the Knowledge of Sellers, no suspension, cancellation, modification, revocation or nonrenewal of any material Permit is pending or threatened.

**Section 3.11** **Absence of Certain Developments; No Undisclosed Liabilities; No Material Adverse Effect**.

**(a)** Other than as a result of the preparation for, commencement, and pendency of the Chapter 11 Cases, or in connection with the negotiation and execution of the Related Agreements or the consummation of the Contemplated Transactions, since December 31, 2025, the Business has been conducted in the Ordinary Course of Business.

**(b)** There has not been any change that has had, or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

**(c)** The Sellers do not have any Liability, except for Liabilities (i) reflected in or reserved against on the financial statements of the Sellers or the Business, (ii) incurred in the Ordinary Course of Business since the date of the latest balance sheet of the Sellers or the Business (none of which is a Liability resulting from breach of contract, breach of warranty, tort, infringement or misappropriation under any Contract or Law or any Action), (iii) otherwise disclosed in Section 3.11(c) of the Disclosure Schedules, (iv) that would not be required to be reflected on a consolidated balance sheet or the notes thereto of the Sellers and the Business, and

(v) contemplated under this Agreement or otherwise incurred in connection with this Agreement or the Contemplated Transactions.

**Section 3.12 Anti-Bribery Compliance**.

**(a)** Neither any Seller nor the Transferred Entities nor, to the Knowledge of Sellers, any director, officer, agent, employee or other Person acting on behalf of any Seller or Transferred Entity has in the past five (5) years, directly or indirectly corruptly offered, authorized, or made, any payment or offered any other thing of value, to any Government Official or Person with which any Seller or Transferred Entity does business, in order to secure any improper advantage, official action, or to improperly obtain or retain business in connection to the Business or Transferred Assets.

**(b)** In connection with the operation of the Business and ownership of the Transferred Assets, Sellers and Transferred Entities have designed and implemented an adequate anti-corruption compliance program and system of internal controls, reasonably designed to detect and prevent bribery by or on behalf of Sellers or Transferred Entities.

**Section 3.13 Compliance with Trade Restrictions**.

**(a)** Each Seller with respect to the Business and ownership and use of the Transferred Assets and each Transferred Entity has complied, and is now complying, in all material respects with all applicable trade restrictions, including U.S. sanctions and export controls including those administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC") or the Bureau of Industry and Security of the U.S. Commerce Department ("BIS"), the United Kingdom, the European Union, and any other applicable trade or export law, rule, regulation or requirement of similar effect (together "Trade Restrictions").

**(b)** Except as would not, individually or in the aggregate, be material to the Business, taken as a whole, and except as authorized or as permitted under applicable Trade Restrictions, neither any Seller nor Transferred Entity, nor, to the Knowledge of Sellers, any director, officer, agent, employee or Affiliate of any Seller (in relation to the Business or Transferred Assets) or Transferred Entity, has, at any time during the five years prior to the Effective Date engaged in the sale, purchase, import, export, re-export or transfer of products or services or otherwise done business, either directly or indirectly, to, from or with (i) Cuba, Iran, North Korea, Sudan, Syria, the Crimea region of Ukraine or Venezuela (collectively, the "Sanctioned Countries") or (ii) any Person targeted by the United States, European Union, or United Nations economic sanctions or export controls, including Persons who are owned or controlled by the government of a Sanctioned Country; Persons designated on the United Nations Consolidated Sanctions List; Persons designated on any EU or UK restricted parties list; Persons designated on the OFAC List of Specially Designated Nationals and Blocked Persons or OFAC Sectoral Sanctions Identification List (or any entity 50% or more owned by the foregoing); or Persons identified on the BIS Entity List, Denied Persons List, or Unverified List (see: https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/Other-OFAC-Sanctions-Lists.aspx) (collectively, "Restricted Parties").

**(c)** Except as would not, individually or in the aggregate, be material to the Business, taken as a whole, and except as authorized or permitted under applicable Trade Restrictions, during the five years prior to the Effective Date, no Seller (in relation to the Business or Transferred Assets) or Transferred Entity has been a party to or beneficiary of, or had any interest in, any franchise, license, management or other contract with any Person, either public or private, in the Sanctioned Countries or with any Restricted Parties, or been a party to any investment, deposit, loan, borrowing or credit arrangement or involved in any other financial dealings, directly or indirectly, with any Person, either public or private, in the Sanctioned Countries or who is a Restricted Party.

**(d)** Neither any Seller nor any Transferred Entity or present directors, officers, agents, employees or Affiliates of any Seller or Transferred Entity are Restricted Parties or otherwise subject to Trade Restrictions.

**Section 3.14** **<u>Personal Data; Data Security</u>**. Sellers and Transferred Entities have taken reasonable steps (including implementing, and monitoring compliance with, adequate measures with respect to technical and physical security) designed to protect the information technology systems used in connection with the Business and designed to ensure that all Personal Data is protected against loss and against unauthorized access, use, modification, disclosure or other misuse, as set forth in applicable Law, including implementing reasonable disaster recovery and security plans and procedures. To the Knowledge of Sellers, there have been no actual or potential unauthorized intrusions or breaches of the security of the information technology systems used in connection with the operation of the Business nor any loss, theft, or unauthorized access to or misuse of Personal Data. Sellers, Transferred Entities and the conduct and operation of the Business as currently conducted is in material compliance with Sellers' and Transferred Entities' rules, policies, and procedures regarding Personal Data and any Material Contracts by which Sellers or Transferred Entities are bound regarding Personal Data.

**Section 3.15** **<u>Taxes</u>**.

**(a)** Sellers have timely filed all tax returns that they were required to file and have timely paid in full all Taxes that they were required to pay as reflected on such tax returns.

**(b)** There are no Liens for Taxes on any of the Transferred Assets.

**(c)** Sellers have not granted any waiver of any statute of limitations with respect to, or any extension of a period for the assessment of, any Taxes.

**(d)** There is no action, suit, proceeding, investigation, audit, claim, assessment or judgment now pending against any Seller or relating to the Transferred Assets in respect of any Taxes.

**(e)** No Seller is a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

**Section 3.16** **<u>UK Regulated Entity</u>**.

**(a)** The UK Regulated Entity is duly authorized and regulated by the FCA and holds all Authorizations required to carry on its business in the ordinary course.

**(b)** The UK Regulated Entity's Authorizations are in full force and effect and have not been suspended, restricted, varied, cancelled, or revoked, whether in whole or in part, and there is no pending or, so far as the Sellers are aware, threatened action by the FCA to suspend, restrict, vary, cancel or revoke any of its Authorizations.

**(c)** The UK Regulated Entity is not carrying on any regulated activity within the meaning of FSMA or any other regulated activity under UK law other than activities that fall within the scope of its Authorizations unless it is able to rely on an exemption.

**(d)** The UK Regulated Entity is compliant in all material respects with all applicable laws, regulation and regulatory rules including the FCA Rules, requirements, and guidance issued by the FCA from time to time.

**(e)** The UK Regulated Entity has, at all times, held and maintained Own Funds, Liquid Assets and capital resources of a type and in amount sufficient to satisfy all requirements imposed on it under UK Capital Regulations.

**(f)** No regulatory authority, governmental body, agency or commission has:

**(i)** commenced or, so far as the Sellers are aware, threatened to commence any investigation, enquiry, review, disciplinary action, or enforcement action against the UK Regulated Entity or any of its directors, officers, employees or contractors;

**(ii)** issued any warning notice, decision notice, final notice, supervisory notice, variation of permissions notice, or requirement notice to the UK Regulated Entity; or

**(iii)** imposed any financial penalty, censure, restriction, or sanction on the UK Regulated Entity or any of its directors, officers, employees or contractors.

**(g)** So far as the Sellers are aware, there are no circumstances that are reasonably likely to give rise to any investigation, enquiry, disciplinary action, or enforcement action by any regulatory authority, governmental body, agency or commission against the UK Regulated Entity or any of its directors, officers, employees or contractors.

**(h)** Each individual performing a Senior Management Function for or on behalf of the UK Regulated Entity holds valid approval from the FCA.

**(i)** The UK Regulated Entity has conducted, and maintained adequate records of, all required regulatory reference checks, criminal checks, and fitness and propriety assessments in respect of its SMF Holders and Certified Persons.

**(j)** No SMF Holder or Certified Person of the UK Regulated Entity is, so far as the Sellers are aware, subject to any regulatory investigation, disciplinary action, or disqualification proceedings by any regulatory authority, governmental body, agency or

commission, and the UK Regulated Entity is not aware of any circumstances that are reasonably likely to give rise to any such proceedings.

**(k)** Neither the UK Regulated Entity nor any of its directors, officers, employees or contractors has been convicted of or is under investigation for, any offence under any anti-money laundering, anti-bribery, financial crime, or sanctions legislation.

**Section 3.17 Cayman Regulated Entity.**

**(a)** The Cayman Regulated Entity is duly registered as a broker dealer with the Cayman Islands Monetary Authority ("CIMA") under and pursuant to Section 5(4) of the Cayman Islands Securities Investment Business Act ("SIBA") and such registration ("SIBA Registration") permits The Cayman Regulated Entity to carry on its securities investment business in the ordinary course.

**(b)** The Cayman Regulated Entity's SIBA Registration is in full force and effect and has not been suspended, restricted, varied, cancelled, or revoked, whether in whole or in part, as of the Effective Date.

**(c)** The Cayman Regulated Entity is not carrying on any regulated activity other than activities that fall within the scope of its SIBA Registration.

**(d)** The Cayman Regulated Entity is compliant in all material respects with all applicable rules, requirements, and guidance issued by CIMA and any other applicable Governmental Authority from time to time.

**(e)** The Cayman Regulated Entity holds Own Funds, liquid assets and capital resources of a type and in amount sufficient to satisfy all requirements imposed on it under applicable law.

**(f)** Except as set forth in Schedule 3.17(f), neither CIMA, nor any other applicable Governmental Authority has:

**(i)** commenced or, so far as the Sellers are aware, threatened to commence any investigation, enquiry, review, disciplinary action, or enforcement action against the Cayman Regulated Entity or any of its directors, officers, employees or contractors;

**(ii)** issued any notice of regulatory action, enforcement, or variation of permissions to the Cayman Regulated Entity; or

**(iii)** imposed any financial penalty, censure, restriction, or sanction on the Cayman Regulated Entity or any of its directors, officers, employees or contractors.

**(g)** So far as the Sellers are aware, there are no circumstances that are reasonably likely to give rise to any investigation, enquiry, disciplinary action, or enforcement action by CIMA or any other applicable Governmental Authority against the Cayman Regulated Entity or any of its directors, officers, employees or contractors.

**(h)** The Cayman Regulated Entity has never provided virtual asset services as a virtual asset provider as defined under Sections 2 and 3 of the VASP Act (as defined in Schedule 3.17(f)).

**(i)** Neither the Cayman Regulated Entity nor any of its directors, officers, employees or contractors has been convicted of or is under investigation for, any offence under any anti-money laundering, anti-bribery, financial crime, or sanctions legislation.

**Section 3.18 Financial Statements**. The Sellers have made available to Buyer true and complete copies of (i) the unaudited balance sheet dated December 31, 2025 (the "Balance Sheet Date"), and (ii) the related statements of income and cash flows (or the equivalent) for the twelve-month period then ended (collectively, the "Seller Financial Statements"). Each of the Seller Financial Statements has been prepared based on the books and records of the Sellers, presents fairly in all material respects the financial condition and results of operations of Sellers and the Business (on a consolidated basis with the business of Sellers' Affiliates) and has been prepared in all material respects in accordance with GAAP as of the dates and for the periods indicated therein, subject to normal year-end adjustments and the absence of footnote disclosures.

**Section 3.19 No Undisclosed Liabilities of the Transferred Entities**. Neither Transferred Entity has any Liability, except for Liabilities (a) reflected in or reserved against on the Transferred Entity Financial Statements, (b) incurred in the Ordinary Course of Business since the date of the most recent balance sheet included in the Transferred Entity Financial Statements (none of which is a Liability resulting from breach of contract, breach of warranty, tort, infringement or misappropriation under any Contract or Law or any Litigation), (c) otherwise disclosed in Schedule 3.19 of the Disclosure Schedules, (d) that would not be required to be reflected on a balance sheet or the notes thereto of the applicable Transferred Entity prepared in accordance with generally accepted accounting principles (or, in the case of the UK Regulated Entity, UK GAAP or IFRS, as applicable), or (e) contemplated under this Agreement or otherwise incurred in connection with this Agreement or the Contemplated Transactions. Since the date of the most recent balance sheet included in the Transferred Entity Financial Statements, there has been no change that has had, or would reasonably be expected to have, a Material Adverse Effect with respect to a Transferred Entity.

**Section 3.20 Material Contracts of the Transferred Entities**. Schedule 3.20 of the Disclosure Schedules sets forth a true and complete list of each of the following Contracts to which either Transferred Entity is a party or by which either Transferred Entity or any of its assets or properties is bound (collectively, the "Transferred Entity Material Contracts"): (a) any Contract involving aggregate annual payments or receipts in excess of $50,000; (b) any Contract relating to Indebtedness of either Transferred Entity; (c) any Contract that restricts or limits the ability of either Transferred Entity to compete in any line of business or with any Person or in any geographic area; (d) any Contract with any Governmental Authority; (e) any Contract with any Related Party (as defined below) of either Transferred Entity; (f) any employment, consulting, or independent contractor agreement with any individual that provides for annual compensation in excess of $100,000 or that cannot be terminated on less than ninety (90) days' notice without penalty; (g) any Contract that grants any Person a license to, or otherwise permits any Person to use, any material Intellectual Property of either Transferred Entity; and (h) any other Contract the loss of which would reasonably be expected to have a Material Adverse Effect. Each Transferred Entity

Material Contract is valid and binding on the applicable Transferred Entity in accordance with its terms and is in full force and effect. Neither Transferred Entity is, and to Sellers' Knowledge, no other party thereto is, in breach of or default under, or has provided or received any written notice of any intention to terminate, any Transferred Entity Material Contract. For purposes of this Section 3.20, "Related Party" means any officer, director, manager, employee, or equityholder of either Transferred Entity or any Affiliate of any of the foregoing.

**Section 3.21 No Other Representations or Warranties**. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULES), NEITHER SELLERS NOR ANY OTHER PERSON MAKES (AND BUYER IS NOT RELYING UPON) ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, THE BUSINESS, THE TRANSFERRED ASSETS (INCLUDING THE VALUE, CONDITION OR USE OF ANY PURCHASED ASSET), THE ASSUMED LIABILITIES OR THE CONTEMPLATED TRANSACTIONS, AND SELLERS DISCLAIM ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SELLERS, ANY AFFILIATE OF SELLERS OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULES), EACH SELLER (I) EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, RELATING TO THE CONDITION OF THE TRANSFERRED ASSETS (INCLUDING ANY IMPLIED OR EXPRESSED WARRANTY OF TITLE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, THE ABSENCE OF LATENT DEFECTS OR COMPLIANCE WITH LAWS AND REGULATIONS, OR OF THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE BUSINESS OR THE TRANSFERRED ASSETS BY BUYER AFTER THE CLOSING), AND (II) DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO BUYER OR ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO BUYER BY ANY DIRECTOR, OFFICER, EMPLOYEE, AGENT, CONSULTANT OR REPRESENTATIVE OF EITHER SELLER OR ANY OF THEIR AFFILIATES).

FURTHER, BUYER ACKNOWLEDGES THAT IT IS A SOPHISTICATED PARTY EXPERIENCED IN THE ACQUISITION OF REAL ESTATE. EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS ARTICLE III, THE TRANSFERRED ASSETS, INCLUDING THE PROPERTY, WILL BE CONVEYED AND TRANSFERRED TO BUYER "AS IS, WHERE IS AND WITH ALL FAULTS." BUYER ACKNOWLEDGES THAT BUYER HAS EXAMINED, REVIEWED, AND INSPECTED ALL MATTERS WHICH IN BUYER'S JUDGMENT BEARS UPON THE TRANSFERRED ASSETS, INCLUDING THE PROPERTY, AND THEIR VALUE AND SUITABILITY FOR BUYER'S PURPOSES AND, EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS ARTICLE III, BUYER IS RELYING SOLELY ON ITS

OWN EXAMINATION, REVIEW, AND INSPECTION OF THE TRANSFERRED ASSETS, INCLUDING THE PROPERTY.

THE PROVISIONS OF THIS SECTION 3.21 SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT AND SHALL BE INCORPORATED INTO THE CLOSING DOCUMENTS TO BE DELIVERED AT CLOSING.

## ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Sellers as follows:

**Section 4.1** **Organization of Buyer**. Buyer is a public limited liability company (*naamloze vennootschap/société anonyme*) incorporated and existing under the laws of the Kingdom of Belgium and has all requisite corporate power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

**Section 4.2** **Authorization of Transaction**.

**(a)** Buyer has full corporate power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

**(b)** The execution, delivery, and performance of this Agreement and the Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other limited liability company action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transactions.

**(c)** This Agreement has been duly and validly executed and delivered by Buyer, and, upon its execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer. Assuming that this Agreement constitutes a valid and legally binding obligation of Sellers, this Agreement constitutes a valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that they are a party thereto, that each Related Agreement constitutes a valid and legally binding obligation of Sellers, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 4.3** **Non-Contravention**. Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements) will (a) conflict with or result in a breach of the certificate of formation or other organizational documents of Buyer, (b) violate any Law to which Buyer is, or its assets or properties are subject, or (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under

any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to prevent, delay, or impair to the ability of Buyer to consummate the Contemplated Transactions.

**Section 4.4 <u>Financial Capacity</u>**.

**(a)** As of the Closing, Buyer (a) will have the resources (including sufficient funds available to pay the Cure Costs, if any, and any other expenses and payments incurred by Buyer in connection with the Contemplated Transactions) and capabilities (financial or otherwise) to perform its obligations hereunder, including the payment of the Purchase Price and all other fees, costs, or expenses to be paid by Buyer that are necessary to consummate the Contemplated Transactions, this Agreement, Related Agreements, and assume the Assumed Liabilities, and (b) will not have incurred any obligation, commitment, restriction, or Liability of any kind, that would materially impair or materially adversely affect such resources and capabilities. Buyer's ability to consummate the Contemplated Transactions is not contingent upon its ability to secure financing or to complete any public or private placement of securities prior to or upon Closing.

**(b)** Immediately after giving effect to the Contemplated Transactions, Buyer shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Buyer or any Seller. In connection with the Contemplated Transactions, Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

**Section 4.5 <u>Litigation</u>**. There is no Litigation pending, or to the Buyer's Knowledge, threatened, that would affect Buyer's ability to perform its obligations under this Agreement, or any other Related Agreement, or to consummate the Contemplated Transactions.

**Section 4.6 <u>Adequate Assurances Regarding Executory Contracts</u>**. Buyer will use commercially reasonable efforts to assure that, as of the Closing, it will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

**Section 4.7 <u>Good Faith Purchaser</u>**. Buyer is a "good faith" purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder. Buyer is entitled to the protections of Section 363(m) of the Bankruptcy Code with respect to all of the Transferred Assets. Buyer has negotiated and entered into this Agreement in good faith.

**Section 4.8 <u>Brokers' Fees</u>**. Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions for which either Seller could become liable or obligated to pay.

**Section 4.9 <u>Condition of Business</u>**. BUYER HAS ENTERED INTO THIS AGREEMENT WITH THE INTENTION OF MAKING AND RELYING UPON ITS OWN

INVESTIGATION OF THE PHYSICAL, ENVIRONMENTAL, ECONOMIC, AND LEGAL CONDITION OF THE ASSETS OF THE BUSINESS AND THAT BUYER IS NOT RELYING UPON ANY STATEMENTS, INFORMATION, REPORTS, REPRESENTATIONS, OR WARRANTIES OTHER THAN THOSE SPECIFICALLY SET FORTH IN ARTICLE III OF THIS AGREEMENT OR IN ANY CONVEYANCE DOCUMENTS EXECUTED AND DELIVERED BY SELLERS, MADE BY SELLERS, OR ANYONE ACTING OR CLAIMING TO ACT ON SELLERS' BEHALF CONCERNING THE ASSETS OF THE BUSINESS, INCLUDING EMPLOYEES OR CONTAINED IN ANY COPIES OF MANAGEMENT PERSONNEL DATA PROVIDED TO BUYER WITH RESPECT TO EMPLOYEES. BUYER FURTHER ACKNOWLEDGES THAT IT HAS NOT RECEIVED FROM SELLERS ANY ACCOUNTING, TAX, LEGAL, ARCHITECTURAL, ENGINEERING, PROPERTY MANAGEMENT, OR OTHER ADVICE WITH RESPECT TO THIS TRANSACTION AND IS RELYING SOLELY UPON THE ADVICE OF ITS OWN ACCOUNTING, TAX, LEGAL, ARCHITECTURAL, ENGINEERING, PROPERTY MANAGEMENT, AND OTHER ADVISORS. BUYER WILL PURCHASE THE ASSETS OF THE BUSINESS IN THEIR "AS IS", "WHERE-IS" AND "WITH-ALL FAULTS" CONDITION ON THE APPLICABLE CLOSING DATE WITHOUT ANY WARRANTIES, WHETHER EXPRESS OR IMPLIED (INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE), EXCEPT FOR THE PROVISIONS OF ARTICLE III OF THIS AGREEMENT AND ANY CONVEYANCE DOCUMENT EXECUTED AND DELIVERED BY SELLERS, AND ASSUMES THE RISK THAT ADVERSE PHYSICAL, ENVIRONMENTAL, ECONOMIC, OR LEGAL CONDITIONS MAY NOT HAVE BEEN REVEALED BY ITS INVESTIGATION.

## ARTICLE V
## CERTAIN COVENANTS

**Section 5.1 Certain Efforts; Cooperation**.

**(a)** Subject to the terms and conditions of this Agreement, each of the Parties shall use its commercially reasonable efforts, subject to a Final Order of the Bankruptcy Court, to make effective the Contemplated Transactions (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the Contemplated Transactions set forth in ARTICLE VII), except as otherwise provided in Section 5.2; provided, however, Sellers shall be entitled to take such actions as are required in connection with the discharge of their fiduciary duties during the Chapter 11 Cases.

**(b)** On and after the Closing, Sellers and Buyer shall use their commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done by Sellers and Buyer all things necessary under applicable Law, and to execute and deliver such documents, ancillary agreements and other papers as may be required to carry out the provisions of this Agreement and consummate and make effective the Contemplated Transactions, including in order to more effectively vest in Buyer all of Sellers' right, title and interest to the Transferred Assets, free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities) expressly contemplated by the Sale Order. Buyer shall at all times take all appropriate actions necessary to permit, and shall refrain from taking any action that would prevent, the Bankruptcy Court to make findings in the Sale Order that (i) Buyer is a good-faith buyer under

Section 363(m) of the Bankruptcy Code, (ii) that the sale of the Transferred Assets contemplated hereby did not involve any improper conduct, including collusion, and cannot be avoided under grounds set forth under Section 363(n) of the Bankruptcy Code, and (iii) Buyer is not a successor to Sellers with respect to the Transferred Assets.

**Section 5.2** **Notices and Consents**.

**(a)** To the extent required by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, Sellers shall give any notices to third parties, and each Seller shall use its commercially reasonable efforts to obtain any third party Consents or sublicenses; provided, however, that Sellers shall not incur any costs associated with the obligations hereunder, other than such ordinary and reasonable professional fees and other costs as described in this Agreement as are required for Sellers to comply with the obligations hereunder and Sellers' obligations hereunder shall only continue until the later of the day that the Chapter 11 Cases are converted, closed or dismissed.

**(b)** Sellers and Buyer shall cooperate with one another in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the Contemplated Transactions and in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers; provided, however, that Sellers shall not incur any costs associated with the obligations hereunder, other than such ordinary and reasonable professional fees and other costs as described in this Agreement as are required for Sellers to comply with the obligations hereunder and Sellers' obligations hereunder shall only continue until the later of the day that the Chapter 11 Cases are converted, closed or dismissed.

**(c)** Subject to the terms and conditions set forth in this Agreement and applicable Law, Buyer and Sellers shall (i) promptly notify the other Party of any communication to that Party from any Governmental Authority in respect of any application, filing, investigation or inquiry concerning this Agreement or the Contemplated Transactions, (ii) if practicable, permit the other Party the opportunity to review in advance all the information relating to Sellers and their respective Subsidiaries or Buyer and its Subsidiaries and/or Affiliates, as the case may be, that appears in any application or filing made with, or written materials submitted to, any third party and/or any Governmental Authority in connection with the Agreement and the Contemplated Transactions and incorporate the other Party's reasonable comments, (iii) not participate in any substantive meeting or discussion with any Governmental Authority in respect of any filing, investigation, or inquiry concerning this Agreement and the Contemplated Transactions unless it consults with the other Party in advance, and, to the extent permitted by such Governmental Authority, gives the other Party the opportunity to participate in and/or attend such meeting and/or discussion, and (iv) furnish the other Party with copies of all correspondences, filings, and written communications between them and their Subsidiaries and/or Affiliates and Representatives, on the one hand, and any Governmental Authority or its respective staff, on the other hand, with respect to this Agreement and the Contemplated Transactions; provided, however, that any materials or information provided pursuant to any provision of this Section 5.2(c) may be redacted before being provided to the other Party (A) to remove references concerning the valuation of Buyer, Sellers, or any of their Subsidiaries, (B) to remove references concerning financing arrangements, (C) as

necessary to comply with contractual arrangements, and (D) as necessary to address reasonable privilege or confidentiality issues. Sellers and Buyer may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 5.2(c) as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel and any retained consultants or experts of the recipient and shall not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Buyer, as the case may be). Each of Sellers and Buyer shall promptly notify the other Party if such Party becomes aware that any third party has any objection to the Agreement on antitrust or anticompetitive grounds.

**Section 5.3 Bankruptcy Actions**.

**(a)** Sale Order. Seller shall use commercially reasonable efforts to cause the Sale Order to be entered by the Bankruptcy Court. The Sale Order shall be in a form acceptable to Buyer in its reasonable discretion and provide, among other things, that:

**(i)** this Agreement is valid and enforceable;

**(ii)** this Agreement and the Contemplated Transactions are approved;

**(iii)** on the Initial Closing Date, the Transferred Assets shall be sold to Buyer free and clear of any and all Liens (except for Permitted Liens), including any Liens granted during the Chapter 11 Cases, and Liabilities (other than Assumed Liabilities);

**(iv)** on the Initial Closing Date, the Assigned Contracts shall be assumed by Sellers and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, and, unless a counterparty to an Assigned Contract has agreed otherwise in writing, the Buyer shall pay the Cure Costs due in connection with the assumption and assignment of the Assigned Contracts;

**(v)** all causes of actions against any counterparty to the Assigned Contracts, related in any way to the Assigned Contracts, shall be forever released and waived by Sellers. Sellers, however, shall be entitled to assert any defenses against any claim asserted by any counterparty to the Assigned Contracts; and

**(vi)** all Persons and entities, including, Tax, regulatory and other Governmental Authorities, lenders, trade and other creditors holding interests or claims of any kind or nature whatsoever against Sellers or their assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with or in any way relating to Sellers, the Business, the Transferred Assets, or the operations of Sellers prior to the Closing shall have no claims against Buyer, its Affiliates, or their respective successors or assigns, the Business, or the Transferred Assets, subject to rights of such Persons and entities for claims arising out of Assumed Liabilities.

**(b)** Sale Order Findings. The Sale Order shall contain findings by the Bankruptcy Court that (i) Buyer is a good-faith buyer under Section 363(m) of the Bankruptcy Code, (ii) Buyer is not a successor to Sellers, and (iii) the sale of the Transferred Assets

contemplated hereby did not involve any improper conduct, including collusion, and cannot be avoided under grounds set forth under Section 363(n) of the Bankruptcy Code.

**(c)** Cooperation. Sellers and Buyer agree to use commercially reasonable efforts to cooperate, assist and consult with each other to obtain the issuance and entry of the Bidding Procedures Order and Sale Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. The Sale Order shall also indicate that the transactions set forth in this Agreement may be consummated immediately upon entry of the Sale Order and pursuant to Bankruptcy Rule 6004(h), the sale of the Transferred Assets is not stayed pending the expiration of fourteen (14) days from the date of entry of the Sale Order. In the event the Sale Order is appealed, Sellers shall use their commercially reasonable efforts to oppose any such appeal.

**Section 5.4** **Certain Restricted Conduct**. Except as in the Ordinary Course of Business, as directed by the Bankruptcy Court, as set forth on Schedule 5.4 or as otherwise consented to in advance in writing by Buyer, during the period from the Effective Date to the Closing, no Seller shall, and each Seller shall cause each of its respective Affiliates not to, with respect to the UK Regulated Entity:

**(a)** sell, lease, license, transfer, or dispose of any assets of the UK Regulated Entity;

**(b)** dispose of or permit to lapse any rights in, to or for the use of any permit or any material Intellectual Property;

**(c)** permit, offer, agree or commit (in writing or otherwise) to permit, any of the Transferred Assets to become subject, directly or indirectly, to any Lien, except for Permitted Liens;

**(d)** directly or indirectly, cancel, forgive, settle, or compromise any debt or claim or waive or release any right of Sellers that constitute a Purchased Asset;

**(e)** do any other act that would, to Sellers' Knowledge, cause any representation or warranty of either Seller in this Agreement to be or become untrue in any material respect or intentionally omit to take any action necessary to prevent any such representation or warranty from being untrue in any material respect; or

**(f)** authorize or enter into any Contract, agreement, or commitment with respect to any of the foregoing.

**Section 5.5** **Contracts**. If at any time Sellers become aware, on or before the UK Equity Closing, of any heretofore Assigned Contract to which either Seller is a party that satisfies the description set forth in Section 3.7, but has not been included on Schedule 3.7 of the Disclosure Schedule, Sellers shall promptly thereafter advise Buyer of the existence of such Contract and provide Buyer with a copy thereof. Buyer shall have the right, for a period of five (5) Business Days following the delivery of any such Contract, to review such Contract and during such period Sellers shall refrain from modifying, terminating, or rejecting such Contract without Buyer's express prior written consent unless otherwise directed by the Bankruptcy Court. Buyer shall have

the option, exercisable by written notice to Sellers given within such five (5) Business Day period, to request that Sellers assume (if applicable), assign and sell such Contract to Buyer. If Buyer timely exercises such option and subject to compliance with Section 365 of the Bankruptcy Code, Sellers shall use commercially reasonable efforts to assume (if applicable), assign, and sell such Contract to Buyer, as promptly as reasonably practicable, on the same terms and conditions as would be applicable under this Agreement to the Assigned Contracts; provided, however, that Buyer shall be responsible for the payment of any Cure Cost in connection with the assumption and assignment of such Assigned Contract (if applicable). If Buyer fails to timely exercise its option or declines to exercise such option, Sellers shall reject such Contract.

**Section 5.6** **Wrong Pockets**. If at any time after the Initial Closing Date until the date that is twelve (12) months following the Initial Closing Date, the Sellers or any of their Affiliates hold any Transferred Assets, the Sellers shall (x) promptly notify Buyer, and (y) if requested in writing by Buyer, transfer, or cause to be transferred, at no cost to Sellers or their Affiliates, as promptly as reasonably practicable, to Buyer, or an Affiliate designated by Buyer, any such asset, and until such time, Sellers or an Affiliate designated by Sellers shall hold such asset for Buyer's benefit and account and manage and operate such asset for Buyer's benefit and account, with all gains, income, losses, Liabilities and Taxes or other items generated or accruing to be for and of Buyer's account.

**(b)** If at any time after the Closing Date until the date that is twelve (12) months following the Closing Date, Buyer holds any assets transferred to Buyer pursuant to this Agreement that do not constitute Transferred Assets, then Buyer shall (i) promptly notify Sellers, and (ii) if requested in writing by any Seller, as promptly as reasonably practicable, at no cost, transfer or cause to be transferred, to such Seller or an Affiliate designated by such Seller, any such asset, and until such time, Buyer shall hold or cause to be held such asset for Seller's and its applicable Affiliates' benefit and account and manage and operate such asset for Seller's and its applicable Affiliates' benefit and account, with all gains, income, losses, liabilities and taxes or other items generated to be for Seller's and its Affiliates' account.

**(c)** Sellers will deliver or cause to be delivered to Buyer or its designee all notices, correspondences, and other items relating to the Transferred Assets and Assumed Liabilities that are from time to time received by them or are in their possession. Buyer will promptly deliver or cause to be delivered to Sellers all notices, correspondences and other items relating to the Excluded Assets or Excluded Liabilities that are from time to time received by Buyer or in its possession.

**(d)** If any transfer is made pursuant to this Section 5.6, no additional consideration shall be provided to any Person in respect to such transfer, to the extent permitted by applicable Law. The Parties shall use commercially reasonable efforts to structure such transfer in an equitable manner for both the Sellers, the applicable Seller Affiliates, Buyer and Buyer's Affiliates including from legal and tax perspectives with a view to ensuring that from an economic standpoint the relevant transfer is neutral for the Parties as if such transfer had occurred on the Closing Date.

**Section 5.7 Due Diligence and Integration Cooperation**.

**(a)** As promptly as practicable after execution and delivery of this Agreement, Buyer and each of the Sellers shall use their respective best efforts, and reasonably cooperate with each other Party in good faith, to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, appropriate or desirable to: (i) identify and agree upon any assets, properties, rights, or interests of Sellers or their Affiliates that are used in or necessary for the operation of the Business and that should be included as Transferred Assets (including by supplementing the applicable Schedules hereto by mutual written agreement of the Parties in accordance with this Agreement); (ii) obtain all Consents, approvals, authorizations, and waivers of any third party or Governmental Authority that are necessary in connection with the consummation of the Contemplated Transactions, including any Consents required for the assignment of the Assigned Contracts and the transfer of any transferable and necessary Permits or Authorizations (provided, that, with respect to this clause (ii) only, Buyer and each Seller, respectively, shall be required to use only their reasonable efforts); and (iii) assist in Buyer's preparation for the integration of the Transferred Assets and the Transferred Entities following the applicable Closing, including by (x) providing Buyer with reasonable access to information (including stored data and electronic records), personnel, systems (including computers, stored data and software), and facilities of Sellers relating to the Business as Buyer may reasonably request in writing for transition planning purposes (subject to any customary confidentiality or non-reliance letter required by Sellers' accountants, if any, and any confidentiality obligations or privilege) and (y) providing email addresses for and facilitating contact with any customer set forth in a customer list transferred to Buyer in connection with the Transferred Data (any such customer list, a "Transferred Customer List"), and transferring any additional information or documentation for the purpose of onboarding such customers as may be reasonably requested by Buyer in writing with the prior written consent of such customer, subject to applicable Law and any Orders of the Bankruptcy Court. Without limiting the foregoing, the Sellers shall not, and shall cause their respective Affiliates not to, take any action, or fail to take any action, that would reasonably be expected to hinder, delay, or impede the integration of the Transferred Assets, the Transferred Cayman Equity Interests, or the Transferred UK Equity Interests by Buyer or the performance of any of the actions contemplated by this Section 5.7; and

**(b)** Sellers shall use commercially reasonable efforts, and cooperate with Buyer in good faith, to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, appropriate or desirable to: (i) assist Buyer in the integration of the Transferred Assets and the Transferred Entities as of the applicable Closing into Buyer's operations, including by providing Buyer and its Representatives with reasonable access to information, personnel, systems, and facilities of Sellers relating to the Business as Buyer may reasonably request in writing for integration and transition purposes (subject to any customary confidentiality or non-reliance letter required by Sellers' accountants, if any, and any confidentiality obligations or privilege); (ii) transfer, deliver, or make available to Buyer, as promptly as reasonably practicable, all Records relating to the Transferred Assets, the Business, and the Assumed Liabilities, including (x) all personnel files, employment records, payroll records, benefits information, training records, and other employee-related documentation pertaining to any employees who transfer to Buyer or any of its Affiliates in connection with the Contemplated Transactions, and (y) all customer records, supplier records, operational data, and other books and records necessary for the continued operation of the Business, in each case, to the extent included

in the Transferred Assets; and (iii) provide such other reasonable assistance and cooperation as Buyer may reasonably request in writing in connection with the transition and integration of the Business, in each case subject to applicable Law and any Orders of the Bankruptcy Court. Without limiting the foregoing, the Sellers shall not, and shall cause their respective Affiliates not to, take any action, or fail to take any action, that would reasonably be expected to hinder, delay, or impede the integration of the Transferred Assets or the Transferred Entities by Buyer or the performance of any of the actions contemplated by this Section 5.7.

**Section 5.8** **Notification of Certain Events**.

**(a)** From and after the Initial Closing Date until the UK Equity Closing Date (or earlier termination of this Agreement), Sellers shall promptly notify Buyer of, and furnish Buyer with any information it may reasonably request with respect to, the occurrence of any event or condition or the existence of any fact that would reasonably be expected to cause any of the conditions to the obligations of Buyer to consummate the UK Equity Closing set forth in Section 7.1 not to be satisfied. Sellers' satisfaction of their obligations in the foregoing sentence shall not relieve the Sellers of any of their other obligations under this Agreement.

**(b)** From and after the Initial Closing Date until the UK Equity Closing Date (or earlier termination of this Agreement), Buyer shall promptly notify Sellers of, and furnish Sellers with any information it may reasonably request with respect to, the occurrence of any event or condition or the existence of any fact that would reasonably be expected to cause any of the conditions to the obligations of the Sellers to consummate the UK Equity Closing set forth in Section 7.2 not to be satisfied. Buyer's satisfaction of its obligations in the foregoing sentence shall not relieve Buyer of any of its other obligations under this Agreement.

## ARTICLE VI
## OTHER COVENANTS

**Section 6.1** **Cooperation**. Each of the Parties shall cooperate with the other Parties, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Transferred Assets and Assumed Liabilities from Sellers to Buyer and to minimize the disruption to the Business resulting from the Contemplated Transactions.

**Section 6.2** **Further Assurances**. In case at any time any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, at any Party's request and sole cost and expense, each Party shall promptly take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey, and assign to Buyer all of the Transferred Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Sellers' retention of the Excluded Assets and Excluded Liabilities. Without limiting the generality of this Section 6.2, to the extent that either Buyer or Sellers discover any additional assets or properties which the Parties mutually agree should have been transferred or assigned to Buyer as Transferred Assets but were not so transferred or assigned, Buyer and Sellers shall cooperate and

promptly execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Buyer.

**Section 6.3 Availability of Business Records**.

**(a)** Buyer shall promptly provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to all Records included in the Transferred Assets and any Transferred Entity for periods prior to the Closing Date to comply with applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality, and shall preserve such Records until the latest of (i) one two (2) years after the UK Equity Closing Date, (ii) the required retention period for all government contact information, records or documents, or (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases. Such access shall include access to any information in electronic form to the extent reasonably available. Buyer acknowledges that Sellers have the right to retain copies of all of Records included in the Transferred Assets for periods prior to the Closing. Prior to destroying any Records included in the Transferred Assets for periods prior to the Closing, Buyer shall notify Sellers thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Sellers to retain such Records, at Sellers' cost and expense.

**Section 6.4 Use of Name and Marks**. Except in connection with the Chapter 11 Cases or with respect to the BLOCKFILLS Trademark, neither Sellers nor any of their respective Affiliates or Subsidiaries shall use, license or authorize any third party to use, any name, slogan, logo or Trademark which is similar or deceptively similar to any of the names, Trademarks or service marks included in the Intellectual Property included in the Transferred Assets.

**Section 6.5 Data Privacy Protection**. Buyer acknowledges that the Transferred Assets may include personally identifiable information ("PII") within the meaning of Section 363(b) of the Bankruptcy Code, along with associated personal information about Sellers' customers. In connection with the same, Buyer agrees to: (a) employ appropriate security controls and procedures (technical, operational and managerial) to protect PII and personal information, (b) abide by all applicable Laws and regulations with respect to PII and (c) take such further actions with respect to PII as may be agreed by the Parties. Sellers agree to take such action reasonably requested by Buyer, including amending their privacy policies with respect to PII, as may be necessary to transfer the PII to Buyer, including sending a notice to the subjects of the PII and giving each such subject the right to object to the transfer of the PII. Buyer agrees that it shall, absent a customer's consent received after adequate notice: (a) abide by Sellers' privacy policies and privacy-related covenants made in Sellers' terms of service that were in effect as of the Petition Date, (b) respect prior requests of customers to opt out of receipt of marketing messages (to the extent Sellers make Buyer aware of such requests; provided that Buyer shall seek to obtain such information from Sellers) and (c) use PII only for the purposes of continuing Business operations and continuing to provide similar goods and services to customers, including marketing the products and services related to the Transferred Assets. Buyer shall use its reasonable commercial efforts to obtain the consent of a customer for any additional use of PII or other personal information or before making material changes to Sellers' privacy policies that weaken a customer's consumer protection. Furthermore, to the extent PII includes any social security

numbers, Buyer shall limit such use to Tax reporting purposes, and shall purge such information from its databases when such information is no longer required for that purpose.

**Section 6.6 UK Regulated Entity Conduct.**

Except (a) as may be required by the Bankruptcy Court or applicable Law or (b) for the consequences resulting from the continuation of the Chapter 11 Cases:

**(a)** From and after the date of this Agreement until the UK Equity Closing Date (or earlier termination of this Agreement), the Sellers shall procure that the UK Regulated Entity shall:

**(i)** at all times maintain in full force and effect all Authorizations required under FSMA and the FCA Rules to carry on its business in the ordinary course;

**(ii)** comply in all material respects with all applicable laws, regulation and regulatory rules including the FCA Rules, requirements, and guidance issued by the FCA from time to time;

**(iii)** take all steps reasonably necessary to ensure that no Authorization is suspended, revoked, varied or made subject to any condition or limitation;

**(iv)** not take, or omit to take, any action and not permit any action to be taken or omitted, that would, or could reasonably be expected to, jeopardize, restrict, suspend, revoke, or otherwise adversely affect any of its Authorizations;

**(v)** at all times hold and maintain Own Funds, Liquid Assets and capital resources of a type and in an amount sufficient to satisfy all requirements imposed on it under UK Capital Regulations;

**(vi)** promptly provide the Buyer with copies of all material written communications with the FCA or any other regulatory authority, governmental body, agency or commission during the period from and after the Initial Closing, to the extent permitted by applicable Law; and

**(vii)** not, without the prior written consent of the Buyer (such consent not to be unreasonably withheld, conditioned or delayed and subject to compliance with applicable employment law):

**(A)** appoint or nominate any individual to perform a Senior Management Function, in place of, or in addition to, any existing SMF Holder;

**(B)** submit or make any application to the FCA for the approval of any individual as an SMF Holder, or withdraw any such application already submitted; or

**(C)** appoint or nominate any individual to perform a Certified Function in place of, or in addition to any existing Certified Person;

**(viii)** at all times hold and maintain an amount of Cash equal to or greater than the Initial Closing Minimum Cash or, the UK Equity Minimum Closing Cash, as applicable;

**(b)** From and after the Effective Date until the UK Equity Closing Date (or earlier termination of this Agreement), where the Buyer provides its consent to the appointment of a new SMF Holder pursuant to Section 6.6(a)(vii), the Sellers shall procure that the UK Regulated Entity:

**(i)** promptly prepare and submit to the FCA all necessary regulatory applications and notifications in connection with such appointment, including all supporting documents for the proposed appointee;

**(ii)** keep the Buyer reasonably informed of the progress of any such regulatory application, including by promptly providing copies of any material correspondence with the FCA in connection therewith; and

**(iii)** not take any step to implement the appointment of the proposed SMF Holder prior to the receipt of the requisite regulatory approval from the FCA, unless otherwise agreed by the Buyer in writing.

**(c)** From and after the Effective Date until the UK Equity Closing Date (or earlier termination of this Agreement), the Sellers shall notify the Buyer promptly (and in any event within two (2) Business Days) upon becoming aware of:

**(i)** any SMF Holder or Certified Person giving notice of their intention to resign, retire or otherwise cease to perform their Senior Management Function or Certified Function;

**(ii)** the death, incapacity, or other circumstances rendering any SMF Holder or Certified Person unable to perform their Senior Management Function or Certified Function; or

**(iii)** the withdrawal, suspension, or variation of the regulatory approval of any SMF Holder by the FCA.

Upon receipt of such notification, the Parties shall, acting in good faith, cooperate to agree a process for the orderly replacement or temporary coverage of the relevant Senior Management Function or Certified Function in compliance with the SM&CR and applicable regulatory requirements.

**(d)** From and after the Effective Date until the UK Equity Closing Date (or earlier termination of this Agreement in accordance with its terms), to the extent permissible under applicable Law and subject to confidentiality and any applicable privilege, the Sellers shall notify the Buyer in writing as soon as reasonably practicable (and in any event within two (2) Business Days) upon becoming aware of:

**(i)** any actual or written threatened action by the FCA or any other Governmental Authority in relation to the UK Regulated Entity, including (without limitation) any investigation, review, or enforcement action;

**(ii)** any actual breach of applicable laws, regulation and regulatory rules including the FCA Rules, requirements, and guidance issued by the FCA from time to time or the terms and conditions of any Authorization by the UK Regulated Entity; or

**(iii)** a fact or circumstance that Seller reasonably expects will give rise to the occurrence of the matters described in clauses (i) or (ii).

**Section 6.7** **<u>Key Employees & Employee Matters</u>**. The Sellers shall use commercially reasonable efforts to, and shall use commercially reasonable efforts to cooperate with Buyer to, cause the Key Employees to commence employment with Buyer pursuant to the Key Employee Offer Letters, including providing any necessary information with respect to transfers of visas and visa applications of the Key Employees. For a period of one year following the Closing Date, each Seller agrees that it shall not (and shall direct its employees, stockholders, directors and agents, as applicable, not to, on any Seller's behalf) solicit (directly or indirectly) or encourage others to solicit for employment or hire any of the Key Employees; provided, that nothing herein shall prohibit the solicitation or employment of any person who responds to general solicitations or advertisements, who initiates contact with any Seller or any its Affiliates or who is not employed by Purchaser or any of its Affiliates.

**Section 6.8** **<u>Cayman Notification</u>**.

**(a)** As promptly as possible following and in any event within twenty-one (21) days of the consummation of the purchase of the Transferred Cayman Equity Interests contemplated hereby, the Parties shall use reasonable best efforts to cooperate with each other and arrange for a written notification in respect of the transfer of the Transferred Cayman Equity Interests to the Buyer to be prepared and submitted to CIMA by or on behalf of the Cayman Regulated Entity ("<u>Cayman Notification</u>").

**(b)** In the event that, following the Initial Closing and/or the Cayman Notification, CIMA requires a request for approval in respect of the transfer of the Transferred Cayman Equity Interests to the Buyer to be submitted to CIMA by the Cayman Regulated Entity, then each Party shall use commercially reasonable efforts to cooperate with the other Party and take all actions reasonably necessary to prepare and submit such approval request to CIMA, and to obtain such approval (or a non-objection) from CIMA as may be required, as promptly as practicable, including by promptly preparing and submitting all required application materials, filings and supporting documentation, and responding to any requests for additional information or clarification from CIMA, including the Buyer obtaining approvals (after complying with making prompt submissions) from CIMA in respect of CIMA's Regulatory Policy on Fitness and Propriety (December 2020) for Controlled Functions (as defined therein) in relation to any directors, senior officers, managers, officers, shareholders, and licensed professional directors the Buyer wishes to appoint in respect of BDM.

**Section 6.9** **<u>Other Regulatory Filings</u>**.

**Section 6.10 Change in Control Condition.**

**(a)** The Buyer shall use reasonable endeavors at its own cost to procure that the Change in Control Condition is satisfied as soon as possible following the date of this Agreement and, in any event, by the Outside Date.

**(b)** Without prejudice to the generality of Section 7.5(b), the Buyer shall as soon as reasonably practicable following the date of this Agreement, prepare and submit to the FCA notice under section 178 of FSMA from the Buyer in respect of its proposed acquisition of control of the UK Regulated Entity pursuant to the Agreement (the "Section 178 Notice"), together with all supporting documentation required by the FCA to accept the Section 178 Notice as complete.

**(c)** The Buyer shall keep the Sellers regularly informed of progress towards satisfying the Change in Control Condition including:

**(i)** notifying the Sellers in writing of any material communications (whether written or oral) with, or requests for information received from, the FCA in relation to the acquisition of control of the UK Regulated Entity; and

**(ii)** notifying the Sellers of any matter or circumstance that is reasonably likely to prevent the Change in Control Condition from being satisfied on or prior to the Outside Date as soon as reasonably practicable following such matter or circumstance coming to its attention.

**(d)** The Sellers shall provide, and shall procure that other members of the Sellers' Group provide, the Buyer with such information and assistance as the Buyer requires for the purposes of complying with its obligations in relation to the Change in Control Condition, including promptly providing any information relating to the UK Regulated Entity, the Sellers or other members of the Sellers' group that the Buyer reasonably requires for the purpose of preparing the Section 178 Notice or any other filings, submissions or notifications (including for the purposes of responding to requests for further information) in connection with the Change in Control Condition.

**(e)** The Buyer will notify the Sellers in writing as soon as reasonably practicable of it becoming aware that the Change in Control Condition has been satisfied.

**Section 6.11 Non-Competition**. During the period commencing on the Closing Date and ending on the fifth anniversary of the Closing Date, the Sellers shall not, [and shall cause their Affiliates not to, directly or indirectly, for themselves or on behalf of or in conjunction with any other Person, (a) engage in the Business, or market, sell, offer for sale, license, distribute, make available, provide, support, or maintain any product or service that is directly competitive with the Business, (b) participate or engage in, acquire any financial or beneficial interest in or otherwise render any competitive services to any Person engaged in the Business, or (c) provide information about Transferred Assets to a Person engaged in the Business; provided, however, that nothing herein shall restrict, prohibit or limit (i) any Seller's acquisition and passive ownership of less than 5% of the outstanding capital stock of a Person that is listed on any national securities exchange, (ii) any Seller's ownership or operation of the Excluded Assets or (iii) any business or commercial

relationship with any Person in connection therewith; provided always that in respect of an Affiliate who is an individual (including any employee, director or officer of the Sellers or any of their respective Affiliate entities), the Sellers shall be required to procure only (for purposes of this Section 6.11) that such individuals shall not seek to entice away any of the customers contained in a Transferred Customer List.]

**Section 6.12** **Exclusivity**. Until the UK Equity Closing Date or earlier termination of this Agreement, Seller shall not, nor shall it authorize or instruct any of its Representatives retained by it to (a) solicit, initiate or knowingly encourage the submission of any Alternate Transaction by any Person or (b) participate in any discussions or negotiations regarding, or furnish to any Person any non-public information with respect to, or take any other action intended to facilitate the making of any inquiry or proposal to the UK Regulated Entity that constitutes any Alternate Transaction by any Person.

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.1** **Conditions to Buyer's Obligations**.

**(a)** Subject to Section 7.3 and Section 7.4, Buyer's obligation to consummate the applicable Closing shall be subject to the satisfaction, fulfillment or, where legally possible, waiver, on or prior to the applicable Closing Date, of the following applicable conditions:

**(i)** as of the UK Equity Closing Date solely as it relates to the UK Equity Closing Transactions (except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (1) each representation or warranty contained in Section 3.1 through Section 3.2, Section 3.5 and Section 3.16 shall be true and correct in all but *de minimus* respects, and (2) each other representation or warranty set forth in ARTICLE III shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (2) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (2) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

**(ii)** Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Initial Closing solely as it relates to the Initial Closing Transactions or prior to the UK Equity Closing solely as it relates to the UK Equity Closing Transactions, in each case, in all material respects;

**(iii)** Sellers shall have caused the documents and instruments required by Section 2.8(c) to be delivered to Buyer at, or tendered subject only to, the applicable Closing;

**(iv)** as of the Initial Closing Date, there shall not be any continuing Material Adverse Effect;

**(v)** solely as it relates to the UK Equity Closing, the Change in Control Condition has been satisfied;

**(vi)** solely as it relates to the UK Equity Closing, Seller shall have delivered to Buyer the UK Regulatory Capital Confirmation;

**(vii)** as of the UK Equity Closing Date there shall not be any continuing UK Regulatory Material Adverse Event nor shall there have been any UK Regulatory Material Adverse Event following the Initial Closing Date and prior to the UK Equity Closing Date that has not been waived in writing by the Buyer;

**(viii)** (1) solely as it relates to the Initial Closing, the UK Regulated Entity shall have an amount equal to or greater than the Initial Closing Minimum Cash and (2) solely as it relates to the UK Equity Closing, the UK Regulated Entity shall have an amount equal to or greater than the UK Equity Closing Minimum Cash;

**(ix)** Sellers shall have delivered a certificate from an authorized officer of each Seller to the effect that each of the conditions specified in Section 7.1(a)(i), Section 7.1(a)(ii), Section 7.1(a)(iv) and Section 7.1(a)(viii) have been satisfied, in each case, solely as it relates to the Initial Closing or the UK Equity Closing, as applicable.

**Section 7.2 Conditions to Sellers' Obligations**.

**(a)** Subject to Section 7.3 and Section 7.4, Sellers' obligation to consummate the applicable Closing shall be subject to the satisfaction, fulfillment or, where legally possible, waiver, on or prior to the applicable Closing Date, of the following conditions:

**(i)** as of the Initial Closing Date solely as it relates to the Initial Closing Transactions or as of the UK Equity Closing Date solely as it relates to the UK Equity Closing Transactions (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (1) each representation or warranty contained in Section 4.1 through Section 4.2 shall be true and correct in all but *de minimis* respects, and (2) each other representation or warranty set forth in ARTICLE IV shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (2) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the UK Equity Closing Transactions or the transactions contemplated by any Related Agreement; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (2) for purposes of this condition, all qualifications as to "materiality" contained in such representations and warranties shall be disregarded;

**(ii)** Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Initial Closing solely as it relates to the Initial Closing Transactions or prior to the UK Equity Closing solely as it relates to the UK Equity Closing Transactions, in each case, in all material respects;

**(iii)** Buyer shall have caused the documents, instruments and payments required by Section 2.8(b) to be delivered to Sellers at, or tendered subject only to, the applicable Closing;

**(iv)** solely as it relates to the UK Equity Closing, the Change in Control Condition has been satisfied; and

**(v)** Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 7.2(a)(i) and Section 7.2(a)(ii) have been satisfied, in each case, solely as it relates to the Initial Closing or the UK Equity Closing, as applicable.

**Section 7.3** **Other Closing Conditions**. Subject to Section 7.4, the Parties' obligation to consummate the Contemplated Transactions in connection with the Initial Closing and the UK Equity Closing are subject to satisfaction or waiver of the following conditions:

**(a)** no Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Order that is in effect and that has the effect of making such Closing illegal or otherwise prohibiting the consummation of such Closing; and

**(b)** the Sale Order shall have been entered by the Bankruptcy Court and shall be a Final Order.

**Section 7.4** **No Frustration of Closing Conditions**. Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate any of the Contemplated Transactions set forth in Section 7.1, Section 7.2, or Section 7.3, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its commercially reasonable efforts with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.

**Section 7.5** **Change in Control Condition**. The UK Equity Closing is subject to and conditional upon: (a) the FCA giving notice in writing in accordance with (i) section 189(4)(a) of FSMA that it approves the Buyer acquiring control of the UK Regulated Entity, or (ii) section 189(5) of FSMA that it approves the Buyer acquiring control of the UK Regulated Entity unless such approval is subject to a condition (other than an immaterial or a de minimis condition) that the Buyer, acting reasonably and in its sole discretion, determines would have an adverse impact in a material respect on the business, operations, financial condition and/or reputation of the Buyer's business following the UK Equity Closing; or (b) the FCA being treated by virtue of section 189(6) of FSMA as having approved the Buyer's acquisition of control of the UK Regulated Entity, and in either case, the UK Regulated Entity is able to conduct its business in all material respects under applicable Law immediately following the UK Entity Closing (alternatively, the "Change in Control Condition").

## ARTICLE VIII
## TERMINATION

**Section 8.1 Termination of Agreement**. This Agreement may be terminated and the Contemplated Transactions abandoned at any time prior to the UK Equity Closing (except as otherwise expressly stated to apply to a different period):

**(a)** by the mutual written consent of Buyer and Sellers;

**(b)** by either Buyer, on the one hand, or Sellers, on the other hand, if there shall be any applicable Law that makes consummation of the Contemplated Transactions illegal or otherwise prohibited or if consummation of the Contemplated Transactions would violate any Final Order of any Governmental Authority having competent jurisdiction;

**(c)** by Sellers by giving written notice to Buyer (i) in the event Buyer has breached any representation, warranty, agreement, or covenant contained in this Agreement such that any condition set forth in Section 7.2 or Section 7.3 shall become incapable of being satisfied without cure for a period of ten (10) Business Days after notice of the breach, or (ii) in the event that any condition set forth in Section 7.2 or Section 7.3 shall become incapable of being satisfied, unless such failure shall be due to the failure of any Seller to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition (if capable of being waived) is not waived by Buyer;

**(d)** by Buyer by giving written notice to Sellers (i) in the event either Seller has breached any representation, warranty, agreement, or covenant contained in this Agreement such that any condition set forth in Section 7.1 or Section 7.3 shall become incapable of being satisfied without cure for a period of ten (10) Business Days after notice of the breach, or (ii) in the event that any condition set forth in Section 7.1 or Section 7.3 shall become incapable of being satisfied, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition (if capable of being waived) is not waived by Sellers;

**(e)** by Buyer if:

**(i)** the Chapter 11 Cases are dismissed or converted to cases under Chapter 7 of the Bankruptcy Code;

**(ii)** any Seller consummates a Plan in the Chapter 11 Cases that does not authorize or approve the Contemplated Transactions; or

**(iii)** any Seller executes an Alternate Agreement; or

**(f)** At any time prior to the UK Equity Closing, by Buyer if the Buyer identifies, in the course of the period between Initial Closing Date and the UK Equity Closing Date, any fact, matter, circumstance or information relating to the UK Regulated Entity which, individually or in aggregate, constitutes a Material Adverse Event or a UK Regulatory Material Adverse Event; provided, that any such termination shall only terminate the obligations of the Parties with respect to the sale and transfer of the Transferred UK Equity Interests and shall have no effect on, and

shall not result in the unwinding, rescission or reversal of, any transactions consummated at the Initial Closing, including the sale and transfer of the Transferred Assets and Transferred Cayman Equity Interests and the assumption of the Assumed Liabilities, all of which shall remain in full force and effect in accordance with their terms and the terms of the Sale Order; or

**(g)** in the period from the Initial Closing Date and up to the UK Equity Closing Date, by either Buyer, on the one hand, or Sellers, on the other hand, if the UK Equity Closing shall not have occurred on or before twelve (12) months from the date of this Agreement, or such other time period as is agreed in writing between the Parties (the "Outside Date"); provided, that any such termination shall only terminate the obligations of the Parties with respect to the UK Equity Closing and shall have no effect on, and shall not result in the unwinding, rescission or reversal of, any transactions consummated at the Initial Closing Transactions, including the sale and transfer of the Transferred Assets and Transferred Cayman Equity Interests and the assumption of the Assumed Liabilities, all of which shall remain in full force and effect in accordance with their terms and the terms of the Sale Order.

**Section 8.2 Procedure Upon Termination**. In the event of termination and abandonment by Buyer, on the one hand, or Sellers, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by Buyer or Sellers.

**Section 8.3 Effect of Termination**.

**(a)** Except as otherwise expressly set forth in this Agreement, nothing herein shall relieve any Party from Liability for any breach of covenant occurring prior to any termination of this Agreement.

**(b)** No termination of this Agreement pursuant to Section 8.1 shall be effective until written notice thereof is given to the non-terminating Party specifying the provision hereof pursuant to which such termination is made. If the Contemplated Transactions are not consummated (i) this Agreement shall become null and void and of no further force and effect (except that ARTICLE I (*Definitions*), ARTICLE IX (*Miscellaneous*), and this ARTICLE VIII (*Termination*) shall survive any such termination), and (ii) if this Agreement is unilaterally terminated by Buyer or by Sellers pursuant to a unilateral termination right set forth in this ARTICLE VIII, Sellers shall not be entitled to any damages, losses, or payment from Buyer, and Buyer shall have no further Liability of any kind to Sellers, any of its Affiliates, or any third party on account of this Agreement.

**(c)** Nothing herein shall preclude any Party from exercising their respective remedies under Section 5.3(a) or Section 9.1.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.1 Remedies**. Each of Buyer and Sellers recognize that if it breaches or refuses to perform any covenant set forth in this Agreement, monetary damages alone would not be adequate to compensate the other Party for its injuries. Each Party shall therefore be entitled, in

addition to any other remedies that may be available, to obtain specific performance of, or to enjoin the violation of, the terms of such covenants. If any Litigation is brought by a Party to enforce such covenants, the other Party against which such Litigation is subject shall waive the defense that there is an adequate remedy at Law. Buyer and each Seller agrees to waive any requirement for the security or posting of any bond in connection with any Litigation seeking specific performance of, or to enjoin the violation of, such covenants. Buyer and each Seller agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.

**Section 9.2** **Expenses**. Each of Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing Party in such action or proceeding (*i.e.*, the Party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing Party such costs and expenses (including, but not limited to, all court costs and reasonable attorneys' fees) as the prevailing Party may incur in the pursuit or defense thereof.

**Section 9.3** **Entire Agreement**. This Agreement, the Related Agreements and all related exhibits and schedules constitute the entire agreement among the Parties and supersede any prior and contemporaneous understandings, agreements, representations and warranties (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof; provided, however, that any confidentiality agreement between the Parties or their Affiliates with respect to the sale of the Business shall survive in accordance with its terms. In the event of any inconsistency between the statements in the body of this Agreement and the Related Agreements and the related Exhibits and Schedules, the statements in the body of this Agreement shall control. The Parties have not relied on any statement, representation, warranty, or agreement of the other Party or of any other person on such Party's behalf, including any representations, warranties, or agreements arising from statute or otherwise in law, except for the representations, warranties, or agreements expressly contained in this Agreement. The recitals set forth above are expressly incorporated herein by reference.

**Section 9.4** **Incorporation of Schedules, Exhibits and Disclosure Schedule**. The schedules to this Agreement (the "Schedules"), the Disclosure Schedule, the exhibits to this Agreement, and the documents and other information made available in the Disclosure Schedules are incorporated herein by reference and made a part hereof.

**Section 9.5** **Amendments and Waivers**. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any

rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.5 except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

**Section 9.6** **Succession and Assignment**. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. None of the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; provided, however, that Buyer may elect either to assign any or all of its rights arising under this Agreement or to have the Transferred Assets conveyed or transferred to, or any or all of the Assumed Liabilities assumed by, one or more designees, in each case without the consent of any of Sellers; provided, however, Buyer shall remain liable for all of its obligations to Sellers under this Agreement after any such assignment; provided, further, that Sellers shall be permitted to assign any of their rights hereunder pursuant to a Plan confirmed in the Chapter 11 Cases or pursuant to a Final Order of the Bankruptcy Court.

**Section 9.7** **Notices**. All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient, (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), (c) when sent by email (with written confirmation of transmission), or (d) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Seller, then to:

Reliz Technology Group Holdings Inc.
401 West Ontario St., Suite 400
Chicago, IL 60654
Attn: [_]
Email: [_]

with a copy (which does not constitute notice) to:

McDermott Will and Schulte LLP
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Attn: David R. Hurst
Email: dhurst@mcdermottlaw.com

McDermott Will and Schulte LLP
One Vanderbilt Avenue
New York, New York 10017
Attn: Darren Azman and Joseph B. Evans
Email: dazman@mcdermottlaw.com and jbevans@mcdermottlaw.com

McDermott Will & Schulte LLP
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131
Attention: Gregg Steinman
Email: gsteinman@mcdermottlaw.com

If to Buyer, then to:

Keyrock S.A.
Avenue Louise 480, 1050 Ixelles RPM Bruxelles, Belgium
Attention: Reza Ghadiri-Zare
Email: legal@keyrock.eu

with a copy (which shall not constitute notice) to:

Cooley (UK) LLP
22 Bishopsgate
London, EC2N 4BQ, United Kingdom
Attention: Jonathan Cohen
Email: jonathanjcohen@cooley.com

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 9.7.

**Section 9.8 Governing Law; Jurisdiction**. This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of Law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Law. Prior to the closing of the Chapter 11 Cases, the Parties hereto agree that any Litigation seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement, any Related Agreement or the Contemplated Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such Litigation and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such Litigation in the Bankruptcy Court or that any such Litigation which is brought in the Bankruptcy Court has been brought in an inconvenient forum; provided that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the federal courts of the United States of America sitting in Delaware, shall have exclusive jurisdiction over such Litigation.

**Section 9.9** **Severability**. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

**Section 9.10** **No Third-Party Beneficiaries**. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

**Section 9.11** **No Survival of Representations, Warranties and Agreements**. None of the Parties' representations, warranties, covenants and other agreements in this Agreement, including any rights of any other Party or any third party arising out of any breach of such representations, warranties, covenants and other agreements, shall survive the Closing, and none of the Parties will have any Liability to each other after the Closing for any breach thereof except for claims against the Parties for Fraud with respect thereto, except for (i) those covenants and agreements contained herein that by their express terms apply or are to be performed in whole or in part after the Closing, (ii) this ARTICLE IX, and (iii) all defined terms set forth in ARTICLE I that are referenced in the foregoing provisions referred to in clauses (i) and (ii) above.

**Section 9.12** **Construction**. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement. Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the Effective Date." Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement. Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time. Any reference herein to "dollars," "USD" or "$" means United States dollars. Any reference herein to "GBP" or "£" means pound sterling.

**Section 9.13** **Computation of Time**. In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of Rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

**Section 9.14 Mutual Drafting**. Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 9.15 Disclosure Schedule**. All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement. The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule. The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure with respect to any other sections of the Disclosure Schedule to which such disclosed matter reasonably relates, or to the extent that such relationship is reasonably apparent on the face of the disclosure contained in the Disclosure Schedule. No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. In no event shall the disclosure of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties and/or covenants set forth in this Agreement. All attachments to the Disclosure Schedule are incorporated by reference into the Disclosure Schedule in which they are directly or indirectly referenced.

**Section 9.16 Non-Recourse**. Except in the case of Fraud, no past, present or future director, officer, employee, incorporator, member, partner, or equity holder of Buyer or any Seller shall have any liability for any obligations or liabilities of such Party under this Agreement or any other Related Agreement, for any claim based on, in respect of, or by reason of the transactions contemplated hereby and thereby.

**Section 9.17 Headings; Table of Contents**. The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 9.18 Counterparts; Email Signatures**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by email with scan attachment copies or other electronic signature method, including DocuSign, each of which shall be deemed an original.

**Section 9.19 Time of Essence**. Time is of the essence of this Agreement.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the Parties have caused this Share and Asset Purchase Assignment to be duly executed by their respective authorized Representatives as of the Effective Date.

**SELLERS:**

**RELIZ TECHNOLOGY GROUP HOLDINGS INC.**

By: ______________________________
Name:
Title:

**RELIZ TECHNOLOGIES LLC**

By: ______________________________
Name:
Title:

**RELIZ LTD**

By: ______________________________
Name:
Title: Director

**RELIZ CI LTD**

By: ______________________________
Name:
Title: Director

**BASIS GROUP HOLDINGS INC.**

By: ______________________________
Name:
Title:

**<u>BUYER</u>:**

**Keyrock S.A.**

By: ________________________________________
Name:
Title:

# EXHIBIT A

## FORM OF BILL OF SALE

[TO BE ADDED]

**EXHIBIT C**

**NON-FOREIGN STATUS AFFIDAVIT**

[TO BE ADDED]

# EXHIBIT B

## FORM OF ASSUMPTION AND ASSIGNMENT AGREEMENT

[TO BE ADDED]

**EXHIBIT D**

**ALLOCATION SCHEDULE**

[TO BE ADDED]

# EXHIBIT E

## STOCK TRANSFER FORM

## PART 1 – MINORITY SALE DOCUMENTS

**STOCK TRANSFER FORM**

(TRANSFER BY COMPANY)

(Above this line for Registrars only)

| | | |
|---|---|---|
| Consideration Money USD [●] | | Certificate lodged with the Registrar<br>(For completion by the Registrar/Stock Exchange) |
| Name of Undertaking. | Basis Capital Markets UK Limited (Company No. 09882444) | |
| Description of Security. | Ordinary Shares of £1 each | |
| Number or amount of Shares, Stock or other security and, in figures column only, number and denomination of units, if any. | Words<br>One hundred sixty-eight | Figures<br>168<br>(168 units of £1 each) |
| Name and address of registered holder should be given in full. | In the name(s) of<br>Philip Millar<br>[Transferor address] | |

| | |
|---|---|
| I/We hereby transfer the above security out of the name(s) aforesaid to the person(s) named below.<br>Signature(s) of transferor(s)<br>1. ............<br>2. ............<br>3. ............<br>4. ............<br>A Body corporate should execute this transfer under its common seal or otherwise in accordance with applicable statutory requirements. | Stamp of Selling Broker(s) or, for transactions which are not stock exchange transactions, of Agent(s), if any, acting for the Transferor(s).<br>Date ............ |
| Full name(s), full postal address(es) (including County or, if applicable, Postal District number) of the person(s) to whom the security is transferred.<br>Please state title, if any, or whether Mr., Mrs. or Miss.<br>Please complete in type or in Block Capitals. | **Keyrock S.A.**<br>Avenue Louise 480<br>1050 Brussels<br>Belgium |

I/We request that such entries be made in the register as are necessary to give effect to this transfer.

| Stamp of Buying Broker(s) (if any). | Stamp or name and address of person lodging this form (if other than the Buying Broker(s)). |
|---|---|
| | |

## FORM OF CERTIFICATE REQUIRED - TRANSFERS NOT CHARGEABLE WITH *AD VALOREM* STAMP DUTY

**Complete Certificate 1 if:**

- the consideration you give for the shares is £ 1,000 or less and the transfer is not part of a larger transaction or series of transactions (as referred to in Certificate 1).

**Complete Certificate 2 if:**

- the transfer is otherwise exempt from Stamp Duty and you are not claiming a relief, or
- the consideration given is not chargeable consideration.

**Certificate 1**

* Please delete as appropriate

I/We* certify that the transaction effected by this instrument does not form part of a larger transaction or series of transactions in respect of which the amount or value, or aggregate amount or value, of the consideration exceeds £ 1,000

** Delete second sentence if certificate is given by transferor

I/We* confirm that I/we* have been authorised by the transferor to sign this certificate and that I/we* am/are* aware of all the facts of the transaction. **

| *Signature(s)* | *Description ("Transferor", "Solicitor", etc)* |
|---|---|
| .......................................... | ....................................................... |
| .......................................... | ....................................................... |
| .......................................... | ....................................................... |

*Date*

..........................................

**Certificate 2**

* Please delete as appropriate

I/We* certify that this instrument is otherwise exempt from *ad valorem* Stamp Duty without a claim for relief being made or that no chargeable consideration is given for the appropriate transfer for the purposes of Stamp Duty.

** Delete second sentence if certificate is given by transferor

I/We* confirm that I/we* have been authorised by the transferor to sign this certificate and that I/we* am/are* aware of all the facts of the transaction. **

| *Signature(s)* | *Description ("Transferor", "Solicitor", etc)* |
|---|---|
| .......................................... | ....................................................... |
| .......................................... | ....................................................... |
| .......................................... | ....................................................... |

*Date*

..........................................

**Notes**

(1) You don't need to send this form to HM Revenue & Customs (HMRC) if you have completed either Certificate 1 or 2, or the consideration for the transfer is nil (in which case you must write 'nil' in the consideration box on the front of the form). In these situations send the form to the company or its registrar.

(2) In all other cases - including where relief from Stamp Duty is claimed - send the transfer form to HMRC to be stamped.

(3) Information on Stamp Duty reliefs and exemptions and how to claim them can be found on the HMRC website at hmrc.gov.uk/sd.

**STOCK TRANSFER FORM**
(TRANSFER BY COMPANY)

(Above this line for Registrars only)

| Consideration Money | Certificate lodged with the Registrar |
|---|---|
| USD [●] | (For completion by the Registrar/Stock Exchange) |

| | | |
|---|---|---|
| Name of Undertaking. | Basis Capital Markets UK Limited (Company No. 09882444) | |
| Description of Security. | Ordinary Shares of £1 each | |
| Number or amount of Shares, Stock or other security and, in figures column only, number and denomination of units, if any. | Words<br><br>One hundred sixty-eight | Figures<br><br>168<br>(168 units of £1 each) |
| Name and address of registered holder should be given in full. | In the name(s) of<br><br>Anders Henrikson<br><br>[Transferor address] | |

| | |
|---|---|
| I/We hereby transfer the above security out of the name(s) aforesaid to the person(s) named below.<br><br>Signature(s) of transferor(s)<br><br>1. ............<br>2. ............<br>3. ............<br>4. ............<br>A Body corporate should execute this transfer under its common seal or otherwise in accordance with applicable statutory requirements. | Stamp of Selling Broker(s) or, for transactions which are not stock exchange transactions, of Agent(s), if any, acting for the Transferor(s).<br><br>Date ............ |
| Full name(s), full postal address(es) (including County or, if applicable, Postal District number) of the person(s) to whom the security is transferred.<br><br>Please state title, if any, or whether Mr., Mrs. or Miss.<br><br>Please complete in type or in Block Capitals. | **Keyrock S.A.**<br>Avenue Louise 480<br>1050 Brussels<br>Belgium |

I/We request that such entries be made in the register as are necessary to give effect to this transfer.

| Stamp of Buying Broker(s) (if any). | Stamp or name and address of person lodging this form (if other than the Buying Broker(s)). |
|---|---|
| | |

**FORM OF CERTIFICATE REQUIRED - TRANSFERS NOT CHARGEABLE WITH *AD VALOREM* STAMP DUTY**

**Complete Certificate 1 if:**

- the consideration you give for the shares is £ 1,000 or less and the transfer is not part of a larger transaction or series of transactions (as referred to in Certificate 1).

**Complete Certificate 2 if:**

- the transfer is otherwise exempt from Stamp Duty and you are not claiming a relief, or
- the consideration given is not chargeable consideration.

**Certificate 1**

* Please delete as appropriate

I/We* certify that the transaction effected by this instrument does not form part of a larger transaction or series of transactions in respect of which the amount or value, or aggregate amount or value, of the consideration exceeds £ 1,000

** Delete second sentence if certificate is given by transferor

I/We* confirm that I/we* have been authorised by the transferor to sign this certificate and that I/we* am/are* aware of all the facts of the transaction. **

| *Signature(s)* | *Description ("Transferor", "Solicitor", etc)* |
|---|---|
| .......................................... | .................................................... |
| .......................................... | .................................................... |
| .......................................... | .................................................... |

*Date*

..........................................

**Certificate 2**

* Please delete as appropriate

I/We* certify that this instrument is otherwise exempt from *ad valorem* Stamp Duty without a claim for relief being made or that no chargeable consideration is given for the appropriate transfer for the purposes of Stamp Duty.

** Delete second sentence if certificate is given by transferor

I/We* confirm that I/we* have been authorised by the transferor to sign this certificate and that I/we* am/are* aware of all the facts of the transaction. **

| *Signature(s)* | *Description ("Transferor", "Solicitor", etc)* |
|---|---|
| .......................................... | .................................................... |
| .......................................... | .................................................... |
| .......................................... | .................................................... |

*Date*

..........................................

**Notes**

(1) You don't need to send this form to HM Revenue & Customs (HMRC) if you have completed either Certificate 1 or 2, or the consideration for the transfer is nil (in which case you must write 'nil' in the consideration box on the front of the form). In these situations send the form to the company or its registrar.

(2) In all other cases - including where relief from Stamp Duty is claimed - send the transfer form to HMRC to be stamped.

(3) Information on Stamp Duty reliefs and exemptions and how to claim them can be found on the HMRC website at hmrc.gov.uk/sd.

## PART 2 – CAYMAN ISLANDS STOCK TRANSFER FORM

## ASSIGNMENT AND TRANSFER OF SHARE CERTIFICATE

FOR THE CONSIDERATION stated below the "Transferor[s]" named below do hereby transfer to the "Transferee[s]" named below the shares or stock specified below subject to the several conditions on which the said shares are or stock is now held by the Transferor[s] and the Transferee[s] do hereby agree to accept and hold the said shares or stock subject to the conditions aforesaid.

**Name of Company:** ________________________________________

**Company Registration Number:** ________________________________

**Number and full description of shares including serial numbers, if any, or amount of stock and number of denomination of units, if any:**

______________________________________________________

**TRANSFER FROM "Transferor[s]" — PRINT NAMES & ADDRESSES**

______________________________________________________

**NAMES** ________________________________________________

**ADDRESSES** ___________________________________________

**CONSIDERATION [words]:** ____________________________________

**CONSIDERATION [figures]:** ___________________________________

**TRANSFER TO "Transferee[s]" — Name[s] [PRINT] Address[es]**

______________________________________________________

**NAMES** ________________________________________________

**ADDRESSES** ___________________________________________

**TRANSFEROR(S)**

Signature: ______________________________

[NAME]

Signature: ______________________________

[NAME]

**TRANSFEREE(S)**

Signature: ________________________________

[NAME]

# EXHIBIT F

## BLOCKFILLS TRADEMARK LICENSE AGREEMENT

[●]